**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
CITIZENS FOR RESPONSIBILITY AND )
ETHICS IN WASHINGTON, )
                                                )
                        Plaintiff, )
                                                )
            v. )            Civil No. 1:07cv1707 (HHK)
                                                )
EXECUTIVE OFFICE OF THE )
PRESIDENT, et al., )
                                                )
                        Defendants. )
_____)

### PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

Perhaps the most shocking thing in the White House defendants' opposition to plaintiff's motion for a temporary restraining order is their completely cavalier attitude toward their record-keeping obligations and their refusal to acknowledge, much less respect, the importance of preserving our nation's history. As *The Washington Post* noted recently, "Presidential records belong to history because they help provide insight into the decisions made by a president and his administration. More important, because they are the byproducts of work done on behalf of the nation, those records belong to the people of the United States."[1] This lawsuit is all about protecting those records and ensuring that the American public will have future access to them.

Plaintiff CREW is seeking a temporary restraining order in the face of the White House defendants' repeated refusal to provide assurances that the only remaining copies of a large body of deleted email records are being preserved as both the Federal Records Act ("FRA") and the Presidential Records Act ("PRA") require. CREW sought those assurances after the White

_____

[1] Editorial, <u>The President's Papers</u>, *The Washington Post*, October 13, 2007.

House lost or deleted millions of email records -- federal and presidential -- that were being improperly archived on White House servers, refused to restore the records and refused to implement an appropriate and effective electronic record-keeping system. When CREW sought access through the Freedom of Information Act ("FOIA") to documents that would shed light on what the White House has done and why with respect to the deleted emails, the Office of Administration ("OA") put roadblock after roadblock in CREW's way, including the newly minted argument that despite years of treating itself as an agency, the OA is no longer an agency subject to the FOIA.[2]  The White House also rebuffed Congress' efforts to learn more about the millions of deleted emails, suggesting falsely that the fault may lie with an outside contractor's failure to conduct daily audits and then failing to provide a congressional committee investigating the matter with the name of the contractor.  See, e.g., Exhibit 1 to Memorandum in Support of Plaintiff's Motion for a Temporary Restraining Order.

Against this backdrop of document destruction and concealment, CREW's concerns about the continued preservation of the back-up copies of the deleted emails, which are all that remain of these historical documents, are more than justified.  The White House defendants' heated rhetoric and aspersions aside, there is a very real risk that absent this Court's intervention, the people of the United States will be unable to lay claim to their records once this president leaves office.  Without question that constitutes imminent irreparable injury that more than justifies the emergency relief CREW is seeking.

---

[2] To make matters worse, the White House defendants now fault CREW for waiting six months to file this lawsuit while it attempted to secure documents that would shed light on precisely what the White House had done and why.

**1. The Record, as Reinforced by the White House Defendants' Opposition Brief, Demonstrates That Plaintiff Will Suffer Irreparable Injury Absent the Requested Relief.**

Simultaneously with the filing of this suit CREW sought assurances from the White House defendants that all back-up copies of the deleted emails are being preserved. CREW did not take this step to preserve its ability to conduct discovery, as the defendants disingenuously claim. The back-up copies themselves are not evidence of the defendants' prior conduct at issue here and, accordingly, not likely to be discoverable. Rather, CREW is seeking to preserve this Court's jurisdiction and its ability to award full and effective relief should CREW prevail in its lawsuit. CREW's complaint includes the allegation that neither the head of the OA nor the archivist complied with their statutory obligations to ensure the continued preservation of federal records. See Complaint, Claim One, Two, Three and Four. If CREW prevails on these claims the relief will include an order that those defendants initiate an action through the attorney general to restore the missing emails, an order that will be meaningless if the back-up copies no longer exist.

This is why the White House defendants' response -- that pursuant to Rule 26 of the Federal Rules of Civil Procedure they are preserving only those disaster recovery tapes in the OA's possession as of September 25, 2007 -- is nearly a non-sequitur to CREW's request and certainly does not provide the assurances to which CREW and this Court are entitled.[3] Left

---

[3] The White House defendants are incorrect not only in their reliance on the discovery rules as the sole source of any preservation obligation they are under, but also that preserving everything in the OA's possession as of September 25, 2007, would comply with those rules. As the courts have made clear, the obligation to preserve evidence runs from the time that litigation is reasonably anticipated. See, e.g., Smith v. Café Asia, 2007 U.S. Dist. LEXIS 73071 (D.D.C. 2007). It is CREW's understanding that in 2002, the OA prepared a memorandum for the White House that discussed, among other things, the risks of not having an appropriate and effective

