**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ) ETHICS IN WASHINGTON, ) ) Plaintiff, ) ) v. ) ) EXECUTIVE OFFICE OF THE ) PRESIDENT, et al., ) ) Defendants. ) | Civil No. 07-01707 (HHK/JMF) |
| NATIONAL SECURITY ARCHIVE, ) ) Plaintiff, ) ) v. ) ) EXECUTIVE OFFICE OF THE ) PRESIDENT, et al., ) ) Defendants. ) | Civil No. 07-01577 (HHK) |

**PLAINTIFF CREW'S OPPOSITION TO DEFENDANTS'**
**CONSOLIDATED MOTION TO DISMISS PLAINTIFFS' COMPLAINTS**

**STATEMENT**

Mischaracterizing the evidence in this case, the nature of plaintiffs' claims, the relief they

are seeking and governing case law, defendants have moved to dismiss the complaints of both

CREW[1] and the National Security Archive.  According to defendants, there are jurisdictional and

merits considerations that prevent this Court from entertaining either suit and that justify

dismissal now, before the defendants have responded specifically to any of the factual and legal

_____

[1] CREW is the acronym for plaintiff Citizens for Responsibility and Ethics in
Washington.

allegations in the complaints or plaintiffs have had an opportunity to conduct discovery that would reveal the extent of the White House defendants' non-compliance with record-keeping laws. Defendants' motion, strategically timed to avoid any accountability for their actions, is without support and must be denied.

First, plaintiffs are not challenging the White House defendants' failure to comply with their obligations under the Presidential Records Act ("PRA") and a more careful review of plaintiffs' complaints would have made that clear. To be sure, the widespread failure of the White House defendants to meet their record-keeping obligations under the PRA provides additional illustration of the extent of their noncompliance generally with federal record-keeping obligations, including under the Federal Records Act ("FRA"). But the heart of these lawsuits is the White House defendants' failure to restore the millions of missing emails subject to the FRA as well as their failure to have adequate policies and procedures for preserving federal records on an ongoing basis.

Second, plaintiffs are not seeking remedies that are outside the scope of judicially sanctioned relief for FRA violations. Once again, a more careful review of plaintiffs' complaints would have made clear that plaintiffs are not asking this Court to "order the restoration and retrieval of any allegedly missing federal records," as defendants erroneously claim.[2] Instead,

_____

[2] See Defendants' Consolidated Motion to Dismiss Plaintiffs' Complaints ("Ds' M.") at 2. Defendants' suggestion that it is a mere allegation that federal records are missing from White House servers is curious given defendants' recognition that this Court "must accept as true all of the factual allegations contained in the complaint when reviewing a motion to dismiss for lack of jurisdiction." D's M. at 9. In addition, White House Press Secretary Dana Perino has publicly acknowledged that emails are missing. See Press Release, White House Office of the Press Secretary, Press Gaggle by Dana Perino and Dr. Ali Al-Dabbagh, Spokesman for the Government of Iraq (April 13, 2007) ("I wouldn't rule out that there were a potential 5 million emails lost"); Press Release, White House Office of the Press Secretary, Press Briefing by Dana

plaintiffs seek to compel defendants to use the administrative and statutory scheme Congress imposed, which would require them to request that the attorney general initiate action to restore the missing federal records.

Third, as courts have recognized under comparable circumstances, plaintiffs' allegations of harm are real, concrete and a sufficient basis from which to conclude they meet Article III requirements for standing. CREW not only is a frequent requester under the Freedom of Information Act ("FOIA") for precisely the kinds of records that have been destroyed and are not being adequately preserved on an ongoing basis, but has multiple pending FOIA requests with components of the Executive Office of the President ("EOP").

Fourth, defendants' arguments against mandamus relief fail to take into account that here there is no administrative remedy for plaintiffs to pursue outside of this Court. Moreover, to the extent full relief were not available under the Administrative Procedure Act ("APA") -- something plaintiffs do not concede -- mandamus relief would be appropriate.

Finally, the EOP is a properly named defendant and defendants conveniently ignore case law from this district that so holds. Moreover, as the complaints make clear, plaintiffs were careful to include only those EOP components subject to the FRA. Defendants' arguments ignore this plain language.

The lack of merit in defendants' motion suggests that it has been interposed to delay these proceedings and block any legitimate attempt to discover the true facts behind the many millions of missing White House emails, facts that are uniquely within the possession of the

---

Perino (April 16, 2007) ("we are aware that there could have been some emails that were not automatically archived because of a technical issue").

White House defendants.  This Court should promptly deny defendants' motion and allow these cases to progress to the fact-finding stage.

## **FACTUAL BACKGROUND**

Early on in the Bush administration, the White House switched from an electronic records management system that automatically captured, preserved and categorized all email sent through the White House email system to a practice that did none of these things.  See U.S. General Accounting Office, Electronic Records:  Clinton Administration's Management of Executive Office of the President's E-Mail System (2001), p. 2, available at www.gao.gov/new.items/d01446.pdf (describing Automated Records Management System ("ARMS") used by the Clinton administration to archive White House emails); Complaint, ¶ 31.[3] Starting in 2002, the White House adopted a practice of storing White House emails -- both federal and presidential in a commingled form -- on White House servers and back-up tapes. Complaint at ¶ 33.  As a result, there are no longer any controls in place to ensure the continued preservation of email records, meaning that anyone with access to White House servers can delete or alter any emails housed on those servers.

In October 2005, in the course of responding to government subpoenas and consistent with its defined mission, defendant Office of Administration ("OA")[4] discovered that many millions of emails were missing from the White House servers where they had been dumped for

---

[3] As used herein the references are to CREW's complaint unless otherwise denoted.

[4] OA's duties and responsibilities include providing "common administrative support and services to all units within the Executive Office of the President, except for such services provided primarily in direct support of the President."  Executive Order No. 12028, § 3(a), 42 Fed. Reg. 62895 (Dec. 12, 1977).

storage.  Id. at ¶ 34.  Acting on its own initiative, OA conducted a detailed analysis of the email

problem and concluded that the missing emails number in the many millions and include emails

from hundreds of days spanning a two and one-half year period (March 2003 to October 2005)

from multiple EOP components.  Id.[5]  At least two potential causes of the millions of deleted

email were identified:  (1) a malfunction in the servers, which at least some in OA did not

consider likely given the magnitude of the problem, and (2) manual deletion by users.  Id. at ¶

35.  Both possibilities would have been prevented had the White House put in place an electronic

records management system similar in function to that used by the prior administration, with

appropriate safeguards against the intentional or inadvertent deletion of archived email records.

Complaint at ¶ 35.

        OA also prepared a plan to recover the missing email from then-existing back-up tapes,

which it presented to, among others, the White House Chief Information Officer.  Id. at ¶ 36.  To

date, however, the White House has not implemented this recovery plan or any other.  Id. at ¶¶

36, 39.  Nor has the White House implemented an electronic records management system, even

in the face of overwhelming evidence that absent such a system emails were and would continue

to be destroyed.  Id.

        With no electronic records management system in place, the only potential repository for

the deleted email records is the back-up tapes that the EOP creates.  Complaint, ¶ 41.  To the

extent they still exist, these back-up tapes contain commingled presidential and federal records

that have been deleted from the White House servers at least since March 2003 through the

_____

        [5] CREW understand that the number of missing emails exceed 10 million, see Sloan
Decl. at ¶ 5, a fact that the White House has not denied.

present.  Id.  To date the White House has said only that the missing emails "*may* be available on back-up tapes" (emphasis added),[6] but has refused to confirm whether they are, in fact, still available.

Plaintiff CREW is a non-profit, non-partisan ethics watchdog group that seeks to deter the unethical and illegal conduct of public officials by publicly disseminating information regarding their conduct.  Complaint at ¶ 5; Declaration of Melanie Sloan ("Sloan Decl.") at ¶ 2 (attached as Exhibit 2).[7]  CREW believes that by its dissemination of  information about public officials, citizens are empowered to have an influential voice in government decisions and the governmental decision-making process.  Id.

To advance its mission, CREW uses a combination of research, litigation, advocacy and public education.  Id. at ¶ 3.  Its research efforts often culminate in reports that it disseminates publicly.  For example, CREW publishes a yearly report, Beyond Delay, that details the misconduct of the most unethical members of Congress.  Other reports CREW has issued in the past year include, *inter alia*, the recently issued report Homeland Security for Sale, documenting

---

[6] See transcript from *CNN*'s The Situation Room, December 5, 2007 (relevant portions attached as Exhibit 1).

[7] In the factual background of their motion defendants include as facts that CREW "*states* in its complaint that it is a 'non-profit, non-partisan corporation . . .*"* and that "CREW *states* that it has a 'direct interest in ensuring that these records are maintained, preserved, and made accessible to the public in accordance with federal law . . ." Ds' M. at 4 (emphasis added). Again, however, defendants must accept as true all the factual allegations contained in the complaint.  Accordingly, CREW's claims as to its nature and its interest in the records at issue are not simply statements of CREW, but allegations of fact that this Court must accept as true for purposes of resolving defendants' motion.  Had defendants wished to contest these facts, they could have filed an answer.  Having opted to avoid responding to any of the factual allegations in the complaint by instead filing a motion to dismiss, defendants are now bound by the rules that govern the consideration and resolution of such a motion.

the misconduct, mismanagement and waste, fraud and abuse at the U.S. Department of Homeland Security; Best Laid Plans, detailing the Federal Emergency Management Agency's plan to respond to a hurricane of Katrina's magnitude and its subsequent failure to implement that plan[8]; Family Affair, detailing the misuse of power by the chairs and ranking members of House of Representative committees and subcommittees to financially benefit family members. All are publicly available on CREW's website, www.citizensforethics.org.  In addition, CREW has created an interactive website, www.governmentdocs.org, on which CREW and a growing number of other organizations post for public review documents obtained through the FOIA. Sloan Decl. at ¶ 4.

 As part of its research, CREW relies heavily on the FOIA.  Since its inception in 2002, CREW has filed hundreds of FOIA requests with a wide variety of government agencies.  Id. at ¶ 3.  CREW's pending requests include requests of OA and the Council on Environmental Quality ("CEQ"), each of which is a component of the EOP.  CREW's FOIA request of OA, now the subject of litigation,[9] seeks among other things the documents OA prepared when it discovered the millions of missing emails and that include analyses of the number of missing emails, the dates for which emails are missing and the EOP components for which emails are missing.  Id. at ¶ 5.  CREW has also requested the recovery plan that OA prepared and presented to then-White House Counsel Harriet Miers, but which was never implemented.  To date, OA has refused to produce any of these arguments, most recently taking the view that it is no longer an agency subject to the FOIA.  Id.  In the past, CREW has filed FOIA requests with the Office of

---

[8] See Sloan Decl. at ¶ 4.

[9] CREW v. Office of Administration, Civil No. 07-0964 (CKK).

Management and Budget, another EOP component.  Sloan Decl. at ¶ 7.

CREW's FOIA request of the OA is part of CREW's ongoing and concerted effort to hold the White House accountable for its multiple violations of record-keeping laws and regulations.  Id. at ¶ 5.  Toward that end, when emails released by the House Judiciary Committee, which was investigating the role of the White House in the U.S. Attorney firings, revealed that White House officials were using private email accounts to conduct government business, CREW requested that the House Committee on Oversight and Government Reform open an investigation. Complaint at ¶ 7.  One month later, on April 12, 2007, CREW released a report, WITHOUT A TRACE:  The Story Behind the Missing White House E-Mails and the Violations of the Presidential Records Act.  This report, which is based in significant part on information provided to CREW by confidential sources, details the multiple ways in which the White House is not complying with its record-keeping obligations and is the first public disclosure of the serious and systemic problems with the way the House manages electronic records.  Id. at ¶ 8.

These efforts are fueled by CREW's direct interest in ensuring that White House records are maintained, preserved and made accessible to the public as federal law requires, given the critical importance of this administration's records to CREW's mission.  Sloan Decl. at ¶ 8.  Moreover, given CREW's commitment to transparency in government, its efforts to combat the actions of this administration to undermine transparency in government and CREW's commitment to educating citizens about how President Bush and his administration perform their duties and responsibilities, CREW will continue to file FOIA requests, including requests of agencies within the EOP.  Id. at ¶¶ 7, 8.  If CREW cannot obtain records of how the president

and other public officials perform in office, it cannot fulfill a central tenet of its mission.  Id. at ¶ 8.  As a result, CREW is harmed by the failure of the White House defendants to restore the missing email and to maintain, on an ongoing basis, an effective electronic records management system that would ensure continued preservation of all federal electronic records.  Sloan Decl. at ¶ 8.

CREW has already sustained harm as a result of the defendants' failure to restore missing emails.  For example, CREW has been advised that a great number of CEQ's emails are among the millions of emails missing from White House servers.  Id. at ¶ 6.  CREW's outstanding FOIA request with CEQ seeks, among other things, records, which it has expressly defined to include emails, that would document this administration's efforts to subvert the scientific evidence of global warming and climate change.  Id.  Given CREW's understanding about the significant percentage of email missing from CEQ, there is a high degree of likelihood that those missing emails include records that are responsive to CREW's request.  Id.  The defendants' failure to restore those missing email have directly deprived CREW of documents it has requested under the FOIA.

