# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, ) ) ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 07-01707 (HHK/JMF) |
| ) | |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., ) ) ) | |
| Defendants. ) | |
| NATIONAL SECURITY ARCHIVE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 07-01577 (HHK) |
| ) | |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., ) ) ) | |
| Defendants. ) | |

## PLAINTIFF CREW'S[1] RESPONSE TO DEFENDANTS' NOTICE OF FILING

Close to midnight on January 15, 2008, the defendants in the above-captioned actions submitted a notice of filing together with the declaration of Theresa Payton, Chief Information Officer for the Office of Administration ("OA") ("Payton Decl.") (Documents 48 and 48-2). This filing was in response to a directive from Magistrate Judge John Facciola (Document 46) requiring defendants to answer four questions concerning the back-up copies that are the subject

---

[1] CREW is the acronym for Citizens for Responsibility and Ethics in Washington.

of the Court's preservation order, in order to resolve plaintiffs' pending motions for discovery.[2]

As set forth below, Ms. Payton's declaration raises several significant questions and issues that

underscore plaintiffs' need for discovery.

### 1. It Is Unclear Whether Defendants Have Responded Fully To The Court's Questions.

This Court's Order of January 8, 2008 (Document 46) posed four questions that

defendants were to answer with respect to "back-ups."  Order at 4.  The Order specifically

defines back-ups "[f]or purposes of these questions" as

> media, no matter how described, presently in their [defendants']
> possession or under their custody or control, that were created
> with the intention of preserving data in the event of its inadvertent
> destruction, and that are being preserved in accordance with Judge
> Kennedy's order.

Id. n. 5.

Notwithstanding this broad definition of "back-ups," defendants' response to the Court's

questions is limited to only a single set of "tapes created and maintained by OA,"only one of the

defendants here.  See Payton Decl. at ¶¶ 7, 12c.  Completely missing from Ms. Payton's

declaration is any discussion of any duplicate or additional back-up copies that are created by

EOP or any other entity on behalf of the EOP or that are maintained elsewhere, including off-

site, or in other systems within the EOP.

Nor does Ms. Payton attest that the tapes "created and maintained by OA" are the only

---

[2] Although Judge Facciola's order references only the motion of plaintiff National
Security Archive, CREW has filed a nearly identical motion for leave to conduct expedited
discovery and both motions were referred to Judge Facciola for determination pursuant to LCvR
72.2(a).  See Order of November 22, 2007 (Document 21).  Moreover, by Order dated November
12, 2007 (Document 17), the two cases were consolidated under the caption CREW v. Executive
Office of the President, Civil Action No. 07-1707.

back-ups that exist within the meaning of the Court's Order. Moreover, her declaration, which was submitted on behalf of all defendants, is based only on her personal knowledge, gained since May 2006, as well as information provided her by members of her staff. Payton Decl. at ¶ 2. Accordingly, it is far from clear how she is competent to respond in full to the Court's questions.

In sum, given the limitations and gaps in the Payton Declaration, there is simply no way for the Court to reliably conclude that defendants have provided complete answers to the Court's questions.

### 2. Defendants Have Now Admitted Back-up Copies Do Not Exist For A Critical Time Period.

As reflected in this Court's Order of January 8, 2008, "[i]f the missing emails are not on th[e] back-ups" plaintiffs' requested relief "will also be time-sensitive: emails that might now be retrievable from email account folders or 'slack space' on individual workstations are increasingly likely to be deleted or overwritten with the passage of time." Order at 3. This was precisely the reason why both plaintiffs sought expedited discovery.

We now know, based on Ms. Payton's declaration, that the White House recycled (or overwrote) back-up tapes until October 2003. Payton Decl. at ¶ 12c. As a result, there are no back-up copies -- at least on the system addressed in Ms. Payton's declaration -- of missing email for the period March to October 2003. The White House's deletion of the potentially only remaining copies of those emails raises a very "time-sensitive" need for expedited discovery, given the likelihood that the other places where those missing email may reside "are increasingly likely to be deleted or overwritten with the passage of time." Order at 3.

Moreover, while the Payton Declaration glosses over this gap,[3] it covers an historically significant time period that includes the start of the Iraq war, the disclosure by top White House officials of the covert identity of Valerie Plame Wilson, the Justice Department's commencement of a criminal investigation into those officials' action and the CIA's destruction of interrogation videotapes. The value of this historical evidence of the Bush presidency, which cannot be overstated, coupled with the requirements that federal law imposes on the defendants to preserve records warrant taking every possible action to locate, recover and restore the missing emails.

### 3. It Appears From The Payton Declaration That Critical And Highly Relevant Evidence May Have Been Destroyed.

When OA discovered the missing email problem in October 2005, it conducted a "detailed analysis" that resulted, in part, in multiple estimates of the number of missing email. See Complaint at ¶ 34. Subsequent to this discovery, OA also developed a plan to recover the missing emails from then-existing White House back-up tapes, a plan that was ultimately rejected by, among others, the White House Chief Information Officer. Id. at ¶ 36. These facts, which are part of the record of this case, are unrefuted by defendants.

When CREW learned of these developments it filed a Freedom of Information Act request with OA for, among other things, the documentation prepared by OA when it discovered the missing emails. That request is now the basis for a lawsuit, CREW v. Office of Administration, Civil No. 07-964 (CKK), in which OA was subject to a court-ordered time-table

---

[3] Ms. Payton states in pertinent part, "in view of this office's practice of preserving all . . . back-up tapes from October 2003 to the present, the back-up tapes should contain *substantially* all the emails sent or received in the 2003-2005 time period. Payton Decl. at ¶ 12d (emphasis added).

for processing the request based on a prioritized list of documents CREW put forth, after court-supervised discussions with OA and its then-Deputy General Counsel Keith Roberts.  This list, embodied in a Court order of June 4, 2007 ("OA Order") (attached as Exhibit 1), includes, *inter alia*, "histograms" that provide a "day-to-day detailed numeric count of the archived e-mails"and the approximately "14-18 different versions" of "spreadsheets summarizing the data by EOP component" as well as "the workbook or workbooks containing this documentation and assessment of the missing email [which] include color-coded spreadsheets."  OA Order at pp. 1-2.

On August 24, 2007, pursuant to this Order, OA sent a response to CREW that consisted of a one-page letter stating that OA had located "approximately 3,470 pages that may be responsive," including "spreadsheets and related documents."  (Attached as Exhibit 2).

Notwithstanding this evidence that OA has many pages of documentation, Ms. Payton's Declaration references only "a chart  . . . that purports to identify certain dates and EOP components for which the chart's creator appears to have concluded that certain EOP components were missing emails on certain dates in the 2003-2005 time period."  Payton Decl. at ¶ 10.  Further, she suggests this lone chart is the "detailed analysis" to which plaintiffs have referred in this lawsuit,  id. and goes on to describe an "apparent lack of supporting documentation" that emails are missing from White House servers.  Id. at ¶ 11.  Her declaration, submitted under penalty of perjury,  is completely at odds with the thousands of pages of documents, including "spreadsheets and related documents," that OA has already acknowledged having.

This raises three possibilities: (1) Ms. Payton was not privy to full information available

to OA when she prepared her declaration, (2) she has testified untruthfully, or (3) the full documentation has been deleted, leaving OA with only a single chart. In any of these cases Ms. Payton's actions, as well as those of the defendants on whose behalf she executed a declaration, would not be in compliance with the Court's order and provide further evidence why expedited discovery is necessary and appropriate.

### 4. Ms. Payton's Suggestion That OA Has Not Yet Confirmed The Existence Of An Email Problem Is Untrue.

Nowhere in Ms. Payton's declaration does she acknowledge that emails are, in fact, missing from White House servers as plaintiffs have alleged. Instead, she attempts to discredit the lone chart she claims is the only evidence of the problem and goes on to assert: "this office has undertaken an independent effort to determine *whether there may be anomalies* in Exchange email counts for any particular days resulting from the *potential* failure to properly archive emails for the 2003-2005 time period." Payton Decl. at ¶ 11 (emphasis added). The suggestion that the White House has not even determined if there is an email problem, a problem Ms. Payton euphemistically refers to as mere "anomalies," is patently untrue.