3

unanswered are legitimate follow-up questions about what that body of disaster recovery tapes consists of, whether and to what extent back-up copies on other mediums (DVDs, CDs, disks, etc.) are being preserved, whether there are other back-up copies in other EOP components, and whether the White House has transferred custody of these tapes to another entity. For all we know, the OA had in its possession only a handful of disaster recovery tapes as of September 25, 2007, which would certainly not address the White House defendants' obligation under the FRA and PRA to preserve the larger body of back-up copies dating back to 2003, when emails began to be deleted from the servers on which they were stored for archival purposes.

To cover up the naked insufficiency of their so-called "assurances," the White House defendants counter with the allegation that CREW has provided mere "rank speculation" that is far from the necessary "'proof that the harm has occurred in the past and is likely to occur again . . .'" Defendants' Opposition to Plaintiff's Motion For A Temporary Restraining Order ("Ds' Oppos."), p. 14 (quotation omitted). There is, however, nothing speculative about the risks present here; indeed, the White House defendants' very opposition brief only reinforces the likelihood of destruction absent the Court's immediate intervention.

First, millions of email have been deleted from White House servers in the past, a fact that the White House has not denied. See Complaint, ¶ 34; White House: Millions of E-Mails May be Missing, CNN.com, April 13, 2007 (attached as Exhibit 8). Had the White House been following proper preservation and archival practices, this would not have happened. The White

---

electronic record-keeping system in place. The White House defendants' decision to not implement such a system in the face of the known risks from this course of inaction -- legal and practical -- put them reasonably on notice from that point forward that litigation was likely. CREW has sought under the FOIA a copy of this memorandum but, not surprisingly, the OA has refused to produce it.

House defendants elected not to implement a proper electronic record-keeping system with the full knowledge that their failure to do so could result in the loss of federal and presidential records. Complaint, ¶ 37. When provided with definitive proof of the gross inadequacies of the system they were using -- specifically that millions of email records had gone missing over a two and one-half year period -- the White House defendants continued to do nothing, raising the likelihood, if not near certainty, that electronic records would continue to be deleted.

Second, in the face of CREW's legitimate request for assurances that all back-up copies are being preserved, the White House defendants have provided only a narrow, carefully worded statement -- not even from the agency itself -- that seems deliberately obtuse and does not account for the entire body of back-up copies at issue. Just as alarming, they have refused to even acknowledge their continuing preservation obligations under the FRA and PRA. And they have cavalierly suggested that the OA is free to recycle or delete back-up tapes after 90 days, even though those back-up tapes may contain the only currently existing copies of deleted federal and presidential records and even though the disposition authority under the cited records schedule does not extend to presidential records. See Ds' Oppos. at 11.

At the heart of the White House defendants' steadfast refusal to provide plaintiff or the Court adequate assurances or any information on exactly what back-up copies still exist is the possibility that the White House has already deleted the bulk of the back-up copies, which it will attempt to justify as within the approved schedules for temporary records. Otherwise why would the White House persistently refuse to answer the logical and necessary question as to what

precisely the OA is preserving?[4] If, however, the body of back-up copies that the OA was proposing to use to restore the deleted emails still exists, then this Court must ensure the continued preservation of the back-up copies to protect its jurisdiction and ability to award full and adequate relief.

Absent here are the kind of assurances that the court in CREW v. Dep't of Homeland Security found acceptable, making this case anything but analogous, contrary to the White House defendants' argument. See Ds' Oppos. at 2. There, in response to CREW's motion for a temporary restraining order, the Court made clear that unless and until the government provided adequate assurances of document preservation through sworn agency declarations, the Court would issue an order compelling preservation. CREW v. Dep't of Homeland Security, Civil No.06-1912 (D.D.C.), Order of February 16, 2007 (attached as Exhibit 9). CREW's request for emergency relief in that case only became moot after the government submitted the required declarations, under penalty of perjury, which detailed precisely what categories of records were being preserved during the pendency of the litigation and by whom. Here, by contrast, the White House defendants have submitted no such declarations, relying instead on the narrow oblique representations of their counsel, which are no substitute for admissible evidence and do not resolve the issue of whether defendants are complying with their statutory preservation obligations.