### This Litigation

To remedy the defendants' violations of federal record-keeping laws, CREW filed this eight-count suit on September 25, 2007, for declaratory, injunctive and mandamus relief.[10] Defendants include OA, OA's Director Alan R. Swendiman, the National Archives and Records Administration ("NARA"), Archivist Dr. Allen Weinstein and "the agency known as the EOP as

---

[10] CREW's complaint is nearly identical to that of the National Security Archives, which was filed on September 5, 2007.

well as its individual agency components that are subject to the Federal Records Act."
Complaint at ¶ 9. Those EOP agency components include OA, CEQ, the Office of Management
and Budget, the Office of National Drug Control Policy, the Office of Science and Technology
Policy and the Office of the United States Trade Representative. Id.

The first four counts of CREW's complaint center on the defendants' failure to take
action to restore the deleted federal record emails. Claim One, relying on the express statutory
authority of 44 U.S.C. § 2905, seeks an order compelling defendant archivist to initiate an action
through the attorney general to restore the deleted emails. Complaint, ¶¶ 49-54. Claim Two
seeks an order compelling the EOP and OA, with the assistance of the archivist, to initiate action
through the attorney general to recover the missing federal record emails as mandated by 44
U.S.C. § 3106. Id. at ¶¶ 55-59. Claim Three seeks a writ of mandamus compelling the archivist
to request that the attorney general initiate action or seek other legal redress to recover the
deleted federal record emails pursuant to the FRA. Id. at ¶¶ 60-66. Claim Four seeks a writ of
mandamus compelling the EOP and OA to comply with their statutory duty under the FRA to
request that the attorney general initiate action or seek other legal redress to recover the deleted
federal record emails. Id. at ¶¶ 6-72.

The remaining four counts center on the defendants' failure to meet their record-keeping
obligations under the FRA. Claim Five seeks a declaration that the archivist is in violation of his
statutory responsibilities by failing to ensure that the White House put in place an adequate
system for preserving and archiving its electronic federal records and an injunction compelling
the archivist to ensure that such a system is established pursuant to the FRA. Complaint, ¶¶ 74-
80. Claim Six is directed at the EOP and OA and seeks similar relief. Id. at ¶¶ 81-87. Claim

Seven seeks a writ of mandamus compelling the archivist to set forth adequate guidelines for the establishment of an adequate system to preserve federal records, as the FRA requires. Id., ¶¶ 81-95. Finally, Claim Eight seeks a writ of mandamus under the FRA compelling the EOP and OA to implement an adequate electronic records system for preserving federal records. Id., ¶¶ 95-103.

On November 12, 2007, in response to CREW's motion for a temporary restraining order and pursuant to the Report and Recommendation of Magistrate Judge Facciola, this Court entered an order (Document 18) requiring the defendants to "preserve media, no matter how described, presently in their possess[ion] or under their custody or control, that were created with the intention of preserving data in the event of its inadvertent destruction."

In lieu of filing an answer to the complaints, defendants filed a consolidated motion to dismiss on November 29, 2007 (Document 39). In their motion, defendants argue that plaintiffs' claims seeking relief for records covered under the PRA must be dismissed, that plaintiffs' claims under the FRA must be dismissed as non-justiciable, that plaintiffs lack standing to maintain this suit, that mandamus relief is not available given the availability of review under the APA and that the EOP is an improperly-named party.

## STATUTORY BACKGROUND

### The Federal Records Act

The FRA is a collection of statutes that governs the creation, management and disposal of federal records. See generally 44 U.S.C. §§ 2101 et seq., 2901 et seq., 3010 et seq., and 3301 et seq. Among other things, the FRA ensures "[a]ccurate and complete documentation of the policies and transactions of the Federal Government," as well as "judicious preservation and

disposal of records."  44 U.S.C. § 2902.

To fulfill this purpose, the FRA requires the head of each agency to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency."  Id. at § 3101.  Under the statute, each agency must also "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency," id. at § 3102, and must "establish safeguards against the removal or loss of records" the agency head determines are necessary and required by regulations of the archivist.  Id. at § 3105.

The FRA also prescribes the exclusive mechanism for the disposal of federal records, which it defines to include:

> all books, papers, maps, photographs, machine readable
> materials, regardless of physical form or characteristics,
> made or received by an agency of the United States
> Government under Federal law or in connection with
> the transaction of public business and preserved or
> appropriate for preservation by that agency . . as evidence
> of the organization, functions, policies, decisions, procedures
> operations, or other activities of the Government or because
> of the informational value of data in them.

44 U.S.C. § 3301.  No records may be "alienated or destroyed" except pursuant to the disposal provisions of the FRA.  Id. at § 3314.

The archivist administers the provisions of the FRA and may authorize an agency to dispose of records that the agency no longer needs and that do not have "sufficient administrative, legal, research, or other value to warrant their continued preservation by the Government."  44 U.S.C. § 3303a(a).  Only if the archivist determines that agency records do not have administrative, legal, research, or other value can the archivist authorize their disposal.  Id.

at §§ 3303a(a), (d) and (e).

An agency wishing to dispose of records must first submit to the archivist either lists of records the agency head determines "are not needed by it in the transaction of its current business," 44 U.S.C. § 3303a(2), or "schedules proposing the disposal after the lapse of specified periods of time of records of a specified form or character" that the agency head determines will not have "sufficient administrative, legal, research, or other value to warrant their further preservation by the Government." Id. at § 3303a(3). Upon receipt of such a request, the archivist must issue a notice requesting public comment on the agency's proposal and the archivist's staff must conduct its own assessment of the value of the records the agency is proposing to destroy. Id. at § 3303a(a). The archivist is free to accept or reject an agency's proposal. Id. In addition, the archivist may request advice and counsel from Congress regarding the disposal of any federal records the archivist believes may be of special interest to Congress or where the disposal of those particular federal records is in the public interest. 44 U.S.C. § 3301a(c).

If the archivist learns of "any actual, impending, or threatened unlawful removal . . . or destruction of records in the custody of [an] agency," the archivist is required to notify the head of the agency and assist the agency head "in initiating action through the Attorney General for the recovery of records wrongfully removed and for other redress provided by law." 44 U.S.C. § 2905(a). If the agency head does not initiate such action, the archivist "shall request the Attorney General to initiate such action, and shall notify the Congress when such a request has been made." Id.

The FRA places a similar and independent duty on the head of each federal agency to

13

"initiate action through the Attorney General for the recovery of records he knows or has reason to believe have been transferred to his legal custody." 44 U.S.C. § 3106. If the agency head refuses to pursue legal remedies, the Archivist -- as discussed above -- must request that the attorney general take action and must inform Congress that he has made this request. Id.

The archivist also has an affirmative duty to guide and assist federal agencies to ensure the adequate and proper documentation of the policies and transactions of each agency. 44 U.S.C. § 2904(a). In furtherance of these duties, the archivist must promulgate standards and guidelines for federal agency records management, must establish standards for selective retention of records and must assist the agencies in applying the standards to records in the agencies' custody. 44 U.S.C. §§ 2904(b), (c)(1), 2905(a).

At the same time, heads of federal agencies are under an affirmative duty to implement the standards and guidelines for the retention of federal records. Specifically, each agency head must maintain an active records management program that provides for effective controls over the creation and use of federal records and that ensures the application of the archivist's standards and procedures for the preservation of federal records. 44 U.S.C. § 3102. In addition, agency heads are required to establish safeguards against the removal or loss of records determined by the agency to be necessary and required by regulations of the archivist. 44 U.S.C. § 3105.

## ARGUMENT

### I. DEFENDANTS' MOTION TO DISMISS RESTS ON A DEMONSTRABLY FALSE CONSTRUCTION OF CREW'S CLAIMS AND THE RELIEF CREW IS SEEKING.

Despite their admission that the complaints "do not specifically reference the [PRA] as

14

the basis for any one cause of action,"[11] defendants argue for dismissal of claims they allege seek restoration and retrieval of records governed by the PRA as well as review of archival systems for presidential records. As support, defendants point to the background sections of the complaints that include a description of the PRA, a partial quote from the complaints that defendants claim reflects part of the relief the plaintiffs are seeking and CREW's use of the term "White House emails," which defendants equate with presidential records. Ds' M. at 10-11. This argument is frivolous at best and grossly misleading at worst.

First, the mere inclusion of a *description* of the PRA in the background section of the complaint (Complaint, ¶¶ 24-30) cannot reasonably be equated with a *claim* for "relief relating to Presidential records." D's M. at 10. Nor is the inclusion of the PRA in the background section of the complaint surprising given that the records at issue here are commingled with presidential records[12] and the responsibilities of defendant OA include the management of both presidential and federal records. Moreover, it is certainly relevant that defendants OA and the EOP have engaged in a pattern and practice of failing to manage both presidential electronic records and federal electronic records.

Second, defendants' claim that CREW is seeking relief that would require defendants to restore and preserve presidential records rests on a blatantly inaccurate citation to CREW's complaint. According to defendants, CREW's prayer for relief seeks injunctive and mandamus relief "'[requiring] Defendants to restore deleted e-mails from the back-up tapes and to maintain and preserve the federal and presidential records comprised therein.'" Ds' M. at 10, *quoting*

---

[11] Ds' M. at 10.

[12] Complaint at ¶ 33.

Complaint at 28 ¶ 3 (emphasis in original).  In fact, however, CREW's prayer for relief seeks injunctive and mandamus relief that would require the defendants "to restore deleted e-mails from the back-up tapes and to *separately* maintain and preserve the federal and presidential records comprised therein."  Complaint, Prayer for Relief, ¶ 3.

By excluding the word "separately" (but not noting the exclusion), defendants have changed completely the meaning of the order CREW is seeking.[13]  Plaintiffs are requesting that federal and presidential records be maintained separately, rather than in a commingled form as is currently the case, because there are separate and differing obligations that attach to federal and presidential records.  Under the FRA, records "are subject to a strict document management regime supervised by the Archivist."  Armstrong v. EOP, 1 F.3d 1274, 1290-91 (D.C. Cir 1993) ("Armstrong II").  Moreover, federal records are subject to the FOIA, while presidential records are not  Id. at 1290.  These differences explain why until 2002, the White House was maintaining and preserving federal records separately from presidential records in the ARMS system.  CREW seeks an order that would return to that practice, consistent with the requirements of the FRA.  This is a far different request than defendants have represented.[14]

_____

[13] The seemingly purposeful exclusion of a key word in this quotation, with no denotation that the quotation was less than complete, is difficult to reconcile with defendants' obligations under Rule 11 of the Federal Rules of Civil Procedure.

[14] To the extent defendants are suggesting that their decision to commingle federal and presidential electronic records places the entire body of records outside the scope of this Court's review, they are mistaken.  As the D.C. Circuit has made clear, "courts are accorded the power to review guidelines outlining what is, and what is not, a 'presidential record' under the terms of the PRA."  Armstrong v. EOP, 1 F.3d 1274, 1290 (D.C. Cir. 1993).  This Court may also review "EOP guidelines" to "ensur[e] that they do not encompass within their operational definition of presidential records materials properly subject to the FOIA."  Id.  This review is "absolutely essential to preventing the PRA from becoming a potential presidential *carte blanche* to shield materials from the reach of the FOIA," as well as "the provisions of the FRA . . ."  Id. at 1292.

Third, defendants rely on a reference in CREW's complaint to "'White House emails'" as support for their argument that CREW is seeking relief outside the scope of this Court's review. D's Mem. at 11, *citing* Complaint at ¶ 103. While "White House emails" may be an imprecise term, CREW has not requested relief under the PRA.[15] On its face, "White House emails" denotes emails that are sent from or received by the White House, an accurate factual description of the emails at issue here. It provides no basis, however, to conclude that the reference is to presidential records under the PRA.

In sum, there is a complete lack of factual support for defendants' assertion that plaintiffs are seeking relief for records covered by the PRA. Given the outright misrepresentations on which defendants' argument is based, there is a serious question about whether it was lodged for an improper purpose. At a minimum, it does not provide a basis to dismiss any aspect of the complaints.

## II.  CREW HAS RAISED JUSTICIABLE CLAIMS UNDER THE FRA.

Defendants also argue that CREW's claims under the FRA must be dismissed as non-justiciable. As support, defendants again cite to paragraph 3 in the Prayer for Relief as well as an opinion from the D.C. Circuit that defendants claim precludes this Court from entering mandamus and injunctive relief that would compel the defendants to comply with their record-keeping obligations under the FRA. See Ds' M. at 12-14. Defendants are mistaken on both points.

First, as a careful review of the complaint makes clear, CREW is not requesting that the

---

[15] CREW is well aware that even if, as it appears, the White House is destroying or has destroyed records that the PRA requires be preserved, there are strict limits on this Court's ability to review violations of that Act. See supra n. 14.