First, at least two spokespersons for the White House have already acknowledged the missing email problem. In a press briefing on April 13, 2007, White House Spokesperson Dana Perino acknowledged a problem with missing White House emails and stated that she was "not taking issue" with CREW's conclusions that there were hundreds of days for which emails were missing. Press Briefing by Dana Perino, April 13, 2007 (attached as Exhibit 3). Neither did Ms. Perino dispute CREW's estimate that the emails numbered over five million. Id. More recently, White House Spokesperson Tony Fratto reportedly said that an uncertain number of White House emails were deleted: "'It was a problem we announced, admitted to and will remedy,'" he

said.'  Elizabeth Williamson, <u>White House Secrecy Starts to Give</u>, *The Washington Post*, January 14, 2008 (attached as Exhibit 4).

Second, the White House advised Special Counsel Patrick J. Fitzgerald of the problem at least two years ago.  By letter dated January 23, 2006, (attached as Exhibit 5) Mr. Fitzgerald advised Mr. Libby's counsel of numerous developments, including "that we have learned that not all email of the Office of Vice President and the Executive Office of President for certain time periods in 2003 were preserved through the normal archiving process on the White House computer system."

Similarly, by letter dated December 20, 2007, Chairman Henry A. Waxman, on behalf of the House Committee on Oversight and Government Reform, sent a letter to Fred F. Fielding, counsel to the president, requesting that the White House provide the committee with information and documents related to the upcoming presidential transition (attached as Exhibit 6).  Chairman Waxman's letter notes as follows:

> According to information received by the Committee, the White House has not implemented a robust system for archiving e-mails and other electronic records despite several efforts to do so.  *In addition, in briefings with White House officials, Committee staff have been informed that during a 2005 review of White House servers, the White House found numerous days with few or no e-mails for certain White House components.*  Nevertheless, even today, more than two years after this problem was first discovered by White House staff, the White House still has not identified the cause of the problem, determined the volume of e-mails lost, or developed a plan for restoring those e-mails that were lost.

(emphasis added).

In short, on multiple occasions to multiple individuals, including as recently as just days ago, the White House has acknowledged that email are missing from White House servers.  Ms.

Payton's statements suggesting uncertainty on this point cannot be reconciled with these prior statements, leading inescapably to the conclusion that either Ms. Payton has not testified truthfully to this Court or she testified without full knowledge.

## CONCLUSION

For the foregoing reasons, as well as those set forth in plaintiff's memorandum in support of its request for expedited discovery, the Court should grant that request.

Respectfully submitted,

*/s/ Anne L. Weismann*
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
  in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20530
Phone:  (202) 408-5565
Fax:  (202) 588-5020

Attorneys for Plaintiff CREW

Dated:  January 17, 2008

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,

    Plaintiff,

    v.

OFFICE OF ADMINISTRATION,

    Defendants.

Civil Action No. 07-964 (CKK)

**ORDER**
(June 4, 2007)

A conference call was held on the record at 10:00 a.m. on Friday, June 1, 2007 to discuss

the resolution of the motion for a Temporary Restraining Order/Preliminary Injunction filed by

Plaintiff, Citizens for Ethics and Responsibility in Washington ("CREW"). Present on the

conference call were counsel for both parties, as well as Keith Roberts, the Deputy General

Counsel of OA. CREW's TRO/PI sought an order requiring Defendant, the Office of

Administration ("OA") to immediately process CREW's Freedom of Information Act ("FOIA")

request and disclose the requested records within 10 days. By letter to counsel for the OA on

May 29, 2007, CREW further specified its priorities with respect to its TRO/PI as follows:

> 1. We are seeking copies of the histograms that were prepared between October
> 2005 and January or February 2006 that provide a day-to-day detailed numeric
> count of the archived e-mails on the EOP servers and any documents reflecting an
> aggregation of this data.
>
> 2. We are seeking the analyses of the data that were performed during that same
> time period and that include spreadsheets summarizing the data by EOP
> component. It is our understanding that there are approximately 14-18 different
> versions of these spreadsheets and that, among others, counsel for the OA has
> copies. We understand that the workbook or workbooks containing this

documentation and assessment of the missing email include color-coded spreadsheets and, accordingly, request that we also be provided with color copies.

3. We are seeking copies of all iterations of the recovery plan that was developed in response to this problem, including the written power-point presentation that was presented in approximately January 2006 to then-White House Counsel Harriet Miers.

4. We seek all emails discussing or referring to any aspects of these three categories of documents from the time period September 2005 to the present. Please note that our request for emails includes any attachments that are responsive to our request.

5. We seek copies of an assessment of the then-current email system that was written in approximately October 2002, and that includes an assessment of the features that a new email archiving system would need to have. We seek all iterations of this assessment, including the one that was presented to then-White House Counsel Alberto Gonzales.

6. We seek copies of all statement of work, requests for proposals and requests for quote that OA issued or that were issued on behalf of OA for the analyses, design, implementation and support of EOP email systems implementation, migration and email records management. Our first priority with respect to this category is any such documents from January 2003 through July 2006. In addition, we are especially interested in documents related to the email archiving system that was developed and tested by the fall of 2005, but was never implemented.

*See* May 29, 2007 Letter from A. Weismann to J. Lin. The Court held previous conference calls

on the record regarding the resolution of CREW's TRO/PI on May 24, 2007 and May 30, 2007.

The discussions held on the record are incorporated in and made part of this Order.

During the course of the June 1, 2007 conference call, the parties agreed to a schedule for

production that will resolve CREW's TRO/PI. Accordingly, it is, this 4th day of June, 2007,

hereby

**ORDERED** that, with respect to Categories 1 through 4, described above:

1. On or before June 21, 2007, OA shall review the universe of 30,000-plus e-mails

culled by OA in response to a previous request for documents regarding missing e-mails and

failure to archive e-mails, and shall produce to CREW all documents that are responsive to Categories 1 through 4, described above. These 30,000-plus e-mails cover the time period between September 2005 and February 3, 2006.

2. In addition to producing copies of e-mails, on or before June 21, 2007, OA shall review and produce copies of paper documents that are responsive to Categories 1 through 4.

3. In the event that CREW determines that the two productions described above are not fully responsive to Categories 1 through 4, OA shall initiate an electronic search for documents responsive to Categories 1 through 4 that date from the time period between February 3, 2006 and February 28, 2006. OA has indicated that this search shall be complete, and that the responsive documents shall be reviewed and ready for production no later than August 24, 2006.

4. Counsel for CREW shall work to craft a list of search terms that CREW believes will lead to the identification of documents responsive to Category 4, and dated between February 3, 2006 and February 28, 2006. OA has committed to conducting such searches upon receipt of a list of appropriate search terms from CREW. It is further

**ORDERED** that, with respect to Category 5, described above:

1. On or before June 21, 2007, OA shall review and produce copies of paper documents responsive to Category 5.

2. In addition, OA shall initiate a search for electronic documents responsive to Category 5. OA has indicated that this search shall be complete, and that the responsive documents shall be reviewed and ready for production no later than August 24, 2006.[1] It is further

---

[1] During the June 1, 2007 conference call on the record, counsel for CREW did not affirmatively accept OA's offer to search for and produce electronic documents responsive to Category 5 on or before August 24, 2006. However, by Notice dated June 1, 2007, CREW informed the Court that CREW did not intend to litigate the issue of the time frame in which OA would produce such documents. *See* Notice, *Citizens for Responsibility and Ethics in*

**ORDERED** that, with respect to Category 6, described above:

1. On or before June 21, 2007, OA shall review and produce copies of documents responsive to Category 6 that are currently within OA's possession.

2. In addition, OA shall initiate a search for documents responsive to Category 6 that are in the possession of the Department of the Interior, and shall furnish the Court and CREW with notice of when OA expects to be able to produce such documents to CREW. It is further

**ORDERED** that, in light of the foregoing, it appears that the issues raised in CREW's TRO/PI motion have been resolved. CREW's TRO/PI [3] is therefore DENIED.