Equally inapposite is Hester v. Bayer Corp., 206 F.R.D. 683 (M.D. Ala. 2001), a case on which the White House defendants place particular reliance. See Ds' Oppos. at 15-16. In

---

[4] Of course, if the White House defendants have already destroyed back-up copies there is little this Court can do by way of emergency relief as to those deleted records, but this Court can issue an order preventing the White House defendants from destroying any further records.

Hester, the district court was reviewing the propriety of an open-ended discovery preservation order entered by the state court in response to a one-page ex parte request from the plaintiff that was intended to preserve evidence in the case. 207 F.R.D. at 686. Here, by contrast, plaintiff's request is not premised on a discovery obligation or intended to preserve evidence, was made after repeated efforts to seek assurances from the White House defendants without involving the Court, is based on a course of conduct by the White House defendants including a refusal to act in the face of a wholesale destruction of records required by law to be preserved and a seemingly deliberate and conscious decision not to implement an effective and appropriate electronic record-keeping system.

Plaintiff, then, stands in the same shoes as the Armstrong plaintiffs, where the court granted their request for a temporary restraining order to ensure continued preservation of White House back-up tapes. Armstrong v. Bush, 807 F.Supp. 816 (D.DC. 1992). In Armstrong the plaintiffs were seeking emergency relief to prevent the loss of back-up tapes at the end of the Reagan presidency. As the court recognized, destruction of those tapes would result in "immediate and irreparable" harm that justified the entry of a temporary restraining order. Id. at 820. There, as here, the White House refused to provide adequate guarantees that tapes would not be destroyed and this failure, coupled with the history of past presidents destroying their presidential records, led the court to readily conclude that absent the requested relief, there would be immediate and irreparable harm. Id. at 820-21. This conclusion applies with equal force here.[5]

---

[5] The White House defendants argue that Armstrong is inapplicable in part because plaintiff here, unlike the Armstrong plaintiffs, has not contended that the disaster recovery tapes are permanent records. Ds' Oppos. at 16-17 n.9. This is a distinction without a difference -- as

Finally on the issue of irreparable injury the White House defendants argue that such harm is speculative and far from the certainty required for a temporary restraining order. This ignores the past destruction of millions of electronic records as a result of actions by the White House defendants, the continuing refusal of the White House defendants to acknowledge, much less comply with, their ongoing record preservation obligations under the FRA and the PRA, and defendants' failure to provide assurances that all existing back-up copies are being preserved. Under these circumstances there is a very serious risk of destruction that amply justifies emergency relief.

### 2. The Balance of Hardships Tips Decidedly in Favor of Granting the Temporary Restraining Order.

The White House defendants offer only an anemic argument as to the burden they would face from a requirement that they preserve all back-up copies. Most significantly, they ignore the simple fact, recognized by the Armstrong court, that "preserving the records in this case on backup tapes, which is done regularly in any event, will present no undue burden to the executive branch of government." 807 F.Supp. at 821.

Without a response to this common-sense proposition, the White House defendants argue only that issuing a preservation order here "would subject countless government agencies or officials" to similar "prophylactic" measures. Ds' Oppos. at 19. A preservation order here, however, is necessary because the White House defendants have ignored and continue to ignore

---

the only remaining copies of presidential and federal records, the back-up copies at issue have the same importance and relevance as those at issue in Armstrong. Moreover, as the only remaining copies the back-up copies here are permanent records unless and until the missing records are restored, as it is the nature of the record, not its medium, that dictates its record status under both the FRA and the PRA.

their legal obligations. Accordingly, any normal presumption of regularity to which the White House defendants would otherwise be entitled[6] is overcome by the specific and compelling evidence that they are in fact acting in an irregular and illegal manner.

As to any harm to the public, its interest is defined and controlled by the record-keeping statutes, which are intended to preserve this president's records for the public as part of our nation's history. See, e.g., Armstrong, 807 F.Supp. at 821 ("The FRA was designed to preserve records for historical purposes and the Plaintiffs are within the FRA zone of interest. By enacting the statute, Congress has made a determination that the preservation of records is in the public interest."). Given the careless and cavalier attitude the White House defendants have shown to this interest in the past, it should come as no surprise that their brief makes no mention of the public's rightful claim to these records.