Court "order the retrieval of federal records from disaster recovery tapes," as defendants erroneously claim.  See D's M. at 12.  Rather, the relief requested in Claims One through Four is directed at compelling the defendants to initiate action, through the attorney general, for the restoration of deleted federal records.  See Complaint at ¶ 54 (seeking injunction "compelling defendant Archivist pursuant to [the FRA] to request that the attorney general initiate action"); ¶ 59 (seeking injunction compelling EOP and OA under the FRA "to request that the attorney general initiate action"); ¶ 66 (seeking mandamus "ordering the defendant Archivist to comply with the statutory duty imposed by 44 U.S.C. § 2905 to request that the attorney general initiate action"); ¶ 73  (seeking mandamus "ordering the defendants EOP and OA to comply with the statutory duty imposed by 44 U.S.C. §2905 to request that the attorney general initiate action").

CREW's requested relief tracks precisely the statutory scheme Congress imposed through the FRA for the recovery of records and the role of the judiciary in enforcing compliance with that scheme that the D.C. Circuit has recognized.  In Armstrong v. Bush, 924 F.2d 282 (D.C. Cir. 1991) ("Armstrong I"), the D.C. Circuit rejected the government's claim that judicial review was precluded of a claim that then-President George H. W. Bush and the National Security Council were destroying electronic records in contravention of the FRA. Relying on the statutory scheme and congressional intent to "establish a more effective administrative enforcement process to prevent the unlawful destruction or removal of records by agency officials," 924 F.2d at 292, the court concluded that there was judicial review "of the agency head's or Archivist's refusal to seek the initiation of an enforcement action by the Attorney General," to "ensure[] that the administrative enforcement and congressional oversight provisions will operate as Congress intended."  Id. at 295.

CREW, a private litigant, is seeking the exact relief that the Armstrong I court deemed permissible and appropriate in the face of defendants' refusal to act to prevent the further destruction of federal records and to restore federal records already destroyed, namely an order requiring defendants "to fulfill their statutory duty to . . . ask the Attorney General to initiate legal action." Id. There could not be a more perfect congruence between CREW's requested relief and the relief authorized by the Armstrong I court.

Defendants' suggestions to the contrary rest once again on a demonstrably false construction of CREW's complaint. While defendants argue that "[t]o the extent that plaintiffs seek in claims one through four relief broader than that permitted by this Circuit, the FRA or the APA, plaintiffs' claims must be dismissed,"[16] they fail to identify a single place in any of those claims where CREW is, in fact, seeking relief broader than that permitted by the D.C. Circuit. The complete absence of any factual support for defendants' make-weight argument raises a question as to why it was presented in the first

Even more troubling is defendants' claim that CREW is not entitled to "specific injunctive relief based on the Armstrong I court's statement that under the APA there is "'judicial review of [whether defendants'] recordkeeping guidelines and directives' are arbitrary and capricious, or contrary to law," D's M. at 14, quoting Armstrong, 924 F.2d at 296. Relying on this partial passage from Armstrong I, defendants argue that Claims Five through Eight, which they characterize as "not seek[ing] judicial review of defendants' current recordkeeping guidelines and directives," D's M. at 14, must be dismissed.

---

[16] D's M. at 13.

In making this argument defendants have confused two distinct concepts -- scope of judicial review and remedy -- to reach a conclusion that cannot be squared with the language or holding of <u>Armstrong I</u>.  The full sentence in the <u>Armstrong</u> opinion from which defendants have pulled a fragment is under the heading "V.  Standard of Review and Proceedings on Remand," and states:

> Although the district court correctly held that the APA authorized judicial review of appellants' record-keeping guidelines and directives, it denied appellants' motion for summary judgment, pending further development of the record, on the grounds that 'a reasonable factfinder, surveying the record in the light most favorable to the plaintiffs, would [not] necessarily conclude that the guidelines are adequate."

924 F.2d at 296 (citation omitted).  As is clear from the context, the court was commenting on the standard of review and not what specific relief could be awarded, a separate issue altogether.

That CREW is challenging record-keeping practices that fit within this scope is clear from a review of its complaint.  Specifically, CREW is challenging the failure of the defendants to implement an appropriate and adequate electronic records management system and their decision after abandoning ARMS to substitute back-up tapes for such a system in addition to dumping federal record emails on White House servers, commingled with presidential records.  <u>See</u> Complaint at ¶¶ 32, 33, 39- 41, 45.  In other words, CREW is challenging record-keeping policies that rely on methods of preserving federal records that are plainly deficient when measured against the requirements of the FRA and NARA guidelines and regulations.

Defendants' real quarrel is with the relief CREW is seeking, which they characterize as "far-reaching" and outside the scope of what <u>Armstrong I</u> authorizes.  Ds' M. at 14.  As discussed above, however, this claim, rests on a fundamental misconstruction of language in

Armstrong I describing the scope of judicial review, not the propriety of specific remedies.

Indeed, on the issue of remedy, a subsequent decision in Armstrong makes clear that injunctive relief is appropriate to redress the same kinds of legal violations at issue here. When the D.C. Circuit next faced the Armstrong case in 1993 (Armstrong II), the issues before it were whether the district court had properly held that defendants' guidelines for managing electronic records did not comport with the FRA and the district court's contempt findings. The district court had entered declaratory relief in the form of an order declaring that defendants' practices were arbitrary, capricious and contrary to law. Armstrong v. EOP, 1 F.3d at 1281, *citing* Armstrong v. EOP, 810 F.Supp. 335 (D.D.C. 1993). In addition, the district court had entered injunctive relief enjoining the archivist "to 'seek the assistance of the Attorney General with notice to Congress, and take all necessary steps to preserve, without erasure, all electronic Federal Records generated at the defendant Agencies.'" Id. The district court had also "enjoined all the defendants 'from removing, deleting, or altering information on their electronic communications systems until such time as the Archivist takes action . . . to prevent the destruction of federal records, including those records saved on backup tapes.'" Id.

The D.C. Circuit affirmed these holdings, reversing only the district court's contempt findings. In response to the government's claim that the injunctive order swept too broadly, the court stated in relevant part:

> In this case, the Archivist had failed to take any actions -- formal or informal -- necessary to prevent the statutory violations . . . Given that circumstance, the district court did not abuse its discretion in ordering the Archivist to take the specific actions provided for in the statute. Similarly unpersuasive is the appellants' argument that the district court should not have enjoined the defendant agencies from destroying any electronic records until new guidelines were in place. Because

> these systems continue to produce federal records, the district
> court used its discretion appropriately in insisting upon a
> full-scale method for preventing the records' destruction until
> the agencies came up with new, adequate records management
> guidelines to replace the ones voided by the district court's
> declaratory order.

Id. at 1288 n.12.  Here, too, in Claims Five through Eight, CREW is requesting that this Court

exercise its discretion to issue appropriate injunctive relief that would require the defendants to

adopt a "full-scale method" for preventing the destruction of federal electronic records, relief

that is well within what the D.C. Circuit has sanctioned.

### III.  CREW HAS STANDING TO MAINTAIN THIS SUIT.

#### A.  CREW has suffered an injury-in-fact.

To invoke the Court's jurisdiction under Article III of the Constitution, a plaintiff must

demonstrate, as an "irreducible constitutional minimum," Lujan v. Defenders of Wildlife, 504

U.S. 555, 560 (1992), an injury-in-fact that is "fairly traceable" to the challenged act and "likely

to be redressed by the requested relief." Allen v. Wright, 468 U.S. 737, 751 (1984).  CREW's

injury, an inability to obtain through the FOIA information necessary to accomplish CREW's

mission, is directly traceable to the White House defendants' unlawful document retention

policies and procedures.  Accordingly, CREW has standing to sue.

In arguing that CREW has not suffered an injury-in-fact, defendants rely on a

mischaracterization of CREW's injuries, ignore completely case law establishing that groups like

CREW have standing to challenge an agency's failure to comply with the FRA, misrepresent the

court's ruling in Am. Friends Serv. Comm. v. Webster, 720 F.2d 29, 46 (D.C. Cir. 1983), and

advocate a theory of standing that would completely undermine Circuit precedent concerning

judicial review under the FRA.

As set forth in the complaint and the attached declaration of Melanie Sloan, CREW's executive director,[17] CREW is a frequent FOIA requester, having filed hundreds of FOIA requests since its inception, each of which included a request for electronic records, with a wide variety of agencies. Sloan Decl. at ¶ 3. At present, CREW has pending requests with OA[18] and CEQ, each of which seeks emails. Id. at ¶¶ 3, 5. Given CREW's understanding that a significant percentage of CEQ's emails are among the missing email, it is virtually certain that those email include records CREW has requested under the FOIA.[19] Id. at ¶ 6. Moreover, CREW will continue to file FOIA requests, including requests of agencies within the EOP, given CREW's commitment to transparency in government, its efforts to combat the actions of this administration to undermine transparency in government and CREW's commitment to educating citizens about how President Bush and his administration perform their duties and responsibilities. Sloan Decl. at ¶ 8.

---

[17] As defendants acknowledge, this Court may properly consider matters outside the complaint in deciding plaintiff's standing. Ds' M. at 8-9.

[18] Defendants argue that this request cannot support CREW's standing because OA is not an agency. Ds' M. at 17 n.5. CREW has demonstrated in CREW v. OA, Civil No. 07-964 (CKK,) that such an assertion is false as a matter of fact and law. For the Court's convenience a copy of CREW's opposition brief is attached as Exhibit 3. In any event, even if OA were not an agency, it nevertheless would have an obligation to process CREW's request and release non-exempt material pursuant to its administrative decision to process CREW's FOIA request on an expedited basis and a subsequent court-ordered timetable for completing processing.

[19] According to defendants, CREW's allegations are too "conclusory" to be accepted by this Court. Ds' M. at 17 n.5. The problem, however, is that defendants are in exclusive control of the facts that would establish definitively that emails CREW seeks have been deleted or are subject to deletion on an ongoing basis and to date has resisted all discovery on this issue as well as refusing to produce records in response to CREW's FOIA request of OA. Compare Environmental Defense Fund v. Wheelabrator Technologies, Inc., 725 F.Supp. 758, 774 (S.D.N.Y. 1989) ("Although EDF makes no particular showing that hazardous waste is in fact accepted by the Facility, it could not have done so as the facts necessary to that showing are within the exclusive control of defendants, and discovery has not yet been taken").

As a result, CREW has a direct interest in ensuring that White House records are maintained, preserved and made accessible to the public as federal law requires, given the critical importance of this administration's records to CREW's mission. Sloan Decl. at ¶¶ 3, 8. If CREW cannot obtain records of how the president and other public officials perform in office, it cannot fulfill a central tenet of its mission. Id. at ¶ 8. It necessarily follows that CREW is harmed by the failure of the White House defendants to restore the missing email and to maintain, on an ongoing basis, an effective electronic records management system that would ensure continued preservation of all federal electronic records.

Despite the specificity and concreteness of CREW's injuries, defendants argue that CREW lacks standing because it is asserting a grievance that is "'shared in substantially equal measure by all or a large class of citizens.'" Ds' M. at 16 (citation omitted). This argument ignores the fact that CREW, as a non-profit, non-partisan watchdog group, was established for the express purpose of disseminating information to the public that sheds light on the conduct of public officials, and that it does so through the publication of reports and the public dissemination of documents it obtains through the FOIA on its website. Sloan Decl. at ¶¶ 2-4. In this regard, CREW stands apart from the public at large and this distinction is sufficient to establish its standing to sue. Compare Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C. Cir. 1990) ("if an organization points to a concrete and demonstrable injury to its activities . . .the organization passes through the first [standing] gateway").

Defendants also point to this Circuit's opinion in Am. Friends Serv. Comm. v. Webster, 720 F.2d 29, 56 (D.C. Cir. 1983) as well as the district court's decision below, which they claim stand for the proposition that the sufficiency of a claim of harm based on the denial of access to

records is "questionable."  Ds' M. at 17.  The law, in fact, is to the contrary.

First, the D.C. Circuit's discussion of standing in <u>Webster</u> focuses exclusively on whether the plaintiffs were within the zone of interests of the federal record-keeping laws, as this was the only standing issue the government challenged on appeal.[20]  720 F.2d at 47.  Thus, its opinion cannot properly be read as questioning whether a group like CREW that uses information derived from the FOIA to achieve its core mission and that has been frustrated in meeting its mission by the White House defendants' policy of knowingly using an email storage system that is susceptible to electronic records being destroyed has suffered an injury in fact.

Moreover, contrary to defendants' suggestion, post-<u>Webster</u> cases make clear that denial of information such as that occurring here constitutes an injury-in-fact.  For example, in <u>Federal Election Comm'n v. Akins</u>, 524 U.S. 11 (1998), the Supreme Court found that a plaintiff had standing to challenge the Federal Election Commission's refusal to disclose campaign-related contributions and expenditures as the Federal Election Campaign Act requires, reasoning that informational harm is sufficiently concrete and specific to constitute an injury-in-fact.  Likewise in <u>Public Citizen v. Dep't of Justice</u>, 491 U.S. 440 (1989), the Supreme Court recognized that denial of access to committee meetings and records under the Federal Advisory Committee Act constituted an injury-in-fact for Article III purposes.  And, in <u>Dep't of Justice v. Reporters Comm. for Freedom of the Press</u>, 489 U.S. 749 (1989), a suit under the FOIA challenging the agency's denial of a request for specific agency records, the denial of those records constituted an injury-in-fact.

---

[20] Here defendants are not challenging whether plaintiffs are within the zone of interests of the FRA, a challenge defendants could not bring in any case given the D.C. Circuit's opinion in <u>Armstrong I</u>, 924 F.2d at 287-88.