**SO ORDERED.**

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

_____

*Washington v. Office of Administration*, Civil Action No. 07-964 (D.D.C. Jun. 1, 2007). Accordingly, it appears to the Court that this issue has been resolved as set forth above.

# EXHIBIT 2

**EXECUTIVE OFFICE OF THE PRESIDENT**
**OFFICE OF ADMINISTRATION**
WASHINGTON, D.C. 20503
August 24, 2007

Via Federal Express

Ms. Anne Weismann
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, NW, Suite 450
Washington, DC 20005

RE: Freedom of Information Act Request

Dear Ms. Weismann:

Pursuant to the Court's Orders of June 4, June 7 and August 7, 2007 this letter responds in part to the pending FOIA requests of Citizens for Responsibility and Ethics in Washington ("CREW"). Specifically, this provides the response, due by August 24, 2007, as specified in the Court's June 4, June 7 and August 7, 2007 Orders with respect to the Categories 1 through 4 dating from the time period between February 3 and February 28, 2006, as well as documents responsive to Category 5.

On August 22, 2007, OA filed its Motion for Judgment on the Pleadings, asserting that it is not subject to FOIA. Those arguments are not repeated here since, as described above, this letter is provided in response to the Court's Orders.

OA has located approximately 3,470 pages that may be responsive to CREW's requests as required in the Court's June 4, June 7 and August 4, 2007 Orders. Such documents include spreadsheets and related documents. After reviewing the documents, OA has determined that all of the approximately 3,470 pages are exempt from disclosure in their entirety or do not contain reasonably segregable portions that OA could release. The documents are exempt from release under the following FOIA provisions:

(1) Title 5 U.S.C. § 552(b)(5) exempts inter-agency/intra-agency communications and records that fall within the Attorney Work Product, Attorney Client, and/or Deliberative Process Privileges. OA has located potentially responsive documents that fall within those categories; and

(2) Title 5 U.S.C. § 552(b)(6) [Personal Privacy Matters] protects the identities of Federal employees who may be potential targets of threats and harassment. As such, there is a heightened interest in the identity and duty locations of current and former employees that is concurrent with the increased security awareness demanded in this time of national emergency.

Since this matter is in litigation, please contact Jean Lin at 202-514-3716 if you have any questions.

Sincerely,

F. Andrew Turley
Deputy General Counsel

# EXHIBIT 3



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH

 CLICK HERE TO PRINT

For Immediate Release
Office of the Press Secretary
April 13, 2007

## Press Briefing by Dana Perino
White House Conference Center Briefing Room

1:41 P.M. EDT

📹 Video (Windows)
🖥 Press Briefings
🔊 Audio

MS. PERINO: Good afternoon. Happy Friday. Okay, I don't have anything to announce. I'll just go to questions.

Q Have you been able to determine why Karl Rove's ability to delete emails was --

MS. PERINO: No, not between the gaggle and now, I haven't.

Q Okay. How about the list of the 22 officials; are you ready to release that?

MS. PERINO: No, but we've taken it under consideration. No, I don't have that ready yet, but we are consulting -- obviously, we're in communication with the committee, meaning the House Judiciary Committee, as well as the RNC general counsel. And so a lot of these things are being discussed at that level. And so in between 10 a.m. and now I wasn't able to get a conclusion.

Q Do you know whether White House officials were able to delete their own emails even after this archival policy went into effect?

MS. PERINO: White House officials -- you mean somebody like myself?

Q Who had the RNC accounts.

MS. PERINO: If they could have deleted their own emails --

Q After the 2005 archive provision went into effect. Did they retain the ability?

MS. PERINO: I believe that that would have been within the realm of possibility, but I don't know of anybody that -- again, we don't know of anybody that actually was doing that, to my knowledge, and we do not have any indication that there was any basis to conclude that there was any wrongdoing, intentional wrongdoing in the use of the RNC emails. You're talking about the double-delete function, where you can delete your deleted files?

Q Yes.

MS. PERINO: I don't know.

Q Dana, is there a limit to the mailbox size with the RNC accounts? Do you know that level of detail, whether you'd have to delete at some point or you couldn't get any more emails?

MS. PERINO: I don't know. I know that oftentimes our computers can slow down, but we have an automatic archiving system that comes through and cleans it up for us. And all of the emails, except for the ones -- the very small slice of the universe I've told you about that have the GWB accounts -- any email that touches any part of an EOP or White House server or computer, those are automatically preserved.

Q Dana, Democrats are concerned that perhaps these accounts were used in order to keep information -- harder

to be under public scrutiny, harder to find through discovery, things like that. They're not satisfied that these emails can't be retrieved. What's your --

MS. PERINO: I would caution against anyone making any broad, sweeping conclusions. What we have done is come forward to talk about the small slice of universe -- small slice of the universe of the emails that we've identified that have the potential to possibly not be there. And, again, I think that one of the things that's difficult is the things that we don't know. We don't know them, but we're trying to find them out. And there are ways that you can retrieve any emails that are potentially lost. And we are beginning conversations with outside consultants, forensic consultants who could tell us the best way to do that, the best way to retrieve those. But, again, I would stress to you that we have seen no basis to conclude that there was any intentional wrongdoing with the use of these emails.

Q But this was a problem, a mistake.

MS. PERINO: I said it yesterday, I think I said it concisely.

Q Dana, if I could follow. We have mentioned before the group called Citizens for Responsibility and Ethics in Washington. They issued this report, and they are saying their analysis shows that between March 2003-October 2005, there were hundreds of days in which emails were missing -- this being in the White House system, not the RNC -- and that this equated -- it was estimated that roughly over 5 million email messages were missing.

MS. PERINO: I don't know if that group actually has -- I don't know how they do an analysis on an internal White House system. But I did check it out, and we are in communication with the Office of Administration to see if there are days or partial days when there were emails that would have gone missing. And in terms of -- "missing" is a word that -- maybe misplaced, or not necessarily lost forever. I think there are backup tapes, there are different ways in order to go back and find emails.

And in talking with them and with the Counsel's Office, there is no indication that anyone who is working on a server or in terms of technical capability that would be able to look at a server, clean up a server, or, in terms of when we converted from Lotus Notes to Microsoft Outlook if there would have been any potential loss there, that there was any intentional loss of any document. I think that those folks take those jobs very seriously and endeavor to make sure that all of the records are preserved for the Presidential Records Act, as well as the Federal Records Act.

Q So, just to be clear, are you taking issue with their conclusions, or are you just saying --

MS. PERINO: I'm not taking issue with their conclusions at this point. We're checking into them. And, again, there's 1,700 people in the Executive Office of the President. I don't know how -- we'll try to find out how many emails a day are sent with that many people. I can assure you it's a high number. But I also will tell you that the technical folks that we've spoken to in the preliminary discussions was that if there had been an inadvertent human error or a technical problem where there were days where emails might have been misplaced, that either, one -- well, one, it wouldn't have been intentional; and, two, there are ways that we can try to gather those if need be.

Think about it. I mean, there are sometimes -- and I don't have a list of the days with me -- but if it was a Saturday or a Sunday, oftentimes because we have such a large organization that works 24/7, but mostly Monday through Friday, if they do any maintenance on our servers, just like in your organizations, they often do it on times when it's slow -- slow periods. And so if they are looking at those days -- we just need to do a little bit more work before I can answer definitively.

Q So, to your knowledge, there's no problem within the White House email system, in terms of messages or emails that have been deleted? Or at this point, you just don't know?

MS. PERINO: No, what I'm saying is that -- the way that the system is set up, and the way to comply with the Presidential Records Act is that any email that goes to or from a White House account, an EOP account that you all email us on, those are automatically preserved. Their question was specific not to GWB emails but to White House account emails, and their question is -- the allegations that there could be days, whole days missing.

And what I'm saying is, we're looking into that. But I would caution people from making any broad conclusions about that, for the reasons I've stated -- which is, there's no indication that that would have been intentional, and there are ways that you can find missing emails. And that's one of the ways that they do that. I'm not a technical expert, but they have the expertise on that.