Instead, the White House defendants argue that because a preservation order is unnecessary here, granting plaintiff's emergency motion would be a wasteful and inappropriate use of judicial resources that would "expand the possibility of Rule 65 abuse" and is therefore contrary to the public interest. Ds' Oppos. at 18. This ignores the fact that there is already a check in place to guard against the abuse of interim injunctive relief in the form of a district court judge who rules on the merits of each such motion based on the facts before him or her. Just as those facts compel the conclusion here that emergency interim relief is necessary and appropriate to prevent irreparable harm, in another case on other facts a court might decide differently. Simply stated, the only precedent that granting a temporary restraining order here would establish is that on these facts such an order is warranted.

---

[6] See Ds' Oppos. at 19.

9

### 3. Plaintiff Has Demonstrated a Likelihood of Success on the Merits.

As plaintiff anticipated, the White House defendants argue that plaintiff lacks standing to sue. First, they suggest there is a serious question whether plaintiff has suffered an injury in fact, citing the D.C. Circuit's opinion in <u>American Friends Serv. Comm. v. Webster</u>, 720 F.2d 29, 46 (D.C. Cir. 1983). Ds' Oppos. at 21 n.12. This is a serious misapplication of <u>Webster</u> that cannot be squared with is actual holding.

The <u>Webster</u> case concerned a challenge by various individuals and organizations to the FBI's records destruction program as contrary to law, including the FRA. In addressing a claim that the plaintiffs lacked standing, the Court identified three categories of plaintiffs: (1) a group that included individuals and organizations whose need for documents arose out of their professions, and "had in the past made FOIA requests . . . had other requests pending, and intended to request FBI files in the future"; (2) a group that consisted of individuals who were subjects of FBI investigations or alleged victims of FBI activities; and (3) a group that included organizations seeking to further civil liberties and civil rights who argued that the destruction of the documents deprived them of research materials that they could disseminate. <u>Id.</u>

Here, the White House defendants argued that CREW is most analogous to this third group of plaintiffs. D's Oppos. at 21 n.12. In fact, however, CREW fits into the first category of defendants that the court concluded had standing. Like that first group, CREW has made FOIA requests in the past, has FOIA requests pending with EOP components, including the OA and the Council on Environmental Quality, and intends to request documents in the future. Moreover, like the first group of <u>Webster</u> plaintiffs, CREW uses the documents it seeks through its FOIA requests to share information with the public through memoranda, reports, or press releases. For

example, on June 27, 2007, CREW released a report, *The Best Laid Plans: The Story of How the Government Ignored its own Gulf Coast Hurricane Plan*, about the problems with the federal government's response to Hurricane Katrina victims, that relied significantly on documents CREW obtained through a FOIA request to the Department of Homeland Security.  These facts dictate here, as in <u>Webster</u>, that CREW has standing to bring this FRA lawsuit.  <u>See also</u> <u>Armstrong v. Bush</u>, 924 F.2d 282, 288 (D.C. Cir. 1991) (finding plaintiffs that were researchers and historians who made extensive use of government documents were within the zone of interests of the records creation and management provisions of the FRA).

Second, the White House defendants argue that CREW's injury is not redressable because CREW's request for relief is dependent on the actions of a third party not before the court, the attorney general, to whom a request by the archivist or the head of the OA to initiate an action would be addressed.  Ds' Oppos. at 21-22.  This argument ignores the express findings of the D.C. Circuit in <u>Armstrong v. Bush</u>, 924 F.2d 282 (D.C. Cir. 1991), a decision the White House defendants cite as support for their redressability argument (<u>see</u> Ds' Oppos. at 22).

Contrary to the White House defendants' contorted construction of the <u>Armstrong</u> decision, the D.C. Circuit expressly recognized that a plaintiff could sue to challenge the failure of an agency head or the archivist to refuse to seek the initiation of an enforcement action by the attorney general.  924 F.2d at 295.  The words of the court have particular force here and compel the conclusion that CREW has standing to sue:

> [J]udicial review of the agency head's and Archivist's failure to take enforcement action reinforces the FRA scheme by ensuring that the administrative enforcement and congressional oversight provisions will operate as Congress intended.  Unless the Archivist notifies the agency head (and, if necessary, Congress) and requests the Attorney General to initiate legal action, the

> administrative enforcement and congressional oversight provisions will not be triggered, and there will be no effective way to prevent the destruction or removal of records. Thus, if the agency head or Archivist does nothing while an agency official destroys or removes records in contravention of agency guidelines and directives, private litigants may bring suit to require the agency head and Archivist to fulfill their statutory duty to notify Congress and ask the Attorney General to initiate legal action.