Defendants also ignore completely the one decision most closely on point, Public Citizen v. Carlin, 2 F.Supp.2d 1 (D.D.C. 1997), rev'd on other grounds, 184 F.3d 900 (D.C. Cir. 1999). Plaintiffs there were challenging the lawfulness of a general records schedule issued by the archivist that governed the disposal of electronic agency records. There, as here, the government argued that plaintiffs lacked standing because they had not suffered an injury-in-fact. The court disagreed, reasoning that the individual plaintiffs and plaintiff organizations had made FOIA requests for electronic records in the past, some had pending requests and at least one had "reason to make future requests for such records for research projects . . ." 2 F.Supp. 2d at 6. In concluding that the plaintiffs had suffered an injury-in-fact, the court relied on declarations demonstrating that the plaintiffs "face a real risk that records will not be available to them in electronic form because of the implementation of [general records schedule 20], even though the 1996 amendments to the FOIA specifically allow the plaintiffs to request records in electronic form." Id. (citation omitted).

Here, too, CREW faces a real risk that if defendants' unlawful record-keeping practices continue, emails CREW has requested and will request in the future[21] will not be available to it. This is not mere speculation;[22] reliance on the current system has already led to the deletion of many millions of emails and the absence of any safeguards on an ongoing basis almost guarantees that additional emails have been and will continue to be deleted. With past, current

---

[21] While defendants argue that future harm is too speculative to confer standing (Ds' M. at 19), it is settled law that "[one] does not have to await the consummation of threatened injury to obtain preventive relief." Blum v. Yaretsky, 457 U.S. 991, 1001 (1982); see also Public Citizen v. Burke, 655 F.Supp. 318, 320 (D.D.C. 1987), aff'd, 843 F.2d 1473 (D.C. Cir. 1988).

[22] See Ds' M. at 20.

and anticipated future FOIA requests, CREW has standing to maintain this suit.[23]

### B. CREW's claims are redressable.

Defendants also challenge CREW's standing on redressability grounds, claiming that full relief is dependent on the actions of the attorney general, who is not a party to this suit. Ds' M. at 22. This argument, if accepted, would make a nullity of the D.C. Circuit's determination in Armstrong I that suits such as CREW's are critical to ensuring that the enforcement and oversight provisions of the Federal Records Act function as Congress intended. As the Court explained,

> Unless the Archivist notifies the agency head (and, if necessary, Congress) and requests the Attorney General to initiate legal action, the administrative enforcement and congressional oversight provisions will not be triggered, and there will be no effective way to prevent the destruction or removal of records. Thus, if the agency head or Archivist does nothing while an agency official destroys or removes records in contravention of agency guidelines and directives, private litigants may bring suit to require the agency head and Archivist to fulfill their statutory duty to notify Congress and ask the Attorney General to initiate legal action.

921 F.2d at 295.[24] See also id. at n.12 ("We emphasize the mandatory statutory language because it indicates that the agency head and Archivist are required to take action to prevent the

---

[23] Defendants also rely on the court's conclusion in Am. Historical Ass'n v. NARA, 310 F.Supp.2d 216, 228 (D.D.C. 2004), that plaintiffs there lacked standing to challenge an executive order governing presidential records because they had no outstanding requests for presidential records. Ds' M. at 21. What defendants fail to account for, however, is that CREW has outstanding requests with both OA and CEQ, either one of which is sufficient to confer standing.

[24] In Armstrong, as here, the attorney general was not a party to the litigation. This did not affect the Court's conclusion that suit was proper to trigger the administrative enforcement and congressional oversight provisions of the FRA.

unlawful destruction or removal of records *and, if they do not, private litigants may sue under the APA to require them to do so.*") (emphasis added).

Defendants' argument also fails to take into account the four claims in the complaint that address defendants' failure to implement and maintain an adequate system to preserve federal records under the FRA. Full relief on these claims does not involve the actions of a third party. For example, Claim Five seeks an declaratory and injunctive relief compelling the archivist to ensure the establishment of an adequate electronic records management system at the White House, while Claim Six seeks the same relief from the White House defendants. Claim Seven seeks mandamus relief against the archivist compelling him to comply with his statutory duties, while Claim Eight seeks the same relief against the White House defendants. In arguing that plaintiffs' claims are not redressable, defendants conveniently ignore one-half of the complaint.

Simply stated, the defendants have failed to fulfill their mandatory statutory duties, a violation that would be redressed by an order of this Court directing them to notify Congress and request that the attorney general initiate legal action as well as injunctive and mandamus relief compelling them to meet their statutory obligations to have an effective electronic records management system in place. Accepting defendants' contrary redressability argument is tantamount to saying that no one save the attorney general can bring suit to enforce the provisions of the FRA, a proposition that is directly contradicted by the D.C. Circuit's decision in <u>Armstrong I</u>.

**IV.  MANDAMUS RELIEF IS APPROPRIATE HERE TO FULLY REDRESS DEFENDANTS' FAILURE TO COMPLY WITH THEIR NON-DISCRETIONARY OBLIGATIONS.**

Relying on a single district court case, defendants argue that plaintiffs' requests for writs of mandamus must be dismissed because plaintiffs are seeking the same relief under the APA. Ds' M. at 22.  The case they cite, however, does not compel that result.

In <u>Am. Chiropractic Ass'n v. Shalala</u>, 108 F.Supp.2d 1 (D.D.C. 2000), the court considered plaintiff's request for mandamus relief to redress its claim that Medicare beneficiaries were wrongfully denied access to certain chiropractor services.  Relying in large part on the Supreme Court's prior ruling that "mandamus relief is not appropriate where a party has an available administrative remedy under the Medicare program,"[25] and the availability of administrative review, the court concluded that it did not have jurisdiction under the Mandamus Act.  108 F.Supp.2d at 11-12.

The instant case presents very different facts.  First, plaintiffs have no administrative process to pursue outside of this Court for relief from defendants' failure to comply with their record-keeping obligations.  Although the FRA imposes a wide variety of duties and obligations on the defendants, it does not afford plaintiffs any administrative avenue to challenge defendants' failure to meet those duties and obligations before the agency.  This litigation represents plaintiffs' only hope of ensuring the proper preservation of the White House defendants' federal records.  Second, if -- as defendants have argued -- the full relief plaintiffs seek were not available under the APA (something CREW disputes), then mandamus relief

---

[25] <u>Id.</u> at 11, *citing* <u>Heckler v. Ringer</u>, 466 U.S. 602, 617 (1984)

would be both necessary and appropriate.[26]

## V.  EOP IS A PROPERLY NAMED PARTY.

Finally, defendants argue that because only those EOP components subject to the FRA are properly named defendants, the EOP must be dismissed.  Ds' M. at 23.  This argument ignores the plain language of the complaint, which makes clear that defendant EOP "includes the agency known as the EOP as well as its individual agency components that are subject to the Federal Records Act."  Complaint, ¶ 9.  There is simply no merit to defendants' careless claim that the complaint "sweep[s] in components that are not subject to the FRA."  Ds' M. at 23.

Defendants also fail to mention, much less distinguish, the one decision on the issue of whether the EOP is a proper party to a lawsuit challenging the exercise of authority under the FRA, Public Citizen v. Carlin, 2 F.Supp.2d 1, 8 (D.D.C. 1997).[27]  In Public Citizen Judge Friedman rejected the government's claim, similar to that made here, that permitting a lawsuit to go forward against the EOP would risk subjecting entities not governed by the FRA to any relief ordered by the court.  Relying on the FOIA's inclusion of the EOP as an agency for purposes of that statute as well as the EOP's "authority . . . to impose requirements on all of the EOP components in certain matters," specifically "the preparation of records disposition schedules" and the fact that administration of EOP records "is handled by and on behalf of the EOP as a

---

[26] On the merits of plaintiffs' request for mandamus relief, defendants do not deny that plaintiffs seek to enforce a clear, nondiscretionary duty, the necessary predicate for mandamus relief.  Of course, the court's ruling in Armstrong I emphasizing the statutory duties that the FRA imposes on the archivist and agency head would foreclose such a challenge.  See 924 F.2d at 295.

[27] Although the issue was raised in Armstrong II, the court deemed it waived because the government never raised the issue below.  See 1 F.3d at 1282 n.4.

single entity," Judge Friedman concluded that the EOP was a proper party to the lawsuit.  Id. at

9.    Here, as in Public Citizen, the EOP acts as a single entity for purposes of administering

White House records.  As set forth in the complaint, White House servers contain emails in a

commingled form from all EOP components.  See Complaint at ¶ 33.  Just as significantly,

maintaining the EOP as a defendant here, as in Public Citizen, "will not affect components of the

EOP that are not governed by the FRA," 2 F.Supp.2d at 9, given the clarification in the

complaint that defendant EOP includes those components that are subject to the FRA.

Complaint at ¶ 9.  Accordingly, defendants motion to dismiss the EOP as a party defendant must

be denied.

## CONCLUSION

        For the foregoing reasons, defendants' joint motion to dismiss must be denied.  Pursuant

to LCvR 7(f), CREW respectfully requests an oral hearing on this matter.

                                        Respectfully submitted,

                                        /s/ Anne L. Weismann
                                        Anne L. Weismann
                                        (D.C. Bar No. 298190)
                                        Melanie Sloan
                                        (D.C. Bar No. 434584)
                                        Citizens for Responsibility and Ethics
                                          in Washington
                                        1400 Eye Street, N.W., Suite 450
                                        Washington, D.C.  20530
                                        Phone:  (202) 408-5565
                                        Fax:  (202) 588-5020

                                        Attorneys for Plaintiff CREW

Dated: December 12, 2007

# EXHIBIT 1

2 of 2 DOCUMENTS

CNN

December 5, 2007 Wednesday

**SHOW:** THE SITUATION ROOM 5:00 PM EST

# Omaha Mall Shootings; Iran's Nuclear Program; Terror Suspects Fight for Rights; Clinton Vote on Iran a "Mistake"; State of Emergency in Northwest; Modern-Day "Bonnie and Clyde"

**BYLINE:** Wolf Blitzer, Carol Costello, Jack Cafferty, Ed Henry, Michael Ware, Jamie McIntyre

**SECTION:** NEWS; International

**LENGTH:** 8552 words

**HIGHLIGHT:** Full coverage of the latest on the shootings at a mall in Omaha, Nebraska. Henry reports the latest attempts by President Bush to pressure Iran.

BLITZER: But let's begin with the breaking news. We're getting new details on that story we have been following for the past couple of hours. Multiple shots fired inside a mall department store in Omaha, Nebraska. There are now believed to be at least five victims, with two of them now reported dead.

Carol Costello is monitoring developments for us for us.

She's joining us now with the latest.

What do we know -- Carol.

CAROL COSTELLO, CNN CORRESPONDENT: Yes, Wolf.

As far as we know right now, police in Omaha, Nebraska still searching that mall, going from store to store, searching for a gunman, someone -- either one or two people -- opened fire inside of that department store you were talking about, called Von Maur. And, according to witnesses, shot one man in the head and another man on a cell phone who was calling 911.

Hospital officials are saying now that a man and woman are dead and there is another woman in the hospital right now in critical condition.

Other witnesses inside the store told us they heard five or six shots. Other witnesses said they heard 20 to 30 shots. We saw at least two people taken from the mall on stretchers. We're hearing at least five or more people have been injured besides those that dead that I told you about.

Now, as I said, police are still going store to store. So some people reportedly are still holed up inside that mall, hiding in back rooms. The mall is locked down until police can wrap this thing up. Witnesses do say they saw some shoppers coming from the mall with hands on top of their head. And that's probably because police want to get them out of the mall and they want to make sure those people are not the gunman, so they're telling them to put their hands on their head.

We do know, Wolf, as you said, a man and woman dead. That's according to hospital officials. And one woman is in very critical condition. Five or more injured -- maybe up to 10. We just don't know. One local affiliate reporting that there was a man in

In the meantime, let's check back with Jack Cafferty. He's got The Cafferty File.

The White House quickly reacting, Jack...

CAFFERTY: They did, yes.

BLITZER: ...to your e-mail question...

CAFFERTY: I have a statement from the...

BLITZER: ...of the last hour.

CAFFERTY: I have a statement here, Wolf, from the White House concerning the Citizens for Responsibility and Ethics in Washington, which is a private citizen government watchdog group that asserts that there are 10 million missing White House e-mails.

The acronym for that group is CREW. The statement is as follows: "CREW has yet to provide any basis for their assertion, be it their original assertion -- five million e-mails -- or their new claim. We are aware that some e-mails may not have been automatically archived in the past, but they may be available on backup tapes. Unlike what the liberal group CREW has asserted, we have never been without a backup system. The Office of Administration at the White House has been maintaining and preserving backup tapes for the official e-mail system."

Now, on to other things. You remember those heady days when home prices were rising like the tech stocks did back in the late 1990s?

The housing market was on fire. Subprime mortgage loans, rapidly rising housing prices -- well, that was a combination simply too to pass up for a lot of people. The trouble is, those things never last. And when that bubble burst, the hangover from the real estate party is turning out to be much worse than anyone expected.