Q Just a quick follow here. They alleged that White House Counsel Harriet Miers was informed of this problem at the time, these missing emails, and that they -- that she didn't do anything about it or the White House didn't do anything about it. Are you aware of that, or --

MS. PERINO: I haven't spoken to Harriet. Obviously, she's no longer working here. But we are -- Scott Stanzel and I are working to find as much information as possible, and we're talking to the Office of Administration. Remember, sometimes -- we don't have the same personnel, necessarily, that we had three or four years ago. So we're working to get the answers for you.

Q Dana, can we go back broadly for just one moment?

MS. PERINO: Okay.

Q You've had a change of policy here. Why?

MS. PERINO: Well, as I said, this -- now stepping back away from that particular problem on EOP emails and talking about, specifically about GWB RNC-hosted accounts, out of an abundance of caution at the beginning of the administration, there were two basic notices, in terms of policy, on this issue. One was, official White House business should be done on official White House accounts.

The second one was -- and it was much more extensive -- how an individual who has responsibilities in both the political and the official worlds would avoid violating the Hatch Act. And that was very explicit, and the Hatch Act says you cannot use a government-issued computer or any sort of government-issued equipment, which is paid for by taxpayer dollars, to do any sort of political business. And so out of an abundance of caution, and because people were concerned about violating the Hatch Act, and because of convenience, in terms of managing multiple devices, as the BlackBerrys became more ubiquitous, the policy wasn't always followed correctly.

And so we decided that the best thing to do was to let you know that, and to, secondly, have a new policy, one that makes it much more clear and gives the employee much more clear guidance. There was a failing both on not having a clear guidance, not having good management or overseeing of the issue, and then individuals not following through on the guidance.

Again, I think it was more -- I don't think it was intentional, and there's no indication that there was anything improper or improper use of these RNC emails. But it is better now to have a clearer policy in which people know exactly where the lines are, and if they have questions about whether they fall in the gray area and where the line is, the Counsel's Office has let them know that their door is open and that they're happy to help them make those judgments.

Q Could you enunciate what that policy is and when it went into effect?

MS. PERINO: It was recently, only in the last couple weeks or so, I think.

Q And what is that policy?

MS. PERINO: I think it's what I've just described to you, which is that you still need -- that White House business still needs to be done on White House official accounts; political -- I see your point -- political affairs business needs to be done on your RNC account. We want to make sure that people aren't using government-sponsored -- or government-paid-for equipment to do political business, but that, out of an abundance of wanting to make sure we're complying with the Presidential Records Act, that you should figure out a way to preserve those documents, so either by printing them out or saving them in some way on your computer or CC-ing yourself so that if, in the future, at any time the Counsel's Office needs to review those documents, they are available.

Q Dana, I'm unclear on -- you said the policy wasn't always followed before. But then is there an indication of wrongdoing there, and violation of the Hatch Act?

MS. PERINO: I think the way to describe it would be that there's no indication that anyone was intentionally not following the policy. I think that the policy wasn't very clear, and that people needed a clearer policy. And especially because technology changed pretty rapidly. I think people at the White House -- and I don't know about you all -- but we didn't have access to BlackBerrys until well after -- right around after September 11th. And then at that point, it was only a very few people. And now it's much more widespread.

Q Are you certain there was no violation of the Hatch Act? I mean, you just said the policy wasn't always followed. So what does that mean, exactly?

MS. PERINO: I don't know of anybody that violated the Hatch Act.

Q Whether it was intentional or not --

MS. PERINO: I don't know of anyone that violated the Hatch Act or would have intentionally violated the Hatch Act.

Q Dana, just following up on that, two questions. First, at the outset of the administration you had this policy. Were there ethics trainings? Was it just a written policy that was distributed? How was the policy communicated to your staff?

MS. PERINO: I've worked here a long time; I can't remember. I do know that we get a written policy. I do know that -- and there is ethics training for everyone. I can't remember specifically how this was described in that ethics training.

Q And then you said -- actually, three questions. You said there wasn't enough oversight of the policy. Whose job is it to oversee that people were adhering to this policy? Who fell down on the job?

MS. PERINO: That's a good question. I don't specifically know. I think it was more a definition of senior staff, senior management.

Q And then with respect to Karl, Henry Waxman, after his meeting with the RNC, or his aide's meeting with the RNC lawyer yesterday, wrote a letter stating that the committee had, in 2005, adopted a policy specifically aimed at Karl Rove, that precluded him from manually deleting his emails from the RNC server. Why did the RNC need a special policy for Karl Rove?

MS. PERINO: As I said this morning, there are ongoing discussions between our Counsel's Office and the RNC general counsel, and it's just not something I'm able to answer right now. I understand that you want the answer, I just don't have it for you.

Go ahead, Holly.

Q When you talk about this guidance at the beginning of the administration, our understanding is that Gonzales, when he was in the White House Counsel's Office, he issued some guidance on this. Is that true, and can you release that guidance?

MS. PERINO: Can I look into it?

Q Yes.

MS. PERINO: It would follow that as Counsel to the President and in charge of the ethics counsel -- that's not illogical, but I need to check.

Q Can that be released, so we could actually see what was --

MS. PERINO: We typically have not released internal White House documents, but I'll take a look.

Q The thing is, since you're saying it was unclear, it was confusing, that way we could see for ourselves, and judge it.

MS. PERINO: Yes. Go ahead, John.

Q Have you read or been briefed on the letter from Waxman to Gonzales?

MS. PERINO: I have read the letter.

Q Okay, because at the end it seems to indicate that Rove's email capabilities were changed -- I'm sorry, I don't have the specific language in front of me -- but it seems to indicate that his email capabilities were changed because of an investigation. There's some mention of an investigation.

MS. PERINO: This follows within what Sheryl was asking about, and it's just not something I can answer right now.

Q Do you think that the increased focus on Karl Rove's

email and possibly his emails being missing might give more ammunition to Democrats who want to see him brought up to testify?

MS. PERINO: My experience has been that any time Karl Rove's name is mentioned, it adds to the ammunition, regardless of merit.

Q Do you think it has merit?

MS. PERINO: No comment. Go ahead, Peter.

Q Following up on a question from yesterday, were you able to determine who determined that the emails were missing and how this was determined?

MS. PERINO: Broadly but not specifically, in terms of the Counsel's Office review. I think that's when they realized that that -- remember, the Justice Department has been working to be responsive to the Congress, providing the documents that they ask for. And in one of those documents it showed that a White House employee had sent an email to the Justice Department, and it was from a GWB account. And that's what raised a question about it. There was nothing improper about using that account, but that's where it initiated. And so I think that from there, that's where they started looking into it more.

Q So someone went back and looked into that and found that it and others were missing, is that what you're saying?

MS. PERINO: Well, I'm not saying that anyone said that they were missing. The question is, is there a potential that some could have been lost. And, yes, there is a potential that some could have been lost, but we don't have a definition in terms of that universe or an answer specifically on that, until we are able to talk more about the forensics.

Q You've been talking about so many policies today and in the other briefing. Just to try to clarify, you said the policy wasn't clear, the policy was not always followed correctly. Which policy or policies are you talking about?

MS. PERINO: Just specifically about -- the example that I can give you is that from the White House manual that I've looked at, there is one paragraph explaining -- it's a short paragraph explaining that you should do White House official business on your White House official account. And then when you get to the part about how to avoid violating the Hatch Act, there's two pages of very explicit instruction. That's why I say that that policy was a little bit more clear.

Q And that's been sharpened now?

MS. PERINO: Yes. Go ahead, Alexis.

Q Dana, I want to go back in time, related to what Sheryl was asking. When the White House Counsel told the White House employees to be in full compliance with the subpoenas and requests for information in the Plame investigation, for example, did the Counsel's Office, with knowledge of the RNC accounts -- which the counsel did have -- instruct or inform the RNC that the White House officials should all be responsive to the subpoenas, in relation to their RNC accounts?

MS. PERINO: Going back to the Plame investigation?

Q Yes.