Id.[7]

The White House defendants also argue that this Court lacks jurisdiction to order directly that records be restored because such relief can be sought only by the government. Ds' Oppos. at 22-23. The precise boundaries of this Court's jurisdiction have yet to be determined in the wake of decisions such as Armstrong, which left open the question of whether the attorney general's failure to initiate an enforcement action is reviewable. 924 F.2d at 295. What is settled, however, is that the head of the OA and the archivist have a mandatory duty to act in the face of the White House defendants' past and ongoing violations of their record-keeping responsibilities under the FRA. If, however, the White House defendants are not required to preserve all of the back-up copies of the millions of deleted electronic records, as a practical matter there will be no effective way to redress the past violations of law, and the public at large will suffer an irreparable harm. This is more than sufficient to justify the entry of a temporary restraining order. See Armstrong, 807 F.Supp. at 821 (recognizing that defendants' claim that

---

[7] That the attorney general is not before the court does not, contrary to the White House defendant's contorted argument (Ds' Oppos. at 22), mean that plaintiff's injury is not redressable. The agency head and the archivist are required to take action to prevent the destruction or removal of agency records. Armstrong, 924 F.2d at 295-96. Their failure to perform a mandatory statutory duty has caused harm to the plaintiff and is redressed by an order directing them to fulfill their statutory mandates.

back-up tapes in question did not constitute "records" within the meaning of the FRA and other statutes was an "issue that will have to be resolved on the merits of the case" and did not provide a basis to deny the requested emergency preservation order).

**4. The Requested Relief is an Appropriate Remedy that Maintains the Status Quo.**

Finally, the White House defendants attack the contours of the preservation order plaintiff is seeking, arguing that it is not sufficiently detailed and that it alters the status quo. Each of these arguments is without merit.

First, it is unrealistic in the extreme to expect the plaintiff to be able to identify "what emails are actually deleted or missing," Ds' Oppos. at 4 n.2, as this is information that is uniquely in the hands of the White House defendants. Accordingly, it falls to the White House defendants, not the plaintiff, to identify the extent to which the order plaintiff seeks is overly broad because it encompasses back-up tapes that do not contain copies of the missing emails.

Moreover, it is plaintiff's understanding that the nature of back-up tapes makes it difficult, if not impossible, to ascertain which particular tapes contain the deleted emails. That is why an order that requires preservation of all back-up tapes is necessary. Compare Armstrong, 807 F.Supp. at 823 (where it was impossible to know which materials on the back-up tapes were presidential and which were federal, court ordered all the information on the electronic systems to be saved). Any incremental burden to the White House defendants to maintain back-up tapes that do not contain any of the deleted emails is more than offset by the danger that the American people will be permanently deprived of an important piece of our nation's history.

Second, the White House defendants argue that plaintiff is seeking to alter the status quo and accordingly bears a greater burden that it has not met. Ds' Oppos. at 13 n.7. As the D.C.

Circuit recognized in <u>Webster</u>, however, a preliminary injunction prohibiting an agency from destroying records until it has complied with its obligations under the FRA is precisely the proper kind of relief that the court should enter.  720 F.2d 29.  <u>See also</u> <u>Armstrong</u>, 807 F.Supp. at 822.  Moreover, requiring the White House defendants to do that which the law already requires of them cannot legitimately be characterized as impermissibly altering the status quo.

## <u>CONCLUSION</u>

The narrowly circumscribed and purposefully oblique "assurances" that the White House defendants have offered to plaintiff and this Court on preservation heighten, not eliminate, the concern that absent this Court's immediate intervention, historical evidence of this presidency will be forever lost.  Accordingly, for the foregoing reasons and those set forth in plaintiff's initial brief, plaintiff's request for a temporary restraining order should be granted.

Respectfully submitted,

_____/s/_____
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
  in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20530
Telephone:  202-408-5565
Fax:  202-508-506

Attorneys for plaintiff

Dated:  October 15, 2007

14

**EXHIBIT 8**



INTRODUCING
RIGHT FIT
BY LANE BRYANT™    SA

**CNN.com**

AMERICAN MORNING    SITUATION ROOM    LOU DOBBS TONIGHT    PAULA ZAHN NOW    LARRY K

Member Center: Sign In | Register

SEARCH    ⦿ THE WEB    ○ CNN.COM

Home  World  U.S.  Weather  Business  Sports  Analysis  Politics  Law  Tech  Science  Health  Entertainment

# POLITICS

Tools:  Save  |  Print  |  E-mail  |

# White House: Millions of e-mails may be missing

POSTED: 7:07 p.m. EDT, April 13, 2007



(GETTY IMAGES)

The lawyer for Bush aide Karl Rove said that e-mails sought by the CIA leak prosecutor were also missing.