Real estate foreclosures have now risen to the point that they are threatening the overall economy. People who were enticed into buying more house than they could afford because of very low teaser mortgage rates are now seeing those mortgage payments rise when the loans are being adjusted upward. And a lot of people simply can't afford the higher house payments and they're losing their homes.

Enter the federal government. President Bush is expected to outline a plan tomorrow to freeze mortgage rates for five years for many U.S. homeowners who are facing these sharp increases in their monthly payments. Officials say the plan could help prevent up to a half a million borrowers from possibly losing their home this next year.

The program will be aimed at borrowers who can afford their existing rates and who are current on their payments, but could -- who possibly could face default when their mortgage resets at a higher interest rate next year.

So the question we're posing this hour is this -- should the federal government bail out homeowners who are facing foreclosure because of rising interest rates?

E-mail your thoughts to caffertyfile@CNN.com or go to CNN.com/caffertyfile -- Wolf.

BLITZER: Jack, thanks very much.

Coming up, criticism for the Democratic presidential frontrunner, Hillary Clinton, from one of her rivals.

(BEGIN VIDEO CLIP)

GOV. BILL RICHARDSON (D), PRESIDENTIAL CANDIDATE: Well, she is qualified. But she made a mistake in voting for that resolution. That was saber rattling.

(END VIDEO CLIP)

BLITZER: Democratic presidential candidate Bill Richardson joining us in THE SITUATION ROOM. You're going to find out what else he has to say about Hillary Clinton and a lot more.

Also, Washington State now reeling from the worst flooding in decades. Hundreds of people are rescued from their homes.

**EXHIBIT 2**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 07-01707 (HHK/JMF) |
| | ) | |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| NATIONAL SECURITY ARCHIVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 07-01577 (HHK) |
| | ) | |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF MELANIE SLOAN

I, Melanie Sloan, hereby declare as follows:

1. I am the executive director for Citizens for Responsibility and Ethics in Washington ("CREW"), plaintiff in the above-captioned case. I have held this position since February 5, 2003. As executive director my responsibilities include approving legal actions that the organization decides to initiate, writing and reviewing court and administrative filings and reports and disseminating information publicly regarding the conduct of government officials.

2. CREW is a non-profit, non-partisan ethics watchdog group organized under section 501(c)(3) of the Internal Revenue code. CREW was formed in October 2002, and seeks to deter

the unethical and illegal conduct of public officials by publicly disseminating information

regarding their conduct.  CREW believes that by its dissemination of information abut public

officials, citizens are empowered to have an influential voice in government decisions and the

governmental decision-making process.

3.  To advance its mission, CREW uses a combination of research, litigation, advocacy

and public education.  As part of its research, CREW relies heavily on the Freedom of

Information Act ("FOIA").  Since 2003, CREW has filed hundreds of FOIA requests with a wide

variety of government agencies.  Virtually all of these requests have included requests for

electronic records.  The most effective tool CREW has to advance its mission is the

dissemination of information CREW gains from these processes, including the FOIA.

4.  CREW uses documents it obtains from the FOIA for, among other things, reports that

it issues.  For example, in July 2006, CREW issued a report, Best Laid Plans, that details the

Federal Emergency Management Agency's plan to respond to a hurricane of Katrina's magnitude

and its subsequent failure to implement that plan.  This report was based in large part on

documents obtained through FOIA requests of the U.S. Department of Homeland Security.  In

addition, CREW has created an interactive website, www.governmentdocs.org, on which CREW

and a growing number of other organizations post for public review documents obtained through

the FOIA.

5.  With respect to the Executive Office of the President ("EOP"), CREW currently has

FOIA requests pending with the Office of Administration ("OA") and the Council on

Environmental Quality ("CEQ"), each of which is also the subject of litigation brought by

CREW.  CREW's request of OA seeks, *inter alia*, documents OA prepared when it discovered

that more than 10 million emails are missing from White House servers. CREW understands that those documents include analyses of the number of missing emails, the dates for which emails are missing and the EOP components for which emails are missing. CREW has also requested that OA produce the recovery plan for the missing emails that OA prepared but that was never implemented. To date, OA has refused to produce any of these documents and most recently has taken the position that it is no longer an agency subject to the FOIA. CREW's FOIA request of the OA is part of CREW's ongoing and concerted effort to hold the White House accountable for its multiple violations of record-keeping laws and regulations.

6. CREW's FOIA request with CEQ seeks, among other things, records that would document the administration's efforts to subvert the scientific evidence of global warming and climate change. CREW understands that a significant portion of CEQ's emails for the period March 2002 through October 2005 are among the emails missing from White House servers. Accordingly, CREW believes there is a high degree of likelihood that those missing emails include records that are responsive to CREW's FOIA request of CEQ.

7. CREW's past FOIA requests include requests with the Office of Management and Budget, another EOP component. CREW will continue to file FOIA requests in the future, including requests of EOP components, given the critical importance of this administration's records to CREW's mission.

8. As a result of the FOIA requests CREW has filed in the past, has pending with EOP components and will file in the future, CREW has a direct interest in ensuring that White House records are maintained, preserved and made accessible to the public as federal law requires and that the deleted emails are restored and available for public access. CREW is committed to

3

transparency in government and is attempting through its FOIA requests to combat the actions of

this administration to undermine that transparency.  In addition, CREW is committed to

educating the public about how President Bush and his administration perform their duties and

responsibilities.  If CREW cannot obtain the records it is seeking through its FOIA requests, it

cannot fulfill a central tenet of its mission.

    I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _12/12/07_

                                         _____
MELANIE SLOAN
Executive Director
Citizens for Responsibility and
 Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
(202) 408-5565

4

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND :
ETHICS IN WASHINGTON,                       :
                                                            :
            Plaintiff,                                  :
                                                            :
    v.                                                     :          Civil Action No. 07-0964 (CKK)
                                                            :
OFFICE OF ADMINISTRATION,           :
                                                            :
            Defendant.                               :
_____:

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
## FOR JUDGMENT ON THE PLEADINGS

Respectfully submitted,


ANNE L. WEISMANN
(D.C. Bar No. 298190)
MELANIE SLOAN
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
  in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone:  (202) 408-5565
Fax:  (202) 588-5020


Attorneys for Plaintiff

September 4, 2007

## <u>TABLE OF CONTENTS</u>

**PAGE(S)**

STATEMENT.................................................................................................. 1

BACKGROUND............................................................................................. 3

    A. The Office Of Administration.................................................... 3

    B. CREW's FOIA Request, OA's Response And This Litigation............................... 6

ARGUMENT................................................................................................... 9

I. THE ISSUE OF WHETHER OA IS AN AGENCY FOR PURPOSES OF THE
   FOIA CANNOT BE DECIDED ON THE BASIS OF THE PLEADINGS...................... 9

    A. Standard For Judgment On The Pleadings............................................. 9

    B. The Pleadings Here Do Not Establish As A Factual Matter That OA
       Is Not An Agency Under The FOIA.................................................... 10

II. PLAINTIFF MUST BE AFFORDED DISCOVERY ON THE AGENCY ISSUE
    GIVEN THAT THE RELEVANT EVIDENCE RESTS SOLELY WITH THE
    GOVERNMENT........................................................................................ 18

III. ALTERNATIVELY THE COURT SHOULD RULE THAT OA IS AN
    AGENCY SUBJECT TO THE FOIA.......................................................... 20

CONCLUSION................................................................................................ 26

### TABLE OF AUTHORITIES

**CASES**                                                                  **PAGE(S)**

Armstrong v. Executive Office of the President,
     90 F.3d 553 (D.C. Cir. 1996)............................................................ passim

Bell Atlantic Corp. v. Twombly,
     127 S.Ct. 1955 (2007)...................................................................  9

Covad Communications Co. v. Bell Atlantic Corp.,
     407 F.3d 1220 (D.C. Cir. 2005)........................................................  10

*Electronic Privacy Information Center v. Office of Homeland Security,
     Civil Action No. 02-620 (CKK).......................................................  passim

EEOC v. St. Francis Xavier Parochial Sch.,
     117 F.3d 621 (D.C. Cir. 1997).........................................................  10

Fay v. Perles,
     484 F.Supp.2d 12 (D.D.C. 2007).....................................................  9

Goldgar v. Office of Administration,
     26 F.3d 32 (5th Cir. 1994)...............................................................  23

Kissinger v. Reporters Committee for Freedom of the Press,
     445 U.S. 136 (1980)........................................................................  21

Land v. Dollar,
     330 U.S. 731 (1947)........................................................................  20

*Meyer v. Bush,
     981 F.2d 1288 (D.C. Cir. 1993).......................................................  passim

*National Security Archive v. Archivist,
     909 F.2d 541 (D.C. Cir. 1990).........................................................  22

Pacific Legal Foundation v. Council on Environmental Quality,
     636 F.2d 1259 (D.C. Cir. 1980).......................................................  21,26

Rushforth v. Council of Economic Advisers,
     762 F.2d 1038 (D.C. Cir. 1985).......................................................  3,18,25

Schuchart v. La Taberna Del Alabardero, Inc.,
    365 F.3d 33 (D.C. Cir. 2004)............................................................. 9

*Soucie v. David,
    448 F.2d 1067 (D.C. Cir. 1971)........................................................11,25,21

Sweetland v. Walters,
    60 F.3d 852 (D.C. Cir. 1995)............................................................ 15,16

Wilderness Soc'y v. Griles,
    824 F.2d 4 (D.C. Cir. 1987).............................................................. 18,20

Wise v. Glickman,
    257 F.Supp.2d 123 (D.D.C. 2003)..................................................... 10

## STATUTES AND REGULATIONS

5 U.S.C. § 552..........................................................................................11,23

5 C.F.R. Part 2502, 42 Fed. Reg. 47112 (July 14, 1980).................................. 4

5 C.F.R. § 2502.16.................................................................................. 4,23

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 12(c)................................................................................ 9,10

## LEGISLATIVE MATERIAL

H.R. Conf. Rep. No. 93-1380, 93d Cong., 2d Sess. 14 (1974)........................... 11

S. Conf. Rep. No. 1200, 93d Cong., 2d Sess. 15 (1974)................................... 11

## MISCELLANEOUS

Reorganization Plan No. 1 of 1977, § 2, 42 Fed. Reg. 56101, 91 Stat. 1633...................... 3

*Executive Order No. 12028, 42 Fed. Reg. 62895 (Dec. 12, 1977)...................... passim

*Executive Order No. 12122, 44 Fed. Reg. 11197 (Feb. 26, 1979)...................... passim

* cases and authorities chiefly relied upon

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 07-0964 (CKK) |
| | : | |
| OFFICE OF ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
## FOR JUDGMENT ON THE PLEADINGS

### STATEMENT

As this Court has recognized in the past, in determining whether an entity of the Executive Office of the President ("EOP") is an agency for purposes of the Freedom of Information Act ("FOIA") it is "at the very least, helpful, if not required" to have deposition testimony and other evidence on issues such as the degree of independent authority that an entity in fact exercises. Electronic Privacy Information Center v. Office of Homeland Security, Civil Action No. 02-620 (CKK), Memorandum Opinion, December 26, 2002, p. 12 (attached as Exhibit 1). Public documents such as executive orders simply do not provide "definitive proof" of an EOP entity's status as a non-agency. Id. at 12.

Notwithstanding the approach that this Court and the D.C. Circuit have sanctioned as necessary for resolving the agency issue, the Office of Administration ("OA") asks the Court here to rule solely on the basis of the pleadings that OA is not an agency. To be sure, OA attaches public documents to its motion that it suggests the Court can consider beyond the pleadings -- precisely the kind of documents this Court has eschewed as definitive proof of

agency status – but asks the Court to confine its review to the facts presented in the pleadings.

Not only is OA's approach analytically unsound, but the publicly available facts strongly suggest, if not prove conclusively, that OA is an agency subject to the FOIA.  Completely missing from OA's brief -- whether by intention or design -- is any mention of the language in the executive order establishing OA that makes clear OA is to provide administrative support and services "to all units within the Executive Office of the President, *except for such services provided primarily in direct support of the President.*"[1]  A subsequent provision of that executive order states unequivocally that the effect of the order is to transfer to OA primary responsibility for "performing all administrative support and service functions of units" within EOP "*except to the extent those functions are performed by the White House Office primarily in direct support of the President.*"[2]  The clear and repeated language of the executive order limiting OA's responsibilities makes the government's failure to even mention, much less explain, this language all the more inexcusable.

OA's litigating position here also cannot be reconciled with its consistent prior practice of holding itself out as subject to the FOIA.  Like other EOP entities that the D.C. Circuit deemed to be agencies, OA has published FOIA regulations, has responded consistently to FOIA requests, and in all other respects has acted as an agency under the FOIA.  OA's attempt here to adopt an "on-again off-again definition" of itself as an agency[3] must therefore fail.

---

[1] Executive Order No. 120028, § 3, 42 Fed. Reg. 62785 (Dec. 12, 1977) (emphasis added).

[2] Id., § 5 (emphasis added).

[3] See, e.g., Rushforth v. Council of Economic Advisers, 762 F.2d 1038, 1041 (D.C. Cir. 1985).