MS. PERINO: I don't -- I don't know the answer to that, and to avoid --

Q Can you check on that, and whether any information was then transferred from the RNC to the White House and then the White House to the investigators?

MS. PERINO: I will check into it and I'll see what we can say.

Q And then the second question I have is, currently now the White House network system has a pop-up message when or if employees try to delete something, that says, you can't delete, you're in violation of the blah-blah-blah law.

MS. PERINO: I must not have ever violated it, because it's never popped up on my computer. I don't know what you're talking about. I've never seen it.

Q Okay, so you've never seen it. My question is, is the new policy now installing that sort of message in any way on the RNC accounts?

MS. PERINO: Not that I'm aware of, but, again, I've never seen such a message, so I'll have to check into it.

Let me go to Suzanne, and then I'll go to the back again.

Q Dana, you keep saying that there's no indication that anybody willfully or intentionally misused the email system. What is that based on? Is the White House conducting interviews with the 22 people who had double accounts or --

MS. PERINO: I'll decline to talk about the internal review that we have that is ongoing, but I feel pretty confident in the source that I talked to that we are able to say that there is no basis to say that anyone was improperly and intentionally misusing one of the accounts that they were provided to avoid violating the Hatch Act. There's just no -- there's no indication of that.

And that's why I encourage people to not make any broad, sweeping conclusions about this, and to understand that our position has been, let's let people know that we think we had a problem, we're going to fix the problem and we're going to be working with the committee, with the RNC and then the House Judiciary Committee in their inquiry.

Q So it's fair to say that at least those 22 people have been approached in some way by the White House, through your investigation, and you've been reassured that their intentions were not --

MS. PERINO: Since I don't know that -- I don't know specifically if that's true about all 22 people. Let me check into it.

Q Karl Rove, perhaps?

MS. PERINO: I think he's aware. He's aware.

Goyal.

Q Two quick questions. One, if President has been informed or briefed on the situation in Bangladesh? Because there's a new army man and he has arrested and charged the two former --

MS. PERINO: I don't know. But I'll check into it.

Q And, second, how is our friend, dear friend, Tony Snow doing? And we pray for him.

MS. PERINO: Tony is doing really, really well. So he'd be happy to know you're thinking of him.

Go ahead, Joanie.

Q Does the President think that Paul Wolfowitz should remain President of the World Bank, given the controversy?

MS. PERINO: The President has full confidence in Paul Wolfowitz. He's done a remarkable job at the World Bank, where they are working to lift people up out of poverty from around the world. He's apologized for the matter, and his board is undergoing an internal review. And we expect him to remain as World Bank President -- he has the President's support. But for more detail and questions I would have to refer you over to the World Bank, who is conducting that independent review.

I'll go to Mark, and then I'll do Les.

Q Next week's schedule, Dana, as you described it to us as war on terrorism speeches Wednesday, Thursday, and Friday, if I've got my days right this time.

MS. PERINO: Yes.

Q Is this all a continuation of the Iraq supplemental debate, or is it something beyond that?

MS. PERINO: You can be sure that there's going to be discussion about the Iraq war supplemental debate. Remember, Wednesday is when we have the members coming down, the bipartisan, bicameral leadership on Wednesday. But the President, when he goes to visit the United States Holocaust Memorial Museum and make a statement there, he will not be talking about the Iraq war supplemental. That will be different type of remarks. And then we'll travel the next two days.

Q But he will in Ohio and Michigan?

MS. PERINO: Yes.

Q What time is the --

MS. PERINO: It's in the afternoon, mid-afternoon.

Les.

Q Thank you very much, Dana. If I could follow up this question. Page one of this morning's New York Times reports that Mr. Wolfowitz's tenure as President of the World Bank was, "thrown into turmoil by disclosure that he helped arrange a pay raise for his companion, Shaha Riza, for which he was greeted with, 'booing, cat calls, and cries for his resignation by staff members.'" And I have two questions. Does the President believe it was right or wrong for Mr. Wolfowitz to do this for what the Times terms "his companion"?

MS. PERINO: As I said, the President apologized for the matter. He's taken full responsibility for it. I'm sorry, Paul Wolfowitz apologized for the matter, and has talked to his board about it, and there's a review underway.

Q What definition of this word, "companion," can the public conclude, other than mistress? Does the President believe that people he nominated to such posts --

MS. PERINO: I'm not going to go there, Les -- not going to do it.

Q -- a mistress, rather than getting married?

MS. PERINO: Not going to do it. Thanks for trying to push the envelope, but not going to do it.

Q You'd like to run away from that?

MS. PERINO: Kelly, go ahead.

Q I just want to go back one more time. You've talked about not finding any indication of wrongful intent. But there were employees who used their RNC accounts for official government business, isn't that what you were --

MS. PERINO: I think that there were probably instances of that, but I think that was probably either out of an abundance of caution, or because of convenience. As I said, you're managing multiple email accounts, and plus we live in a world where we work 24/7. And I think that, again, there was no willful intention, but that there is a possibility that because you're using multiple accounts and trying to juggle that, that that was a problem. That's why we're working to fix it.

Q Out of an abundance of caution they used their RNC accounts to do official business?

MS. PERINO: Well, I think that when people have -- I think there are gray areas -- when they feel that there was a gray area that possibly they erred on the wrong side of it. I haven't seen copies of these emails, where they would -- where these were described.

Q Can you talk about what gray area would be?

Q It wasn't discussing the firing of federal prosecutors? That clearly is official business, is it not?

Q Or is it politics?

MS. PERINO: Well, I guess that is one of the questions that's before us in the U.S. attorney matter. I'm going to decline to comment on that specific question. Let me take it back to the Counsel's Office and see what I can say.

Q Is the President meeting with any potential candidates for this war czar position this weekend?

MS. PERINO: No. Steve Hadley is -- he hasn't even narrowed the list down, so he hasn't sent anyone to the President yet.

Q And he won't this weekend?

MS. PERINO: Not that I'm aware of, no. I'm going to do one more in the back -- go ahead.

Q Regarding the bombing in the Iraqi parliament, is there any new information as to how that occurred, and where was the lapse in security?

MS. PERINO: No, we don't have an update yet. Dr. Al-Dabbagh was here this morning, the press secretary for the government of Iraq. I was thrilled to have him here; I hope that you guys enjoyed it, as well. But right now we don't have any update, but if we get some over the weekend, we'll let you know.

Q One more topic, Dana. Governor Corzine was in a very serious accident, and it's been reported that he was not wearing a seat belt. Does the President wear a seat belt when he is in motorcades?

MS. PERINO: You know, I've never been with him in the limo to have personal knowledge of that, so we'll see if we can ask.

Q Thank you.

END 2:03 P.M. EDT

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2007/04/20070413-6.html

CLICK HERE TO PRINT

**EXHIBIT 4**

http://w3.nexis.com/new/delivery/PrintDoc.do?fromCart=false&dnld.

1 of 2 DOCUMENTS

# The Washington Post

## washingtonpost.com

The Washington Post

January 13, 2008 Sunday
Suburban Edition

# White House Secrecy Starts to Give;
# As Congress Intensifies Efforts for Openness, Administration Accedes

**BYLINE:** Elizabeth Williamson; Washington Post Staff Writer

**SECTION:** A-SECTION; Pg. A05

**LENGTH:** 1157 words

After years of hammering on the walls of secrecy surrounding the Bush White House, activists and Congress have begun, slowly, to open some cracks.

A federal magistrate on Tuesday ordered the administration to reveal by this week whether it has backup copies of millions of missing White House e-mails, which may describe decisions related to the Iraq war.

Last month, a federal judge ruled that lists of presidential visitors that President Bush has kept secret are in fact public records.

On New Year's Eve, Bush bowed to lawmakers in his own party and signed a bill speeding the release of millions of government documents requested by Americans under the Freedom of Information Act (FOIA), a measure he has opposed.

In the waning days of an administration marked by a penchant for confidentiality, open government groups and Congress have redoubled efforts to ensure that the written record of the Bush presidency is not lost to history. They say recent developments show growing irritation with a president who has used national security concerns to draw a veil over the workings of the executive branch and to hoard power for the White House.