 ◀ Previous  ● ○  Next ▶

**VIDEO**                          Browse/Search

  **White House e-mail controversy widens** (1:52)

  **Leahy on missing e-mails** (1:05)

  **Gonzales' lawyer resigns; what now?** (5:04)

**RELATED**

• **NEW:** White House spokeswoman says 5 million official e-mails may be n
• White House admits it should have kept e-mails on private GOP system
• Chairman of Senate Judiciary Committee doubts e-mails are deleted
• Committee investigating whether U.S. attorneys' firings were politically mo

Adjust font

**WASHINGTON** (CNN) -- Millions of White House e-mails may be missing, V
spokeswoman Dana Perino acknowledged Friday.

"I wouldn't rule out that there were a potential 5 million e-mails lost," Perino t
reporters.

The administration was already facing sharp questions about whether top pr
advisers including Karl Rove improperly used Republican National Committe
that the White House said later disappeared.

The latest comments were a response to a new report from a liberal watchdo
Citizens for Responsibility and Ethics in Washington (CREW), alleging that o
year period official White House e-mail traffic for hundreds of days has vanis
possible violation of the federal Presidential Records Act. (Watch CREW's c
the missing messages 📹 )

"This story is really now a two-part issue," CREW's Melanie Sloan told CNN
there's the use of the RNC e-mail server that's inappropriate by White Hous
and secondly we've also learned that there were between March of 2003 an
2005 apparently over 5 million e-mail that were not preserved and these are
the regular White House server."

Perino stressed there's no indication the e-mails were intentionally lost, but s
careful not to dispute the outside group's allegations. "I'm not taking issue w
conclusions at this point," Perino said. "We're checking into them. There are
people in the Executive Office of the President."

E-mail might have been deleted
E-mail accounts scrutinized
Gonzales documents subpoenaed
Subpoena and cover letter (PDF)

## White House: 'We screwed up'

Perino's disclosure about the White House e-mail comes a day after she adr
the White House "screwed up" by not requiring e-mails from Republican Par
campaign accounts to be saved and was also trying to recover those e-mail:

Perino said 22 aides in the political arm of the president's office use party or
e-mail accounts, which were issued to separate official business from politic
Some of those accounts were used to discuss the December firings of eight
prosecutors, a shake-up that has triggered a spreading controversy on Capi

Congressional investigators have questioned whether White House aides us
accounts from the Republican Party and President Bush's re-election campa
official government business to avoid scrutiny of those dealings.

Sen. Patrick Leahy, the chairman of the Senate Judiciary Committee, accus
House of trying to hide messages related to
the U.S. attorneys, which has stirred up a hornet's nest on Capitol Hill.

"You can't erase e-mails, not today," said Leahy, D-Vermont. "They've gone
many servers. They can't say they've been lost. That's like saying, 'The dog
homework.' " (Watch Leahy compare e-mails to Nixon tapes 🔊 )

Leahy said the e-mails would have remained on party or campaign compute
and he compared the situation to the famous 18½-minute gap in one of the '
tapes.

"They're there," he said. "They know they're there, and we'll subpoena them
necessary, and we'll have them."

Perino told reporters that the e-mails from those accounts should have been
said policy has not kept pace with technology. She said computer experts w
retrieve any records that have been deleted.

"We screwed up, and we're trying to fix it," she told reporters.

## E-mails sought by special prosecutor also missing

Patrick Fitzgerald, the special prosecutor in the CIA leak case, disclosed las
some White House e-mails in 2003 were not saved as standard procedure c

In a January 23, 2006, letter to the defense team of former White House aid
"Scooter" Libby, Fitzgerald wrote: "We advise you that we have learned that
mail of the Office of Vice President and the Executive Office of President for
periods in 2003 was preserved through the normal archiving process on the
House computer system."

Robert Luskin, personal attorney for Rove, told CNN Friday that he "has no
doubt" Fitzgerald's assertion that some White House e-mail was missing.