At an absolute minimum, this Court cannot on the basis of the pleadings -- even as amplified by public documents such as executive orders and budget submissions -- "foreclose the possibility that [OA] is an agency."[4]  Instead, the issue of OA's agency status can be resolved only after appropriate discovery, including depositions, that elicits facts concerning the actual nature of the authority OA enjoys, its operational proximity to and relationship with the president, and its organizational structure.

## BACKGROUND

### A.  The Office Of Administration

The Reorganization Plan No. 1 of 1977 established the Office of Administration within the EOP and directed that it "shall provide components of [EOP] with such administrative services as the President shall from time to time direct."  Reorganization Plan No. 1 of 1977, § 2, 42 Fed. Reg. 56101, 91 Stat. 1633.  Subsequently, through Executive Order 12028 President Jimmy Carter clarified more specifically OA's duties and responsibilities.  In particular, that executive order provides:

> The Office of Administration shall provide common administrative support and services to all units within the Executive Office of the President, except for such services provided primarily in direct support of the President.

Executive Order No. 12028, § 3(a), 42 Fed. Reg. 62895 (Dec. 12, 1977) ("EO 12028").  The exclusion of the president from OA's primary responsibilities is also echoed in section 5 of EO 12028:

> The primary responsibility for performing all administrative support

---

[4] Electronic Privacy Information Center v. Office of Homeland Security, Civil Action No. 02-620 (CKK), Memorandum Opinion, December 26, 2002 at 9 ("EPIC Op.").

3

> and service functions of units within the Executive Office of the
> President shall be transferred and reassigned to the Office of
> Administration; except to the extent those functions are vested by
> law in the head of such a unit, other than the President; and except
> to the extent those functions are performed by the White House
> Office primarily in direct support of the President.

EO 12028, § 5.

President Carter subsequently amended EO 12028 through Executive Order No. 12122,

which provides in pertinent part as follows:

> Subject to such direction or approval as the President may provide
> or require, the Director shall organize the Office of Administration,
> contract for supplies and services, and do all other things that the
> President, as head of the Office of Administration, might do.

Executive Order No. 12122, § 4(a), 44 Fed. Reg. 11197 (Feb. 26, 1979) ("EO 12122").

In 1980, OA published its first FOIA regulations establishing procedures to obtain

records from OA. 5 C.F.R. Part 2502, 42 Fed. Reg. 47112 (July 14, 1980) (attached as Exhibit

2).[5] Among other things, OA's initial FOIA regulations provided that "all records by the Office

of Administration are available to the public, *as required by the Freedom of Information Act*."

Id. at Part 2502.16 (emphasis added). OA's current FOIA regulations, also found at 5 C.F.R.

Part 2502, contain this same provision. See 5 C.F.R. § 2502.16.

In addition to providing access to OA's FOIA regulations, the official White House

website – www.whitehouse.gov -- provides a wealth of other information concerning OA's

compliance with the FOIA. For example, the website posts OA's annual FOIA reports dating

---

[5] Although these regulations, together with documents available from the White House's
own website discussed below, are not part of the pleadings, this Court can take judicial notice of
them as publicly-available documents to the same extent the government has requested that the
Court take judicial notice of OA's budget submissions.

back to 1996. See www.whitehouse.gov/oa/foia/readroom.html. Among other things, those

reports reveal the number of FOIA requests OA receives and processes each fiscal year and the

basis for any withholdings the agency has made. For example, in Fiscal Year 2006, OA received

67 FOIA requests. See www.whitehouse/gov/oa/foia/foia2006.pdf.

Until this past weekend, the White House's official website also explained in two

separate places how FOIA works within the EOP. As provided therein, "The President's

immediate personal staff and units within the EOP whose sole function is to advise and assist the

President are not subject to FOIA." www.whitehouse.gov/oa/foia/eop-foia.html;

www.whitehouse.gov/oa/foia/handbook.html.[6]   The site went on to list the specific EOP entities

that are subject to the FOIA:

> Council on Environmental Quality
> Office of Administration
> Office of Management and Budget
> Office of National Drug Control Policy
> Office of Science and Technology Policy
> Office of the United States Trade Representative.

Id. Also listed were the six entities considered exempt from FOIA's provisions. Id. In addition,

the Department of Justice's website listing of principal FOIA contacts at federal agencies

includes OA. See www.usdoj.gov/oip/foiacontacts.html.[7]

---

[6] Copies of these postings as they existed as of August 31, 2007, are attached as Exhibit
3. The White House's eleventh-hour changes made during the pendency of litigation over OA's
status cannot erase its prior consistent treatment of the OA as an agency subject to the FOIA.

[7] DOJ's listing also includes under the heading Executive Office of the President the five
other EOP components that the White House's website denotes as agencies subject to the FOIA
(Council on Environmental Quality, Office of Management and Budget, Office of National Drug
Control Policy, Office of Science and Technology Policy and Office of the United States Trade
Representative) in addition to the Privacy and Civil Liberties Oversight Board. Id.

### B.  CREW's[8] FOIA Request, OA's Response And This Litigation

Based on information CREW received that a massive amount of email -- at least five million -- during a two and one-half year period mysteriously went missing from White House servers CREW sent a FOIA request to OA on April 16, 2007, seeking documents OA had assembled and prepared related to the loss of EOP email records.  See Exhibit A to Complaint. On April 18, 2007, CREW sent a second clarifying request that delineated four categories of records CREW is seeking, all related to the loss of email and proposals developed to restore the deleted email as well as implement a new electronic record-keeping system that would ensure proper preservation of records under both the Federal Records Act and the Presidential Records Act.  See Exhibit B to Complaint.  CREW's requests also sought a waiver of fees as well as expedition for the express purpose of disseminating any responsive documents to the public based on the widespread and exceptional media interest in the White House emails, the revelations about the use by high-ranking EOP officials of outside email accounts and the fact that the White House has known since the fall of 2005 that at least five million emails are missing from its records management system, but has done nothing to address or fix the problem. Exhibits A and B to Complaint.

By letter dated April 27, 2007, OA acknowledged receipt of CREW's requests and granted the requests for a fee waiver and expedited processing.  Exhibit C to Complaint.  OA also stated, however, that due to "unusual circumstances" it could neither process the requests within FOIA's mandatory time-frames nor could it provide an anticipated date for completing

---

[8] CREW is the acronym for plaintiff Citizens for Responsibility and Ethics in Washington.

processing. Id.

On April 30, 2007, CREW sent a follow-up letter to OA explaining that OA's assessment

that CREW was seeking an "extensive list of records" was inaccurate. Exhibit D to Complaint.

When OA failed to respond to this letter or provide CREW with an anticipated date for

completing processing, CREW filed the complaint in this matter on May 23, 2007, along with a

motion for a preliminary injunction.

At the direction and assistance of the Court, the parties negotiated a time-table for OA to

process CREW's prioritized categories of documents that resolved the pending motion for

emergency relief. See Order of June 4, 2007, as modified by Order of June 7, 2007.[9] At no time

during those discussions did OA suggest it was not subject to the FOIA.

Pursuant to the Court's Orders, OA made its first response on June 21, 2007. There, for

the first time, OA stated that it was processing CREW's requests "as a matter of administrative

discretion" based on its claim that "on occasion" OA provides direct administrative support to

the president. Letter from Carol Ehrlich, FOIA Officer, to Anne L. Weismann, June 21, 2007

(Exhibit 1 to Plaintiff's Motion to Modify Order -- Document 12).[10] OA also claimed it had

located 504 pages that "may be responsive," which it described as including "emails,

spreadsheets, procurement-related documents, and internal guidance." Id. Of those documents,

_____

[9] It was revealed recently, in a letter from Chairman Henry A. Waxman to Fred F.
Fielding, Counsel to the President, that at the same time OA was telling this Court it would need
months to process CREW's request it was meeting with House Oversight Committee staff
specifically to brief them on the White House email system and the missing email. See Letter
from Chairman Henry A. Waxman to Fred F. Fielding, August 30, 2007 (attached as Exhibit 4).

[10] References to pleadings and other motions filed in this case include reference to the
document number assigned to each filing.

OA claimed approximately 454 pages were exempt under Exemptions 2, 5 and 6. Finally, OA

released 50 pages, including nine pages of a document dated November 12, 2002, 26 pages of a

document dated June 24, 2003, with a July 2005 amendment and interagency agreement dated

September 24, 2005, and 15 pages of a document dated September 21, 2004. Id. None of these

documents included information related directly to the deleted emails.

Given the total absence of any meaningful information to enable an assessment of the

completeness of OA's production, on July 2, 2007, CREW requested that the Court modify its

orders (Document 12). Specifically, CREW requested that the Court require OA to provide

additional information, including a description of the withheld documents and an identification

of the exemption claimed for each withheld document. Id. OA has opposed the motion and

briefing is now complete.

Thereafter, on July 27, 2007, the parties filed a Joint Proposed Schedule (Document 17)

as ordered by the Court. Defendant, for its part, stated "OA will move to dismiss this action on

the ground that OA is not an 'agency' subject to FOIA." Joint Proposed Schedule, ¶ 6. By

Order dated August 7, 2007, the Court ordered OA to file its brief in support of its motion to

dismiss on or before August 21, 2007, with CREW's opposition due on or before September 4,

2007, and OA's reply due by September 11, 2007. Order of August 7, 2007 (Document 18). OA

was also directed to comply with the Court's prior orders regarding its processing of CREW's

requests. Id. Finally, the Court noted it was holding in abeyance CREW's motion to modify

pending resolution of OA's motion to dismiss. Id.

Contrary to its representations to the Court, OA did not file a motion to dismiss. Instead,

on August 21, 2007, OA filed a motion for judgment on the pleadings pursuant to Rule 12(c) of

8

the Federal Rules of Civil Procedure (Document 20). As exhibits to its motion OA included

three of OA's budgets for Fiscal Years 2006, 2007 and 2008, that it claims are evidence of its

mission. See Defendant's Motion for Judgment on the Pleadings and Memorandum in Support

at 13 ("D's Mem.").

In addition, on August 24, 2007, OA sent its second response to CREW's FOIA requests.

OA's one-page letter (attached as Exhibit 5) states in summary form that OA has located

"approximately 3,470 pages that may be responsive," that "[s]uch documents include

spreadsheets and related documents," and that all 3,470 pages are exempt in their entirety (or do

not contain reasonably segregable portions) pursuant to exemptions 5 (attorney work product,

attorney client and/or deliberative process privileges) and 6 (personal privacy matters).

## ARGUMENT

### I. THE ISSUE OF WHETHER OA IS AN AGENCY FOR PURPOSES OF THE FOIA CANNOT BE DECIDED ON THE BASIS OF THE PLEADINGS.

#### A. Standard For Judgment On The Pleadings

In ruling on a motion for judgment on the pleadings, the court's review is confined to the

pleadings and the facts they contain. See, e.g., Fay v. Perles, 484 F.Supp. 2d 12, 14 (D.D.C.

2007). Any facts must be construed most favorably to the non-moving party, Schuchart v. La

Taberna Del Alabardero, Inc., 365 F.3d 33,3 5 (D.C. Cir. 2004), and such motion must be denied

where the complaint, at a minimum, alleges a "plausible entitlement to relief." Bell Atlantic

Corp. v. Twombly, 127 S. Ct. 1955, 1967 (2007).

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, if the moving party

presents matters outside the pleadings, a motion for judgment on the pleadings "shall be treated

9

as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." While courts are permitted to take judicial notice of certain public documents in deciding such motions, a court generally exercises its discretion to do so to avoid unnecessary proceedings. So, for example, in Covad Communcations Co. v. Bell Atlantic Corp., 407 F.3d 1220, 1222 (D.C. Cir. 2005), cited by OA in its brief,[11] the court looked to the public record in another related judicial proceeding precisely to avoid an unnecessary proceeding in the case before it. Indeed, virtually all of the cases cited by OA in support of its claim that including OA budget submissions does not transfer its motion to one for summary judgment involved a court's consideration of publicly filed documents or documents pertaining to judicial or quasi judicial proceedings.[12] Notably, OA cites no case -- and CREW is aware of none -- sanctioning a party's use of a motion for judgment on the pleadings to avoid discovery and prevent the court from considering a full and complete record.

## B. The Pleadings Here Do Not Establish As A Factual Matter That OA Is Not An Agency Under The FOIA.

Under the FOIA, "[e]ach agency" "shall make records promptly available" upon request, subject to certain exceptions. 5 U.S.C. § 552(a)(3)(A). The Act, as amended in 1974, defines "agency" to include:

---

[11]D's Mem. at 7 n.1.

[12] For example, in EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997), the documents in question were referenced in the complaint and consisted of publicly filed notices of recordation. Similarly, in Wise v. Glickman, 257 F.Supp. 2d 123, 130 n. 5 (D.D.C. 2003), the documents in question were rulings of arbitrators that were in the public record.

> any executive department, military department, Government
> corporation, Government controlled corporation, or other
> establishment in the executive branch of the Government
> (including the Executive Office of the President), or any
> independent regulatory agency . . .

Id. at § 552(f)(1).

The legislative history of this provision makes clear that by including the EOP in the

definition of "agency," Congress did not intend to include "the President's immediate personal

staff or units in the Executive Office whose sole function is to advise and assist the President."