Those developments include the declassification of the nation's intelligence budget and new recommendations that the president's daily intelligence briefings be saved as presidential records.

"They're getting exactly the open government results they labored to prevent, and in part because they so overreached," said Thomas Blanton, who heads the National Security Archive at George Washington University. "They could have gotten 90 percent of the extra power they wanted if they went to Congress and the public, but by going for 100 percent and doing it in total secrecy, they undermined their own legitimacy and left the presidency weaker than when they started."

White House spokesman Tony Fratto responded that "we are simply trying to preserve national security information, because that's in the best interests of the country; we are indeed protective of the prerogatives of the executive branch."

Fratto said the administration is working to resolve the missing e-mails issue, and that Bush's concerns about the FOIA requests centered on the resources required, not the release of information.

The line was drawn early in the Bush administration, when Vice President Cheney stiff-armed lawmakers and environmentalists who requested records from his energy policy task force, a battle the White House won in the Supreme Court.

As the executive branch tightened its grip on information, even the Department of Health and Human Services was provided new power to classify its work. In 2001, Bush issued an executive order giving past presidents and their families the authority to stall release of presidential papers indefinitely.

When Bush in 2002 invoked executive privilege and the "national interest" in refusing a subpoena from Rep. Dan Burton (R-Ind.), then the chairman of the House Government Reform Committee, for Justice Department documents relating to a decades-old murder investigation, Burton complained about a "veil of secrecy that is descending around the administration."

But most of the secrecy measures emerged from the attacks of Sept. 11, 2001, when efforts to keep government decision-making closely held drew few objections from Congress and a frightened public.

Early in 2002, then-Attorney General John D. Ashcroft issued a memo urging government agencies to use whatever legal means necessary to reject requests for public documents allowed by the FOIA. Later, then-White House Chief of Staff Andrew H. Card Jr. directed agencies to restrict access to "sensitive but unclassified" information.

Days after Democrats took control of Congress in January 2007, the House and Senate passed H.R. 1, which implemented the recommendations of the 9/11 Commission. The bill includes a provision to improve congressional oversight of the intelligence community by making the nation's annual intelligence budget figure public. The Directorate of National Intelligence released the $43.5 billion figure Oct. 30.

Congress subsequently revived efforts to speed up the release of public documents and activists used lawsuits in an attempt to pry loose White House correspondence and other material, particularly related to the war.

"The administration has brought these challenges on itself," said Sen. Susan Collins (R-Maine), ranking minority member of the Senate Homeland Security and Governmental Affairs Committee, who favored the disclosure of the intelligence budget. "By trying to keep secret information that doesn't need to be secret, it invites skepticism of all of its secrecy claims."

This year, Congress took aim at a years-old logjam created by delays in responding to public records requests. The White House opposed the Open Government Act of 2007 and enlisted allies in Congress to block it. But in December, Senate Minority Whip Jon Kyl (R-Ariz.) lifted his hold on the bill. On New Year's Eve at his ranch in Crawford, Tex., Bush signed it.

The law penalizes agencies that take months or years to meet FOIA requests by denying them the right to charge research or copy fees for documents released after the 20-day deadline, among other provisions.

In 2006, Sens. Barack Obama (D-Ill.) and Tom Coburn (R-Okla.) drafted a bipartisan bill requiring the White House budget office to put government contract information online. The bill eventually passed, and Bush signed it. The site, USASpending.gov, went online last month.

The administration, however, has won other battles over secrecy.

Last month, the Foreign Intelligence Surveillance Court rejected a request by the American Civil Liberties Union to release documents on the administration's warrantless wiretapping program. A bill overturning Bush's executive order on the release of presidential records remains mired in Congress. And the White House continues to refuse congressional demands for information about detainee interrogation methods.

Open government advocates see last week's court order that the White House reveal whether it has backup records of millions of deleted e-mails as the next big battle in the disclosure war.

The National Security Archive and Citizens for Ethics and Responsibility in Washington, which are seeking the records, say they cover about 10 million e-mails deleted from White House databases from 2003 to 2005. Federal law requires the White House to retain such records.

Fratto said the e-mails were inadvertently deleted, and their number is uncertain. "It was a problem we announced, admitted to and will remedy," he said.

By attacking White House efforts at secrecy now, advocates also hope to put such tactics beyond the reach of future administrations.

"Once a precedent is set and an administration not sufficiently rebuked, this kind of secrecy becomes a permanent option," said Steven Aftergood, director of the project on government secrecy at the Federation of American Scientists.

**LOAD-DATE:** January 13, 2008

**LANGUAGE:** ENGLISH

**DISTRIBUTION:** Maryland

**GRAPHIC:** IMAGE; By Alex Wong -- Getty Images; Shown with Rep. David Price (D-N.C.), Sen. Susan Collins (R-Maine) has said of the White House, "By trying to keep secret information that doesn't need to be secret, it invites skepticism of all of its secrecy claims."

**PUBLICATION-TYPE:** Newspaper

Copyright 2008 The Washington Post
All Rights Reserved

# EXHIBIT 5



# Office of Special Counsel

*Patrick J. Fitzgerald*
*Special Counsel*

*Chicago Office:* **Dirksen Federal Building**
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(312) 353-5300

*Washington Office:* **Bond Building**
1400 New York Avenue, Ninth Floor
Washington, DC 20530
(202) 514-1187

*Please address all correspondence to the Washington Office*

<u>Via Telefax & Regular Mail</u>     January 23, 2006

William Jeffress, Esquire
BAKER BOTTS
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2400

Theodore V. Wells, Esquire
PAUL WEISS LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Joseph A. Tate, Esquire
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19103

Re: <u>United States v. I. Lewis Libby</u>

Dear Counsel:

This letter is in response to your letter of January 5, 2006. We incorporate the prior responses in our letters of December 3, 2005, and January 9, 2006. This follows our telephone conference of January 18, 2006.

As a preliminary matter, your letter indicates a belief that it is "very common" in the District of Columbia to engage in "open file" discovery, but my understanding is to the contrary. To my understanding, "open file" discovery is not common in that district, nor in the Department of Justice more broadly. That is particularly the case where the matter involves extensive classified and national security materials. Moreover, it is not the ordinary practice for federal prosecutors to provide discovery in a perjury/obstruction of justice prosecution as to all matters that were considered but not charged in the overarching grand jury investigation, particularly one that is ongoing. As you are aware, your client has not been charged with a substantive violation of Title 18, United States Code, Section 793. Accordingly, your client is not entitled to discovery of sensitive national security materials pertinent only to a prosecution of a substantive violation of that statute.

In any event, the fact that we have not elected to provide you with everything the defense has requested should not obscure the fact that the defense is being given far more discovery than is required by the language of Rule 16 of the Federal Rules of Criminal Procedure. To cite but one example, we are making available to you all material obtained from the Office of Vice President: in essence, "open file" discovery regarding the office where your client was employed. We have endeavored to draw a line that expedites resolution of this matter while at the same time safeguarding other governmental interests and the ongoing investigation. In making discovery

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 2

determinations, we have endeavored to provide no preferential treatment of Mr. Libby solely on account of his former official position.

I note that our January 18, 2006, telephone conference was productive in achieving a clearer understanding of the areas where we disagree which will lend itself to presentation to the court for resolution. We also agreed during the telephone conference that if we decided to produce any items to you despite our belief that we were not required to do so that you would not view such production as a waiver of our position that such discovery was not required or argue that such a production was a concession that we were obligated to produce any additional documents that may be in the possession of other government agencies.

In your requests, you greatly expand the sweep of subsection 16(a)(1)(E) which governs "documents and objects" by making requests for "information," rather than "documents and objects," and by defining documents "material to preparing the defense" to include memos, recordings and transcripts in a manner which would sweep in grand jury minutes and reports of interview (most commonly reports of interview in the form of FBI form 302's). That is flatly inconsistent with the narrower category of "documents and objects" set forth in subsection 16(a)(1)(E) and is contrary to both subsection 16(a)(2) which says that reports and government memoranda (prepared by an attorney or agent) are not discoverable, and to subsection 16(a)(3) which limits grand jury transcript discovery to the defendant's grand jury testimony. To define "documents" to include grand jury transcripts and debriefing reports would contravene the Jencks Act and the enumerated provisions of Rule 16. Thus, in reviewing our response, you should understand that, unless specified otherwise below, we are not producing such grand jury transcripts or FBI 302's or other reports, as they are not required to be produced pursuant to Rule 16.