"You're quite right," Luskin said in a telephone interview. "There was a gap t

Democrats charge this raises questions about whether the public has gotten
story on everything from the CIA leak case to the fired U.S. attorneys contro

"The biggest problem here is really that here is a White House that is delibe
violating an existing statute that requires them to preserve all records," said
we have significant evidence now both from the RNC e-mail and the White F
that are missing that the White House was using every means possible to a\
complying with the law."

Luskin said it was "foolish speculation" for CREW -- which serves as counse
ambassador Joe Wilson and his wife, Valerie Plame, in a private suit agains
other Bush officials -- to suggest that the gap in White House e-mail helped
indictment in the CIA leak case. Luskin said Fitzgerald told him that Rove wa
the case because he "did nothing wrong."

Luskin added that until this month, Rove believed his RNC e-mail was being
and did nothing wrong.

"Rove has always understood from very early on in the Bush administration
and campaign e-mail were being archived," said Luskin. "He was absolutely
until very, very recently that any e-mails were lost. And he never asked that
deleted or asked for the authority to delete e-mails."

*CNN's Ed Henry and Lisa Goddard contributed to this report.*

Tools:   Save   |   Print   |   E-mail   |   Most Popular   |

**Next story in Politics**          **Politics**

**FOLLOW RELATED TOPICS**

Search Topic                                                E-m

**White House**

**Patrick Leahy**

**Justice Department**

                                                           A

What are E-mail Alerts? | Manage Alerts | Create Your Own

**TOP STORY**



**Rapper T.I. wins awards after arrest**

Despite rapper T.I.'s absence, the show went on
second-annual BET Hip-Hop Awards -- even whe
scheduled to perform.

**LATEST NEWS**

MOST POPULAR          TOP STORIES          BEST VIDE

Mystery, questions on high seas
'View' co-host maternity leave
Can you deduct a home office?
Rapper T.I. arrested
Sen. Craig say's he'll appeal

International Edition    Languages    **CNN TV**    **CNN International**    **Headline News**    **Transcripts**

**EXHIBIT 9**

*UNITED STATES DISTRICT COURT*
*FOR THE DISTRICT OF COLUMBIA*

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et a., | ) ) ) |
| Defendant. | ) ) |

Civil Action No. 06-1912 (JGP)

**ORDER**

This matter comes before the Court on **Plaintiff's Motion For A Temporary Restraining Order** [12], Defendants' **Response To Plaintiff's Motion For Temporary Restraining Order** [14], and **Plaintiff's Reply To Defendants' Response To Plaintiff's Motion For A Temporary Restraining Order** [15]. The parties appeared before the Court on Plaintiff's motion on February 16, 2007. During the course of the hearing, counsel for Defendants represented to the Court that Defendants, and in particular the U.S. Department of Homeland Security and the United States Secret Service, are preserving, during the entire pendency of this litigation, any and all records, documents, and/or other materials, including but not limited to electronic documents, Worker and Visitor Entry System ("WAVES") records, and/or Access Control Records System ("ACR") records, that are potentially responsive to Plaintiff's Freedom of Information Act request that is the subject of this action. Counsel further represented to the Court that Defendants would not transfer any potentially responsive records, documents, and/or other materials to another department or agency, including but not limited to the White House Office of Records Management, without first creating and retaining a copy of

the record.  Counsel further represented to the Court that Defendants would file a Declaration with the Court on or before February 22, 2007, which would set forth Defendants' document retention policy in regards to this matter, and that this Declaration would be in complete conformity with his verbal representations made to the Court.  Based on Counsel's representations, it is hereby

**ORDERED** that the motion [12] is held in abeyance; and it is further

**ORDERED** that Defendants shall file a Declaration with the Court on or before February 22, 2007; and it is further

**ORDERED** that Plaintiff may file a response, if any, to the Declaration on or before February 26, 2007; and it is further

**ORDERED** that Defendants shall file an opposition to Plaintiff's Motion For A Temporary Restraining Order on or before March 5, 2007; and it is further

**ORDERED** that Plaintiff may file a reply to its Motion For A Temporary Restraining Order on or before March 12, 2007; and it is further

**ORDERED** that Defendants shall give the Court and all parties to this action five (5) days notice before altering, in any respect, its current document retention policy.

**SO ORDERED.**

**DATE: February 16, 2007**                                    **JOHN GARRETT PENN**
                                                               **United States District Judge**