H.R. Conf. Rep. No. 93-1380, 93d Cong., 2d Sess. 14 (1974). In this regard, the drafters

intended to codify the approach of the D.C. Circuit in Soucie v. David, 448 F.2d 1067 (D.C. Cir.

1971). Id. See also S. Conf. Rep. No. 1200, 93d Cong. 2d Sess. 15 (1974).

Specifically, in Soucie, the D.C. Circuit applied a "sole function" test in considering

whether the Office of Science and Technology Policy ("OST" or "OSTP"), an entity within the

EOP, is an agency. As the Soucie court reasoned, "[i]f the OST's sole function were to advise

and assist the President, that might be taken as an indication that the OST is part of the

President's staff and not a separate agency." 448 F.2d at 1075. The court found the OST to be

an agency "[b]y virtue of its independent function of evaluating federal programs," which went

beyond solely advising and assisting the president. Id.

It is therefore clear from the text of the FOIA, as amplified by congressional intent, that

the determination of whether a particular entity within the EOP is an agency is fact-dependent.

This Court came to this same conclusion in EPIC, noting that the D.C. Circuit " has identified

> 'three interrelated factors' relevant to determining whether those
> who both advise the President and supervise others in the Executive
> Branch exercise 'substantial independent authority' and hence should
> be deemed an agency subject to the FOIA. These factors are: (1) 'how

11

> close operationally the group is to the President,' (2) 'whether it has
> a self-contained structure,' and (3) 'the nature of its delegated authority.'
> These three factors are not necessarily to be weighed equally; rather
> each factor warrants consideration insofar as it is illuminating in the
> particular case.

EPIC Op. at 7, *quoting* Armstrong v. Executive Office of the President, 90 F.3d 553, 558 (D.C.

Cir. 1996) ("Armstrong") (*citing* Meyer v. Bush, 981 F.2d 1288, 1293 (D.C. Cir. 1993)).

    Despite this clear authority, the government takes issue with the three-factor test

endorsed by the D.C. Circuit in both Meyer and Armstrong, arguing instead that the test applies

only in "certain contexts" not present here. D's Mem., p. 15. According to the government, the

only relevant factor here is whether OA has substantial independent authority. Id. at 15-16.

    What the government overlooks is that the three-factor test employed by the Meyer court

is simply a way to determine whether a particular entity within the EOP is not an agency because

it has "characteristics and functions . . . similar to those of the President's immediate personal

staff." Meyer, 981 F.2d at 1293. Whether viewed exclusively through the lens of the actual

authority that an EOP entity wields, or informed by the structure of the entity and its operational

closeness to the president, the touchstone for any analysis of the agency question is the same:

the language and intent of the FOIA to exclude from the definition of agency those entities of the

EOP whose sole function is to advise and assist the President. See Armstrong, 90 F.3d at 558-59

(explaining that the three-part test of Meyer "is designed succinctly to capture the court's prior

learning on the subject whether a unit within the [EOP] is an agency covered by the FOIA. As

reflected in those cases, the specific evidence bearing upon that question varies with the entity in

question.").[13]

Moreover, even if the Court were to adopt the single-factor agency test that OA advances here, it would still be required to consider factual evidence not contained in any of the pleadings or the three OA budget documents included with OA's brief.  In determining whether OA is an agency, the Court must be guided by facts that reveal the actual authority that OA has exercised and its operational proximity to the president as well as facts that would reveal whether OA has "characteristics and functions" like those of the president's immediate personal staff.  None of these facts is contained in the pleadings on which the government asks the Court exclusively to rely.  Indeed, those pleadings are silent on the critical questions of what the actual role that OA plays is and whether it exercises independent authority.  Simply stated, the pleadings "do not foreclose the possibility that [OA] is an agency."  EPIC Op. at 9.[14]

Missing from the record, for example, are the agency declarations and deposition testimony that were so critical to the court in deciding the agency question in Armstrong.  See, e.g., Armstrong, 90 F.3d at 559-60 (discussing declaration of National Security Advisor Anthony Lake), 561 (discussing deposition testimony of the Senior Director for Intelligence Programs).  As a review of the district court opinion in Armstrong reveals,[15] the record in that case was

---

[13] OA's argument also cannot be reconciled with the court's observation in Meyer that "the structure of the group is important in determining its relative independence from the President.  Function is crucial, but, like the architect Louis Sullivan, we believe that form follows function."  981 F.2d at 1296-97.

[14] Notably, in EPIC the government filed with its motion to dismiss considerably more exhibits (15) than OA has proffered here.  See EPIC Op. at 2-3 n.2.  The Court nevertheless found the record insufficient from which to conclude that the Office of Homeland Security was not an agency.

[15] See 877 F.Supp. 690 (D.D.C. 1995).

13

replete with not only deposition testimony from multiple deponents, but also a joint statement of facts, responses to admissions and other discovery requests, internal memoranda and letters and other documents such as National Security Division directives. This evidence, "at the very least," was "helpful, if not required, in determining the status of an entity positioned within the Executive Office of the President." EPIC Op. at 12.

Here, by contrast, there is no testimony from OA officials -- whether by deposition or declaration -- elucidating its status. Instead, the government cites only to certain budget submissions by OA that are far from dispositive on the issue of OA's status as an agency and the executive orders that established OA in the first place. These executive orders not only fail to provide "definite proof" that OA is not an agency,[16] but make clear that OA's sole purpose is not to advise and assist the president.

First and foremost, EO 12028 directs OA to provide administrative support and services to all units within the EOP *"except for such services provided primarily in direct support of the President."* EO 12028, § 3(a) (emphasis added). That same executive order directs that responsibility for providing administrative support to the President remains with the White House Office. Id. at § 5. Thus, by its plain terms, the executive order establishing OA is proof positive that OA is not an entity that solely advises and assists the President. To the contrary, OA's primary mission is to advise and assist all other components of the EOP, save the President.

OA has no response or differing explanation of this language; indeed, OA's brief does not even mention these two provisions of the executive order. Yet this executive order is, in the

---

[16] EPIC Op. at 12.

words of the Meyer court, "the most important indication of [OA's] role." 981 F.2d at 1294.

OA's silence on this most probative evidence speaks volumes about the lack of merit in OA's

position.

The governing executive orders also evidence the independent authority OA has been

given. Pursuant to EO 12122, the director of OA is empowered to "organize the Office of

Administration, contract for supplies and services, and do all other things that the President, as

head of the Office of Administration, might do." EO 12122, § 4(a). And while the director is

"[s]ubject to such direction or approval as the President *may* provide or require," id. (emphasis

added), the use of the word "may" indicates that, in the absence of such direction or approval,

the director is free to act. In other words, OA's director is authorized to act as the president

might, and need not wait for direction, guidance, or orders from the president.

OA suggests otherwise, claiming that this language makes OA akin to the staff of the

Executive Residence found to be outside the scope of the FOIA in Sweetland v. Walters, 60 F.3d

852 (D.C. Cir. 1995). D's Mem. at 13-14. The comparison is inapt; unlike OA, the staff of the

Executive Residence was found to be "exclusively dedicated to assisting the President in

maintaining his home and carrying out his various ceremonial duties." Sweetland, 60 F.3d at

854. OA, by contrast, was created to provide administrative support to all entities of the EOP

except for the president, including entities such as the Office of Management and Budget

("OMB"), OST, and the Council on Environmental Quality ("CEQ"), all EOP components found

to be agencies for purposes of the FOIA.[17]

---

[17] In determining that the Executive Residence is not an agency, the court in Sweetland
was also guided by the "unseemly" result of submitting the Executive Residence to the FOIA,
namely the resulting revelation of "the intimate details of the management of [the president's]

Moreover, the government's litigating position here, including its claim that OA is headed by the president,[18] is directly contrary to the interpretation of the governing executive order that the government advanced before the Supreme Court in Armstrong. The government's brief in opposition to certiorari addresses the specific suggestion that the National Security Council is not unique in having the president as its head, as the OA also is headed by the president, as follows:

> Petitioners suggest . . . that the Office of Administration, a component of the EOP, is also headed by the President. That suggestion is incorrect. *By Executive Order No. 12,122, 44 Fed. Reg. 11,197 (1979), the President has effected a broad delegation of authority over the OA to its Director.* That Executive Order states that, '[s]ubject to such direction or approval as the President may provide or require, [the] Director shall organize the Office of Administration, contract for supplies and services, and do all other things that the President, as head of the Office of Administration, might do.' Ibid. The OA's governing regulations state that the OA 'consists of specified offices, which do not include the President.

Armstrong v. Executive Office of the President, No. 96-1242 (S. Ct. 1996), Brief for the Respondent in Opposition, p. 18 n.5 (emphasis added) ("Armstrong Brief").[19]

The budget documents OA has offered here in support of its claim that it is not an agency also provide proof for the opposite conclusion.[20] For example, OA's Fiscal Year 2008 Budget

---

home, particularly when those details will often be closely connected to his duties as head of State as well as head of Government." 60 F.3d at 855. A determination that OA is an agency and subject to the FOIA will have no such result, particularly as OA lacks proximity to the president.

[18] D's Mem. at 17-18.

[19] Available at http://www.usdoj.gov/osg/briefs/1996/w961242w.txt.

[20] OA's brief cites to the budget submissions only as evidence of OA's "organizational lines," D's Mem. at 4, 16, and its mission. See D's Mem. at 13. These documents, standing

16

(Exhibit 1 to D's Mem.), describes the responsibilities of the Office of the Chief Financial

Officer ("OCFO") as follows: "The OCFO directs, manages, and provides policy guidance and

oversight of financial management activities and operations, including procurement and travel

support." Executive Office of the President, Office of Administration, Fiscal Year 2008 Budget

at OA-3. Similarly, the responsibilities of the Office of the Chief Information Officer include

providing "leadership to the components that OA supports." Id. Moreover, OA's salaries and

expenses are paid from funds that came from other EOP components, including OMB, OSTP,

the United States Trade Representative and CEQ, all EOP components found to be agencies for

purposes of the FOIA. See id. at OA 4-5. The degree of responsibility afforded offices within

OA as well as the sources of at least some of its funding evidence OA's independence from the

President and its corresponding status as an agency.[21]

It necessarily follows that the Court cannot resolve the issue of OA's status as an agency

simply on the basis of the pleadings. OA's brief and exhibits do not foreclose the possibility,

indeed likelihood, that OA has acted with independent authority and is an agency. See EPIC Op.

at 9-10. Nor can it be said that "'each one of the [OA's] enumerated . . . duties is directed at

providing . . . advice and assistance to the president.'" Id. at 10, *quoting* Rushford v. Council of

---

alone, are hardly conclusive on either of these issues.

[21] In addition, while not part of the pleadings, representations by Keith Roberts on behalf of OA also document OA's independent authority. For example, during the June 1, 2007 conference call before the Court, Mr. Roberts stated: "the Office of Administration, our mission is to provide a common administration throughout the deputy office of the president complex so part of that involves *we own all the information technology system* and we do -- we maintain all electronic databases, all the e-mails, and we also do all the searches from the complex." Transcript at 9 (Exhibit A to Plaintiff's Reply in Support of Plaintiff's Motion to Modify (Document 16-2) (emphasis added)).

Economic Advisers, 762 F.2d at 1042. OA's motion for judgment on the pleadings must

therefore be denied.

## II. PLAINTIFF MUST BE AFFORDED DISCOVERY ON THE AGENCY ISSUE GIVEN THAT THE RELEVANT EVIDENCE RESTS SOLELY WITH THE GOVERNMENT.

As a necessary corollary to denying OA's motion for judgment on the pleadings, the

Court must also afford CREW an opportunity to conduct appropriate discovery. The Court has

already noted that "whether OA is an agency subject to the FOIA is . . . a dispositive issue," that

should be resolved in advance of deciding how to proceed on the merits of CREW's claims.

Order of August 7, 2007 (Document 18). OA's failure to proffer definitive evidence on the issue

of OA's agency status,[22] coupled with the fact that "the relevant evidence on this issue rests

solely with Defendant[]," means that CREW must be given "'the opportunity to discover

evidence relevant to [its] jurisdiction claim.'" EPIC Op. at 10-11, quoting Wilderness Soc'y v.

Griles, 824 F.2d 4, 16 n.10 (D.C. Cir. 1987).

In determining the scope of appropriate discovery, the Court should be guided by the

three areas of relevant inquiry identified in Meyer and endorsed in Armstrong: (1) OA's

operational closeness to the president; (2) whether OA has a self-contained structure; and (3) the

nature of OA's delegated authority. Armstrong, 90 F.3d at 558, citing Meyer, 981 F.2d at 1293.

To address the first issue, plaintiff will need discovery on the nature of OA's

communications and interactions with the president and his advisors and the extent to which the

_____

[22] OA's blanket and unsupported statements about the nature of OA's authority (e.g., "[i]t wields no authority independent of the President (D's Mem. at 15)) and its bald statements about OA's proximity to the president (e.g., "on a day-to-day basis, OA's Director reports to senior White House Officials concerning OA activities" (D's Mem. at 18)) are no substitute for the factual evidence the D.C. Circuit has demanded.

18

president has expressly approved OA decisions, findings, or other initiatives. Plaintiff is particularly entitled to this information given the tension between OA's assertion here that it is not an agency and the language of the executive order creating OA that excludes from OA's responsibilities providing services in direct support of the president.