We respond in greater detail to your enumerated requests as follows:

(1): You demand access to all documents referencing Mr. Wilson's 2002 trip to Iraq. The relevance of Mr. Wilson's 2002 trip is the fact that it occurred and that it became a subject of discussion in spring 2003. What took place during that trip is not relevant to the issue of whether Mr. Libby lied about his spring 2003 conversations with various reporters and government officials about Mr. Wilson's wife's employment at the Central Intelligence Agency ("CIA"). Thus, a request for every document which in any way relates to Mr. Wilson's trip and any communications Mr. Wilson had with anybody at any time about the trip is over broad and any attempt to comply with such a request would significantly delay, not expedite, resolution of this matter. Nonetheless, all documents in our possession reflecting conversations involving defendant Libby about Wilson's trip, or meetings Mr. Libby attended during which Mr. Wilson's trip was discussed, have been produced or will be produced prior to February 3. Moreover, when you review the materials in our possession which we have produced or will be producing to you, specifically including the copies of all documents obtained from the Office of Vice President and the materials from our set of

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 3

documents obtained from the Central Intelligence Agency ("CIA"), you will note that they include substantial materials which concern or reflect Mr. Wilson's trip.

(2): We do not have any responsive materials other than material that would be produced pursuant to the Jencks Act if the Government were to call Mr. Wilson to testify at trial, which we do not expect to do. You are obviously aware that Mr. Wilson has made public speeches, written an Op Ed in the *New York Times*, published a book and has been interviewed by media.

(3): As set forth in our prior correspondence, we will not produce every document related in any way to Ms. Wilson's employment, nor is Mr. Libby entitled to every document that might reflect on the damage to national security from disclosure of her employment. However, as we discussed during our telephone conference call on January 18, we intend to address the matter of the use, relevance and admissibility of information concerning Ms. Wilson's employment at the CIA in the context of the Classified Information Procedures Act ("CIPA").

(4): While we do not believe we are required to do so, we will advise you of certain information responsive to your request by letter on or before February 3.

(5): As we previously advised you, we have no formal damage assessment in our possession but, as we discussed during our telephone conference call on January 18, we intend to address the matter of the relevance and admissibility of Ms. Wilson's employment at the CIA in the context of CIPA.

(6) (7) and (8): Aside from any Jencks Act material which will not be produced as discovery, all responsive documents have been produced to you or will be produced to you on or before February 3. As we noted during our conference call, we do not agree that you are entitled to all such materials or that the scope of your request is proper but you are receiving all responsive documents in our possession. We also advised you that when gathering materials during the investigation we did not focus our searches on a topic as broad as that set forth in the request in 7(e) .

(9): This request in effect seeks discovery concerning any other subjects of the ongoing investigation. We have not produced, and do not intend to produce, all documents regarding contacts between government officials other than Mr. Libby and reporters prior to July 14, 2003, but have produced (or will produce before February 3) all documents reflecting contact between Mr. Libby and reporters responsive to this request. Lest there be any doubt, we do have some documents responsive to your request which we are electing not to produce because we do not agree that we are obligated to provide them.

(10) and (11): Aside from any Jencks Act material which will not be produced as discovery, all responsive documents have been produced to you or will be produced to you on or before February 3.

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 4

    In your section entitled "Information Relating to the Government's Investigation of the Media," you assert that the government takes the position that the defense is not entitled to receive in discovery the contemporaneous notes made by the reporters who spoke to Libby, but do not note that you have been provided with all notes in the government's possession that were made by reporters when speaking to Mr. Libby. (As discussed above, the Government has declined to provide notes of conversations between reporters and other government officials.) You elsewhere stated that we declined to provide "any" information about reporters when in fact we have produced documents obtained from media entities as you elsewhere acknowledge.

    (12) - (16): While we do not intend to provide discovery in this regard, and while not required to do so, in order to expedite litigation of this matter we advised you during the January 18 conference call that we were not aware of any reporters who knew prior to July 14, 2003, that Valerie Plame, Ambassador Wilson's wife, worked at the CIA, other than: Bob Woodward, Judith Miller, Bob Novak, Walter Pincus and Matthew Cooper,[1] There are published accounts of when Ms. Miller and Mr. Cooper first learned about Mr. Wilson's wife and from whom. Mr. Woodward has publicly described his conversation with Mr. Libby on June 27, 2003, as well as the general timing ("mid-June") of his conversation with another unnamed government official with whom he then spoke about Mr. Wilson's wife. Mr. Woodward has also described his conversations in 2003 and later with Mr. Pincus on the subject. Mr. Pincus has published his account of when he first learned information about Wilson's wife from a source he does not name. Mr. Novak has published his account of when he learned about Wilson's wife (some time after July 6) without naming his sources in the account.

    We also advise you that we understand that reporter John Dickerson of *Time* magazine discussed the trip by Mr. Wilson with government officials at some time on July 11 or after, subsequent to Mr. Cooper learning about Mr. Wilson's wife. Any conversations involving Mr. Dickerson likely took place in Africa and occurred after July 11.

    We note that we understand from our January 18 telephone conference that the requests numbered 13 and 14 were intended to be requests limited to the time frame prior to July 14, 2003.

    We otherwise are not producing documents responsive to your request concerning other officials who were in contact with other reporters, as outlined above.

    In addition, you seek miscellaneous items for discovery in an effort to prepare motions. While we do not agree that there is a separate entitlement to discovery in order to facilitate motions which may or may not be well grounded, we advise you of the following in response to your enumerated requests:

---

[1] This statement is not meant to imply that each and every reporter named knew her name prior to July 14, 2003.

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 5

(17): We are reviewing the CIA referral document and will either produce the same to you or advise you otherwise shortly. We do not intend to produce "all documents relating to" that referral document as that could potentially implicate all documents in this investigation.

(18): We are seeking to obtain a copy of the order empaneling the grand jury public which we did not have in our possession and will either produce the same to you or advise you otherwise shortly.

(19)-(22): We will be providing to you prior to February 3 copies of subpoenas and pertinent correspondence relating to reporters referenced in the Indictment and/or whom we expect to call at trial.[2] We are specifically withholding subpoenas (and correspondence) which were addressed to reporters whose testimony was directed towards government officials other than Mr. Libby.

The Requests for Asserted "Brady" Material

We recognize that your requests for discovery seek the categories of items requested both pursuant to Rule 16 as well as pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). We do not agree, however, that each of your requests is appropriate under the governing standards nor, as discussed in prior correspondence, do we agree with your implicit view that we are aligned with all government agencies for purposes of discovery.

(A): We are aware of our *Brady* and *Giglio* obligations regarding witnesses and will comply with those obligations.

(B) and (C): We do not agree that if there were any documents indicating that Ms. Wilson's employment was not classified during the relevant times that any such documents would constitute *Brady* material in a case where Mr. Libby is not charged with a violation of statutes prohibiting the disclosure of classified information.[3]

(C): We do not agree that if there were any documents indicating that Ms. Wilson did not act in an undercover capacity or did not act covertly in the five years prior to July 2003 (which we neither confirm nor deny) that any such documents would constitute *Brady* material in a case where

---

[2] We are not providing correspondence such as transmittal letters, legal briefs filed, appellate briefs filed and various correspondence concerning scheduling, filing, sealing, redacting and unsealing of briefs and other court documents regarding litigation.

[3] I note that Ms. Wilson's employment status was classified but has since been declassified so that we may now confirm such status. In any event, we are not aware of any documents in our possession stating that Ms. Wilson's affiliation with the CIA was not classified at the relevant times.

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 6

Mr. Libby is not charged with a violation of statutes prohibiting the disclosure of classified information.