Second, plaintiff will need discovery on the staffing and organizational structure of OA. Although the government appears to concede here that OA has a self-contained structure (see D's Mem. at 16-17), its failure to provide adequate factual evidence on this critical factual issue requires supplementation of the record through discovery.

Third, plaintiff will need discovery on the manner in which OA has actually fulfilled the responsibilities assigned to it in EO 12028 and EO 12122. This includes consideration of OA's interactions with other EOP components and the degree to which those components must seek OA approval or action on administrative functions.

This discovery can be accomplished in part through the use of interrogatories, admissions and requests for production of documents. In the final analysis, however, plaintiff will need to conduct targeted depositions of individuals who can speak to the actual authority and independence that OA has wielded. Documents, while certainly probative, do not address sufficiently how the OA has actually acted. Indeed, it was the deposition testimony of senior officials with the National Security Council that led the court in Armstrong to conclude that the NSC was not an agency. Armstrong, 90 F.3d at 561, 555-560. As Armstrong illustrates, it is necessary to consider not only the nature of the authority delegated to OA, but how it has actually exercised that authority.

The government will undoubtedly argue that discovery is unnecessary and that it should

19

first be given an opportunity to supplement the record further. Such a request should not be

granted. OA represented to the Court that it would be filing a motion to dismiss, and the Court

so ordered. Instead, however, OA filed a motion for judgment on the pleadings -- a transparent

attempt to foreclose any factual inquiry beyond what the government chose to put before the

Court.[23] Under these circumstances, OA is not entitled to another try before discovery is

commenced.

Moreover, plaintiff bears the burden of establishing this Court's jurisdiction and cannot

do that here without access to facts that are in the exclusive knowledge and control of the

government. See EPIC Op. at 8. In short, discovery is both necessary and appropriate and

should proceed at the earliest opportunity given the great public interest in and importance of the

substantive issues that this case presents.

### III. ALTERNATIVELY THE COURT SHOULD RULE THAT OA IS AN AGENCY SUBJECT TO THE FOIA.

Alternatively the Court can conclude, based on the language of OA's governing

executive orders and the consistent position that OA has taken in the past, that it is an agency

subject to the FOIA.[24] As discussed supra, OA does not solely advise and assist the president as

evidenced in the executive order establishing the OA, which directs that OA provide

---

[23] In deciding a motion to dismiss based on a claim that the court lacks jurisdiction, a reviewing court may look beyond the pleadings to consider facts relevant to the jurisdictional issue. Land v. Dollar, 330 U.S. 731, 735 n.4 (1947). Courts have also recognized that in responding to a motion to dismiss a plaintiff must be given "the opportunity to discover evidence relevant to his jurisdictional claim." Wilderness Soc'y, 824 F.2d at 16 n.10.

[24] Such a finding is a predicate to the Court's jurisdiction, given that the FOIA vests jurisdiction in district courts to enjoin an "agency" from withholding agency records. 5 U.S.C. § 552(a)(4)(B); see also Kissinger v. Reporters Committee for Freedom of the Press, 445 U.S. 136, 139 (1980).

administrative support to all EOP entities except for the president. See EO 12028, §§ 3(a), 5.

Just as importantly, as the government has recognized in the past, through EO 12122, "the

President has effected a broad delegation of authority over the OA to its Director." Armstrong

Brief at 18 n.5.

These executive orders -- the "most important indication" of OA's role[25]-- place OA on

the same footing as other EOP entities found to be agencies for FOIA purposes.  For example, in

Soucie, the D.C. Circuit concluded that OST was an agency "[b]y virtue of its independent

function of evaluating federal programs."  448 F.2d at 1075.  Similarly, the director of OA

functions independently of the president in organizing OA, contracting for supplies and services,

and doing all other things that the president might do.  EO 12122 at § 4(a).

Likewise, in Pacific Legal Foundation v. Council on Environmental Quality, 636 F.2d

1259 (D.C. Cir. 1980), the court placed great weight on executive orders that expanded CEQ's

functions to include oversight of the activities of federal agencies and regulatory authority.  Id. at

1262.  There, as here, the executive orders granted the EOP entity independent authority that

went beyond solely advising and assisting the president.[26]  Based on this precedent and the

language of the executive order, the Court can properly conclude that OA is an agency under the

FOIA.

Moreover, while no court has ruled explicitly that OA is an agency, the D.C. Circuit at

---

[25] Meyer, 981 F.2d as 1294.

[26] OA suggests that because OA "is entirely a Presidential creation" it necessarily cannot
be an agency.  D's Mem. at 15.  Meyer makes clear, however, that this is not relevant.  See 981
F.2d at 1296 ("We do not think much should turn on whether the President delegates authority to
a White House group by memorandum or by Executive Order.").

21

least implicitly so found in <u>National Security Archive v. Archivist</u>, 909 F.2d 541 (D.C. Cir.

1990).  At issue there were four FOIA requests of OA for documents related to the Tower

Commission's investigation.  The executive order establishing the Tower Commission also

directed OA to provide the Commission with administrative and support services, including

funding.  After OA denied the requests on the ground that it did not "maintain" any of the

documents in question, NSA redirected its FOIA requests to the White House Counsel's Office.

The White House Counsel's Office denied the requests on the ground that it was not an agency

subject to the FOIA.  <u>See generally</u>, 909 F.2d at 543.

 The D.C. Circuit agreed with the district court that the claims against OA were properly

dismissed given that the Tower Commission, and not OA, had "sole possession and control of

the requested documents" and there was therefore "no basis for upsetting its conclusion that the

Office of Administration did not withhold the documents."  <u>Id.</u> at 545.  By sharp contrast, the

claims against the White House Counsel's Office were found properly dismissed for the very

different reason that "the Office of the President," in which the White House Counsel's Office is

found, "is not an 'agency' for purposes of the FOIA."  <u>Id.</u>  Critical here is the fact that the D.C.

Circuit treated OA as subject to the FOIA -- dismissing the FOIA claims against it only because

OA had not improperly withheld documents -- while at the same time it found the claims against

the White House Counsel's Office properly dismissed because the office was not an agency.

Stated differently, a necessary predicate to the D.C. Circuit's ruling as to OA was that OA was

an agency subject to the FOIA in the first instance.

 The conclusion that OA is an agency is reinforced by OA's past practices.  Since 1980,

OA has published regulations governing access to its records under the FOIA.  Those regulations

22

provide unambiguously that  "all records by the Office of Administration are available to the
public, *as required by the Freedom of Information Act*."  5 C.F.R. § 2502.16 (emphasis added).
Pursuant to the FOIA regime that it has adopted, OA has processed hundreds of FOIA requests
over the years and submitted yearly reports as the FOIA requires (5 U.S.C. § 552(e)(1)).  <u>See</u>
www.whitehouse.gov/oa/foia/readroom.html.  Moreover, the White House's own website (until
this past weekend) delineated the OA as an EOP entity that is subject to the FOIA because its
sole function is not to advise and assist the president.  <u>See</u> www.whitehouse.gov/oa/foia/eop-
foia.html.

  OA's past conduct also includes the litigating positions it has adopted throughout the
years.  As discussed <u>supra</u>, the government's brief filed before the Supreme Court in <u>Armstrong</u>
adopts the same expansive interpretation of OA's independent authority pursuant to EO 12122 as
that plaintiff is advancing here -- an interpretation that cannot be reconciled with OA's newly
minted argument that it is not an agency.  Further, there is no suggestion in the <u>National Security
Archives</u> case that OA ever questioned the court's jurisdiction over it or its status as an agency
under the FOIA.

  This is equally true in the only other reported FOIA decision involving OA that plaintiff
has located, <u>Goldgar v. Office of Administration</u>, 26 F.3d 32 (5th Cir. 1994).  <u>Goldgar</u> involved a
FOIA request of OA to which the agency responded that it had no responsive records.  <u>Id.</u> at 34.
On appeal, in response to the plaintiff's argument that he was seeking "information," not agency
records, the Fifth Circuit ruled that such a request is an "abuse[] and misus[e] [of] the FOIA."
26 F.3d at 35.  The court held alternatively that if the plaintiff were seeking a record, "we hold
that no such record exists and that Goldgar has failed to state a claim under the FOIA . . ."  <u>Id.</u>

23

Importantly, there is no suggestion that OA ever argued it was not an agency subject to the FOIA, nor did the appellate court reach that issue. Instead, its opinion presupposes the general applicability of the FOIA to OA.

OA's treatment of CREW's FOIA requests also reinforces the notion that it is an agency subject to the FOIA. Upon receipt of CREW's request, OA sent a letter granting expedition and the fee waiver request. At no time did OA ever represent, or even suggest, that it was not subject to the FOIA or was processing the request only as a matter of administrative discretion. See Exhibit C to Complaint. Once in litigation, OA participated in court-supervised discussions over a schedule for processing the six prioritized categories of documents CREW was seeking in its request for emergency relief. At no time during those discussions did OA represent, or even suggest, that it was not subject to the FOIA. In its answer, OA denied the allegations pertaining to the court's jurisdiction and venue, Answer at ¶ 3 (Document 10), but amplified this denial in its first affirmative defense wherein it stated: "The Court lacks jurisdiction over the subject matter of this complaint because no records have been improperly withheld." Id., First Defense. Completely missing from OA's answer was any suggestion that OA is not subject to the FOIA in the first place because it is not an agency. That OA has raised this defense now -- in an apparent effort to avoid having to account for or produce any documents that would document the degree of the White House's prior knowledge about the deleted email and its failure to address the problem -- cannot excuse or erase its consistent prior practices.

Nevertheless, OA argues that its prior conduct is not probative on the issue of whether it is an agency subject to the FOIA, citing Armstrong. D's Mem. at 19-20. This reliance is misplaced. First, the Armstrong court characterized the NSC's past practice as "*voluntarily*

subject[ing] certain of its records to the FOIA" "in the interest of permitting public access to *some* NSC records . . ." 90 F.3d at 566 (emphasis added). As even the <u>Armstrong</u> plaintiff conceded, "even as the NSC was treating some of its institutional records as though they were subject to the FOIA and the FRA [Federal Records Act], it was declining to treat other records in that way." <u>Id.</u> The D.C. Circuit accordingly found that the NSC's prior references to itself as an agency were not probative on the agency issue because "quite simply, the Government's position on that question has changed over the years." 90 F.3d at 566. Indeed, precisely because "the NSC's past behavior has been inconsistent -- both logically and factually" the court found that it did not "illuminate the legal question" of whether the NSC was an agency subject to the FOIA. <u>Id.</u>

By contrast, as outlined above, there is nothing inconsistent about OA's past practices. Unlike the NSC, there is nothing to suggest OA has "voluntarily subjected certain of its records to the FOIA." Quite the opposite is true. Since at least 1980, when it published its first FOIA regulations, OA has represented that it is required under the FOIA to make its records available upon request. In the 30 years of its existence there has been no suggestion until now -- when faced with a potentially very embarrassing, if not outright damaging, FOIA request -- that it is not an agency subject to the FOIA. OA's sudden about-face on the agency question has been rejected repeatedly and explicitly by the D.C. Circuit in favor of exactly the kind of indicia of agency status present here. <u>See</u> <u>Soucie</u>, 448 F.2d at 1075 (OST's publication of FOIA regulations "lends additional support to the conclusion that it is a separate administrative entity"); <u>Rushforth</u>, 762 F.2d at 1041 (discussing <u>Pacific Legal Foundation</u> in which the D.C. Circuit "rejected the CEQ's proffered on again-off again definition" after CEQ had admitted in

25

the past that it was an agency).

In sum, the available evidence points unmistakably to one conclusion: OA is, as it has

consistently represented itself to be, an agency for purposes of the FOIA.

## CONCLUSION

For the foregoing reasons, the Court should deny defendant's motion for judgment on the

pleadings and grant plaintiff an opportunity to conduct discovery. Alternatively, the Court

should rule that OA is an agency and must respond fully and promptly to CREW's FOIA

requests. Pursuant to LCvR 7(f) plaintiff hereby respectfully requests that the Court hold an oral

hearing on defendant's motion.

Respectfully submitted,

*/s/ Anne L. Weismann*
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
 in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone: (202 408-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

Dated:  September 4, 2007

26

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

CITIZENS FOR RESPONSIBILITY AND    )
ETHICS IN WASHINGTON,              )
                                   )
            Plaintiff,             )
                                   )
      v.                           )    Civil No. 07-01707 (HHK)(JMF)
                                   )
EXECUTIVE OFFICE OF THE            )
PRESIDENT, et al.,                 )
                                   )
            Defendants.            )
_____)
NATIONAL SECURITY ARCHIVE,         )
                                   )
            Plaintiff,             )
                                   )
      v.                           )    Civil No. 07-01577 (HHK)(JMF)
                                   )
EXECUTIVE OFFICE OF THE            )
PRESIDENT, et al.,                 )
                                   )
            Defendants.            )
_____)

## [PROPOSED] ORDER

The Court having considered defendants' motion to dismiss, plaintiffs' opposition thereto

and the entire record it is hereby ORDERED that defendants' motion is DENIED..


Dated: _____          _____
                                    HENRY H. KENNEDY, JR.
                                    United States District Judge