(D) and (E): We do not agree that any documents indicating that any reporter heard or suspected prior to July 14, 2003, that Ms. Wilson worked at the CIA constitutes *Brady* material but in any event incorporate our earlier response on this issue.

(F): We do not agree that any time witnesses disagree on facts that you are entitled to all documents so indicating in advance. We are aware of our *Brady* and *Giglio* obligations regarding witnesses and will comply with those obligations.

(G): We do not agree that all documents reflecting favorably on Mr. Libby's character or reputation for truthfulness or reflecting his propensity to comply with laws, regulations and nondisclosure agreements or of assuring that others complied with those regulations constitute *Brady* material (nor that such documents could be easily defined) as prior instances of non-criminal conduct are not considered exculpatory.

(H): Your request for *Giglio* impeachment material is premature and over broad. You will receive such material for Government witnesses, not for "potential" Government witnesses (however that term is defined). Moreover, the scope of records you seek is far beyond the scope of what is required. By way of illustrative (but not exhaustive) example, you seek all documents relating to any juvenile arrest of any potential government witness in a case where there will be no witnesses where any such arrest would be remotely recent or relevant to the trial.

<u>Other requests</u>:

There have been no search warrants executed and no communications intercepted pursuant to Title III at the direction of the prosecution team during the course of this investigation.

At this time we do not intend to offer any evidence of "other crimes" pursuant to Rule 404(b). As we discussed during our telephone conversation, Mr. Libby testified in the grand jury that he had contact with reporters in which he disclosed the content of the National Intelligence Estimate ("NIE") to such reporters in the course of his interaction with reporters in June and July 2003 (and caused at least one other government official to discuss the NIE with the media in July 2003). We also note that it is our understanding that Mr. Libby testified that he was authorized to disclose information about the NIE to the press by his superiors. We expect that such conduct will be the subject of proof at trial in that we intend to introduce Libby's grand jury transcript in evidence and Mr. Libby has testified that the purpose of his July 8 meeting with Ms. Miller was to transmit information concerning the NIE. Our anticipated basis for offering such evidence is that such facts are inextricably intertwined with the narrative of the events of spring 2003, as Libby's testimony itself makes plain. At this time, we do not intend to offer the evidence pursuant to Rule 404(b).

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 7

    We are not obligated at this time to disclose impeachment material of Mr. Libby should he testify in his defense.

    We are aware of no evidence pertinent to the charges against defendant Libby which has been destroyed. In an abundance of caution, we advise you that we have learned that not all email of the Office of Vice President and the Executive Office of President for certain time periods in 2003 was preserved through the normal archiving process on the White House computer system.

    Should you have any questions or comments regarding any of the foregoing, or should you wish to discuss this matter generally, please do not hesitate to call me at the number listed above.

Very truly yours,

PATRICK J. FITZGERALD
Special Counsel

# EXHIBIT 6

HENRY A. WAXMAN, CALIFORNIA,
CHAIRMAN

TOM LANTOS, CALIFORNIA
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
JOHN F. TIERNEY, MASSACHUSETTS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
BRIAN HIGGINS, NEW YORK
JOHN A. YARMUTH, KENTUCKY
BRUCE L. BRALEY, IOWA
ELEANOR HOLMES NORTON,
    DISTRICT OF COLUMBIA
BETTY McCOLLUM, MINNESOTA
JIM COOPER, TENNESSEE
CHRIS VAN HOLLEN, MARYLAND
PAUL W. HODES, NEW HAMPSHIRE
CHRISTOPHER S. MURPHY, CONNECTICUT
JOHN P. SARBANES, MARYLAND
PETER WELCH, VERMONT

ONE HUNDRED TENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY (202) 225–5051
FACSIMILE (202) 225–4784
MINORITY (202) 225–5074

www.oversight.house.gov

TOM DAVIS, VIRGINIA,
RANKING MINORITY MEMBER

DAN BURTON, INDIANA
CHRISTOPHER SHAYS, CONNECTICUT
JOHN M. McHUGH, NEW YORK
JOHN L. MICA, FLORIDA
MARK E. SOUDER, INDIANA
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
MICHAEL R. TURNER, OHIO
DARRELL E. ISSA, CALIFORNIA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
VIRGINIA FOXX, NORTH CAROLINA
BRIAN P. BILBRAY, CALIFORNIA
BILL SALI, IDAHO
JIM JORDAN, OHIO

December 20, 2007

Mr. Fred F. Fielding
Counsel to the President
The White House
1600 Pennsylvania Avenue
Washington, DC 20500

Dear Mr. Fielding:

In January 2009, the National Archives will take possession of the presidential records of the Bush Administration. I have concerns about whether the White House has prepared for this process and is preserving records according to its obligations under the Presidential Records Act.

Congress passed the Presidential Records Act in 1978, making clear that a president's records belong to the American public, not to the president or his advisors. The Act defines presidential records as:

> documentary materials, or any reasonably segregable portion thereof, created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.[1]

The Act requires each president to "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of his constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are maintained as Presidential records."[2]

Serious questions have been raised about whether the White House has sufficient systems in place to preserve presidential records and to prepare for the transition to the next President. In just over one year, the White House will be required to turn over all of its presidential records to

---

[1] 44 U.S.C. §2201.

[2] 44 U.S.C. §2203.

Mr. Fred F. Fielding
December 20, 2007
Page 2

the National Archives for storage, review, and eventual release to the public. According to information received by the Committee, the White House has not implemented a robust system for archiving e-mails and other electronic records despite several efforts to do so. In addition, in briefings with White House officials, Committee staff have been informed that during a 2005 review of White House servers, the White House found numerous days with few or no e-mails for certain White House components. Nevertheless, even today, more than two years after this problem was first discovered by White House staff, the White House still has not identified the cause of the problem, determined the volume of e-mails lost, or developed a plan for restoring those e-mails that were lost.

Moreover, the Committee learned earlier this year that a large number of White House officials, including some of the President's closest advisors, regularly used RNC e-mail accounts. As documented in a majority staff report, many of these e-mails have apparently been destroyed.[3]

The official records of this presidency belong to the American public. The public needs assurances that these records are being properly maintained and will be provided to the National Archives at the end of this administration. For these reasons, the Committee is considering holding hearings next year to examine the White House's past actions relating to compliance with the Presidential Records Act, as well as its plans for the handover in January 2009. In order to prepare for these hearings, I ask that you provide the Committee with the following documents:

1. Any documents relating to potential failures to archive or maintain Executive Office of the President e-mails during the Bush Administration, including documents discussing options for restoring or recovering lost e-mails;

2. Information about e-mail back-up tapes maintained by the White House, including the number of back-up tapes holding White House data, the content of those tapes, and a description of how these tapes are labeled, organized, and stored;

3. Any documents relating to the maintenance or development of existing or proposed electronic records management, e-mail archiving, or e-mail retrieval systems for the Executive Office of the President during the Bush Administration, including internal White House communications, requests for proposals, statements of work, task orders, and other contract documents; and

4. Any documents relating to the transfer of presidential records to the National Archives at the end of the Bush Administration, including communications with the National

---

[3] Majority Staff, House Committee on Oversight and Government Reform, *Interim Report: Investigation of Possible Presidential Records Act Violations* (June 2007).

Mr. Fred F. Fielding
December 20, 2007
Page 3

Archives on this issue, needs assessments, plans, contract documents, and internal White House communications, such as directives to White House staff regarding preservation of records and other preparation for the transition.

I request that you provide the documents requested above by February 1, 2008. In addition, I request that you provide my staff with a briefing by the same date from the official or officials in charge of preparation for the transition of presidential records from the White House to the National Archives.

The Committee on Oversight and Government Reform is the principal oversight committee in the House of Representatives and has broad oversight jurisdiction as set forth in House Rule X. An attachment to this letter provides additional information about how to respond to the Committee's request.

If you have any questions about this request, please contact Michael Gordon or Anna Laitin with the Committee staff at (202) 225-5420.

Sincerely,

Henry A. Waxman
Chairman

Enclosure

cc:    Tom Davis
       Ranking Minority Member