## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

CITIZENS FOR RESPONSIBILITY AND ) 
ETHICS IN WASHINGTON, )
                               )
             Plaintiff, )
                               )
          v. )           Civil No. 07-01707 (HHK/JMF)
                               )
EXECUTIVE OFFICE OF THE )
PRESIDENT, et al., )
                               )
           Defendants. )
_____)
NATIONAL SECURITY ARCHIVE, )
                               )
             Plaintiff, )
                               )
          v. )           Civil No. 07-01577 (HHK)
                               )
EXECUTIVE OFFICE OF THE )
PRESIDENT, et al., )
                               )
           Defendants. )
_____)

## PLAINTIFF CREW'S MOTION TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT AND FOR SANCTIONS

        Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") hereby moves this Court to order defendants to show cause why they should not be held in contempt for violating the Court's Memorandum Order of January 8, 2008 (Document 46) and for sanctions. The grounds for this motion are set forth in the accompanying memorandum of points and authorities filed in support of CREW's motion.

        Pursuant to LCvR 7(m), the undersigned counsel conferred with defendants' counsel by telephone on March 6, 2008, in an effort to resolve this matter short of filing this motion, including defendants' voluntary withdrawal of the Declaration of Theresa Payton. Plaintiff was

unable to resolve or narrow the issues and defendants' counsel has authorized plaintiff to

represent that defendants oppose this motion.

Respectfully submitted,

_____/s/_____
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
   in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20530
Phone:  (202) 408-5565
Fax:  (202) 588-5020

Attorneys for Plaintiff CREW

Dated:  March 6, 2008

2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 07-01707 (HHK/JMF) |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) ) ) | |
| Defendants. | ) ) | |
| NATIONAL SECURITY ARCHIVE, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 07-01577 (HHK) |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF CREW'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT AND FOR SANCTIONS

### STATEMENT

The stakes in this litigation are high for both the defendants and the American public.

Defendants risk exposure of the facts behind the complete and utter dereliction of their record-keeping responsibilities, facts that raise serious and disturbing questions about why the White House has failed to take any action in the face of millions of email records that have gone missing. The American public, for its part, risks losing a significant body of the historical records of this presidency, records that will shed light on critical and highly controversial

decisions.  To protect the public's interests, CREW has sought and secured a preservation order

and has requested expedited discovery to ascertain whether broader preservation obligations

should be imposed on the defendants.

It now appears that the intersection of these conflicting interests has led the defendants to

knowingly submit false, misleading and incomplete answers to questions the Court posed to

determine whether broader interim relief is necessary.  Recently disclosed documents by the

House of Representatives Committee on Government Oversight and Reform ("Oversight

Committee") and the testimony before that committee of Theresa Payton, defendants' proffered

declarant to answer the Court's questions, reveal several ways in which Ms. Payton's declaration

and the White House's answers are false, misleading and incomplete.

First, Ms. Payton attested to a "lack of supporting documentation" for a chart identifying

dates and components for which email is missing and noted "serious reservations about the

reliability of the chart."  Declaration of Theresa Payton ("Payton Decl.") at ¶¶ 10, 11 (attached as

Exhibit 1).  Both statements are misleading and the first is patently false.  The White House is in

possession of hundreds of pages of documentation supporting and explaining the multiple charts

that the Office of Administration ("OA") prepared, documentation that was put together by a

team of information technology experts.  Moreover, the entire analysis was subjected to an

independent verification and validation process.

Second, Ms. Payton attested that because her office has been retaining back-up tapes

since October 2003, emails sent or received during the 2003 through 2005 time-period "should

be contained on existing back-up tapes."  Id. at ¶ 12c.  Further, Ms. Payton attested on behalf of

defendants that her office does not know if any emails "were not properly preserved in the

archiving process." Payton Decl. at ¶ 12d.  Documents released by the Oversight Committee

demonstrate that each of these statements is false and that, contrary to OA's representations here,

the back-up tapes at a minimum do not contain all of the emails of the Office of the Vice

President for a critical period in the fall of 2003.

Taken as a whole this evidence demonstrates defendants' blatant disregard for the truth

and the processes of this Court.  The number and degree of contradictions between Ms. Payton's

declaration and the documentary evidence rise to the level of contempt and possibly fraud on this

Court, and warrant sanctions against both Ms. Payton and the defendants on whose behalf her

false, misleading and incomplete statements were made.

## **BACKGROUND**

These consolidated lawsuits involve challenges by CREW and the National Security

Archive to the knowing failure of the White House defendants to recover, restore and preserve

millions of email records created and/or received within the White House as well as the failure of

the archivist and head of OA to take enforcement action to ensure adequate preservation of all

federal records.  Complaint, ¶ 1.[1]  Plaintiffs also seek an order compelling the defendants to

implement an adequate electronic records management system in compliance with federal law.

Id. at ¶ 2.

After defendants failed to respond to letters from each plaintiff requesting a meeting

pursuant to Rule 26(f) of the Federal Rules of Civil Procedure, plaintiffs filed requests for

expedited discovery.  Underlying both motions was the critical need to ensure the greatest

possible preservation of the records of this presidency, preservation that is otherwise in grave

---

[1]The references herein are to CREW's complaint.

jeopardy given the past conduct of the defendants.  The motions also pointed out how time is of the essence given the upcoming transition to a new administration.

After considering these motions, Magistrate Judge Facciola issued a Memorandum Order on January 8, 2008, explaining the Court's need for additional information to ascertain whether the requested relief is necessary.  Specifically, the Court pointed out the possibility "that a small amount of information not currently in the record may have a large affect on the resolution of this Motion and the direction of this lawsuit."  Memorandum Order at p. 3 ("Mem. Ord.").  Accordingly, the Court ordered the defendants to provide answers, "by counsel in a sworn declaration"[2] to the following questions:

> 1.  Are the back-ups catalogued, labeled or otherwise identified to indicate the period of time they cover?
>
> 2.  Are the back-ups catalogued, labeled or otherwise identified to indicate the data contained therein?
>
> 3.  Do the back-ups contain emails written and received between 2003-2005?
>
> 4.  Do the back-ups contain the emails said to be missing that are the subject of this lawsuit?

Id. at 4 (footnotes omitted).

On January 25, 2008, defendants submitted the declaration of Theresa Payton, OA's chief information officer, "in accordance with the Court's instructions."  Notice of Filing, January 15, 2008 (Document 48), p. 1.  In addition to providing answers to the Court' four questions, Ms. Payton's declaration (Document 48-2) discusses the so-called "disaster recovery system" within the Executive Office of the President ("EOP") and the plaintiffs' claims.  Payton Decl. at pp. 2-5.

---

[2] Id. at p. 4 n.4.

Ms. Payton also attested under penalty of perjury to the truth and correctness of her statements. Id. at p. 7.

One month later, on February 26, 2008, the Oversight Committee held a hearing on the topic "Electronic Records Preservation at the White House." See Committee Hearings of the U.S. House of Representatives, Hearing on the Electronic Records Preservation at the White House, Preliminary Hearing Transcript, Feb. 26, 2008 ("Hearing Trans.") (attached as Exhibit 2). The witnesses at the hearing included, *inter alia*, Ms. Payton and defendants Alan Swendiman and Allen Weinstein, all of whom testified under oath. Hearing Trans. at p. 25.

The Democratic committee staff also released a report summarizing their findings to date. Committee on Oversight and Government Reform, Memorandum to Members of the Committee, Supplemental Information for Full Committee Hearing on White House E-mails, February 26, 2008 ("Comm. Memo") (attached as Exhibit 3). After the hearing the Oversight Committee released the sources of supplemental information ("Supp. Info.")(attached as Exhibit 4),[3] the written responses of former OA employee Steven McDevitt to the Committee's questions (attached as Exhibit 5) and a spreadsheet showing missing email messages by day and EOP component.[4] The documents released by the Committee, with the exception of Mr. McDevitt's written responses, were provided to the Committee by either the EOP or NARA. See Comm.

---

[3] For the Court's convenience CREW has numbered the supplemental documents, which as released by the Oversight Committee did not have consecutive numbering, and will use its numbering herein.

[4] Given the size of this document it is not included as an exhibit here, but it is available at http://oversight.house.gov/documents/20080227155329.pdf (last visited March 3, 2008). The Committee also released the opening statements of Chairman Henry Waxman and the three invited witnesses.

Memo at p. 1 ("the Committee received more than 20,000 pages of internal e-mails and other documents from the White House and the National Archives and Records Administration.").

## ARGUMENT

### I. DEFENDANTS ARE IN CONTEMPT OF THIS COURT BY KNOWINGLY SUBMITTING FALSE, MISLEADING AND INCOMPLETE ANSWERS TO THE COURT'S QUESTIONS.

#### A. Standards For Contempt

For nearly two centuries the Supreme Court has recognized the "inherent powers of federal courts . . . which 'are necessary to the exercise of all others.'" Roadway Express v. Piper, 447 U.S. 752, 764 (1980), *quoting* U.S. v. Hudson, 7 Cranch 32, 34 (1812). These powers include the " inherent power to enforce compliance with their [the courts'] lawful orders through civil contempt." Shillitani v. U.S., 384 U.S. 364, 370 (1966). See also Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991) ("[I]t is firmly established that 'the power to punish for contempts is inherent in all courts.'" (*quoting* Ex Parte Robinson, 87 U.S. 505, 510 (1874)); Armstrong v. Executive Off. of the President, 1 F.3d 1274, 1289 (D.C. Cir. 1993).

A court has at its disposal a number of sanctions for litigation misconduct including civil and criminal contempt and fraud on the court. A "primary aspect" of a court's discretion in this area "is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." Chambers, 501 U.S. at 45. As the Supreme Court has explained, "[t]hese powers are 'governed not by rule or statute, but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" Id. at 43, *quoting* Link v. Wabash R. Co., 370 U.S. 626, 630-31 (1962).

Civil and criminal contempt each serve different purposes and require different showings.

Civil contempt is remedial in nature and is "used to obtain compliance with a court order." Food Lion, Inc. v. United Food & Commercial Workers, Int'l Union, 103 F.3d 1007, 1016 (D.C. Cir. 1997) (citation omitted). A sanction such as civil contempt is also "for the benefit of the complainant." Evans v. Williams, 206 F.3d 1292, 1294-5 (D.C. Cir. 2000). Criminal contempt, on the other hand, "is punitive, to vindicate the authority of the court." Id. Moreover, state of mind and intent are relevant inquiries in determining whether a party should be held in criminal contempt for willfully violating a court order,[5] while for civil contempt "the intent of the recalcitrant party is irrelevant." Nat'l Labor Relations Bd. v. Blevins, 659 F.2d 1173, 1184 (D.C. Cir. 1981). See also Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 441 (1911).

Civil contempt will lie only for violating a court order that is "'clear and unambiguous.'" Armstrong, 1 F.3d at 1289, *quoting* Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 16 (1st Cir. 1991). This is assessed under "an objective standard that takes into account both the language of the order and the circumstances surrounding the issuance of the order." U.S. v. Young, 107 F.3d 903, 907 (D.C. Cir. 1997). Whether the putative contemnor has violated a clear and unambiguous order must be proven by "'clear and convincing evidence.'" Armstrong, 1 F.3d at 1289, *quoting* Washington-Baltimore Newspaper Build, Local 35 v. Washington Post Co., 626 F.2d 1029, 1031 (D.C. Cir. 1980). The moving party bears the initial burden of proof, Food Lion, 103 F.3d at 1016, after which the burden shifts to the putative contemnor to prove "good faith substantial compliance" with the court order. Id. at 1017.

## B. Defendants' Violation Of This Court's Clear And Unambiguous Order

---

[5] For these purposes willfulness has been defined as a "deliberate or intended violation, as distinguished from an accidental, inadvertent or negligent violation." TWM Manufacturing Co. v. Dura Corp., 722 F.2d 1261, 1272 (6th Cir. 1983).

**Rises To The Level Of Contempt Of Court**

Applying these standards here leads inescapably to the conclusion that defendants have violated a clear and unambiguous court order.  First, the order from this Court was clear and unambiguous.  Defendants were directed to provide answers to four questions in the form of a "sworn declaration" that was "to be provided by counsel."  Mem. Ord. at p. 4.[6]  The four questions asked for very specific information as to whether the back-up copies indicated the period of time they cover, the data they contain, whether they contain emails written between 2003 and 2005 and whether they contain "the emails said to be missing that are the subject of this lawsuit."  Id. (footnote omitted).

That the Order was clear and unambiguous is also apparent from the defendants' response, in which they voiced no concern or question over the meaning of the Court's Order.  Nor did the defendants raise any concerns or questions about the scope of their responsibilities in responding to the Court's questions.  Instead, through a three-sentence notice of filing, defendants submitted the declaration of Theresa Payton and noted it was "submitted in accordance with the Court's instructions."  Notice of Filing at p. 1 (Document 48).  By filing Ms. Payton's declaration defendants signified they were able to respond fully to the Court's questions.

Nevertheless, it is now apparent that defendants' responses are in some material ways

---

[6] To the extent the Court's order placed the burden of responding directly on defendants' counsel, consideration of whether plaintiff should be awarded its costs pursuant to 28 U.S.C. § 1927 may be warranted.  Under that statute, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

false, misleading, incomplete and accordingly violate the Court's order. First, the Court's Order made specific reference to the missing emails that are the subject of this lawsuit. Mem. Ord. at 4. In response, Ms. Payton claimed an "apparent lack of supporting documentation" of "whether there may be anomalies in Exchange email counts for any particular days resulting from the potential failure to properly archive emails for the 2003-2005 time period." Payton Decl. at ¶ 11. Ms. Payton described "a chart created by a former employee" that she "believe[s] is what Plaintiffs refer to as the 'detailed analysis.'" Id. at ¶ 10. The reference to "detailed analysis" comes from CREW's Complaint at ¶ 34 (and the Complaint of the National Security Archive at ¶ 32), id. at ¶ 9, which states as follows:

> In October 2005, in response to government subpoenas, the OA discovered that many electronic communications of the White House had not been properly preserved. After discovering the problem, *the OA -- on its own initiative -- conducted a detailed analysis and concluded that commencing in March 2003, there were hundreds of days of missing White House e-mails created or received between March 2003 and October 2005.* The OA further estimated that as of that time, at least five million e-mails -- and most likely many millions more -- had been deleted from the servers and were recoverable only from back-up tapes.

(emphasis added).

Ms. Payton's description of the documentation that OA prepared is false and misleading, as evidenced in part by the written answers of Steven McDevitt, who served as an information technology specialist-project manager in OA's Office of the Chief Information Office ("OCIO") from September 2002 through July 2003, and thereafter as director of the architecture and engineering directorate of the OCIO from July 2003 to October 2006.[7] Contrary to Ms. Payton's

---

[7] As the hearing transcript makes clear, Mr. McDevitt did not testify under oath because of constraints placed upon him by the White House Counsel's Office. See, e.g., Hearing Trans.

declaration claiming that a single chart was created by one employee, Mr. McDevitt explained

that, in fact, a 15-person team within OA conducted an extensive multi-phase assessment of the

missing email problem that resulted in a final analysis of "approximately 250 pages in length"

that "included the complete background data and trend analysis" in addition to a separate

analysis summary report.  Responses from Steven McDevitt, question 20 ("McDevitt Resp.").

Mr. McDevitt described some of the accompanying materials as follows:

> There were numerous documents, PowerPoint presentations
> and other memoranda that described the analysis that was
> performed, the actions taken to correct the process and the
> recommendations to improve the processing of .pst files.
> The team documented the details of each action taken to
> clean up and correct the identified issues.
>
> There must be thousands of email messages between the
> team members that describe the actions of the team, the
> completion of specific tasks, analysis of issues and to
> provide status to OCIO management, OA Counsel and OA
> management.

McDevitt Resp., question 23.

The misleading, if not outright false, nature of Ms. Payton's statements is also

demonstrated by Mr. McDevitt's description of the verification that was performed of OA's

analysis.  As he describes,

> During this analysis process, a high level of formality and
> review was performed on every step of the process.  The
> team performing the analysis met daily and in some cases
> multiple times per day.  Each activity was documented
> either in meeting notes or in emails distributed to the entire
> team . . . an independent verification and validation was

---

at pp. 8,10, 21-22.  If the Court deems it necessary, CREW would be happy to seek sworn
testimony from Mr. McDevitt either through a deposition subpoena, a declaration, or at any
hearing the Court should hold.

> performed by a separate set of contractors who were not
> members of the team that was performing the analysis
> effort.

Id., question 25.  Moreover, "[t]he results of this analysis, both in preliminary and final form

were presented on various occasions to OA management and OA counsel . . . throughout the

period of October 2005 through February 2006."  Id., question 26.

Some of these details were confirmed by John Straub, former director of OA during this

period.  In an interview with the Oversight Committee staff Mr. Straub stated that he oversaw

this effort, was "consumed" by it and "worked closely with Mr. McDevitt to locate the missing

e-mails."  Committee Memo at p. 19.  Moreover, according to documents shown to the

Committee, "the White House Counsel's office was aware of these issues and met frequently

with Mr. McDevitt's team."  Id.

Ms. Payton's statements are highly inconsistent and cannot be reconciled with both Mr.

McDevitt's written responses and Mr. Straub's statements to the Oversight Committee.  During

her hearing testimony, when confronted with some of these inconsistencies, Ms. Payton did not

deny a lack of knowledge regarding the work of this team.  Instead, when pressed by

Representative Eleanor Holmes Norton as to whether she was unaware of the 15-person team

who worked on the missing email analysis in light of her statement "that a single member

created . . . this chart perhaps indeed almost on his own," Ms. Payton responded:  "No,"[8] and

further that "all I know is that they [the team] put data together . . ."  Hearing Trans. at p. 113.

Records NARA produced to the Oversight Committee also document Ms. Payton's

awareness of the "2005 report" months before she executed her declaration in this case.  For

---

[8] Hearing Trans. at p. 112.

example, a record of a meeting between EOP and NARA staff that took place on October 11, 2007, notes: "We asked if Theresa [Payton] had reviewed an electronic version of the 2005 report . . ." Supp. Info. at p. 23.

Second, and perhaps most serious of all, Ms. Payton's statements in her declaration concerning the back-up copies and whether they contain any missing emails are false and appear designed to mislead the Court into believing that both discovery and any additional interim relief are unnecessary. Specifically, in response to the Court's question of whether the back-up copies "contain emails written and received between 2003-2005," Ms. Payton stated in relevant part:

> In October 2003, this office [OA] began preserving and storing
> all back-up tapes and continues to do so. *For that reason,*
> *emails sent or received in the 2003-2005 time period should*
> *be contained on existing back-up tapes*.

Payton Decl. at ¶ 12c (emphasis added). Likewise, in response to the Court's question about whether the back-up copies "contain the emails said to be missing that are the subject of this lawsuit," Ms. Payton responded in pertinent part that "[a]t this stage, *this office does not know if any emails were not properly preserved in the archiving process*." Id. at ¶ 12d (emphasis added). She also stated:

> in view of this office's practice in the 2003-2005 time period
> of regularly creating back-up tapes for the EOP Network,
> which includes servers containing emails, and in view of
> this office's practice of preserving all such back-up tapes from
> October 2003 to the present, *the back-up tapes should contain*
> *substantially all the emails sent or received in the 2003-2005*
> *time period*.

Id. (emphasis added).

Documentary evidence makes clear that at the time the EOP defendants submitted this declaration they knew that critical emails were missing from the Office of the Vice President in

12

the September 20, 2003 to October 6, 2003 time-period during which the Department of Justice was conducting an investigation into the disclosure by top White House officials of the identity of covert CIA operative Valerie Plame Wilson. An internal OA November 28, 2005 memorandum documents "the planned activities to recover Office of Vice President email from the target period of September 30, 2003 to October 6, 2003."[9] Supp. Info. at pp. 44-46. That memorandum also documents the fact that after restoring the server containing "the journal mailboxes for the target period" from a backup "performed on 10/21/03" OA found "*no* messages for the target period . . . present in the journal mailbox." Id. at p. 46. (emphasis added). As a result, according to this memorandum, OA had to restore "[t]he Exchange server that contained the OVP mailboxes" from "a backup that was performed on 10/21/2003," and from which email "was extracted from each of the 70 OVP mailboxes and copied to a .PST file." Id.

In other words, despite Ms. Payton's representation that emails sent or received in the 2003-2005 period should be contained on existing back-up tapes, for a critical period from September 30, 2003 to October 6, 2003, the .pst archives containing the journaled files that she represented were captured by back-up tapes[10] were missing. Instead, OA could recover only those emails in the personal email accounts of officials in the vice president's office that had not been deleted by the individual users by the time the back-up was created. See also Committee Memo at 3 ("The only e-mails that could be recovered and provided to the Special Counsel were

_____

[9] It appears that the White House provided this memorandum to the Oversight Committee.

[10] See Payton Decl. at ¶ 7 (describing disaster recovery back-up process).

13

e-mails that the White House was able to restore from the personal e-mail accounts of officials in the Vice President's office"); Hearing Trans. at 89-90.[11]

The Court posed these questions to ascertain the completeness of the existing set of back-up copies subject to the Court's current preservation order.  Defendants' responses were made with full knowledge that at least one critical subset of email was missing, yet defendants failed to acknowledge that omission and instead represented that emails sent or received in the 2003-2005 time-period "should be contained on existing back-up tapes."  Those statements are false and misleading.[12]

Defendants' false and misleading statements cannot be excused by any lack of personal knowledge on Ms. Payton's part.  The Court ordered *the defendants* to respond to its questions and it was clearly incumbent on the defendants to adduce accurate and complete responses.  That Ms. Payton purported to submit her declaration "on behalf of the Defendant OA," Payton Decl. at ¶ 2, does not excuse or explain the defendants' failure to respond completely, accurately and in a non-misleading manner to the Court's questions.[13]

-----

[11] When confronted with these facts during her testimony before the Oversight Committee Ms. Payton admitted "that 70 mailboxes were restored . . ."  Hearing Trans. at 90.

[12] There is also reason to question the sincerity of Ms. Payton's statement that the "independent assessment" her office has undertaken is expected "to be completed in the near term," Payton Decl. at ¶ 11.  Just last week Ms. Payton told the Oversight Committee that OA has targeted completion of phases one and two of its three-phase assessment for some time this summer, Hearing Trans. at p. 135, while OA has been telling NARA since May 2007 that it was on the verge of completing its assessment.  See, e.g., Supp. Info. at p. 28 (email dated June 20, 2007, from Gary Stern, General Counsel of NARA, to Emmet Flood and Christopher Flood of the White House Counsel's Office, noting "we were informed that the OA CIO audit of the missing email situation should be completed in about 4 weeks." ).

[13] In this regard, it bears repeating that defendants' notice of filing, submitted with Ms. Payton's Declaration, notes that it was being "submitted in accordance with the Court's instructions," Notice of Filing at p. 1, which were directed to all the defendants, not only OA.

In this regard, defendants' obligations are analogous to the obligations that Rule 30(b)(6) of the Federal Rules of Civil Procedure imposes on a responding party. Those include a duty to designate a deponent (here a declarant) "knowledgeable on the topic." Banks v. Office of the Senate Sergeant-At-Arms, 241 F.R.D. 370, 373 (D.D.C. 2007), *citing* Alexander v. FBI, 186 F.R.D. 137, 141 (D.D.C. 1998). Moreover, parties responding to a Rule 30(b)(6) notice also have an obligation to "prepare the [declarant] so that . . . she can testify on matters both within . . . her personal knowledge as well as those 'reasonably known by the responding entity.'" Banks, 241 F.R.D. at 373, *quoting* Alexander v. FBI, 186 F.R.D. at 141. See also McKesson Corp. v. Islamic Republic of Iran, 185 F.R.D. 70, 79 (D.D.C. 1999) ("A designee of the receiving entity [under Rule 30(b)(6)] should not only testify about matters within his or her own personal knowledge, but also about matters which the receiving entity has reasonable knowledge and access."). In the Rule 30(b)(6) context, the purpose "is to 'curb the 'bandying' by which officers or managing agents of a corporation are deposed in turn but each disclaims knowledge of the facts that are clearly known to the organization and thereby to it.'" Banks, 241 F.R.D. at 372-73, *quoting* Fed. R. Civ. P. 30(b)(6) advisory committee notes.

That purpose applies with equal force here. The Court, having imposed a clear and unambiguous obligation on the defendants to respond to four discrete questions, should not have to countenance "bandying" and gamesmanship by which defendants proffer the declaration of an individual who is either wilfully uninformed or has offered patently untruthful and misleading responses.

In sum, the clear weight of the evidence establishes that defendants have violated this Court's order by offering incomplete, false and misleading responses to a direct Court order.

Accordingly, sanctions are warranted for conduct that is patently "disrespectful to the court and to deter similar misconduct in the future." Webb v. District of Columbia, 146 F.3d 964, 971 (D.C. Cir. 1998), *cited in* Landmark Legal Found. v. Environmental Protection Agency, 272 F.Supp.2d 70, 85-86 (D.D.C. 2003).[14]  In addition, given the urgency behind plaintiffs' requests for expedited discovery, the defendants' responses to the Court's order place "an intolerable burden" on the court, which will now be required "to modify its docket to accommodate the delay caused by the contumacious party." Id.  This misconduct more than justifies sanctions under prevailing Circuit precedent.

## II.  APPROPRIATE SANCTIONS FOR DEFENDANTS' CONTUMACIOUS BEHAVIOR INCLUDE COSTS, ATTORNEYS' FEES AND DISCOVERY.

This Court has varied and flexible sanctions available to "fashion an appropriate sanction for conduct which abuses the judicial process." Chambers, 501 U.S. at 44-45.  Although civil contempt is not punitive in nature, sanctions for civil contempt "can be imposed to compensate the complainant for losses sustained as a result of the contumacious conduct." Landmark Legal Found., 272 F.Supp.2d at 86, *citing* U.S. v. United Mine Workers, 330 U.S. 258, 303 (1947).

---

[14] Conduct that is especially egregious may rise to the level of fraud on the court that also "warrants a finding of civil contempt." Cobell v. Norton, 226 F.Supp.2d 1, 121 (D.D.C. 2002), *vacated in part and remanded*, 334 F.3d 1128 (D.C. Cir. 2003).  This flows from a court's inherent powers, which include "[t]he authority to respond to and punish fraud on the court . . ." Id. at 24, *citing* Universal Oil Products v. Root Refining Co., 328 U.S. 575, 580 (1946); Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1119 (1st Cir. 1989).  Behavior that is considered to be a fraud on the court includes "some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." Aoude, 892 F.2d at 118.  The Court should also consider whether criminal contempt sanctions are warranted, a matter within the Court's purview. See Landmark Legal Found., 272 F.Supp.2d at 77 ("it is the court that makes the initial decision whether a criminal contempt proceeding should take place.").

Toward that end, courts often award attorneys' fees and expenses necessitated by a civil contempt hearing. See, e.g., Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 718 (1967); Food Lion, 103 F.3d 1017 n.14. Other sanctions recognized by courts to address a party's civil contempt include "drawing adverse evidentiary inferences or precluding the admission of evidence." Shepherd v. Am. Broad. Co., 62 F.3d 1469, 1475 (D.C. Cir. 1995).

This Court should exercise its inherent authority here to fashion a remedy that includes both an award of attorneys' fees and costs as well as permitting the plaintiffs to take the deposition of Ms. Payton at the defendants' expense. Specifically, CREW should be awarded its costs and attorneys' fees associated with this motion and any subsequent hearing the Court may hold, as well those costs and attorneys' fees associated with its motion for expedited discovery.

As to discovery, defendants' contumacious behavior has delayed the resolution of plaintiffs' motions for expedited discovery and cast serious doubt on the true facts regarding the back-up copies that defendants have been directed to preserve. Accordingly, a deposition of Ms. Payton conducted under oath represents the most effective way to ascertain the facts necessary to answer fully and accurately the Court's questions. In addition, if Ms. Payton is not sufficiently knowledgeable, plaintiffs should be permitted to depose another EOP official or officials who can testify to what Ms. Payton cannot, at the defendants' expense. Only in this way will CREW be adequately compensated for defendants' contumacious conduct.

## CONCLUSION

For the foregoing reasons, the Court should immediately issue a show cause order why defendants should not be held in contempt for their submission of false, incomplete and misleading answers in response to the Court's Memorandum Order of January 8, 2008.

17

Respectfully submitted,

_____/s/_____
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
   in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20530
Phone:  (202) 408-5565
Fax:  (202) 588-5020

Attorneys for Plaintiff CREW

Dated:  March 6, 2008

18

**EXHIBIT 1**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No: 1:07-cv-01707 (HHK/JMF) ) |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) ) ) |
| Defendants. | ) ) |
| NATIONAL SECURITY ARCHIVE, | ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No: 1:07-cv-01577 (HHK/JMF) ) |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF THERESA PAYTON

I, Theresa Payton, declare as follows:

1.      My name is Theresa Payton and I currently hold the position of Chief Information

Officer (CIO) in the Office of Administration (OA), Executive Office of the President (EOP). In

this capacity, I am responsible for providing strategic and operational leadership within the

Office of the Chief Information Officer (OCIO). I have held the position of CIO in OA since

May 2006.

2.      I submit this Declaration on behalf of the Defendant OA pursuant to the Order of

Magistrate Judge John M. Facciola dated January 8, 2008. The statements contained in this

Declaration are based on my personal knowledge and on information provided to me by members of my staff in the performance of my official duties.

**A.**   *OA and the OCIO*

3.    OA was created by Reorganization Plan No. 1 of 1977 and Executive Order 12028.  Its primary functions include providing common administrative and support services for the EOP components.

4.    The OCIO, which is an operating unit of OA, provides around-the-clock customer service for all EOP components and the Office of the Vice President, consisting of more than 3000 users and customers, in excess of 200 servers, and over 100 applications.  Specifically, the OCIO is responsible for providing EOP components with unified enterprise services such as production support, application development and support, office automation, e-mail, disaster recovery back-up information, Continuity of Operations (COOP) support, and intranet capabilities.  It also provides coordination of compliance programs for Federal Records, Federal Enterprise Architecture, and Information Assurance.  The OCIO is also charged with protecting and safeguarding the complex, sensitive but unclassified EOP network (EOP Network) (including the infrastructure, web sites, remote access, and data).

5.    As part of its email record-keeping responsibilities, the OCIO employs an archiving process.  Since the phased deployment of Microsoft Exchange as the email system for the EOP Network, that process has entailed saving journaled emails to .pst files that are then maintained on the EOP Network.

**B.**   *The EOP's Disaster Recovery System*

6.    As a matter of good business practices, the EOP Network has been and continues to be regularly "backed-up" onto disaster recovery back-up tape media as part of the EOP's

disaster recovery system. The back-ups occur as a protective measure for purposes of restoring EOP operations in the event of a disaster or catastrophic incident resulting in the partial or total loss of operating systems and data. OA's process for creating disaster recovery back-up tapes ("tapes" or "back-up tapes") has changed over time, undergoing periodic upgrades, enhancements and improvements. The data-types contained on the tapes include the server software, such as operating systems and applications. The data-types also include files saved on the server such as, for example, email databases and/or email environment information.

7.      The purpose of the tapes created and maintained by OA is to create a "snapshot" of the EOP Network, including its operating systems, as well as applications and data thereon, at the point in time of the back-up. For example, the snapshot captures all email information present on the EOP Network in the journals, the .pst archives, and the customer mailboxes at the time the back-up is created. In the event of a disaster or catastrophic incident that results in the partial or total loss of operating systems and data, these tapes could be used to reconstruct the data on the EOP Network as it existed at the time of the last back-up. Thus, any reconstruction following a disaster or catastrophic incident should reflect the EOP Network at the time of the last back-up. Configuration changes, system patches, anti-virus updates and other changes made after the latest back-up but prior to the disaster or catastrophic incident would not be included on tapes and, thus, would not be reflected in a reconstructed system. Similarly, any emails sent or received after the latest back-up but prior to the disaster or catastrophic incident may not be backed up on tapes and, thus, may not be reflected in a reconstructed system. This limitation in the disaster recovery back-up process is consistent with industry standards for these types of disaster recovery systems.

8.    The back-up tapes have been used to restore information that is not otherwise available on the EOP Network. When applied to email recovery, the process is complex, labor intensive and costly. By way of hypothetical example, a request to recover a specific file(s) from a particular date or date range within the period of 2003-2005 would be forwarded to the OCIO. The OCIO would then ordinarily consult a media database, similar to a catalogue or back-up tape index, to identify a range of tapes that correspond to that request. In this process, the OCIO may pull tape sets backed up prior to and/or subsequent to the target date period to ensure they have the full population of potential tape sets that may contain the requested file. Additionally, the OCIO would then restore the data-type environment, applicable software, and/or information, and then conduct a search for the information requested.

**C.    *Plaintiffs' Claims***

9.    As I understand the Complaint, plaintiffs allege that the EOP failed to electronically archive some emails in the period 2003-2005. Plaintiffs allege that OA created a "detailed analysis" of this alleged problem. *See* CREW Comp., ¶ 34; NSA Comp., ¶ 32.

10.    I am aware of a chart created by a former employee within the OCIO that purports to identify certain dates and EOP components for which the chart's creator appears to have concluded that certain EOP components were missing emails on certain dates in the 2003-2005 time period. Specifically, the chart appears to have concluded that some components on some dates had either (i) a lower-than-expected number of emails preserved in the normal electronic archiving process, or (ii) no emails preserved in the normal electronic archiving process. I believe this is what Plaintiffs refer to as the "detailed analysis."

11.    The OCIO has reviewed the chart and has so far been unable to replicate its results or to affirm the correctness of the assumptions underlying it. Accordingly, this office has

4

serious reservations about the reliability of the chart. Given these concerns, and the apparent

lack of supporting documentation, this office has undertaken an independent effort to determine

whether there may be anomalies in Exchange email counts for any particular days resulting from

the potential failure to properly archive emails for the 2003-2005 time period. That process is

underway and we expect the independent assessment to be completed in the near term.

**D.    *Responding to the Court's Questions***

12.    In light of this background, I now turn to the four questions posed by the Court:

a.    **Question No. 1: Are the back-ups catalogued, labeled or otherwise identified
to indicate the period of time they cover?**

It is possible to discern an approximate time period of the latest information

backed up to a tape set by examining the information in the media database and

reviewing the information for the last date on which data was written to an

individual back-up tape. The media database does not display information that

indicates fixed, identifiable periods of time. However, the tapes are labeled with a

barcode, which correlates to an entry in the media database and, in turn, to the

information about the last back-up to a particular tape.

b.    **Question No. 2: Are the back-ups catalogued, labeled or otherwise identified
to indicate the data contained therein?**

For each back-up tape, the media database contains a field identifying the type of

server that is backed up. Although the information in this field does not reveal

details about the data itself, it does identify whether a particular back-up tape

should contain data relating to Microsoft Exchange emails and/or email

environment information.

5

c.  **Question No. 3: Do the back-ups contain emails written and received between 2003-2005?**

Prior to October 2003 and continuing through 2005 and to the present, this office has regularly created back-up tapes for the EOP Network, which includes the system's email servers. Consistent with industry best practices relating to tape media management for disaster recovery back-up systems, these tapes were recycled prior to October 2003. In October 2003, this office began preserving and storing all back-up tapes and continues to do so. For that reason, emails sent or received in the 2003-2005 time period should be contained on existing back-up tapes.

d.  **Question No. 4: Do the back-ups contain the emails said to be missing that are the subject of this lawsuit? [Footnote omitted.]**

As I understand the Complaint, some emails are alleged to be missing from electronic archives in the period 2003-2005. At this stage, this office does not know if any emails were not properly preserved in the archiving process. We are continuing our efforts to determine whether there may be anomalies in Exchange email counts for any particular days in 2003-2005 resulting from the potential failure to properly archive emails. However, in view of this office's practice in the 2003-2005 time period of regularly creating back-up tapes for the EOP Network, which includes servers containing emails, and in view of this office's practice of preserving all such back-up tapes from October 2003 to the present, the back-up tapes should contain substantially all the emails sent or received in the 2003-2005 time period.

6

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, the foregoing to be true

and correct.

Executed the _15_ day of January, 2008.

THERESA PAYTON
Chief Information Officer
Office of Administration, Executive Office
of the President

7

**EXHIBIT 2**

STENOGRAPHIC MINUTES
Unrevised and Unedited
Not for Quotation or
Duplication

HEARING ON THE ELECTRONIC RECORDS

PRESERVATION AT THE WHITE HOUSE

Tuesday, February 26, 2008

House of Representatives

Committee on Oversight and

Government Reform,

Washington, D.C.

"This is a preliminary transcript of a Committee Hearing. It has
not yet been subject to a review process to ensure that the statements
within are appropriately attributed to the witness or member of
Congress who made them, to determine whether there are any
inconsistencies between the statements within and what was actually
said at the proceeding, or to make any other corrections to ensure the
accuracy of the record."

## Committee Hearings

### of the

# U.S. HOUSE OF REPRESENTATIVES



**OFFICE OF THE CLERK**
**Office of Official Reporters**

1  Court Reporting Services, Inc.

2  HGO057000

3  HEARING ON THE ELECTRONIC RECORDS

4  PRESERVATION AT THE WHITE HOUSE

5  Tuesday, February 26, 2008

6  House of Representatives

7  Committee on Oversight and

8  Government Reform,

9  Washington, D.C.

10      The committee met, pursuant to call, at 10:00 a.m., in

11  Room 2157, Rayburn House Office Building, the Honorable Henry

12  A. Waxman [chairman of the committee] presiding.

13      Present: Representative Waxman, Towns, Cummings,

14  Kucinich, Davis of Illinois, Tierney, Clay, Watson, Yarmuth,

15  Norton, Sarbanes, Welch, Davis of Virginia, Burton, Mica,

16  Platts, Duncan, Issa, Foxx, and Bilbray

17      Staff Present: Phil Schiliro, Chief of Staff; Phil

18  Barnett, Staff Director and Chief Counsel; Kristin Amerling,

19  General Counsel; Karen Lightfoot, Communications Director and

20  Senior Policy Advisor; David Rapallo, Chief Investigative

HGO057.000                                                          PAGE 2

21 | Counsel; John Williams, Deputy Chief Investigative Counsel;

22 | Michael Gordon, Senior Investigative Counsel; Earley Green,

23 | Chief Clerk; Teresa Coufal, Assistant Clerk; Caren Auchman,

24 | Press Assistant; Kerry Gutknecht, Staff Assistant; William

25 | Ragland, Staff Assistant; Larry Halloran, Staff Director;

26 | Jennifer Safavian, Chief Counsel for Oversight and

27 | Investigations; Keith Ausbrook, General Counsel; Steve

28 | Castor, Counsel; Ashley Callen, Counsel; Patrick Lyden,

29 | Parliamentarian & Member Services Coordinator; Brian

30 | McNicoll, Communications Director; Benjamin Chance, Clerk;

31 | and Ali Ahmad, Deputy Press Secretary

32        Chairman WAXMAN. Good morning.  The Committee will

33   please come to order.

34        Today's hearing focuses on whether President Bush and

35   the White House are complying with the Presidential Records

36   Act.

37        The Presidential Records Act was enacted in 1978 to

38   ensure that White House records are preserved for history and

39   are owned by the American people.  It requires the President

40   to preserve the records that document the activities,

41   deliberations, decisions, and policies of the White House.

42        The emergence and remarkable surge in popularity of

43   e-mail has presented problems in complying with the Act.  As

44   members of this Committee know, President Clinton experienced

45   these problems.  In 1994, he established the Automated

46   Records Management System to archive Presidential records,

47   including e-mails.  But the system had technical flaws.  For

48   a period of time, it would not preserve e-mails sent by

49   officials whose name began with the letter D.

50        Well, in 2000, Dan Burton, who was then Chair of this

51   Committee, alleged that the Clinton Administration

52   deliberately lost and withheld e-mails from Congress.  Mr.

53   Burton held five hearings on that issue and forced the White

54   House to spend over $11 million to reconstruct 200,000

55   e-mails.

56        In the end, the overblown charges of wrongdoing were

57  proven false.  The lost e-mails turned out to be the result

58  of a few technical glitches, not any intentional acts.

59      The silver lining to the Committee's investigation,

60  though, was that the problems in the Automatic Records

61  Management System were addressed.  When President Clinton

62  left office and President Bush came into office, the White

63  House had in place a system for archiving White House e-mails

64  that complied with the Presidential Records Act.

65      That is what makes the actions of the Bush

66  Administration so inexplicable.

67      President Bush's White House kept the Automatic Records

68  Management System in 2001.  But in September 2002, for

69  reasons that we have never found an adequate explanation, the

70  Bush Administration White House decided to replace the

71  Automatic Records Management System.

72      In its place, the White House adopted a system that one

73  of its own experts described as ''primitive'' and carried a

74  high risk that ''data would be lost.''  The system also had

75  serious security flaws.  Until the problem was corrected in

76  2005, all officials in the White House had access to the

77  archive system and the ability to delete or alter existing

78  information.

79      The White House's own analysis of its system identified

80  over 700 days in which e-mail records seem either impossibly

81  low or completely nonexistent.  This 2005 analysis was

 82  prepared by a team of 15 White House officials and

 83  contractors.

 84      And these are not the only missing e-mails from the

 85  White House.  We also know that over 80 White House

 86  officials, including some of the most senior officials in the

 87  White House, routinely used e-mail accounts at the Republican

 88  National Committee.  The RNC didn't preserve e-mails for over

 89  50 of these officials and has few e-mails for any White House

 90  officials prior to 2006.

 91      The result is a potentially enormous gap in the

 92  historical record.  Karl Rove, the President's closest

 93  political advisor, was a prolific user of his RNC e-mail

 94  account.  Yet, the RNC preserved virtually none of his

 95  e-mails before 2004.  The result is that we may never know

 96  what he wrote about the buildup to the Iraq war.

 97      In recent weeks, the White House has launched an all-out

 98  attack on its own analysis of the missing e-mails.  One White

 99  House spokesman tried to claim that there were no missing

100  e-mails after all.  Another senior White House official said

101  she had ''serious reservations'' about the accuracy of the

102  White House's previous work and that she had ''so far been

103  unable to replicate its  results or to affirm the correctness

104  of the assumptions underlying it.''

105      While many of us have grown used to the White House

106  attacking congressional or independent study that conflicts

107    with President Bush's policies, this is the first time I can

108    remember the White House using those same tactics on itself.

109    And it is remarkable.

110         But that is not all.  The White House is also refusing

111    to cooperate with the National Archives.  For almost a year,

112    the nonpartisan National Archives has been urging the Bush

113    White House to assess the problem of missing e-mails and to

114    take ''whatever action may be necessary to restore any

115    missing e-mails.''

116         The lack of cooperation became so severe that, last May,

117    the Archivist himself wrote to the White House Counsel, Fred

118    Fielding, to urge ''utmost dispatch'' in addressing the

119    missing e-mails.

120         Yet in September 2007, the Archive's General Counsel

121    drafted a memo summarizing the White House's decision to

122    ignore the request of the Archivist.  He wrote:  ''We still

123    have made almost zero progress in actually moving ahead with

124    the important and necessary work that is required for a

125    successful transition.  Our repeated requests have gone

126    unheeded.  Of most importance, we still know virtually

127    nothing about the status of the alleged missing White House

128    e-mails.''

129         The Archives also asked the White House to start

130    recovering official e-mails that the Republican National

131    Committee deleted pursuant to its policy of regularly purging

132   e-mails from its servers.  These repeated requests have also

133   been rebuffed.  In fact, the RNC has informed our Committee

134   that it has no intention of trying to restore the missing

135   White House e-mails from backup tapes containing past RNC

136   e-mail records.

137        My staff has prepared an extensive memorandum that

138   summarizes what we have learned through our investigation

139   into the missing White House e-mails so far, and I ask that

140   this memorandum and the documents it cites be made part of

141   the hearing record.

142        I also--

143        Mr. ISSA. Mr. Chairman, I object.  Reserving the right

144   to object.

145        Chairman WAXMAN. The gentleman is recognized on his

146   reservation.

147        Mr. ISSA. Mr. Chairman, apparently, the memo cites an

148   interrogatory from a gentleman, Mr. McDevitt, and I object

149   because those interrogatories appear to have been essentially

150   adopted in lieu of testimony because they appear to support

151   the majority.  And, by definition, if they are allowed to

152   come into the record, what we are effectively doing is

153   preventing the minority from having an opportunity to openly

154   challenge what seem to be, to us, inconsistent and

155   self-serving statements.

156        The fact is that we would like to have a clear hearing

157  and a clear understanding.  We want to have all parties that

158  may have something to say not only say it, but be open to

159  reasonable cross-examination.

160       Chairman WAXMAN. If the gentleman would permit, let me

161  give you a clear understanding of what happened.  The White

162  House objected to our doing an interview with this person.

163  They suggested we do a set of interrogatories.  We proceeded

164  on a bipartisan basis at the staff level to do exactly that.

165  We now seek to make this information public.

166       I know that the Republicans now would say, well, we

167  would like to have an interview or deposition, but we

168  followed the rules.  And that is what we are seeking today,

169  is to disclose what we have so far in following the rules.

170       If the gentleman objects, he objects, and we will have

171  to have a vote for the Committee at some point during the

172  hearing.  But, as I understand, Mr. Davis does not object.  I

173  will yield to him if he does, but--

174       Mr. DAVIS OF VIRGINIA. Well, what we do object to is

175  putting the interrogatories in their entirety into the

176  record, for several reasons, and our staffs have talked about

177  this. Just as we do with all investigations, all non-White

178  House employees involved have been required to sit for

179  transcribed interviews or deposition, but Mr. McDevitt was

180  not.  The White House's concerns were no different for his

181  testimony than for other witnesses that were put under that,

182  but somehow the majority was most accommodating to Mr.

183  McDevitt.

184      We were wondering whether Mr. McDevitt was able to avoid

185  an on-the-record interview because he supplied a version of

186  the story that pleased the majority that was critical of the

187  White House, and that was our concern.  The White House's

188  concerns were no different for his testimony than for other

189  witnesses.

190      From 2002 to 2006, Mr. McDevitt was responsible for

191  managing the White House's e-mail archiving system.  In his

192  opinion, 400-plus days of White House e-mails went missing.

193  This sensational charge is not supported by the evidence that

194  we have gathered.  Though the course of the investigation--

195      Chairman WAXMAN. Mr. Davis?

196      Mr. DAVIS OF VIRGINIA. Yes.

197      Chairman WAXMAN. Mr. Davis, let me interrupt you.

198      Mr. DAVIS OF VIRGINIA. Sure.

199      Chairman WAXMAN. And I am going to give you a full

200  opportunity to debate this question, but I want to respond

201  and then we will get further along with this.

202      Mr. DAVIS OF VIRGINIA. Sure.

203      Chairman WAXMAN. If there is objection, there is

204  objection.  We won't include it in the record at this point,

205  but we will on a vote of the Committee.

206      Evidently, the Republicans are unhappy that Mr.

207 | McDevitt, who worked at the White House, gave testimony they

208 | didn't like.  But we followed the rules that the White House

209 | set out, and the Republicans were happy for us to follow

210 | those rules. And now that they read the testimony, they would

211 | like to impeach the fellow from the White House who said

212 | things that they didn't like.

213 |      Mr. DAVIS OF VIRGINIA. Well, he is no longer at the

214 | White House.

215 |      Chairman WAXMAN. Pardon?

216 |      Mr. DAVIS OF VIRGINIA. He is no longer there.

217 |      Chairman WAXMAN. He is no longer at the White House.

218 |      Mr. DAVIS OF VIRGINIA. That is correct.  In fact--

219 |      Chairman WAXMAN. But the White House did not want him to

220 | sit for a deposition, and that is why we did what we did. Ms.

221 | Payton did not have an interview, as the Republicans are

222 | asking that we should have had for Mr. McDevitt.

223 |      But the Chair will move on and declare that this will

224 | not be part of the record by unanimous consent, and we will

225 | renew the debate and action by the Committee at an

226 | appropriate time on a motion to make this part of the record.

227 |      Mr. ISSA. Mr. Chairman, point of inquiry.

228 |      Chairman WAXMAN. The gentleman will state his point of

229 | inquiry.

230 |      Mr. ISSA. Does that mean that you are withdrawing your

231 | unanimous consent at this time?

232        Chairman WAXMAN. I will withdraw my unanimous consent. I

233    am withdrawing my unanimous consent request just as it

234    pertains to the interrogatories for Mr. McDevitt.

235        Mr. ISSA. So you are now moving that sans the references

236    to interrogatories, the rest will go forward?

237        Mr. DAVIS OF VIRGINIA. Which is normal Committee

238    practice.  I mean, generally--

239        Chairman WAXMAN. Is there objection?

240        Mr. ISSA. Mr. Chairman, I will dispense--

241        Ms. WATSON. Can you finish your statement, Mr. Chairman?

242        Chairman WAXMAN. Yes?

243        Ms. WATSON. Can you finish your statement and then--

244        Chairman WAXMAN. I finished my statement.  We are going

245    to put in the information except for the interrogatories.

246        Mr. ISSA. Mr. Chairman, concluding my time, because we

247    were all speaking, I guess, on my time--

248        Chairman WAXMAN. Is there an objection?

249        Mr. ISSA. Mr. Chairman, reserving.  I would only like to

250    clarify that the Minority did not sign off, so it was not a

251    bipartisan procedure.

252        Chairman WAXMAN. That is not a proper reservation.

253    Either you are for letting this go on the record as Mr. Davis

254    has suggested we do, as ordinary Committee activities--

255        Mr. ISSA. Without reference.

256        Chairman WAXMAN.--without reference to the

257 interrogatories, or you agree to it.  Give us your--you have

258 a reservation.  Give us your withholding of unanimous consent

259 request or agreement to the unanimous consent request.

260      Mr. ISSA. Without that, I agree.

261      Chairman WAXMAN. Then that will be part of the record.

262      Now I would like to continue with my opening statement.

263      We have this extensive memorandum that summarizes what

264 we have learned through our investigation into the missing

265 White House e-mails, and I also urge members of the public to

266 review this memorandum carefully.  E-mail archiving by its

267 nature is a complex and technical subject.  The memorandum

268 provides a guide to what we have learned from our interviews

269 of White House officials and our review of over 20,000 pages

270 of internal White House and Archives documents.  That is now

271 in this record.

272      I am determined not to make the same mistakes some of my

273 Republican colleagues made eight years ago.  I don't want to

274 jump to any conclusions or make any sensational allegations

275 of wrongdoing without any evidence.

276      At the same time, the White House's actions make

277 absolutely no sense.  There is an old saying--if it ain't

278 broke, don't fix it--but that is exactly what the Bush White

279 House did to the automated record system.  It had a system

280 that archived its e-mails and it intentionally dismantled an

281 effective system and replaced it with a primitive alternative

282 | that just didn't work.

283 |     It initiated its own study of missing e-mails in 2005

284 | and now derisively attacks its own work as incompetent and

285 | grossly inaccurate.

286 |     It has continually resisted not just the efforts of this

287 | Committee, but also those of the National Archives, which has

288 | the responsibility to carry out the Presidential Records Act.

289 |     Well, none of this makes any sense, which is why we are

290 | holding this hearing today and why this hearing is so

291 | important.

292 |     So I look forward to what our witnesses have to say so

293 | that we can finally start making progress on this important

294 | open Government issue.

295 |     [Prepared statement of Chairman Waxman follows:]

296 | ********** COMMITTEE INSERT **********

297        [The referenced material follows:]


298   ********** COMMITTEE INSERT **********

299    Chairman WAXMAN. The Chair would now like to recognize

300  Mr. Davis for his opening statement.

301    Mr. DAVIS OF VIRGINIA. Thank you, Mr. Chairman.

302    Let me say at the front I think the Committee is

303  entitled to the e-mails, and we want to work with you to get

304  them, absent some showing of privilege, which they have not

305  come forward with yet because they can't seem to find them.

306  So I don't think there is any disagreement on our wanting to

307  be able to get to that; it is the characterizations which we

308  differ in our opinion.

309    Just to dwell on Mr. McDevitt for a minute and why we

310  feel as passionate as we do about this, from 2002 to 2006, he

311  was responsible for managing the White House's e-mail

312  archiving system.  In his opinion, 400-plus days of White

313  House e-mails went missing, but this sensational charge is

314  not supported by the evidence that we have gathered.  Through

315  the course of this investigation, we have learned that many

316  of these so-called missing e-mails were simply misfiled.

317    On Tuesday of last week, the Majority issued a set of 47

318  interrogatories to Mr. McDevitt and, three days later, he has

319  replied with 25 pages of responses, a very quick turnaround,

320  indeed, unless he had been supplied with the questions ahead

321  of time.  His robust response is based on dated information,

322  since he left the White House approximately 18 months ago.  A

323  lot of facts about these so-called missing e-mails have

324 changed, and continue to change.

325    Our staff has really not had the opportunity to examine

326 Mr. McDevitt on the record under oath and, consequently, his

327 interrogatory responses, if entered into the record as is,

328 would remain unchallenged, and that is not appropriate.

329    We spoke with Mr. McDevitt on Sunday afternoon.  He

330 remains unusually passionate about his time at the White

331 House Office of Administration.  We can't understand his

332 reluctance to be interviewed on the record or why he wasn't

333 compelled, yesterday, for testimony on the record.

334    You have been very accommodating to this witness.  Our

335 staff has made it clear to your staff we wanted to examine

336 him on the record.

337    His views on the situation, in my judgment, is colored

338 by his apparent personal investment in various technology

339 decisions that he made, and many of these were ultimately

340 rejected.  Without the opportunity to test Mr. McDevitt's

341 views on the record, we remain skeptical of the content of

342 his interrogatory responses, and we think the Committee

343 should as well.

344    The preservation of essential records, though, is a

345 Government-wide responsibility and a growing challenge with

346 so much more of the public's business done today using

347 electronic media rather than paper.  The massive

348 proliferation of digital records confronts each branch of

349  Government with complex and potentially costly questions

350  about which records to keep, how long to keep them, and how

351  best to store and index them for retrieval.

352       But it appears today's hearing may be less about

353  preserving records and more about resurrecting this claim

354  that the White House lost millions of official e-mails.  It

355  is a charge that is based on a discredited internal report

356  conveniently leaked to the media.  Information gathered since

357  then has forced Administration critics to back away from the

358  politically charged allegation and acknowledge the less

359  sensational but far more probative technical realities that

360  are at work here.

361       Regarding the capabilities of the White House's

362  information technology infrastructure, the facts are not all

363  in yet, and in that respect this hearing would be viewed as

364  premature.  But we do know this much:  During the White House

365  migration from Lotus Notes to a Microsoft e-mail system in

366  2002, some archive files may have been mislabeled, making

367  them difficult to find using routine search protocols.

368       A preliminary study in 2005 using these old protocols

369  seemed to show 473 days of which no e-mails were sent at all.

370  The White House has been very open with our staff about the

371  technical flaws in that early search and they have devoted

372  substantial technological resources to solving the e-mail

373  glitch.

HGO057.000                                                    PAGE     18

374          One of our witnesses today, White House Chief

375     Information Officer Theresa Payton, is leading that effort.

376     Last Friday, she briefed the Committee staff that the 473-day

377     gap has been reduced to 202.  So a substantial portion of the

378     missing e-mails appear not to be missing at all, just filed

379     in the wrong digital drawer.  The restoration recovery

380     process continues and should continue.

381          But the Committee's voracious appetite for White House

382     e-mails raises another issue worth discussing today: the

383     boundaries between legitimate oversight and counterproductive

384     intrusion into the operations of a co-equal branch of

385     Government.

386          Any frustration at the White House's inability to

387     instantaneously produce every conceivable stream of electrons

388     has to be tempered by both the legal rights and prerogatives

389     of the Executive and by the technical realities of modern

390     Government record-keeping.

391          The Presidential Records Act does not require the White

392     House to keep every paper or electronic document generated in

393     the course of daily business.  The law requires Presidential

394     records to constitute adequate documentation of official

395     deliberations and decisions.

396          I expect we will hear today that the White House is well

397     aware of its obligations under the Presidential Records Act

398     and other laws, and cognizant of the duty to preserve and

399 | provide adequate Presidential records for the National
400 | Archives.
401 | In terms of the scope of the oversight, we should keep
402 | in mind the power of inquiry, when used injudiciously, can
403 | become the power to distract or to disrupt those trying to
404 | execute the laws that we write.
405 | Remember where all this started:  an investigation of a
406 | GSA administrator.  From there we moved to a far broader
407 | inquiry into the Hatch Act compliance at cabinet departments
408 | and a subpoena to the Republican National Committee for
409 | e-mails from the White House.  From that inquiry we came to
410 | this hearing to discuss e-mails about e-mails.
411 | At some point this risks becoming investigation for its
412 | own sake or for the sake of private plaintiffs looking to use
413 | the Committee to conduct non-judicial discovery in pending
414 | lawsuits against the Government.  Nor is it the best use of
415 | our time and resources to attempt to micro-manage Executive
416 | Branch activities, like the next White House transition,
417 | based on groundless suspicions or incomplete investigations
418 | into missing e-mails.
419 | Nevertheless, our witnesses can help us understand the
420 | intricacies and challenges of electronic records
421 | preservation. We welcome their testimony this morning, and I
422 | want to repeat, I think, as, institutionally, the Legislative
423 | Branch does have the right to pursue these and to get these

424 │ e-mails, Mr. Chairman.

425 │     Thank you very much.

426 │     [Prepared statement of Mr. Davis of Virginia follows:]


427 │ ********** COMMITTEE INSERT **********

428    Chairman WAXMAN. Thank you very much, Mr. Davis.

429    Before we recognize our witnesses, we are going to have

430  a private discussion and set a time for a debate and a vote

431  on adding the interrogatories to the record, but I just want

432  to give clarification of what had transpired.

433    On January 30th, the Committee wrote to Mr. McDevitt

434  asking him to come in for an interview.  He was responsive

435  and immediately scheduled an interview for Monday, February

436  11th. The White House then contacted Mr. McDevitt and

437  instructed him not to discuss with the Committee broad areas

438  relevant to our investigation, including ``any deliberative

439  discussions involving the participation of OCIO management.''

440    So Mr. McDevitt e-mailed us and he said, based on the

441  direction of the White House, ``there is practically nothing

442  that I am authorized to discuss with the Committee.''  As a

443  result, given these limitations placed on us by the White

444  House counsel, he said he would have to decline our request

445  for an interview.  So both sides requested this interview.

446    Over the next week, minority and majority staff

447  discussed the Committee's interest in obtaining information

448  from Mr. McDevitt, and on February 14th our staffs jointly

449  agreed to send Mr. McDevitt questions in writing, allowing

450  him to share his responses with the White House counsel.  So

451  together our staffs sent him questions.  He responded in

452  writing to those questions.  The White House had a chance to

453 review his answers and they cleared them without any

454 redactions.

455    Now, after we got the answers from Mr. McDevitt, his

456 responses this past weekend, the Minority staff indicated

457 they wanted to speak with Mr. McDevitt in person.

458 Nevertheless, even at this late date, our staff went to great

459 lengths to accommodate the Minority.  After they read his

460 written reports, they didn't feel comfortable with it.  So,

461 on Sunday night, Minority and Majority staff jointly called

462 Mr. McDevitt to see if he would be willing to come in for an

463 interview or deposition.  He stated he still had the same

464 concerns about the White House instructions.  However, he

465 went on to answer questions from the Minority, the

466 Republicans, for an hour and a half, answering every single

467 question they had.

468    Despite this second opportunity to question Mr.

469 McDevitt, the Minority now says it is somehow unfair to use

470 any information provided by Mr. McDevitt because they didn't

471 get an opportunity to question him.  Well, they had an

472 opportunity two weeks ago.  They got another opportunity on

473 Sunday night, which they fully exhausted.

474    It seems to me if the Minority has a beef with anyone,

475 it should be the White House Counsel's Office, since they are

476 the ones who told Mr. McDevitt he wasn't allowed to speak

477 with us in the first place.

478         Mr. DAVIS OF VIRGINIA. Mr. Chairman, let me just

479    quickly--

480         Chairman WAXMAN. Yes.

481         Mr. DAVIS OF VIRGINIA. We will talk about this and we

482    will find an accommodation, but let me just say that there

483    were six other witnesses that were subject to the same White

484    House ground rules, and they were brought in for

485    on-the-record interviews and cross-examination.  Mr. McDevitt

486    was the only one who was accommodation, we believe, because

487    he fit the story you wanted to tell.  And we think that there

488    is another side to that and we would like that opportunity.

489    I don't care what the White House Counsel's Office says on

490    this.  We are speaking to this as a review committee.

491         But we can have this discussion down the road and try to

492    reach an accommodation, and hopefully we can move ahead with

493    our witnesses.

494         Chairman WAXMAN. But I might point out that the other

495    witnesses agreed to come in.  Mr. McDevitt refused to come in

496    for an interview.  And he did that because the White House

497    told him there was nothing he could say to us in an

498    interview. So we proceeded in the way that seemed fit.

499         I know that now that the Minority has looked at what he

500    has to say, they would like to see if they can impeach him,

501    because they don't like what he had to say.

502         Mr. DAVIS OF VIRGINIA. Well, there are inconsistencies

503 | with what he said because he has been gone for 18 months.

504 | Chairman WAXMAN. Well, let's get the witnesses here

505 | today on record and we can ask them questions about what Mr.

506 | McDevitt had to say and probe into this whole thing further.

507 | But the reality is that there are a lot of e-mails--which is

508 | the primary way people send communications to each

509 | other--from high officials in the White House that cannot be

510 | located, and that, as I understand it, is not just what we

511 | are saying, what Mr. McDevitt has said, but the Archives as

512 | well.

513 | And from the Archives we are pleased to have Dr. Allen

514 | Weinstein.  He is the ninth Archivist of the United States

515 | and leads the National Archives and Records Administration.

516 | We also have Gary M. Stern, the General Counsel for the

517 | National Archives and Records Administration.

518 | Sharon Fawcett is the Assistant Archivist for

519 | Presidential Libraries at the National Archives and Records

520 | administration.

521 | Alan R. Swendiman is the Director of White House of

522 | Administration.

523 | And Theresa Payton is the Chief Information Officer at

524 | the White House Office of Administration.

525 | We are pleased to welcome all of you.

526 | Mr. DAVIS OF VIRGINIA. Mr. Chairman, can I just make one

527 | point?  We join with you in wanting to get all the e-mails

528    and not giving up.  I just want to make that clear.  This is

529    not an effort to stop the disclosure of these.  We want to

530    get at these.  We really object to the characterization of

531    how this came.  I would think much of this is technical and

532    hopefully this hearing will be able to bring both sides an

533    opportunity to bring that out.  Thank you.

534         Chairman WAXMAN. Well, I hope so, because I think, on a

535    bipartisan basis, we want to find out where those e-mails are

536    and get them.  I don't know what characterization you object

537    to, because I have been very careful not to make any

538    characterization, unlike the situation we had in this

539    Committee in the 1990s.

540         Ladies and gentlemen, it is the policy of this Committee

541    that all witnesses that testify before us testify under oath,

542    so I would like to ask you, if you would, to please rise and

543    raise your right hand.

544         Do you solemnly swear that the testimony you will give

545    before this Committee will be the truth, the whole truth, and

546    nothing but the truth?

547         [Witnesses answer in the affirmative.]

548         Chairman WAXMAN. Thank you.

549         The record will indicate that each of the witnesses

550    answered in the affirmative.

551         Dr. Weinstein, why don't we start with you?

552         All of you have sent prepared statements, or those of

553  you who have sent prepared statements.  I want to assure you

554  that they will be in the record in full.  We would like to

555  ask, if you would, to try to limit the oral presentation to

556  five minutes.  You will have a clock that will be indicated

557  on the table.  Green, then after four minutes there will be a

558  yellow; and then after five minutes is complete it will turn

559  red.  If you are not finished by that po int, we would like

560  to ask you to summarize the last part of your testimony.

561       Mr. WEINSTEIN. Can I ask you before I start, Mr.

562  Chairman?

563       Chairman WAXMAN. Yes.

564       Mr. WEINSTEIN. I will be making the only opening

565  statement for the Archives.  I gather my two colleagues from

566  the White House will both make statements.  Does that mean I

567  get 10 minutes?

568       Chairman WAXMAN. Well, go ahead and take whatever time

569  you need.  Under those circumstances, it seems reasonable.

570       Mr. WEINSTEIN. Thank you.

571    STATEMENTS OF THE HONORABLE ALLEN WEINSTEIN, ARCHIVIST OF THE

572    UNITED STATES, NATIONAL ARCHIVES AND RECORDS ADMINISTRATION,

573    ACCOMPANIED BY GARY M. STERN, GENERAL COUNSEL, NATIONAL

574    ARCHIVES AND RECORDS ADMINISTRATION AND SHARON FAWCETT,

575    ASSISTANT ARCHIVIST FOR PRESIDENTIAL LIBRARIES, NATIONAL

576    ARCHIVES AND RECORDS ADMINISTRATION; ALAN R. SWENDIMAN,

577    DIRECTOR, OFFICE OF ADMINISTRATION, THE WHITE HOUSE; THERESA

578    PAYTON, CHIEF INFORMATION OFFICER, OFFICE OF ADMINISTRATION,

579    THE WHITE HOUSE


580    STATEMENT OF THE HONORABLE ALLEN WEINSTEIN


581        Mr. WEINSTEIN. Good morning, Chairman Waxman, Ranking

582    Member Davis, and members of the Committee on Oversight and

583    Government Reform.  Thank you for calling this hearing and

584    for your continued attention to the management, protection

585    and preservation of Government information.

586        The National Archives General Counsel Gary Stern,

587    Assistant Archivist for Presidential Libraries Sharon Fawcett

588    accompany me this morning and will be available to assist me

589    in responding to questions from the Committee.

590        I am pleased to appear before you today to discuss the

591    work of the National Archives and Records Administration,

592    NARA, in managing Presidential papers at the time of

593 transition from one president's administration to the next.

594 I will summarize my remarks and ask that my full statement be

595 included in the record.

596      Let me begin by discussing preparation for the

597 transition in January 2009 of the Presidential records of the

598 George W. Bush Administration to the National Archives.

599 National Archives has a long and successful history of moving

600 Presidential records and gifts from the White House to the

601 custody of the Archives for ultimate deposit in the

602 Presidential library.  We have done this work under the

603 exigent circumstances of current departure, as in the case of

604 Presidents Kennedy and Nixon; the foreshortened notice of

605 one-term administrations, such as George H.W. Bush; and the

606 more predictable pace afforded by a two-term President, for

607 example, William Jefferson Clinton.

608      The National Archives begins preparing for an eventual

609 move from the first day of an administration.  However, as

610 you might imagine, Mr. Chairman, most of the actual work

611 takes place in the last year of a president's term.  We work

612 closely with the White House Counsel's Office, the White

613 House Office of Records Management, the National Security

614 Council, the White House Photo Office, the Office of

615 Administration, and other appropriate White House offices in

616 accounting for all Presidential records--textual, electronic,

617 and audio-visual--and in arranging for their physical

618    transfer to the National Archives.

619         We also work with the White House Gift Unit in

620    inventorying and packing the thousands of foreign and

621    domestic gifts that will be included in the holdings of the

622    Presidential library and museum.  Traditionally, the

623    Department of Defense also supports the National Archives in

624    packing and transporting the records from Washington the

625    library site.

626         Beginning in the summer of 2007, National Archives staff

627    attended several preliminary meetings with White House staff

628    to discuss the transition process.  In late fall, Archives

629    staff began to meet with IT staff from the Office of

630    Administration to discuss the transfer of electronic records.

631    Archives staff has also met with the staff of the National

632    Security Council regarding its classified electronic records,

633    which are maintained separately from the systems managed by

634    the Office of Administration.  We expect that transition

635    meetings will continue on a regular basis and look forward to

636    working with White House staff in ensuring a smooth move of

637    the massive amount of records.

638         The National Archives has leased a temporary facility in

639    the Dallas, Texas area that will serve as the archival

640    repository for these records until the George W. Bush

641    Presidential Library is completed.  We have already begun to

642    hire and train archival staff, along with a museum registrar,

643   who will take charge of the records and gifts as they arrive.

644   We expect to continue the hiring of full staff when we

645   receive our fiscal year 2009 appropriation.

646        Now I would like to turn to your question on the

647   National Archives' actions concerning the possibility of

648   missing White House e-mails.  The Presidential Records Act,

649   PRA, does not give the Archivist the authority--formal or

650   oversight authority--over how an incumbent president performs

651   his records management responsibilities, but, rather, vests

652   records management authority entirely and exclusively with

653   the incumbent president.  Nevertheless, throughout the course

654   of an administration, when we are invited to do so, both I

655   and my staff try to provide our best guidance and advice on

656   matters affecting White House records management.

657        When we read the press reports in April 2007 that the

658   White House had apparently acknowledged that a large number

659   of e-mails might be missing from the Executive Offices of the

660   President, the EOP system, we immediately began to enquire

661   about this matter with White House staff.  The National

662   Archives made similar inquiries in 2006 upon learning of

663   press reports that Special Council Patrick Fitzgerald had

664   reported on e-mail archiving problems with the Office of the

665   Vice President's records.  Some time later in April 2007,

666   White House staff told us that a chart prepared in 2005

667   indicated that there might be some missing e-mails, but that

668  no one within the Executive Office of the President, EOP, had

669  been able to validate the chart's results.  My staff was

670  further informed that efforts would be made to corroborate

671  whether any e-mails were actually missing.

672      In addition, because the EOP mail system contains

673  records governed under both the Presidential Records Act and

674  the Federal Records Act, FRA, on May 6th, 2007, I sent a

675  standard letter to the Director of the White House Office of

676  Administration requesting a report on the allegations of

677  unauthorized destruction of Federal records.  This letter has

678  been provided to the Committee.

679      To this day, I have not received a written reply to the

680  May 6, 2007 letter.  We have been diligent in requesting

681  periodic updates on the status of the White House review of

682  these allegations and the possibility of missing Federal and

683  Presidential e-mails.  The White House has responded

684  regularly, if inconclusively, that its review is still

685  continuing.

686      Further, we have made our views clear, both to the White

687  House and to this Committee, that in the event e-mails are

688  determined to be missing, it is the responsibility of the

689  White House to locate and restore all the e-mails, probably

690  from the backup tapes, and that such a project needs to begin

691  as soon as possible.  The National Archives has also

692  emphasized that supplemental congressional funding to the

693 | White House will almost certainly be necessary for such a

694 | restoration effort.

695 |     A similar situation occurred, as you mentioned, Mr.

696 | Chairman, near the end of the Clinton Administration with its

697 | Automated Records Management System, ARMS, and the Office of

698 | Administration of the White House took full responsibility at

699 | that time in restoring an estimated two million e-mails.

700 | Because of the problems that occurred with the ARMS system

701 | during the Clinton Administration, the National Archives

702 | recommended to the incoming George W. Bush Administration

703 | that it replace ARMS with a new electronic records management

704 | application for its e-mails as soon as possible.

705 |     The Bush 43 White House expressed interest and invited

706 | the National Archives to work with the Office of

707 | Administration in developing the requirements for a new

708 | system.  The National Archives staff worked with the Office

709 | of Administration from late 2001 until the summer of 2004 on

710 | what came to be known as the proposed Electronic

711 | Communications Records Management System, or ECRMS.  The

712 | National Archives staff reviewed deliverables and

713 | documentation produced as part of this system design effort,

714 | with our primary concern being to facilitate the transfer of

715 | these electronic records at the end of the administration.

716 |     In the fall of 2006, the National Archives learned that

717 | the Office of Administration had decided not to implement

718   ECRMS.  In early 2007, the National Archives began meetings

719   with the Office of Administration to discuss how the Office

720   proposed to manage Executive Office of the President e-mails

721   in anticipation of the upcoming transition.  The National

722   Archives was not informed about the possibility of missing

723   e-mails at this time.

724      Mr. Chairman, this concludes my testimony.  Thank you

725   for your attention.  I am happy to answer any questions that

726   may remain.

727      [Prepared statement of Mr. Weinstein follows:]


728   ********** INSERT **********

729        Chairman WAXMAN. Thank you very much, Mr. Weinstein.   I

730   assume Mr. Stern and Ms. Fawcett are here to answer questions

731   that we may have.

732        Mr. WEINSTEIN. Of course.

733        Chairman WAXMAN. Ms. Payton, let's hear from you next.

734   Or would you prefer Mr. Swendiman to go next?  There is a

735   button on the base of the mic.  Be sure it is pushed in and

736   close enough to you to pick it all up.

737 | STATEMENT OF ALAN R. SWENDIMAN

738 |     Mr. SWENDIMAN. Good morning, Mr. Chairman, Ranking
739 | Member Davis, and members of the House Committee on Oversight
740 | and Government Reform.  I am Alan Swendiman and I currently
741 | serve as Special Assistant to the President and Director of
742 | the Office of Administration.  Thank you for inviting me to
743 | participate in this hearing.  Accompanying me is Theresa
744 | Payton, who is the Chief Information Officer for the Office
745 | of Administration.

746 |     I am pleased to appear before you today on the subjects
747 | of e-mail records keeping practices at the Executive Office
748 | of the President during this Administration and the status of
749 | Presidential transition planning in relation to records of
750 | this Administration.  I will summarize these remarks and ask
751 | that my full statement be included in the record.

752 |     I have served as Director of the Office of
753 | Administration since November 27th, 2006.  OA's mission is to
754 | provide common administrative and support services to the
755 | EOP.

756 |     The Office of the Chief Information Office is one of the
757 | operating units of OA.  Among its important functions, OCIO
758 | is responsible for providing all EOP components with unified
759 | enterprise services.  Certain of the subjects that the

760  Committee may ask today are within the purview of the OCIO,

761  and Ms. Payton may speak to them.  I will direct my remarks

762  principally to OA's efforts on the important subject of

763  Presidential transition planning.

764       Presidential records are the property of the United

765  States Government and OA takes very seriously its

766  responsibilities for the transfer of records to the National

767  Archives.  These responsibilities derive in significant

768  measure from the Presidential Records Act and the effective

769  fulfillment of these responsibilities is important to the

770  continuity of the presidency as an institution and for the

771  Bush presidency, and we are focused on making this transition

772  process as smooth and cooperative as possible.

773       Toward that end, transition-related meetings between

774  NARA and White House began in approximately the summer of

775  2007.  At that time, NARA noted and welcomed what it

776  described as EOP's early engagement on transition and

777  Presidential records issues.  Since that first meeting, there

778  have been at least eight meetings with NARA and numerous

779  internal meetings.  For example, NARA has met with the OA

780  Offices of the Chief Financial Officer, the Chief Facilities

781  Management Officer, and the Chief Operating Officer to

782  receive records-related functional and operational briefings

783  and to ask questions. NARA and OA are committed to continuing

784  to meet, and, in fact, the next meeting is this Friday,

785  February 29th.  Through these meetings, NARA will learn about

786  the dozens and dozens of computer applications at the EOP

787  that may have records subject to PRA which will need to be

788  transferred to NARA.

789      Now, the upcoming Presidential transition is going to be

790  a complex one, involving new technologies and new people.

791  These complexities are heightened by the existing cyber

792  threats, of which this Committee is undoubtedly aware, and

793  cyber security considerations impact, among other things, the

794  way we are able to safely transfer records to NARA.

795      This will be the first transition in which OA, as an

796  entity, has been subject to the PRA, and OA is fully engaged

797  in that process.  We have already seen issues arise as to

798  whether certain materials are records or non-records under

799  the PRA.  One particular challenge facing the institution is

800  the necessity of identifying and making available in some

801  form records that will be needed for the forty-fourth

802  president and his or her staff.  Financial records,

803  procurement records, leases, blueprints and other property

804  records, security records, and personnel records are just a

805  few of those kinds of records.

806      From this summary, we trust that the Committee can see

807  that a lot of predicate work has begun and is ongoing.  We

808  have approximately 11 months remaining to work on this

809  transition, and we are committed to making sure that all the

810 | Presidential records that we have transferred to NARA are

811 | transferred at the end of this Administration.

812 | As a final matter, I understand that the Committee has

813 | enquired about whether EOP e-mails may not have been properly

814 | preserved between 2003 and 2005, and the potential

815 | implications on transition should it be determined that such

816 | e-mails are missing.  The potential discovery of this issue

817 | and the immediate response to it, of course, predated my

818 | service as OA Director.  The OA staff, including Ms. Payton,

819 | can discuss this issue in more detail.  But what I can say is

820 | this.  I am proud of the work that they have been doing and

821 | continue to do under the leadership of Ms. Payton in order to

822 | determine whether any such e-mails are missing.  It is a

823 | complex process, one that takes time to do right and one that

824 | we have not taken lightly.

825 | Mr. Chairman, this concludes my statement.  Thank you

826 | for your attention, members of the Committee, and I would be

827 | pleased to answer any questions.

828 | [Prepared statement of Mr. Swendiman follows:]


829 | ********** INSERT **********

830        Chairman WAXMAN. Thank you very much, Mr. Swendiman.

831        Ms. Payton, do you have a statement as well?

832        Ms. PAYTON. Yes.

833 | STATEMENT OF THERESA PAYTON

834 | Ms. PAYTON. Good morning, Chairman Waxman, Ranking
835 | Member Davis, and members of the Committee.  Alan did touch a
836 | little bit on the OCI role, so I would like to talk to you a
837 | little bit about some of the services we offer.
838 | I am Theresa Payton, and I am the Chief Information
839 | Officer in the Office of Administration Executive Office of
840 | the President.  I have been in this role since mid-May of
841 | 2006, and it has been an honor and a pleasure to serve.
842 | Some of the services that we provide to the EOP, as Alan
843 | mentioned, are to the 12 components that comprise the
844 | Executive Office of the President.  There are over 3,000
845 | customers in those 12 components and some of the services
846 | that we provide to them include, but aren't limited to:
847 | office automation; intranet support; 24 by 7 production
848 | support, should they need it; desktop support; we do
849 | continuity of operation support; disaster recovery backup
850 | information; and we are also responsible for the e-mail
851 | messaging system for the sensitive but unclassified part of
852 | the EOP network; and we are also responsible for the records
853 | keeping of all of those e-mails and making sure we have a
854 | successful transition to NARA at the end of the Presidential
855 | transition.

856    I did provide a detailed written testimony that I

857 understand from you, Chairman Waxman, will be in the record,

858 so I just want to give a few summary comments before I turn

859 it over for questions.

860    I wanted to focus on the work primarily that we have

861 been doing from late 2006 up until today and give you a

862 little bit of explanation about the leadership determination

863 of the people that I work for, as well as the people that

864 work for me in the Office of the Chief Information Officer.

865    We have undertaken three tracks since late 2006 until

866 today.  The first track involves people and process; the

867 second track involves improving the current technology we

868 have in place; and then the third track is what we are

869 calling the longer view.  So this is about getting a more

870 comprehensive technology platform in place for archiving

871 records keeping, as well as legal searches.

872    Under people and process, I will just give you a couple

873 examples of some of the things we have been able to

874 accomplish.  First of all, we recognized we have a slim

875 staff, you know, we are a small but mighty team supporting

876 the 3,000 customers.  We have roughly 55 Federal employees

877 and roughly 60 contractors to support these 3,000 customers.

878 We took a look at the resource allocation and the manpower

879 stacked up against records keeping versus the other parts of

880 the operation and the mission that we serve, and in 2006 we

881    had roughly the equivalent of 10 of our 115 employees, from a

882    manpower perspective, dedicated to records keeping.  We have

883    ramped that up.  We looked at our mission.  We have slimmed

884    down some of the services we provide in some other parts of

885    the mission and we ramped that up in 2007.  We had the

886    equivalent of manpower of about 22 people out of the 115

887    focused on records keeping and we have ramped that up a

888    little bit more for 2008, and we are currently running at

889    about 23.5. So that is an example of some of the people

890    investments.

891         From a process improvement standpoint, we put in place

892    some improved processes while we are on the current

893    technology we are, and to make sure that on a go-forward

894    basis we are accounting for all of the information.  So one

895    example of an improvement that we put in place last year is

896    our weekly report.  So the messaging team does daily work.

897    If they have any technology glitches, they note those in a

898    log.  Then there is a second team who does a QA of the work

899    they are doing to make sure that the messages that went into

900    the Microsoft Journal that were then automatically moved

901    through a software program that we have into Microsoft

902    Personal Storage Tables, or PSTs, a second group takes a look

903    at that work and also, if they note any technology glitches,

904    notes that in the log.

905         On a weekly basis an executive summary report is

906  produced for myself and for our Office of Administration

907  General Counsel, and this provides transparency that wasn't

908  available before on a weekly basis about any technology

909  glitches that may have occurred, the mediating steps that

910  needed to be taken or still need to be taken, and then a

911  weekly report as to where they are in their progress.

912      This has provided a couple different tools for us to

913  use, the first being the transparency, and knowing, if there

914  is a glitch, the people need to be focused on fixing that.

915  The second is it actually gives us historical information so,

916  from a go-forward perspective, if somebody is looking back

917  and trying to look for e-mail records on certain dates, they

918  actually have a place they can go look, a comprehensive place

919  that tells them what occurred, what components, and what was

920  done to mitigate that risk.  The other is a learning tool for

921  the team.  So we are in the process of rolling out what is

922  known--and the Government is adopting it--Six Sigma, where

923  you look for opportunities to reduce defects.  And by doing

924  this weekly report, we are collecting statistics so they can

925  look backwards on trends and look for opportunities to reduce

926  future defects.  So that is an example of a process

927  improvement.

928      One of the areas you are probably going to be the most

929  interested in, though, is going to be the technology

930  improvements we have made on our existing technology.  As I

931  mentioned before--and I can go into more detail during the

932  questions--we have e-mail that goes into the Journal, the

933  Microsoft Journal.  It is automatically moved through a

934  program that we have in place since 2005 into the PST archive

935  for records keeping, and what we have been doing is actually

936  re-baselining that entire inventory of the records.  We felt

937  like we had to do this.  We found some different technology

938  glitches in some of some tools that had been wonderful

939  workhorses for EOP, but as we were trying to do the analysis

940  to try and figure out what was going on with the problem days

941  and we were having problems replicating some and some were

942  replicating, we felt it in the best interest to upgrade and

943  update some of those tools and implement those tools around

944  the records keeping inventory and statistical analysis

945  process.

946       We are in the early phase.  We actually have three

947  phases we are implementing for this.  We are in the early

948  phase of that process, where we have just started to get some

949  early results.  They have not had a quality assurance check

950  on them, so the results are very preliminary and they are not

951  conclusive.  Some of the promising trends that we have been

952  seeing is we have identified more e-mails for that exact time

953  period that was looked at in 2005 than was previously

954  identified.  We have been able to identify and locate e-mails

955  with an exchange for days that were previously red.  There

956   are, in this phase one, some days that still show as red.

957   That is where phase two is going to come in.  From a phase

958   two perspective, we will be looking at the message level.

959   And I can get into more detail on that during the Q&A, but in

960   phase two it is our desire and our hope to eliminate all or

961   most of the red days and low volume days by being able to

962   read the information down at a more granular level.

963         When we get through a QA process in phase one and phase

964   two, we will be sitting down with NARA to talk through our

965   findings, where we still have anomalies, if we have any, and

966   when we finish phase two we will sit down with NARA, and if

967   there are any anomalies remaining, that is where we will have

968   the conversation around a records restore, most likely

969   looking at our disaster recovery backup tapes.

970         The OCIO staff is incredibly dedicated.  They are

971   working very hard on this effort.  Everyone on the team wants

972   a successful NARA transition.  We want to make sure we get

973   all of the e-mail records over to NARA at transition.

974         Thank you.  And I would be glad to take any questions.

975         [Prepared statement of Ms. Payton follows:]


976   ********** INSERT **********

977        Chairman WAXMAN. Thank you very much.

978        By bipartisan agreement on the Committee, the Chairman

979   will control 15 minutes of questioning and then Mr. Davis

980   will control 15 minutes on his side.  So I will start off the

981   questions.

982        Mr. Weinstein, I want to ask you some questions first.

983   This hearing is about the White House compliance with an

984   important open Government law, the Presidential Records Act.

985   This Act requires the President to ensure that his

986   activities, deliberations, decisions, and policies are

987   adequately documented.  The Act makes clear that a

988   president's records belong to the American people, not to the

989   President or his advisors or the Republican Party.  As the

990   Archivist, how important do you think the Presidential

991   Records Act is?

992        Mr. WEINSTEIN. It is incredibly important, Mr. Chairman,

993   and I think all of us agree.  Whatever our politics are, we

994   are all in agreement on that point.

995        Chairman WAXMAN. It is important because this preserves

996   the records not only for history, but for the next

997   administration.

998        Mr. WEINSTEIN. The records belong to the American

999   people, and that best preserves it, yes.

1000       Chairman WAXMAN. Thank you.  Now, over the last year,

1001  serious questions have been raised about the White House

1002 compliance with this Presidential Records Act.  We have

1003 learned about two violations of the Act that appear to be

1004 serious.  One involves the extensive use of Republican

1005 National Committee e-mail accounts by White House staff and

1006 the other involves the failure to archive e-mails sent

1007 through the official White House e-mail system.  I want to

1008 start out by asking you about the use of these RNC e-mail

1009 accounts to conduct official White House business.

1010      This Committee first started asking questions about the

1011 use of RNC e-mails last March.  As we investigated, we

1012 learned three facts:  one, many senior White House officials,

1013 including Karl Rove and Andrew Card, had RNC e-mail accounts;

1014 two, these officials made heavy use of these accounts,

1015 including for official purposes, such communicating about

1016 Federal appointments and policies; and, three, the RNC

1017 preserved almost none of these e-mails from President Bush's

1018 first term and only some of the e-mails from his second term.

1019      Dr. Weinstein, the documents that we have seen reveal

1020 that the Archives was concerned about these RNC missing

1021 e-mails as well.  Can you explain why?

1022      Mr. WEINSTEIN. Well, I wish I had all the facts at this

1023 stage in the game, Chairman, to--

1024      Chairman WAXMAN. Can you speak up?

1025      Mr. WEINSTEIN. I wish I had all the facts at this point

1026 to discuss this issue, but the fact is that it has been our

1027  understanding that the White House has been working with the
1028  RNC to try to restore PRA e-mails that were created.

1029       Chairman WAXMAN. Well, perhaps they are or they are not;
1030  we are going to get into that.  But how concerned are you
1031  that we may not have the RNC e-mails from senior White House
1032  staff?

1033       Mr. WEINSTEIN. Well, Mr. Chairman, I am concerned about
1034  the problems that we might have with any group of records,
1035  including these.  I want the fullest, I think the American
1036  people want the fullest possible account of any
1037  administration.

1038       Chairman WAXMAN. Karl Rove was a key advisor to the
1039  President.  We also know he was an extensive user of the RNC
1040  account.  Mr. Rove is reported to have sent and received
1041  ''about 95 percent'' of his e-mails through his RNC account.
1042  His secretary, Susan Ralston, confirmed for the Committee
1043  that Mr. Rove used his RNC account extensively.

1044       When we asked the RNC what kinds of records they had,
1045  they told us they had virtually no e-mails from Mr. Rove
1046  before November 2003.  They had virtually none of his e-mails
1047  for 2001, 2002, and most of 2003.  Well, these years were in
1048  many years the defining years for the Bush Administration;
1049  they include the critical months when President Bush was
1050  making the case for war in Iraq.

1051       Are you concerned about the loss of Mr. Rove's e-mails

1052 | for these years, Mr. Weinstein?

1053 |     Mr. WEINSTEIN. Mr. Chairman, I am concerned about the

1054 | loss of e-mails that are White House e-mails, no matter what

1055 | the system they are involved in.  I am concerned about

1056 | maintaining the fullest possible Presidential records.  I

1057 | should add, perhaps, that in listening to Ms. Payton's

1058 | testimony, we are still awaiting the completion at the White

1059 | House of this process.

1060 |     Chairman WAXMAN. We are too, but I want to ask you about

1061 | these RNC e-mails first, before we get into that.

1062 |     Mr. WEINSTEIN. Before we go any further, though, my

1063 | counsel has dealt with this issue to a very great extent.  I

1064 | would ask Gary Stern if he would like to add anything.

1065 |     Chairman WAXMAN. Mr. Stern?

1066 |     Mr. STERN. Yes.  As we have discussed with the Committee

1067 | staff and with the White House, our view is Presidential

1068 | records exist and must be preserved whatever system they are

1069 | used on.  So to the extent they were used on a non-White

1070 | House system, it is still the responsibility of the White

1071 | House to preserve them.  We understand that, also, White

1072 | House officials create non-Presidential records, and then,

1073 | for those records, it would be appropriate to use a non-White

1074 | House system like the RNC system for non-Presidential records

1075 | involving political campaign and all.

1076 |     Chairman WAXMAN. Well, we know Mr. Rove used most of his

1077  e-mails, whatever the subject, on RNC accounts.  So if we

1078  have a deletion of Mr. Rove's RNC e-mail as the rule for the

1079  White House, not the exception, we don't know what he had to

1080  say.  In fact, the Committee learned that the RNC retained no

1081  e-mail messages for all of 51 of the 88 White House officials

1082  with RNC e-mail accounts.  We know whether they were

1083  personal, political, or official Government.  The records

1084  appear to be woefully incomplete for the remaining 37

1085  officials.  For example, the RNC retained e-mails from before

1086  2006 for only 14.  So we had 51 of the 88 White House

1087  officials using e-mail accounts and the records are

1088  incomplete except for 14 of these officials.

1089       Mr. Stern or Dr. Weinstein, you and others at the

1090  National Archives have made repeated inquiries to the White

1091  House about this problem and the White House appeared to tell

1092  you it was taking all this very seriously.  I want to read

1093  some notes from a May 21, 2007 meeting.

1094       Your staff asked what steps the White House was taking

1095  to restore these e-mails and here is what your staff said

1096  they were told, and I want to quote:  ``We then asked about

1097  the RNC e-mail issue.  They, the White House, are working

1098  with the RNC and looking at this issue.  They are exploring

1099  how they will try to capture the Presidential record e-mails.

1100   This will be a separate restoration effort from the EOP

1101  e-mail restoration.''

1102        Dr. Weinstein, can you tell us what the current status

1103   is of the recovery effort?  Specifically, has the White House

1104   taken steps to restore RNC backup tapes?

1105        Mr. WEINSTEIN. Well, I hate to say this, Mr. Chairman,

1106   but I am afraid that is a question that is going to have to

1107   be asked to Ms. Payton and Mr. Swendiman simply because we

1108   have not been given that information.  We were told by her

1109   testimony that the process is nearly complete, which is a

1110   phrase that she used.

1111        Chairman WAXMAN. You have been told by the White House

1112   that the process is nearly complete to get the RNC e-mails?

1113        Mr. WEINSTEIN. It is in Ms. Payton's testimony.

1114        Chairman WAXMAN. Mr. Stern, do you want to respond to

1115   that?

1116        Mr. STERN. On the RNC system, we have enquired

1117   periodically and we were under the impression they were still

1118   working with the RNC and some effort would be undertaken to

1119   recover whatever could be recovered from either backup tapes

1120   or from laptops, individual hard drives.  We heard today that

1121   maybe the RNC is not doing that, and that would be a concern

1122   and a problem and disappointment.  If it is a funding issue,

1123   that is where Congress would potentially need to come in and

1124   say if there are Government records there, they--

1125        Chairman WAXMAN. So you were relying on the White House

1126   telling you that they are going to make sure they get all the

1127 records, including from the RNC.

1128     Mr. STERN. That is correct, which is their

1129 responsibility.

1130     Chairman WAXMAN. Yes.  And I can understand why you

1131 would think that they should be the one doing it.  But we

1132 talked to the RNC yesterday and they told us that the White

1133 House has taken no steps to obtain backup tapes.  The White

1134 House hasn't begun any type of restoration effort and the

1135 tapes haven't been touched.  I am sure you are concerned

1136 about that, is that correct?

1137     Mr. WEINSTEIN. More than concerned about that, Chairman.

1138  Obviously, if that is the case, this should be looked into

1139 as soon as this hearing is over.

1140     Chairman WAXMAN. Well, Ms. Payton and Mr. Swendiman, I

1141 would like to get your perspective.  The White House told the

1142 Archives last May that it was exploring a restoration of RNC

1143 e-mail, but when we checked, the RNC told us the White House

1144 never even obtained the RNC's backup tapes.  Why isn't the

1145 White House following through to recover and preserve these

1146 records?

1147     Ms. PAYTON. Chairman Waxman, since you mentioned me

1148 first, I will go first.  I have responsibility for the

1149 Executive Office of the President network and e-mails, so I

1150 am, unfortunately, unqualified to talk to you about the RNC

1151 restore; I am not part of that process.  If, at some point,

1152 | there were--

1153 |      Chairman WAXMAN. You are not part of the process to get

1154 | the RNC e-mails?

1155 |      Ms. PAYTON. No, sir, I am not.  No, sir, I am not.

1156 |      Chairman WAXMAN. Okay, well, maybe Mr. Swendiman is part

1157 | of that process.

1158 |      Mr. SWENDIMAN. As part of the Office of Administration,

1159 | Mr. Chairman, we have responsibility for the official but

1160 | sensitive EOP network.  We can't control what individuals do

1161 | on their own.

1162 |      Chairman WAXMAN. But you have the responsibility for all

1163 | the officials working at the White House to get their e-mail

1164 | records, and if they use some other e-mail system, aren't you

1165 | responsible to gather that information under the Presidential

1166 | Records Act?

1167 |      Mr. SWENDIMAN. Well, I am advised, Mr. Chairman, that

1168 | Counsel's Office has taken steps with regard to that.  The

1169 | letters have gone out to former White House employees with

1170 | regards to use of RNC laptops that--

1171 |      Chairman WAXMAN. Letters telling them not to do it in

1172 | the future or to get the information from the past?

1173 |      Mr. SWENDIMAN. Mr. Chairman, I don't know the exact

1174 | substance of the letter, I simply have been advised that that

1175 | step has been taken.

1176 |      Chairman WAXMAN. Will you get that information, what

1177    steps have been taken, what letters have been sent?

1178         Mr. SWENDIMAN. I will consult with counsel, yes, sir.

1179         Chairman WAXMAN. Well, I am sure we asked the counsel

1180    for this information.

1181         The White House e-mails that the RNC deleted are the

1182    core types of communications that the Presidential Records

1183    Act is supposed to preserve; they are the candid

1184    communications of the President's most senior advisors.  The

1185    White House may not want these e-mails disclosed, the White

1186    House may be worried that the true record of how the White

1187    House led the Nation to war in Iraq will be embarrassing, but

1188    that is not a legitimate reason for your failure to recover

1189    the deleted e-mails.  I think it is tremendously important

1190    that we get those Republican National Committee e-mails, and

1191    I assume, Mr. Weinstein, that you agree, the RNC has a box of

1192    backup tapes.

1193         Are they being searched, Mr. Swendiman?

1194         Mr. SWENDIMAN. Mr. Chairman, is what being searched?

1195         Chairman WAXMAN. The box of backup tapes at the RNC.

1196         Mr. SWENDIMAN. I don't know.  All I can tell you, Mr.

1197    Chairman, is that among the steps that I am advised are being

1198    taken is, first of all, I mentioned the letter--

1199         Chairman WAXMAN. Pull the microphone and be sure it is

1200    on.  Our members are having trouble hearing you.

1201         Mr. SWENDIMAN. The second is that there have been

1202  contractual efforts with regards to forensic and recovery.  I

1203  cannot, at this time, tell you the status with regard to

1204  that.

1205      Chairman WAXMAN. Well, this is what this hearing is all

1206  about and that is why you were invited to come.  We were told

1207  that the White House has not even asked for them.  Is that a

1208  problem, if the White House hasn't even asked for them?

1209      They assured you, Dr. Weinstein and Mr. Stern, that they

1210  are going to take care of it and they are going to get this

1211  information.

1212      Mr. WEINSTEIN. Mr. Chairman, I can only promise you one

1213  thing, that you and Ranking Member Davis and members of this

1214  Committee will have my best information on this by the end of

1215  the week.  I am going to make some inquiries as soon as this

1216  hearing is over and hope that we can get to the heart of the

1217  matter.

1218      Chairman WAXMAN. Well, we--

1219      Mr. WEINSTEIN. I don't have an answer for you now.

1220      Chairman WAXMAN. Well, you don't have the answers

1221  because the White House assured you they were getting it and

1222  it looks like, from what we hear, they haven't done anything.

1223      Dr. Weinstein, you wrote to Fred Fielding, the White

1224  House Counsel, about this issue on May 1, 2007.

1225      Mr. WEINSTEIN. Yes, sir.

1226      Chairman WAXMAN. Particularly the archiving in the White

1227   House system itself.  You wrote:  ``We believe that it is

1228   essential that the White House move with the utmost dispatch

1229   both in assessing any problems that may exist with preserving

1230   e-mails on the Executive Office of the President system and

1231   in taking whatever action may be necessary to restore any

1232   missing e-mails.''  After you wrote this letter, your staff

1233   made several attempts to learn more.  These weren't

1234   successful.

1235        Now I want to read from a memo that Mr. Stern wrote to

1236   you on September 5, 2007.  Now we are talking about the

1237   official White House e-mail system.  And Mr. Stern wrote:

1238   ``We still have made almost zero progress in actually moving

1239   ahead with the important and necessary work that is required

1240   for a successful transition.  More significantly, our

1241   repeated requests to begin office-by-office meetings to scope

1242   out and inventory the volume, formats, and sensitivities of

1243   the PRA records that will be transferred to the National

1244   Archives has gone unheeded.  Of most importance, we still

1245   know virtually nothing about the status of the alleged

1246   missing White House e-mails.  We have not received a written

1247   response to our May 5, 2007 letter regarding alleged missing

1248   Federal record e-mails. As we stressed to the White House

1249   last spring, it is vital that any needed backup restoration

1250   project begin as soon as possible in order that it be

1251   completed before the end of the Administration.''

1252      Dr. Weinstein, what was your reaction when Mr. Stern

1253  informed you that the White House had still provided

1254  virtually no information about a potentially large loss of

1255  Presidential records?  And how would you describe the

1256  situation now?  Do you all the information you need to assess

1257  the extent of this problem?

1258      Mr. WEINSTEIN. In response to your first question, Mr.

1259  Chairman, I am obviously not happy about that situation.  I

1260  would like an answer and I would like to move forward on this

1261  process.  In connection with what the situation is today, I

1262  think we have a very sensitized group of people to this

1263  issue, but we don't have the results yet.  So that is why I

1264  ask you for a few more days to see whether I can get some

1265  results for you.

1266      Chairman WAXMAN. Well, we will certainly, without

1267  objection, hold the record open for you to give us any

1268  further information, and I am sure you will get further

1269  questions about this.  But Congress doesn't have all the

1270  information we need.  We still don't know what the White

1271  House is going to recover, whether they are going to recover

1272  the missing White House e-mails that the RNC deleted, and

1273  every week we seem to get a different story from the White

1274  House about whether the White House's own e-mail archives are

1275  complete.  I think it is important we get those RNC e-mails

1276  and we get the White House e-mails from their own operating

1277  system, and without that this Administration is not complying

1278  with the Presidential Records Act.

1279      I want to recognize Mr. Davis for 15 minutes.

1280      Mr. DAVIS OF VIRGINIA. Thank you.  Let me just say that

1281  these people are not responsible for the RNC e-mails.  They

1282  have a separate corporate culture over there, isn't that

1283  correct, in terms of when they move them?

1284      Mr. SWENDIMAN. That is correct.

1285      Mr. DAVIS OF VIRGINIA. And you are not into that loop

1286  particularly.  The other thing that troubles me about this is

1287  the fact that when you have the Committee asking the RNC to

1288  recover e-mails that they may or may not have, that is a huge

1289  expense to the National Committee.  My feeling is--and we

1290  need to look at this in the future--when you have congresses

1291  of different parties going after political committees, that

1292  is taking a lot of money out of the system for congressional

1293  investigations that could go other places, and I think if

1294  Congress really wants to pursue this, we ought to look at an

1295  appropriation or something, and not have it come out of their

1296  coffers.  It has been hundreds of thousands, at a minimum,

1297  that I know that it has cost the RNC in this particular case.

1298      Let me ask some questions.

1299      Ms. Payton, we have backup tapes for all of this, don't

1300  we?

1301      Ms. PAYTON. Excuse me?

1302      Mr. DAVIS OF VIRGINIA. All the e-mails, are there backup

1303  tapes?

1304      Ms. PAYTON. We have disaster recovery backup tapes,

1305  primarily--

1306      Mr. DAVIS OF VIRGINIA. What is the difference between a

1307  disaster recovery backup tape and a backup tape?

1308      Ms. PAYTON. Sure.  Let me try and explain it.  From a

1309  disaster recovery standpoint, which is what our backup tapes

1310  are, what you do is you actually take a picture of what all

1311  of the servers, the applications--

1312      Mr. DAVIS OF VIRGINIA. Well, backup tape covers

1313  everything that happened.

1314      Ms. PAYTON. Yes, sir.

1315      Mr. DAVIS OF VIRGINIA. It may be for disaster recovery,

1316  but are there backups for all of these missing e-mails?

1317      Ms. PAYTON. We believe we should have backups based on

1318  our first pass analysis, which is not complete and has not

1319  been QAed yet.

1320      Mr. DAVIS OF VIRGINIA. But, in all likelihood, there are

1321  backups for everything.

1322      Ms. PAYTON. Yes, sir.

1323      Mr. DAVIS OF VIRGINIA. So there is nothing really

1324  missing here, it is recoverable.

1325      Ms. PAYTON. We won't know until we finish the analysis,

1326  but we feel very confident that we will be able to use the

1327  disaster recovery backup tapes if we need to.  At the end of
1328  phase two of our analysis, if we still have anomalies--
1329       Mr. DAVIS OF VIRGINIA. So the Committee should be able
1330  to get this, if they want it, one way or the other, is that--
1331       Ms. PAYTON. Yes, sir.
1332       Mr. DAVIS OF VIRGINIA. Okay.  I mean, I think that is
1333  important to get out here.  Now, it is expensive going
1334  through the disaster recovery backup tapes to retrieve that,
1335  is it not?
1336       Ms. PAYTON. Yes.
1337       Mr. DAVIS OF VIRGINIA. Can you describe the cost to me?
1338       Ms. PAYTON. The team actually put together an algorithm
1339  based on having to do this before, and basically the
1340  algorithm--and it is a very rough approximation, but if you
1341  have one component one day that needs to be restored from a
1342  disaster recovery backup tape, we have estimated it would
1343  cost around $50,000 for one component one day.  So if you
1344  have three components on one single day, that would be three
1345  times 50,000, which would be 150,000.
1346       Mr. DAVIS OF VIRGINIA. Well, can you give me a ballpark
1347  number if we had to go to the backup?  Assume for a minute we
1348  can't recover the originals of this.  To get what the
1349  Committee wanted to, if we had to go to backup, can you give
1350  me a ballpark?
1351       Ms. PAYTON. There is also servers that would have to be

1352  purchased because you wouldn't want to do the backup on

1353  servers you already have, so we said it would be about

1354  $500,000 for the servers.  And I believe--and I am working

1355  off of memory here--but I believe we had said if we restored

1356  every single day from the original analysis, it was going to

1357  be somewhere in the ballpark of $15 million or more.

1358      Mr. DAVIS OF VIRGINIA. Okay.  But it is recoverable. In

1359  your judgment, by the time you have looked at all of this,

1360  one way or the other, these haven't been doctored or hidden;

1361  it is recoverable.

1362      Ms. PAYTON. Yes, it should be recoverable.

1363      Mr. DAVIS OF VIRGINIA. At a cost.

1364      Ms. PAYTON. The caveat I give is you don't know what you

1365  don't know until you get into the technology.  So sometimes

1366  you don't know if there might be a flaw in a tape and some of

1367  those other things.  But based on what we know right now, it

1368  should be recoverable.

1369      Mr. DAVIS OF VIRGINIA. Okay, thank you very much.

1370      Mr. Issa, do you want to--

1371      Mr. ISSA. Thank you.  I thank the gentleman for

1372  yielding.

1373      Mr. Chairman, I would ask, since I understand we are

1374  going to accept additional information at the end of this

1375  hearing, that the back-and-forth correspondence with Mr.

1376  Steven McDevitt related to the White House guidance and his

1377  further guidance be included in the record.

1378      Chairman WAXMAN. Without objection, that will be the

1379  order.

1380      Mr. ISSA. Thank you, Mr. Chairman.

1381      Mr. DAVIS OF VIRGINIA. Would the gentleman yield for one

1382  more?

1383      Mr. ISSA. Of course.  Take your time.

1384      Mr. DAVIS OF VIRGINIA. Let me just make one other

1385  comment on White House versus RNC, because this is a

1386  long-term problem I think this Committee needs to wrestle

1387  with if we are going to be successful.

1388      You have a political operation in the White House, and

1389  you do politics and you do governance at the same time.  To

1390  be able to use Government systems to do political e-mails

1391  would really not be consistent with the Hatch Act and

1392  everything else.  Is that everybody's understanding?  Mr.

1393  Stern?

1394      Mr. STERN. Well, that is correct, and with the

1395  Presidential Records Act.  The Presidential Records Act

1396  itself requires that White House officials separate

1397  Presidential records from what are called personal records,

1398  which include political records.  So they are supposed to

1399  keep them separate and generally not use Government systems

1400  for non-Governmental business.

1401      Mr. DAVIS OF VIRGINIA. I think what we need to do, we

1402   can't reinvent the past, but, going forward, we should--one

1403   thing this Committee could do is we could is we could outline

1404   some guidelines in the future for how you keep those records,

1405   saving them and the like.  I think that may be helpful.  I

1406   mean, the fact that you had different servers and computers

1407   keeping these things in itself is compliant with the law.

1408        Mr. STERN.  Yes, the notion of having a separate computer

1409   to do political work in the White House makes sense; you just

1410   shouldn't be doing your official work on that computer.

1411        Mr. DAVIS OF VIRGINIA.  Right.  And that would mean that

1412   for the political parties, now all the e-mails wouldn't have

1413   gone--I mean, if it was an RNC or a DNC computer that you

1414   were keeping there, maybe we ought to put out guidelines for

1415   preservation of records, which currently don't exist.  Would

1416   that be a recommendation that might come out of here that

1417   could be helpful in going forward?

1418        Mr. STERN.  I would think so.  And that is the kind of

1419   thing that--you know, the White House Counsel issues records

1420   management guidance for all White House employees that they

1421   should be doing and I think did do, in fact.  There is

1422   guidance to that effect at some level, I believe, by the

1423   White House.

1424        Mr. DAVIS OF VIRGINIA.  But this is--I mean, e-mail, this

1425   is fairly new, this has evolved over the last decade, and it

1426   may be appropriate, Mr. Waxman, at the right time, at least

1427  going forward, that we put out some hard and fast rules.

1428       Mr. Weinstein, do you have any thoughts on that?

1429       Mr. WEINSTEIN. I am in total agreement with that, Mr.

1430  Davis.  One of the points I would like to make is about the

1431  cost of this.  Apparently, this process of restoring e-mails

1432  from the Clinton years cost about $12 million and took about

1433  two years to achieve, so these are not cost-free issues.

1434       Mr. DAVIS OF VIRGINIA. I got you.  Thank you.

1435       Okay, Mr. Issa.

1436       Mr. ISSA. Thank you.

1437       Sort of finishing up with Mr. McDevitt, my understanding

1438  from staff is that the call that was made, they were

1439  prohibited from asking certain probative questions, one of

1440  them clearly would be is Mr. McDevitt working with CREW in

1441  private litigation.  Certainly, that would be a fair question

1442  if he were here before us today.  Another one would be, you

1443  know, were the interrogatories that he submitted the result

1444  of back and forth work with the Majority.  Certainly, I would

1445  like to know that.  Lastly, I might note for the panel before

1446  us that Mr. McDevitt, a Federal employee at FEMA, chose--even

1447  though he is a past White House employee--chose to use his

1448  g-mail account to correspond back and forth with us as to

1449  whether or not he could give testimony.

1450       And I think, Mr. Stern, I will start with you, if you

1451  don't mind.

1452    Is it appropriate to use g-mail when you are a Federal

1453  employee and a committee of Congress is asking you questions?

1454  Or would that have been something that he should have done on

1455  his FEMA account, since he is a Federal employee, and he was

1456  contacted in the ordinary course of previous Federal

1457  employment?

1458    Mr. STERN. Well, ultimately, like we have said, whether

1459  something constitutes official Government business and

1460  therefore a Government record has to preserved on whatever

1461  system you use it on.  People do use their home e-mail

1462  accounts if they are working from home and don't have access

1463  to the Government account.  So the fact of mere use of a

1464  private account for Government business is not prohibited, it

1465  just needs to be preserved according to whatever Government

1466  record-keeping laws apply.

1467    Mr. ISSA. Okay.

1468    Mr. STERN. But g-mail is not something where you can

1469  easily catch the archive on it.

1470    Mr. ISSA. Dr. Weinstein, are you keeping all of the

1471  YouTube stuff that is up on the President?  Are you keeping

1472  all the other activities, the things that show up on the

1473  internet for President Bush and his Administration?  Are you

1474  capturing that? Because certainly it is part of the total

1475  internet, but not part of Ms. Payton's normal capturing.

1476    Mr. WEINSTEIN. What specifically, are you referring to?

1477         Mr. ISSA. Well, if the Chairman thinks that he should

1478    have Karl Rove's every thinking, including correspondence

1479    with the wife or a girlfriend or an old buddy because it was

1480    done at the RNC and not official work, toward this voyeur,

1481    peeping tom thing that you are entitled to everything, the

1482    question is, are you capturing everything or, in fact, are

1483    you leaving a huge amount that is out there not there.  Are

1484    you capturing every utterance of the President, no matter

1485    where he is, for example?

1486         Mr. WEINSTEIN. Congressman, I think you know the answer

1487    to that question.

1488         Mr. ISSA. I do, and, unfortunately, the only time I have

1489    is the time to say that this Committee was supposed to be

1490    looking into the failure to keep 200 days--it continues to

1491    shrink--worth of e-mail, but it is very clear that it is Karl

1492    Rove's nonofficial activities that, for example, were related

1493    to fund-raising or other activities, maybe strategizing how

1494    the Republicans in the House could have kept the majority

1495    rather than become part of the minority, which, I suspect,

1496    Karl Rove did at the RNC.  He probably did that, and would

1497    his successor in a Democrat Administration.

1498         So my question is, if Karl Rove over at the RNC chose to

1499    decide that, let's say talking about fund-raising, or talking

1500    about strategizing how to maintain a majority in the House or

1501    the Senate, if he did something on an e-mail, would that be

1502    appropriate for you to gather at the time, Mr. Weinstein?

1503    You're shaking your head no, so I assume that you have an

1504    answer to that, that that is not appropriate, right?

1505        Mr. STERN. The President's record of that pretty clearly

1506    defines what is a Presidential record and what is not a

1507    Presidential record, and says activities by officials for

1508    purely political purposes, campaigns, reelection of the

1509    President are non-records and should not be maintained by the

1510    Government system and not--they do not come to the National

1511    Archives as Presidential records.  So it is entirely

1512    appropriate to conduct that business on a separate system.

1513        I think the issue is always, was there are also official

1514    Presidential records on that system.  That is what we would

1515    be interested in getting at.

1516        Mr. ISSA. Well, but is there any evidence that any of

1517    you have that there is official Government Presidential

1518    records there?  Or are we simply going on a fishing

1519    expedition at $40,000 or $50,000 dollars a month of campaign

1520    funds at the RNC because we have the power of subpoena?  And

1521    we will forget the second half of that for a moment.

1522        Do any of you know of any official deliberative,

1523    required under law, not nice to have but required under law,

1524    that was done at the RNC?  Obviously, from the Government to

1525    the RNC you have already got, you will capture that.  We are

1526    talking about use of other servers and other e-mails not

1527    related to the Government.  Do any of you know of a single

1528    document, because this Committee doesn't, a single document

1529    that should have been in the archives but, in fact, was done

1530    at the RNC?

1531        Mr. WEINSTEIN. Two points.  First of all, it is hard to

1532    know anything before we have some information.

1533        Mr. ISSA. Okay.  Now, that is the whole point.  We are

1534    not entitled--

1535        Chairman WAXMAN. The gentleman's time--

1536        Mr. ISSA. No, no, but--Mr. Chairman, this is my time, if

1537    you don't mind.  You have used plenty of time that is not

1538    allocated time under the Committee Rules.

1539        I need to be as simplistic as possible because we have

1540    limited time.  If you know of any, you say yes; if you do not

1541    know of any, you say no.  I understand that there might be

1542    some there that we do not know, but there might be some on

1543    YouTube.

1544        The President may have had a conversation, a

1545    deliberative conversation, well, at a fund-raiser.  He may

1546    have done that, but it is not being captured by you today,

1547    nor is there a burden under law to go get it to see, is

1548    there?  You have no mandate to go peeping tom into every

1549    piece of correspondence that people say is private in order

1550    to determine whether it might be public.

1551        Mr. WEINSTEIN. Of course not.

1552          Mr. ISSA. Okay.  So, I mean, it is important for today

1553   because Ms. Payton, I think, has very important information

1554   for us, that there will be a certain amount of days of

1555   re-imaging servers with the images you captured as the

1556   typical backup you do.  It is much faster, obviously, to

1557   capture an image than to do a sequential backup.

1558          You captured images.  If you are lucky, you capture one

1559   and you get 80 days' worth of back, or 30 days worth of back

1560   e-mails; if you are not lucky, you may have to go day after

1561   day after day to capture them.  And I appreciate the fact

1562   that sometimes those images are not 100 percent perfect.  You

1563   might not be able to restore a server, and that may be lost,

1564   and it may be millions of dollars.

1565          But the Committee's legitimate reason for calling this

1566   today, as I understand, is not the RNC; it is whether or not

1567   you can capture that and what it will cost.  And I think you

1568   have given us a great answer that if all we care about is Dr.

1569   Weinstein's ability to get the legitimate archives that we

1570   know should be available to the history of America, you are

1571   going to be able to provide that in all likelihood, all or

1572   virtually all.

1573          So now I get back to the same thing in the remaining

1574   time, and I will ask each of you, do any of you know of

1575   something that was wrongly use outside official channels by

1576   Karl Rove?  Because it is clear the Chairman, a little bit

1577 like Dan Burton, who I disagreed with some of what he did in

1578 the 1990s, but he is clearly wanting to know what Karl Rove

1579 said or did even if Karl Rove did not deliver it as official

1580 work.  And the question is, do any of you know of any

1581 misconduct by Karl Rove using the RNC to circumvent what

1582 would otherwise be official legitimate activities covered

1583 under the Records Act?  Do any of you know of that, yes or

1584 no, please?

1585      Mr. WEINSTEIN. Yes or no?

1586      Mr. ISSA. Yes or no.  I mean, do you know or do you not

1587 know?  You do not know.

1588      Mr. WEINSTEIN. I would say that the question itself is

1589 both above and below my pay grade.

1590      [Laughter.]

1591      Mr. ISSA. Mr. Chairman, I will take that as a no, and

1592 thank you.

1593      Chairman WAXMAN. I would take it as more than a no.

1594      For the record, the White House has a responsibility of

1595 preserving all of the e-mails.  And if some of the e-mails

1596 are at the Republican National Committee, the White House has

1597 a responsibility to get them, but only those that relate to

1598 Federal work, Government activities.

1599      And when we know that, for the record, that there are 51

1600 of the 88 White House officials who had RNC e-mail accounts,

1601 and then we do not know what has happened to 37 of those 51,

1602    and before 2006 only 14 of these officials had the e-mails
1603    even retained at all and that Karl Rove, for example, used 99
1604    percent of his time on RNC e-mails, one would assume he was
1605    doing some Government work.  But we do not know unless we see
1606    the e-mails.  And if we do not see thee-mails, we do not
1607    know.
1608         Mr. ISSA. Mr. Chairman, do you presume that we have a
1609    right to look into private people's lives simply because--
1610         Chairman WAXMAN. Absolutely not.
1611         Mr. ISSA.--there might be something there?
1612         Chairman WAXMAN. Absolutely not.  But the White House
1613    has an obligation to have the official business of the White
1614    House on e-mails that are preserved.  And they need to be
1615    preserved whether they are on one account or another.
1616         Mr. ISSA. Mr. Chairman, I truly agree with you on that,
1617    and that is why we have been cooperating as a minority.  But
1618    I would hope that we would ask the White House just as what I
1619    asked here, are there any records that are covered under
1620    official deliberation in the Records Act that have been
1621    conducted under any non-Government service by any individuals
1622    and ask them to answer that.
1623         Chairman WAXMAN. Mr. Swendiman, that is a good question.
1624    Are there Government activities that are handled on an RNC
1625    e-mail account when we have so many employees of the highest
1626    level in the White House with no official records of their

1627 e-mails, and we know that they use their RNC accounts for

1628 everything that they send on e-mails?

1629     Mr. SWENDIMAN. Well, much of the things that you have

1630 talked about, Mr. Chairman, preceded my coming to the

1631 position of Director of the Office of Administration.

1632     Chairman WAXMAN. Oh.  Well, then, it's improper for us

1633 to ask you.  But you are here representing the White House?

1634 Let me go on to members who are waiting for their opportunity

1635 to ask questions.

1636     Mr. Davis?

1637     Mr. DAVIS OF ILLINOIS. Thank you very much, Mr.

1638 Chairman.

1639     As I listened to that discussion, I just happened to

1640 have in my hand a report that says Investigation of Possible

1641 Presidential Records Act violations.  And information in the

1642 report indicates that White House officials used their RNC

1643 e-mail accounts to conduct official business.  So I am not

1644 sure that we have to speculate about that.  I think that we

1645 actually have the information that has been under

1646 investigation and, actually, is written in a report.  So I

1647 think we can move on.

1648     But let me move on to my questions of Dr. Weinstein.  As

1649 I understand the White House e-mail problem, this all began

1650 in 2002 when the White House decided to move its staff from

1651 the Lotus Notes e-mail system to the Microsoft Exchange

1652  e-mail system.  But when the White House switched away from
1653  the old e-mail system, it also abandoned the archiving system
1654  that went with it.

1655       The archiving system was called the Automatic Records
1656  Management System, or ARMS, and had been used since the
1657  Clinton administration.  The problem was that instead of
1658  putting in place a new archiving system, the White House
1659  began an ad hoc process called journaling.  And under this
1660  process, a White House staffer or contractor would collect
1661  copies of e-mails and manually save them on various White
1662  House service.

1663       The Committee interviewed Carlos Solari, who was Ms.
1664  Payton's predecessor, as the White House Chief Information
1665  Officer, and he told us that this journaling process was ``a
1666  temporary and short-term solution that was not considered a
1667  good long-term solution.''

1668       Dr. Weinstein, your own staff had a similar reaction.
1669  In an e-mail sent last November, Sam Watkins with the
1670  Archives said that the archiving system used by the White
1671  House ``hardly qualifies as a system'' by the usual IT
1672  definition.

1673       My question is, do you agree with this ad hoc journaling
1674  process was not an ideal e-mail archiving system?

1675       Mr. WEINSTEIN. Congressman, may I first compliment you
1676  on a very brief distilled analysis of the systems, which I am

1677  afraid I could not match.  So we will start with the fact

1678  that I am a very low-tech person, I have only been at the

1679  Archives for three years.  But I think the judgment of that

1680  system will have to be made by colleagues who have watched

1681  this over--unfortunately, I am not even sure that Mr. Watkins

1682  is here. Is he here?

1683        So we will listen to my counsel on that one.

1684        Mr. DAVIS OF ILLINOIS. So you would not say that this is

1685  an ideal--

1686        Mr. WEINSTEIN. Well, I think when one has to change any

1687  system completely, or one decides to change any system

1688  completely, you are going to run into not simply the normal

1689  obstacles but that wonderful historical--I am a historian by

1690  profession--and the law of unintended consequences is the

1691  only major historical law which I know, which is--

1692        Chairman WAXMAN. Dr. Weinstein, we're having a hard time

1693  hearing you.  Pull it right up to--

1694        Mr. WEINSTEIN.--which is absolutely infallible for

1695  historians which is a law of unintended consequences.  I am

1696  sure there were some in the change from one system to

1697  another, but perhaps Mr. Stern knows of some specifics here.

1698        Mr. DAVIS OF ILLINOIS. Well, let me ask you, Mr. Stern,

1699  on responsive, do you have any concerns about the adequacy of

1700  the White House archiving system?

1701        Mr. STERN. I think, and as the documents we provided to

1702  Committee reflect, it had been our understanding that the

1703  journaling function was meant to be temporary stop-gap until

1704  they put in a new formal records management application which

1705  we had spent some time working with them during the first

1706  term of the President, and which we still had hoped and

1707  expected they would put in a new formal system.

1708      So I think, as the quote you indicated, or you quoted

1709  from, indicates that it is our view that the journaling

1710  function is not the ideal solution.

1711      Mr. DAVIS OF ILLINOIS. And it has been used for six

1712  years, so I would want to ask Dr. Weinstein, do you have any

1713  concerns--

1714      Mr. WEINSTEIN. Correct.

1715      Mr. DAVIS OF ILLINOIS.--about how long this system has

1716  been used, or the White House has continued to rely upon a

1717  nonproductive system?

1718      Mr. WEINSTEIN. Congressman, in fairness to the White

1719  House, what I would like to see is the results of what my

1720  colleague here, Ms. Payton, is doing.  You indicated that

1721  your process is coming to a conclusion, so I would like to

1722  hear the results of what Mr. Swendiman and his colleagues

1723  have come up with, and it seems to me to be unfair to judge

1724  that system before we have seen it in operation.  And this

1725  is, literally, the first time it can be seen in full

1726  operation.

1727          Mr. DAVIS OF ILLINOIS. Well, let me ask Ms. Payton how

1728    she would respond to that, or if she has any concerns about

1729    it.

1730          Ms. PAYTON. If your question, Mr. Davis--I just want to

1731    make sure I understand the question you are asking me--is

1732    around--is it an ideal solution?

1733          Mr. DAVIS OF ILLINOIS. We used it--I mean, the White

1734    House has continued to use it pretty much knowing that it was

1735    not yielding the kind of results that you would want to have

1736    it yield.

1737          Ms. PAYTON. I think this is a very complex challenge. It

1738    is not as simple to say this is the right software produce

1739    and this is the wrong software product.

1740          What I have been able to gather from the people who have

1741    been here prior to my arrival, as well as some of the

1742    documents that I have read, is best efforts have been made to

1743    actually do a more comprehensive solution, but once the

1744    products had run through their paces through some of the

1745    unique and demanding requirements that EOP has, they have to

1746    do both Presidential Records and Federal Records Act

1747    management.  They have to separate things out by components,

1748    and they have to be able to record key statistics so  that

1749    they can do searches.

1750          And it appears that each time those products were run

1751    through the paces, they were left wanting.  So that has been

1752 the challenge.

1753      So part of what we have been doing in knowing that we

1754 want a more comprehensive solution--this is not the solution

1755 that we want to live on for the rest of the time that we are

1756 on exchange, barring whatever the next platform is that comes

1757 out for e-mail, we know that we want to move to a newer

1758 platform.  However, in the meantime, you have to make do with

1759 what you have and make sure the processes around it are

1760 tight, make sure that people are trained, and as much as you

1761 can improve the technology around it to make sure the

1762 processes capture any potential problems that may happen.

1763      A comprehensive solution still does not account for, if

1764 you have four processes around a comprehensive solution, if

1765 it breaks, you are still going to have challenges.  I think

1766 we have seen that in the industry.  And I am not going to,

1767 you know, mention by name some of the large companies that

1768 have had challenges with this that do have more comprehensive

1769 solutions.

1770      So I hope I am answering your question, Mr. Davis.

1771 Would it be what my staff and I would have picked if we could

1772 have had the ideal world, probably not.  But it is the

1773 solution we have, and our focus is on making sure it is

1774 accurate, reliable, stable, and has good processes around it

1775 until we can get on a more comprehensive solution.

1776      Mr. DAVIS OF ILLINOIS. Thank you very much.

1777        Chairman WAXMAN. The gentleman's time has expired.

1778        Mr. Mica.

1779        Mr. MICA. Thank you, Mr. Chairman.  Sixteen years is, I

1780   think, Mr. Chairman, you have been on the Committee longer, I

1781   am sure you have, but I have been on 16 years.  It is

1782   interesting how what comes around sort of goes around.

1783        Here with this discussion reminded me of, with the

1784   Clinton administration, and the missing FBI files, and those

1785   were not e-mails, those were FBI files.  Remember Craig

1786   Livingstone, and I think Mrs. Clinton was in the middle of

1787   that one, too. But it is interesting how it sort of just all

1788   comes around full circle.  Now, we are looking for some

1789   e-mails.

1790        And this raises an interesting question, because we have

1791   gone from like hard FBI files and documents to the electronic

1792   era.  I had a good discussion with the librarian of Congress

1793   because the same thing is happening with Congress.  You used

1794   to have all these great, well, the archivist has an

1795   incredible collection of hard copies.  I think it is just one

1796   of the most fabulous things I have ever seen is to go into

1797   the Archives. And you do a, generally, a magnificent job of

1798   preserving those documents.  But we are entering a new era in

1799   trying to sort out sort of the rules of how you preserve

1800   electronic communications.

1801        Ms. Payton, this Steven McDevitt that has made some

1802  allegations, part of the reason that he was upset was that, I

1803  had heard that there was a difference in technology he wanted

1804  to implement.  Are you aware of that as far as recording

1805  e-mails and preserving them?

1806        Ms. PAYTON. Did you--

1807        Mr. MICA. Are you aware of that, Dr. Weinstein?

1808        Mr. WEINSTEIN. Well, obviously, in an ideal world, which

1809  is, you know, Congressman, is the world we live in, it would

1810  be best if all concerned had a very high comfort level with

1811  the technology they were using.  I am not privy to the

1812  specific arguments involved with technological debate over

1813  what to do at the White House in this regard.  I am at the

1814  National Archives.

1815        Mr. MICA. Well, is there a difference of opinion as to

1816  how the records were kept, do you know?

1817        Mr. WEINSTEIN. I am not sure that there was.  Did you

1818  have a difference of opinion?

1819        Mr. MICA. Well, if there was not, we would have one

1820  protocol, and everything would, things would be saved.  And,

1821  obviously, some things are missing that Mr. Waxman would like

1822  to find.

1823        Mr. WEINSTEIN. But at the staff level, it seems to me

1824  that one of the things that keeps the system working is a

1825  remarkable amount of civility back and forth, normally,

1826  between the staffs in terms of getting basic things done.

1827        Mr. MICA. But, you know, the high regard I have for the

1828   Archives.  Mr. Stern, I think you were involved in the Sandy

1829   Berger issue, and I asked that we find out about the missing

1830   papers.

1831        Now, Sandy Berger had top secret classified documents he

1832   was charged by President Clinton to report to the 9/11

1833   Commission, and he had access to and misplaced top secret

1834   documents.  Is that not correct, Mr. Stern?

1835        Mr. STERN. He had access.  He had clearance.  I mean, I

1836   could answer your question, if you would like.  It seems that

1837   that is, obviously, a separate topic from what this hearing

1838   is about.

1839        Mr. MICA. No, but you are charged, it is just like I am

1840   going to ask Ms. Payton about the Clinton records, you are

1841   charged with keeping presidential records.  The Clinton

1842   records, is there not a hold on some of those being released

1843   now for the Clinton Library?

1844        Ms. Payton, is that correct?

1845        Ms. PAYTON. My understanding is they are NARA, sort of

1846   in a kind of a temporary area until all of them are--

1847        Mr. MICA. So we cannot get access to Presidential

1848   records from that Administration, and then the Archives,

1849   which does its best in preserving them, particularly a new

1850   mode of communications which is electronic, we take

1851   top-secret hard documents that were stuffed, according to Mr.

1852   Lester's e-mail, which I would like to make part of the

1853   record, Mr. Chairman.

1854       Chairman WAXMAN. We will accept it for review and not

1855   make it part of the record.

1856       Mr. MICA. Okay, but it refers to his e-mail as to how

1857   those documents were preserved, and I guess they were stuffed

1858   in Sandy Berger's socks.

1859       Mr. MICA. Is that what you understand, Mr. Stern?

1860       Mr. STERN. There's been a lot of review and

1861   investigation by lots of folks about what Mr. Berger did.

1862       Mr. MICA. But there are e-mails that say one thing, and

1863   then the IG Report says another thing.  And I want them to be

1864   made part of the record.

1865       Chairman WAXMAN. The gentleman's time has expired.  The

1866   Chair will not admit that in the record.  That has nothing to

1867   do with this hearing.

1868       Ms. Watson?

1869       Ms. WATSON. Thank you so much, Mr. Chairman, I want to

1870   address my remarks to Ms. Payton.  And Ms. Payton, to comply

1871   with the Presidential Records Act, an e-mail archiving system

1872   has to ensure that it captures all pertinent e-mail, but it

1873   also has to prevent people who are unauthorized from

1874   tampering with or deleting e-mail, would you not agree?

1875       Ms. PAYTON. Yes, ma'am.  Yes, absolutely.

1876       Ms. WATSON. And the Committee has been informed that in

1877  2005 the White House was warned that not only its system was

1878  at risk of data loss but also that it was vulnerable to

1879  tampering.  And Mr. McDevitt, who worked for you at the White

1880  House, correct?  He did work for you?

1881       Ms. PAYTON. Yes.  I started mid-May of 2006.

1882       Ms. WATSON. He informed the Committee that there is no

1883  way to guarantee that all records are retained in their

1884  complete and unmodified state.  And he said the approach of

1885  simply storing e-mail messages in PST files provide no

1886  mechanism or audit trail that tracks changes to day the

1887  files. According to him, the integrity of the data could be

1888  called into question because it was not possible to ensure

1889  that inappropriate action, either intentional or

1890  unintentional, could not occur.  So this does not necessarily

1891  mean that someone tampered with White House documents, but it

1892  does mean there is no way to know if someone did.

1893     Let me then address this to Dr. Weinstein.  Does this

1894  raise a concern for you that there could be tampering?

1895     Mr. WEINSTEIN. Congresswoman, anything of this kind

1896  raises concerns for me and any possibility of tampering in

1897  any fashion.  Because of an unfortunate employee--

1898       Ms. WATSON. I know, but are you concerned about that?

1899     Mr. WEINSTEIN. Am I concerned about this specific issue

1900  that you raise?

1901       Ms. WATSON. That the data could be tampered with.

1902      Mr. WEINSTEIN. I would like to see some of the material,
1903  if I may that--

1904      Ms. WATSON. I cannot hear you, sir.

1905      Mr. WEINSTEIN. I would like to read through some of the
1906  material that you have in front of you so that I can judge
1907  for myself.

1908      Ms. WATSON. No.  Give me a yes or no.

1909      Mr. WEINSTEIN. Yes, I am most concerned.  Yes.

1910      Ms. WATSON. Yes is your answer?

1911      Mr. WEINSTEIN. Yes was my answer.

1912      Ms. WATSON. Yes, it is just a simple question, okay.

1913      Mr. McDevitt also raised another concern, and this one
1914  is even more serious.  He stated that there was a critical
1915  security issue in this system that was not identified and
1916  corrected until 2005.  And he said this: ''During this period
1917  it was discovered that the file servers and the file
1918  directories used to store the retained e-mail PST files were
1919  accessible by everyone on the EOP network.''

1920      Now, Ms. Payton, the Executive Office of the President
1921  has several thousand people, and your former employee, Mr.
1922  McDevitt, is saying that until 2005 any of them could access
1923  these e-mail files.  They could delete files, they could
1924  modify files, or read the files of other officials.  Is that
1925  correct?

1926      Ms. PAYTON. Ms. Watson, since that precedes me, I am

1927  going to go off of information based on conversations with my

1928  staff, and in asking and trying to understand the e-mail

1929  situation so we have the right course of action and the right

1930  people matched to it, that has not been brought up.

1931      I mean, at some point in time I can certainly go back

1932  and ask them about that.  That has not been brought up, nor

1933  is that typical--

1934      Ms. WATSON. Let me stop you.

1935      Ms. PAYTON. Yes, ma'am.

1936      Ms. WATSON. Are you saying to me that it has not been

1937  brought up that these files could be deleted or tampered

1938  with?

1939  That there was system-wide access by 3,000 customers to

1940  servers that are in the data center, that is against, you

1941  know, sort of Technology 101 principles, if that happened--

1942  Please.  Please.

1943      It would appear to me that if you had a system in place

1944  so it could be accessed by 3,000 people or unofficial

1945  personnel, and it could be changed, you mean to say that

1946  there was no concern or discussion?  Is that what I am to

1947  hear?

1948      Ms. PAYTON. I have not been made aware that at some

1949  point in time that these servers were open to just anybody.

1950      Ms. WATSON. So, as I understand it, and please correct

1951  me, you had a system in place in the White House for several

1952  years in which anyone could have gone in and deleted files

1953  without a trace?

1954      Ms. PAYTON. Ma'am, I do not know that to be true.  I

1955  have not been told that.

1956      Chairman WAXMAN. The gentlelady's time has expired.

1957      Mr. Duncan?

1958      Mr. DUNCAN. Thank you, Mr. Chairman.  Let me just ask

1959  that again.  I think maybe you just answered this, you do

1960  realize, of course, you are under oath.  Do you have any

1961  knowledge of any kind that any person has ever tampered with

1962  or deleted any of these files?

1963      Ms. PAYTON. I have no knowledge of anybody going out

1964  there and intentionally deleting files that should not be

1965  deleted.

1966      Mr. DUNCAN. All right.

1967      Ms. PAYTON. Again we are referring to a time period

1968  before my time, but I have not had an employee come to me and

1969  say this is something that needs to be researched and that

1970  anything has happened.  So I do not know what to do with that

1971  statement.

1972      Mr. DUNCAN. So you have no knowledge of anybody

1973  purposely trying to hide or delete something from this

1974  Committee or from any Government investigator?

1975      Ms. PAYTON. That is correct.  There is only one

1976  exception that is allowed as far as any kind of delete, and

1977 that has to go through a very specific process.  That is only

1978 in the event that information from the classified network is

1979 found on the unclassified network.  That is the only time

1980 that a delete is allowed to happen, and that is managed

1981 through very tight process.

1982     Mr. DUNCAN. Mr. Swendiman, let me ask you, or Ms. Payton

1983 either one, how many times has your staff or either of you or

1984 your staff briefed Oversight Committee staff, and can you

1985 tell us how many letters of inquiry you have received from

1986 the Committee?

1987     Mr. SWENDIMAN. I briefed the Oversight staff once very

1988 recently in terms of being responsive to the Committee.  We

1989 have certainly in hand the Chairman's letter, and we have

1990 been producing the documents that were requested.  That has

1991 consumed approximately, given the last check of about

1992 February 8th, about 1,500 hours of time from the OA staff to

1993 do that, and that's staff across the board; that is not just

1994 the OCIO's office, but it is the Chief Financial Officer, the

1995 Chief Operating Officer, the Procurement Division, and so

1996 forth.

1997     Mr. DUNCAN. That is really what I was getting at, is

1998 some idea about how much staff time, or how many hours or how

1999 much, has been devoted to trying to find this information.

2000 Do either of you have any idea about how many documents or

2001 interviews have been submitted?  How many pages of documents

2002  of pages have come here to the Committee in regard to this

2003  investigation?

2004       Mr. SWENDIMAN. Right now I think the estimate that I

2005  have been given is that approximately 15,000 pages of

2006  documents have bene produced to the Committee, and

2007  approximately another 15,000 have been shown to the

2008  Committee.

2009       Mr. DUNCAN. So 1,500 hours and 15,000 pages.

2010       Mr. SWENDIMAN. Approximately, sir.

2011       Ms. PAYTON. Mr. Duncan, since you have addressed it to

2012  both of us?

2013       Mr. DUNCAN. Sure.

2014       Ms. PAYTON. Allen covered the OA portion which would

2015  cover my area.  But in addition to that you had asked the

2016  question about briefings, and I have provided, if I remember

2017  correctly, it has been four briefings, two in person, two via

2018  telephone on this topic to Committee staff.

2019       Mr. DUNCAN. All right.  Thank you very much.

2020       Chairman WAXMAN. Mr. Tierney.

2021       Mr. TIERNEY. Thank you, Mr. Chairman.  Ms. Payton, I

2022  would like to ask you about some e-mails that were missing

2023  from Vice President Cheney's office that were related to CIA

2024  Agent Valerie Plame Wilson.  Before I get to any questions,

2025  let me see if I have the chronology right, and I know you

2026  will correct me if I am wrong on that.

2027        I understand that first your office produced a chart in

2028   2005 that showed 473 days with no e-mail sent to or from

2029   certain components of the White House in the Microsoft

2030   Exchange System.

2031        For the Vice President's office, there were days during

2032   the week of October 1, 2003, with no e-mail, and that was

2033   apparently of interest to Special Counsel Patrick Fitzgerald,

2034   who requested those documents during the period.  My

2035   understanding is that when the inventory was done in 2005,

2036   nobody at the White House could locate those e-mails in the

2037   PST files that were stored in the servers.

2038        And now, as far as I know in 2008, the White House still

2039   hasn't located those e-mails in the PST files in the White

2040   House servers.  So after not finding the e-mails there, the

2041   White House went to backup tapes and ultimately recovered the

2042   e-mails for those days.  These were provided to the Special

2043   Counsel.

2044        Is that pretty accurate so far?

2045        Ms. PAYTON. Yes.

2046        Mr. TIERNEY. So my first question, I guess, is what

2047   happened to the files that were supposed to be on the White

2048   House servers?

2049        Ms. PAYTON. Well, we have not finished our analysis, Mr.

2050   Tierney.  We still have, roughly, 17 million e-mails as we

2051   are going through this first pass that we have not attributed

2052  to a component, and in our phase two we will have enhanced

2053  technology which will allow us to read those messages at a

2054  lower level and attribute those to a component.

2055      Mr. TIERNEY. But so far, I mean, this is a long period

2056  of time that has transpired now.  You haven't found them, and

2057  now you went to a pretty serious effort in trying to respond

2058  to Special Counsel Patrick Fitzgerald, I would assume, and

2059  found none of them on the servers and had to go to the

2060  backup. Right?

2061      Ms. PAYTON. Yes, that is correct.

2062      Mr. TIERNEY. Let me ask you about the backup tapes,

2063  then.  They are supposed to, as far as I know, copy

2064  everything on the White House servers, right?

2065      Ms. PAYTON. They are disaster recovery backup tapes, so

2066  they actually take a picture of how things look in the data

2067  center at that day.

2068      Mr. TIERNEY. Right.

2069      Ms. PAYTON. So it is a picture of the server, the

2070  applications on it, and then any data associated with the

2071  applications.

2072      Mr. TIERNEY. So it should copy the journals, the PST

2073  files, and everybody's individual mailboxes.

2074      Ms. PAYTON. Yes.

2075      Mr. TIERNEY. Now, we got a document showing that when

2076  the White House restored the backup tapes for the Vice

2077  President's office, there were no journal files, there were

2078  no PST files containing e-mails for the days that Mr. Bashara

2079  was interested in.  So not only were they missing from the

2080  servers, they were missing from the backup tapes as well.

2081       Can you explain that to us?

2082       Ms. PAYTON. Because this predates me, I do not know all

2083  the details of that particular restorer.  I do know that

2084  they--

2085       Mr. TIERNEY. Well, does it mean that there were no

2086  journal files of the time the backup tape was made?

2087       Ms. PAYTON. I am not sure.  What I do know is that 70

2088  mailboxes were restored and 17,000 e-mails, but I don't know

2089  all the details of that particular restoring process.

2090       Mr. TIERNEY. Well, I would assume, you know, the problem

2091  with just having the mailboxes of individual officials of the

2092  Vice President's office is, it is my understanding, is that

2093  if somebody deletes an e-mail on the same day that they

2094  receive it, it is gone.  It is not stored or whatever.  We

2095  will never know what was on there, so no historical record of

2096  that.

2097       So I am looking at this, and what--I will be an

2098  expert--it looks that there is a lot of unanswered questions

2099  here about the e-mails that were missing from the Vice

2100  President's office.

2101       Ms. PAYTON. Mr. Tierney, if I might, we still have PST

2102  files that we have not been able to associate with a

2103  component.  I am assuming that was the same case back in

2104  2005, but I do not know that for sure.  They contain 17

2105  million e-mails.  Once we go through phase two, it is our

2106  hope and our assumption that we are going to be able to find

2107  e-mails that were properly archived, but they are just not

2108  associated with a component at this point in time.

2109       Mr. TIERNEY. Well, I hope you will forgive me for being

2110  a little bit skeptical, because a lot of time has come and

2111  gone on this.

2112       Ms. PAYTON. I understand.

2113       Mr. TIERNEY. The servers did not have it.  It looks like

2114  the backup certainly, at least to date, has not had it

2115  despite fairly extensive efforts to recapture that.  You

2116  know, you want us to rely on this system to believe that, you

2117  know, this is something that is reliable, and I just do not

2118  see that at this point in time, and it is disconcerting.

2119       I mean, all the other questions what we have seen here

2120  today about the RNC being, deleting tapes and everything

2121  disappearing, and these are critical periods of time where

2122  the historical records should be accurate and should be

2123  complete. In the amount of time that it has taken to review

2124  all of these things and still come up with non-answers is

2125  disturbing.

2126       So I yield back, Mr. Chairman.  Thank you.

2127          Chairman WAXMAN. Mr. Bilbray.

2128          Mr. BILBRAY. Thank you, Mr. Chairman.

2129          Mr. Stern, I had the privilege of having a discussion

2130    with Mary Nichols, who previously was at EPA and now over at

2131    Air Resources Board, about an issue that is raised here, and

2132    that is the California waiver, and the hearing and the

2133    process on that.

2134          In fact, I have noticed that a group that has called

2135    themselves Citizens for Responsible Ethics in Washington,

2136    CREW, has filed a lawsuit pertaining to the latest lack of a

2137    waiver for California pertaining to greenhouse gases.  So,

2138    sir, do you know if they have filed a lawsuit pertaining to

2139    the mandate to use ethanol in California that California

2140    tried to get a waiver for from the Clinton administration and

2141    was blocked by that administration?  Do you know if they

2142    filed anything?

2143          Mr. STERN. I am sorry.  I am with the National Archives.

2144     I am not familiar with that EPA issue.

2145          Mr. BILBRAY. Okay, I appreciate that.

2146          Mr. Chairman, I just don't know if that group was

2147    involved in any litigation pertaining to the other waiver,

2148    but I am interested in this, and, Mr. Weinstein, do we have

2149    the possibility, if we wanted to follow up on this other

2150    waiver, to get into the records of the Clinton Administration

2151    about what was done and why they would not issue a waiver to

2152  California Air Resources Board when we requested it for over

2153  eight years?

2154       Chairman WAXMAN. I think it would depend, Congressman,

2155  on whether those records had already been totally processed

2156  for release.

2157       Mr. STERN. Yes, under the Presidential Records Act, the

2158  Congress, through committee or subcommittee, can make what we

2159  call a Special Access Request for records of a former

2160  President.  So if we got a formal request from the Committee

2161  for Presidential records of the Clinton Administration, then

2162  we would respond to that, search for those records, see if we

2163  have them at the Clinton Library, and respond to the

2164  Committee.  So there is a formal process through the PRA to

2165  do that.

2166       Mr. WEINSTEIN. But that would have to be the Chairman of

2167  the Committee responding.

2168       Mr. BILBRAY. The Chairman of the Committee would have to

2169  request that?

2170       Mr. STERN. That is correct.

2171       Mr. BILBRAY. Okay.  Because it is an ongoing problem

2172  that Chairman Waxman knows we are concerned about the

2173  environmental impact of the ethanol/methanol mandate.  We

2174  have gotten the methanol off, but we still have a mandate on

2175  ethanol, and why the Administration, previous Administration,

2176  kept telling us that they were going to pull the mandate, it

2177  never did; and what meetings and communications they had with

2178  industry representatives who were representing those who were

2179  profiteering off of this mandate as opposed to where we go.

2180      So that is obvious.  Now the concern is what kind of

2181  contacts the Republican Administration that followed made,

2182  specifically to greenhouse gas issues.

2183      Mr. Chairman, at this time I would like to yield my

2184  remaining time to the gentleman from Florida.

2185      Mr. MICA. Ms. Payton, you joined the Office of

2186  Administration in mid-2006, so all the missing e-mail issues

2187  occurred, exclusively, before your tenure began, is that

2188  correct?

2189      Ms. PAYTON. Yes.  I mean that is correct.

2190      Mr. MICA. And were you around when these things took

2191  place, too?

2192      Mr. SWENDIMAN. No.

2193      Mr. MICA. You were not?

2194      Mr. SWENDIMAN. No, my tenure began November 27th of--

2195      Mr. MICA. And so have sort of a little game being

2196  played.  This Steven McDevitt, he worked for you?  Did he

2197  leave on good terms, or was there some dispute?  He is sort

2198  of the accuser here bringing up that they could have had a

2199  system that would have better, that would have preserved

2200  things, and some things may be missing, they may not.  But he

2201  has raised these questions, right?

2202     Ms. PAYTON. He did, initially, report directly to me,

2203  and then once I got a deputy director, he reported to the

2204  deputy director.  Steve--

2205     Mr. MICA. There had to be some disagreement.  I mean,

2206  were you aware that, I mean, now he is making these charges

2207  that you all didn't handle this right.

2208     Ms. PAYTON. He was very passionate about the ECRMS

2209  platform that was going to go to pilot, and the pilot had to

2210  keep being delayed.  And he was--

2211     Mr. MICA. So there was a disagreement on how these

2212  records would be preserved?

2213     Ms. PAYTON. We actually did not make the decision around

2214  ECRMS until after he left.

2215     Mr. MICA. Okay.  An important question, Mr. Chairman.

2216  One of the things I passed after the Clinton fiasco was the

2217  White House had to live under all the laws the rest of us

2218  did. I think Mr. Ehlers and I passed that after we went

2219  through years of seeing the disorganization at the White

2220  House and non-compliance with law under the Clinton

2221  Administration.

2222     Do we need to change the law?  Is there

2223  something--because again we have new technology that we are

2224  trying to capture history.  Let's go right now the line.

2225  Tell me if you think the law is adequate or something we need

2226  to change.

2227       Chairman WAXMAN. The gentleman's time has expired, but

2228  if any members which to answer his question.

2229       Mr. MICA. I don't think--

2230       Chairman WAXMAN. If any witnesses wish to answer his

2231  question.

2232       Mr. SWENDIMAN. I think with regard to the law or rules

2233  on technology, I need to defer to somebody who is an expert

2234  in IT and has a technological background.

2235       Ms. PAYTON. As far as the law goes, I cannot legally

2236  comment on whether or not the law should be changed, but the

2237  fact that more communication that used to happen in the

2238  hallway and used to happen on the telephone now happens on

2239  e-mail.  So e-mail volumes are driving up, and it is now, you

2240  know, it is also a very casual form of communication as well

2241  as a very official form of communication.

2242       So we do have some work to do, both on the user side as

2243  well as on the technology side to understand the new

2244  protocols around managing, preserving it properly, managing

2245  it, planning for that type of volume, because it is only

2246  going to increase.

2247       Did I get at the heart of your question, sir?

2248       Chairman WAXMAN. Well, the question was, do you

2249  recommend a new law.  You are not recommending a new law.

2250  Let's go on, if anybody wants to answer his question,

2251  directly, let's do that, because other members are waiting to

2252    ask their questions.

2253        And the gentleman's time has expired.

2254        Mr. Weinstein?

2255        Mr. WEINSTEIN. Mr. Chairman, as you know, I am an

2256    historian by profession, and I am afraid I am unable to

2257    respond to that question.  Certainly not without you and the

2258    Honorable Member agreeing on a particular thing.  When there

2259    is consensus in this body, then that is the moment that

2260    probably the law should move forward.  I will stop there.

2261        Chairman WAXMAN. Okay.  Anybody else want to respond?

2262        If not, Mr. Yarmuth.

2263        Mr. YARMUTH. Thank you, Mr. Chairman.  I am going to ask

2264    a question that is based on a conversation I had several

2265    years ago, before I ever dreamed of getting into politics,

2266    when I was a journalist.  I actually had forgotten about this

2267    conversation, but I was reminded of it when all of these

2268    disappearing e-mails, when the story of them arose.

2269        A woman told me, this was back in 2004, 2005, that she

2270    had a blood relative who worked for a private contractor

2271    somewhere in a remote area from D.C., I don't remember

2272    whether it was Virginia or Maryland.  And that every six

2273    weeks or so he came, his company came to the White House and

2274    took computers and hard drives back to a remote location

2275    where he was many stories underground.  I am not exactly

2276    clear on which term she used, whether she said cleaned or

2277  scrubbed the hard drives of those computers.

2278       I am very honest to say, she implied a nefarious motive.

2279  I as a journalist wasn't quite sure, and I understand the

2280  danger of hearsay stories like that.  I wouldn't even ask the

2281  question except for the connection to missing data.  So my

2282  question is to Mr. Swendiman and Ms. Payton, are you aware of

2283  any activity or procedure that resembles the activity that I

2284  just described?

2285       Mr. SWENDIMAN. Sir, I am aware of none.

2286       Ms. PAYTON. I can't comment on that time period, but I

2287  can comment currently.  There are, as employees depart, if we

2288  want to be able to re-use their equipment, we actually take

2289  the files and store them on a shared drive.  Then if we want

2290  to re-use their equipment, we would need to wipe their drive,

2291  so that we are not buying a new PC and then you can't use it

2292  any more, every time you have a new person.

2293       So from a current standpoint, that is a practice that we

2294  are using.  I don't know if that answers your question.

2295       Mr. YARMUTH. Well, it may.

2296       Let me ask another one, though.  Are you aware of any

2297  contract with a non-Governmental entity that involves

2298  handling of White House computer information?

2299       Ms. PAYTON. We have--

2300       Mr. YARMUTH. Other than the one you may have just

2301  described.

2302        Ms. PAYTON. We have 60 contractors on staff who help us

2303   with our messaging, who also help us with our PC tech

2304   support. So contractors would be touching computers.  This

2305   process that she is mentioning, I am not sure I am aware of.

2306        Mr. YARMUTH. Okay.  And so you don't, well, okay, I will

2307   leave it at that.  But let me ask a question, you mentioned

2308   one issue with regard to deleting information that might be

2309   classified, and you described it as being subject to a very

2310   tight process.  I think those were your words.  How can we as

2311   a Committee, how can the Congress, how can the American

2312   people be confident in what that process is and that there is

2313   any accountability for it?  Or are we relying totally on the

2314   White House's assurance that it is a tight process that only

2315   deals with classified information?

2316        Ms. PAYTON. I am not exactly sure how to answer your

2317   question.  I mean--

2318        Mr. YARMUTH. Would you be willing to, for instance,

2319   describe the tight process that you use?

2320        Ms. PAYTON. Sure.  I can definitely walk you through

2321   that.

2322        I am sorry, I just got guidance that because we are

2323   talking about classified, I can't talk about the details of

2324   classified in this setting.  So I will just tell you

2325   organizationally, we have an Office of Security Emergency

2326   Preparedness.  If they are notified, they notify us, we get

2327 our direction and we follow our direction.

2328     Mr. YARMUTH. Okay. Doesn't sound like a very tight

2329 process, but I will let you characterize that.

2330     I want to ask you now about the ECRMS program. You made

2331 the decision to cancel that program after what was described

2332 to the Committee by Mr. McDevitt as a pretty extensive

2333 three-year process in which a lot of different people made a

2334 decision that this was the system that was desirable to

2335 implement. You made that decision and you have given in your

2336 written testimony some reasons for it.

2337     You gave, apparently, in a meeting with Mr. Stern's

2338 staff, you gave some slightly different reasons. I would

2339 like to ask Mr. Stern, did you think and did your staff think

2340 that Ms. Payton's reasons for canceling the ECRMS program

2341 were legitimate and were compelling?

2342     Mr. STERN. I am really not in a position to answer that.

2343  We defer to them. And it is the White House's

2344 responsibility to make the records management decisions. We

2345 certainly, as we have said before, hoped and expected they

2346 would have a formal records management system in place. We

2347 thought that ECRMS was going to be it. So we were

2348 disappointed that they didn't use ECRMS and would hope that

2349 they still try to get one in place even now, if they can.

2350     Mr. YARMUTH. My time is up, Mr. Chairman, I yield back.

2351 Thank you.

2352    Chairman WAXMAN. Thank you very much.  Mr. Welch?

2353    Mr. WELCH. Thank you, Mr. Chairman.  I want to thank all

2354 the witnesses.  I want to focus on the recovery of some of

2355 the e-mails and what efforts have been made to do that.  I

2356 don't really want to focus on motives or what we can prove

2357 when we don't have the documentation to draw any realistic

2358 conclusions.

2359    Mr. Stern, the Presidential Records Act of course

2360 requires that official business be available and then stored

2361 in the repository of the National Archives, correct?

2362    Mr. STERN. Correct.

2363    Mr. WELCH. And it is your responsibility to see that

2364 that is done?

2365    Mr. STERN. Correct, to ensure that all the Presidential

2366 records in the White House are transferred to our custody.

2367    Mr. WELCH. Right.  And whether an official action

2368 involving White House business is done in a White House

2369 e-mail account or an RNC account or g-mail account or AOL

2370 account, if it is official business it belongs in the

2371 Archives, correct?

2372    Mr. STERN. Ultimately, at the end of the Administration,

2373 it should be preserved as a Presidential record and then

2374 transferred to us.

2375    Mr. WELCH. And we know that about 88 White House

2376 officials, in fact, used a non-White House mail account to do

2377  some official business, for whatever reason, correct?

2378      Mr. STERN. I guess. I am not familiar with the details

2379  of that. It is my understanding that there was at least some

2380  belief, even by the White House, that there could be official

2381  business done on the RNC system.

2382      Mr. WELCH. And you have made specific inquires from the

2383  White House about having them obtain from the RNC the e-mails

2384  that relate to official White House business, correct?

2385      Mr. STERN. Yes, we asked them to do that.

2386      Mr. WELCH. You asked them to do that in May of 2007?

2387      Mr. STERN. I believe so.

2388      Mr. WELCH. What did they do as a result of that request?

2389      Mr. STERN. We don't know specifically. They said they

2390  were attempting to do that, and we have inquired periodically

2391  and we don't know anything specific except that we though

2392  they were still continuing in that effort.

2393      Mr. WELCH. Since you made the request in May of 2007 for

2394  the White House to gather up its e-mails that were used on

2395  the RNC account, are you aware of any specific, concrete step

2396  that the White House has taken to comply with that request?

2397      Mr. STERN. No.

2398      Mr. WELCH. Do they have a legal duty to provide official

2399  communication records to the Archives?

2400      Mr. STERN. At the end of the Administration, yes.

2401      Mr. WELCH. Ms. Payton, are you aware of any specific and

2402  concrete step that the White House has taken to comply with

2403  the request by Mr. Stern on behalf of the National Archives

2404  to obtain these e-mails?

2405       Ms. PAYTON. Mr. Welch, because that is in a separate

2406  technology team that reports up through RNC, I am not

2407  involved in that.

2408       Mr. WELCH. So the answer is it is not your job, so you

2409  don't know?

2410       Ms. PAYTON. That is correct, sir.

2411       Mr. WELCH. Mr. Swendiman, how about you?

2412       Mr. SWENDIMAN. The Office of Administration is

2413  responsible for the official, sensitive but official EOP

2414  network.  It is not--

2415       Mr. WELCH. So it is not your job, either?

2416       Mr. SWENDIMAN. It is not.

2417       Mr. WELCH. All right.  So nobody here can speak for the

2418  White House and explain to Mr. Stern why they haven't done

2419  what they told Mr. Stern they would do, namely, make those

2420  communications subject to the Presidential Records Act

2421  available to the National Archives?  You don't know?

2422       Mr. SWENDIMAN. Well, I think I have tried to explain

2423  this as I understand it, sir, as to what steps I have been

2424  told have been undertaken.

2425       Mr. WELCH. Well, no, I want to know, well, no steps. Is

2426  he misinformed?

2427        Mr. SWENDIMAN. I am not privy to the communications Mr.

2428   Stern has had with--

2429        Mr. WELCH. Well, let me ask you this.  Apparently, some

2430   of these may be gone forever, we don't know.  But there are

2431   two boxes of backup tapes at the RNC, we are told.  Mr.

2432   Stern, are you aware of any effort to make those backup,

2433   those tapes in those two boxes available to the National

2434   Archives?

2435        Mr. STERN. They wouldn't make those available to us. If

2436   they were going to do a recovery effort, they would either do

2437   it themselves and then search through recovered e-mails for

2438   official e-mails, or they would let somebody through the

2439   White House do that.

2440        Mr. WELCH. Ms. Payton, are you aware of any recovery

2441   effort that has been made with respect to those two boxes?

2442        Ms. PAYTON. No.

2443        Mr. WELCH. Mr. Swendiman, are you aware of any steps

2444   that have been taken to recover the e-mails that are

2445   contained in those two boxes?

2446        Mr. SWENDIMAN. Sir, I can't speak to the two boxes. What

2447   I can--

2448        Mr. WELCH. So you do not know?

2449        Mr. SWENDIMAN. I do not know specifically as to those

2450   two boxes.

2451        Mr. WELCH. So there is no dispute, either on the part of

2452  the White House folks or the National Archives folks, that

2453  any e-mails, whether it's on an RNC account or a White House

2454  account, that may be in those two boxes, and this goes back

2455  to the 2001, 2002 when major decisions in this Country were

2456  being made, including the decision to go to war in Iraq,

2457  there's no question that anything that relates to official

2458  White House business is subject to the Presidential Records

2459  Act?  Mr. Swendiman, do you agree with that?

2460      Mr. SWENDIMAN.  Could you repeat the question, sir?

2461      Mr. WELCH.  Any document, e-mail that relates to White

2462  House business is subject to the Presidential Records Act,

2463  correct?

2464      Mr. SWENDIMAN.  Any document that involves official

2465  business that involves the constitutional, the statutory,

2466  ceremonial activities of the President or the immediate White

2467  House staff is subject to the Presidential Records Act.

2468      Mr. WELCH.  Right, we are reciting the law, we are all in

2469  agreement.  It is the compliance with the law question that

2470  we have.  I understand it is not your job.  So I don't want

2471  to be asking you to do somebody else's job, you have your

2472  hands full.

2473      I guess I will come back to you, Mr. Stern, I am close

2474  to the end of my time.  What if anything can you do in order

2475  that the National Archives have possession of the official

2476  communications that may be there, or what can you do to make

2477  certain that the National Archives can see that whatever

2478  reasonable steps can be taken to recover that which is

2479  available is done, so that the Presidential Records Act is

2480  complied with?

2481      Mr. STERN. Under the PRA, we have no direct authority.

2482  All we can do is ask them for and acquire.  And then we also

2483  can report to the Congress.  Obviously, the Congress is aware

2484  of this issue, so I think the PRA envisions that it is up to

2485  the Congress when dealing with Presidential records to

2486  communicate and work directly with the White House on--

2487      Mr. WELCH. So here is where we are, just to sum up. You

2488  have asked and gotten no reply.  You don't know and somebody

2489  else does, but they are not here.

2490      Thank you very much.  I yield the balance of my time.

2491      Chairman WAXMAN. The gentleman's time has expired.  Mr.

2492  Clay?

2493      Mr. CLAY. Thank you, Mr. Chairman.

2494      Mr. Payton, one of the White House officials who we

2495  contacted in preparing for today's hearing was Steven

2496  McDevitt, who worked for you.  We asked him whether there was

2497  any concern about abandoning the e-mail archiving system and

2498  relying on this ad hoc journaling process.  He said there was

2499  great concern.  Let me show you an excerpt from page 7 of his

2500  answers to the Committee.  He stated: ''There was a great

2501  deal of concern about proceeding with the migration of

2502   Outlook Exchange without having an adequate e-mail records

2503   management solution in place.''

2504        Mr. McDevitt described in detail the risks that were

2505   discussed within the White House on numerous occasions.  One

2506   of the major concerns was the risk of data loss.  He said

2507   this: ''The process by which e-mail was being collected and

2508   retained was primitive, and the risk that that data would be

2509   lost was high.  The potential impact is that the system does

2510   not contain all required data.''

2511        Ms. Payton, what are your views?  Do you agree with your

2512   staff that the archive system was inadequate and risked

2513   losing data?

2514        Ms. PAYTON. The challenge about his statement is it does

2515   predate me.  And this is also his technology professional

2516   opinion.  In talking with the staff on our go-forward basis,

2517   we have improved the people, process and technology with what

2518   we have to live with until we can get to a more comprehensive

2519   solution.  Back at that time, even if you had a more

2520   comprehensive solution in place, if you don't have the right

2521   processes to make sure it is running right, you can still end

2522   up with the same result.  That is why we want to get to the

2523   bottom of our analysis and figure out if we still have any

2524   resulting anomalies and then make a decision around doing a

2525   restore.  But to be able to comment specifically on things

2526   that predated me, I am unable.

2527    Mr. CLAY. But look, it wasn't just the internal White

2528  House staff that raised the red flag about the archive

2529  system. The Committee has obtained notes from a meeting on

2530  January 6th of 2004 between staff from the Archives and the

2531  White House. According to these notes, Archive staff were

2532  also raising these very same concerns with the White House.

2533  And the notes describe how the Archive staff learned that the

2534  White House was converting from Lotus Notes to Microsoft

2535  Exchange e-mail. Then in bold face, the note says this:

2536  ``Messages in Exchange are not being captured in ARMS or any

2537  other system external to Exchange.  The NARA team emphasized

2538  that EOP was operating at risk by not capturing and storing

2539  messages outside the e-mail system.''

2540    What were the best efforts that the White House put

2541  forward when they did not heed their own warning?

2542    Ms. PAYTON. Mr. Clay, I don't know if I have time to, I

2543  would like to, if you would allow me, to actually walk

2544  through sort of where an e-mail travels in the system.

2545    Mr. CLAY. No, we don't have time for that, but I will

2546  say this, in your previous testimony you mentioned how much

2547  it is going to cost to retrieve these e-mails.

2548    Ms. PAYTON. Right.

2549    Mr. CLAY. Well, you know, all of that is taxpayer

2550  dollars.  And it is such a cavalier attitude that it may be

2551  $50,000 one day, $150,000 the next.  But where does the care

2552  come in for taxpayers' money?

2553      Ms. PAYTON. That is part of why we want to do the

2554  analysis first, so we can have a very targeted list.  If

2555  there are any anomalies at the end of the work we are doing,

2556  we have a very targeted list for the restore.  So by having

2557  less days to restore, we will save money as far as the

2558  restore that needs to be done.

2559      Mr. CLAY. And then no one there heeded their own

2560  warnings.  What was all of that about?  Nobody said, wait a

2561  minute, maybe we need to listen to Archives.  Or maybe we

2562  need to listen to our own staff.  And nobody heeded those

2563  warnings. What is all of that?

2564      Ms. PAYTON. I wasn't there, sir, so I don't know.

2565      Mr. CLAY. Dr. Weinstein, do you agree that the White

2566  House process was primitive and that there was a high risk of

2567  data loss?

2568      Mr. WEINSTEIN. If that is what my staff decided after

2569  looking at this process, I would have to agree that there

2570  were some problems.  What the nature of those problems were,

2571  I think even Mr. Payton and Mr. Swendiman would agree that

2572  they were working on a new platform and they didn't have all

2573  the answers.

2574      But I do want to make one point to you, Congressman, on

2575  this issue of who cares about the taxpayer.  And it is

2576  crucially important, particularly for the cultural

2577    institutions in the Country, such as the National Archives,

2578    Library of Congress, others, to be very sensitive to the fact

2579    that we can lose the support of the American taxpayer very

2580    quickly.

2581        Congressman Welch, in his questions, had raised one

2582    question with Mr. Stern, my colleague here.  Basically, one

2583    slight correction, I signed that letter, I drafted the final

2584    version of that letter.  So if the Congressman has any

2585    interest in learning who has been trying to get the

2586    Republican National Committee or whomever to return whatever

2587    materials they may have, I will take responsibility for that.

2588        Chairman WAXMAN. Please speak up.  We can't hear you.

2589        Mr. WEINSTEIN. We have not responded, we have not asked

2590    that question lately.  We asked for the return of this last

2591    year, we periodically question people.  I guess we have to be

2592    a bit stronger in our questioning, in our requests.

2593        Mr. CLAY. But, look, Doctor--

2594        Mr. WEINSTEIN. I will have that information to the

2595    Chairman by the end of this week.

2596        Mr. CLAY. But Doctor, excuse me, it seems like everyone

2597    was warning the White House about the risks of data loss.

2598    And the White House's own technical people were warning them,

2599    and your team in the Archives also warned them.  Yet they

2600    continued with the migration and they continued to rely on

2601    this ad hoc process from 2002 until today.

2602        What troubles me is that these are e-mails documenting

2603   how the Bush Administration was making decisions.  They are

2604   official Presidential documents that the White House is

2605   required by law to save and turn over to the National

2606   Archives.  They belong not to George Bush, but to the

2607   American people.  But the White House seems to have ignored

2608   numerous warnings from people inside and outside the White

2609   House about its flawed approach.  Do you have similar

2610   concerns?

2611        Mr. WEINSTEIN. More than anything else, I want whatever

2612   materials may be in other locations like the Republican

2613   National Committee or any other location, if they are

2614   official White House documents, they belong with the White

2615   House, they belong with the Archives or in preparation for

2616   coming to the National Archives.  My main concern here is

2617   with the future of my institution, National Archives.

2618        Chairman WAXMAN. The gentleman's time is expired.

2619        Ms. Norton.

2620        Ms. NORTON. Thank you, Mr. Chairman.

2621        Ms. Payton, I would like to reconcile your sworn

2622   statements with what the Committee has since learned, and

2623   perhaps you can help us.  On January 15th, 2008, you filed a

2624   sworn declaration in U.S. District Court here regarding the

2625   loss of White House e-mail.  In that declaration you

2626   criticized the chart produced in 2005, showing hundreds of

2627 | days with no White House e-mail.  And here I am going to

2628 | quote what you said in the sworn declaration.  ``I am aware

2629 | of a chart created by a former employee within the OCIO,''

2630 | Office of Chief Information Office.

2631 |      Now, that of course, anyone reading that declaration,

2632 | would believe that a single member created, staff person

2633 | created this chart perhaps indeed almost on his own.  But the

2634 | Committee in fact obtained documents showing that your office

2635 | created a 15 person what you call message storage team to

2636 | work on this problem.  This team documented its actions in

2637 | very painstaking detail and reported frequently to the

2638 | director of administration and White House counsel.

2639 |      Ms. Payton, I ask you, why didn't you mention this team

2640 | of White House officials in your sworn declaration?

2641 |      Ms. PAYTON. Ms. Norton, one of the things that I have

2642 | mentioned before is that because this is prior to my arrival,

2643 | I put the information together based on what my team has told

2644 | me as well as--

2645 |      Ms. NORTON. You are unaware, are you testifying here

2646 | that you were unaware of this team?

2647 |      Ms. PAYTON. No, I am explaining to you is based on what

2648 | the team has told me, as well as information I had, there was

2649 | a group of people who put data together.  But as far as--

2650 |      Ms. NORTON. I am asking you, were you unaware of the

2651 | message storage team who worked on this problem?

2652    Ms. PAYTON. Ma'am, all I know is that they put data

2653    together.  They did not work on the chart.  And that is how

2654    it was presented to me.

2655    Ms. NORTON. Later in your declaration, and here I am

2656    quoting you again, you said ''The OCIO has reviewed the chart

2657    and has so far been unable to replicate its results or affirm

2658    the correctness of the assumptions underlying it.''  We got a

2659    quite different account from Steven McDevitt, he is the

2660    former White House employee who worked on this project.  This

2661    is what he said: ''Extensive testing was performed at that

2662    time to ensure that the tools and the tabulation process was

2663    performed correctly.  An independent verification and

2664    validation also was performed by a different set of

2665    contractors to ensure that this analysis process was

2666    completed correctly and that the data was correctly analyzed

2667    and accurately represented.''

2668    Ms. Payton, why didn't you mention this testing by the

2669    independent contractors?

2670    Ms. PAYTON. I am not aware of that testing.

2671    Ms. NORTON. You still are not aware of that testing?

2672    Ms. PAYTON. I am aware that Steve has made those

2673    statements.  We have a team that does IV&V.  When I asked my

2674    staff about the chart and the validity of the chart, one of

2675    the things they said to me is, as far as they could tell, it

2676    had not gone through an extensive IV&V process.

2677    Ms. NORTON. And so no one made you aware--this is an

2678    amazing testimony given the position you were in and the post

2679    you held.

2680        Now, in your declaration again, it is a sworn

2681    declaration, you stated that there was a ``lack of supporting

2682    documentation.''  For somebody who said she didn't know

2683    anything, you certainly had something to say in your sworn

2684    declaration.  Lack of supporting documentation.  But Mr.

2685    McDevitt told us that the chart itself was just a summary.

2686    He said the complete analysis was 250 pages in length, it

2687    included the complete background data and trend analysis.

2688    Why didn't you mention, Ms. Payton, the 250 page supporting

2689    document in your sworn declaration?

2690        Ms. PAYTON. That document had not been made aware to me.

2691     I know that we produced a lot of documents in response to

2692    this.  So that document must not have been on the radar of my

2693    team to inform me.

2694        Ms. NORTON. My goodness, I don't know how you did your

2695    job.  You seem to have known nothing about it.

2696        Ms. Payton, in your declaration you stated that you have

2697    serious reservations about the reliability of the chart.

2698    Well, it would appear that the easiest way to get information

2699    about the chart was to talk to the person who put it

2700    together, one of those of course is Mr. McDevitt.  In fact,

2701    this is exactly what the Archives recommended to you.  On

2702  November 6th, 2007, Sam Watkins from the Archives sent you

2703  this e-mail, and I am quoting from it, Ms. Payton, ``It would

2704  be useful for someone to contact the original

2705  author-requesters of the chart to ask questions about its

2706  nature and meaning, the methodology used to produce it, the

2707  shortcomings you have noted, and whether they prepared any

2708  additional or related documentation.''  But when we talked to

2709  Mr. McDevitt, he told us that throughout the entire process,

2710  you never contacted him once, even though he worked directly

2711  for you in 2006, while you were there.  Why did you not

2712  contact him, Ms. Payton?

2713      Chairman WAXMAN. The gentlelady's time has expired, but

2714  please answer the question.

2715      Ms. PAYTON. At that point in time, when we were doing

2716  that analysis, we had already found flaws with the tool.  So

2717  talking with Steve at that point, he probably was not aware

2718  that those flaws with the tool that was used existed.

2719      Ms. NORTON. I didn't ask you that.  I said why hadn't

2720  you spoken directly to Mr. McDevitt?

2721      Ms. PAYTON. After he left the EOP?

2722      Ms. NORTON. Directly with him in 2006 while you were

2723  there, Ms. Payton.

2724      Ms. PAYTON. He reported to me directly for a short time,

2725  then he reported to the Deputy Director.  I am not sure I

2726  understand the question.

2727          Ms. NORTON. Ms. Payton, look, I think the credibility

2728    problems you present are patent here.  If you did not know,

2729    then you apparently tried not to know, even when the Archives

2730    told you that someone who was working for you could in fact

2731    tell you and again--

2732          Ms. PAYTON. Steve and I had multiple conversations about

2733    records and--

2734          Ms. NORTON. Why didn't you ask him any of the questions

2735    I have just run down?  If he had all this information, why

2736    didn't you inquire?

2737          Chairman WAXMAN. The gentlelady's time has expired.

2738          Mr. Davis?

2739          Mr. DAVIS OF VIRGINIA. I think the time has expired and

2740    we need to move on.

2741          Chairman WAXMAN. I think that question will have to

2742    stand as a rhetorical question unless you have anything

2743    further you want to add, Ms. Payton.

2744          Ms. PAYTON. No, that is fine.

2745          Chairman WAXMAN. Mr. Sarbanes.

2746          Mr. SARBANES. Thank you, Mr. Chairman.  Thank you to the

2747    witnesses.  I just want to preface my question by saying

2748    that, I am trying to imagine people watching this, just sort

2749    of ordinary folk watching this hearing.  I have to believe

2750    that they would find it completely implausible that this

2751    number of e-mails, this number of days of e-mail traffic

2752    would just disappear by accident.  And I mean to imply what I

2753    am implying.

2754        But let me ask you, Ms. Payton, are you familiar, and I

2755    know you weren't there at the time the White House decided to

2756    abandon the ARMS system that was in place.  But you are an IT

2757    person and you kind of know this arena.  Have you become

2758    familiar with what that ARMS system did?  Do you have any

2759    understanding of what the structure of it was and how it

2760    worked at all?

2761        Ms. PAYTON. I have a general understanding, because it

2762    exists today.  It still houses the Notes records.  It was

2763    built in 1994, and it was built actually for a system that

2764    preceded Notes Mail.  It had to be heavily customized so that

2765    it could interpret Notes Mail and be able to actually store

2766    it in ARMS for record keeping.

2767        Mr. SARBANES. Did you ever find yourself over the last

2768    year or two saying, gosh, I wish they hadn't abandoned that

2769    system back in whenever it was, beginning of the term,

2770    because things would have been a lot easier, we would have

2771    been able to collect things in a much more deliberate

2772    fashion?  Did you ever find yourself saying that kind of

2773    thing?

2774        Ms. PAYTON. Obviously it would be nice.  I try not to

2775    second guess people that I walk in behind.

2776        Mr. SARBANES. It would have been terrific to have had

2777 that system in place.  It seemed to be working extremely

2778 well. It is inexplicable that the White House would choose to

2779 move away from that and toward this other system.  If I was

2780 somebody, if I were somebody who wanted to get around the

2781 system, that wanted to delete e-mails, make the record of my

2782 communications disappear, the system that the White House

2783 moved to would be an easier system to accomplish that, would

2784 you not agree, compared to what had existed before?  It

2785 certainly seems that way from the testimony.

2786        Ms. PAYTON. Actually, Mr. Sarbanes, it is a little bit

2787 more complicated.  Because when an e-mail comes in through

2788 Exchange, it automatically gets copied over to a journal.  So

2789 for example, if you were at the EOP and you were in the

2790 Office of Administration, and let's say I was in OMB, if I

2791 e-mailed you, automatically a copy will go into the Microsoft

2792 Exchange Journal underneath OMB and then when you get your

2793 copy, it goes into the Exchange Journal as well, underneath

2794 OA.  Plus, it is also in your in basket and my sent.

2795        Then when we do the PST archive, your record that is in

2796 the OA journal moves over to the OA PSTs, the personal

2797 storage tables which is also another Microsoft product.  Then

2798 my e-mail, which was under OMB in the OMB journal, would move

2799 over to the--

2800        Mr. SARBANES. Well, my, from reading--

2801        Ms. PAYTON. So there are lots of different places that

2802 | that e-mail would be.

2803 |     Mr. SARBANES. Well, lots of different places also where

2804 | human intervention could alter the recording of the

2805 | information, it seems to me.  But let me move away from you.

2806 | I do want to applaud you for all the things you are trying to

2807 | do now, but it strikes me as building a wonderful barn and

2808 | painting it a wonderful color of red and meanwhile, the cow

2809 | is out the barn and in a pasture somewhere, given what has

2810 | happened.

2811 |     I just wanted to ask the folks from the Archives, if 10

2812 | is where you want to be now in the transition, on a scale of

2813 | 1 to 10, anticipating that we are coming to the end of the

2814 | term, where would you say we are, from your assessment, on a

2815 | scale of 1 to 10?

2816 |     Mr. WEINSTEIN. Let me answer that two ways.  I will say

2817 | that we will be a 10 by January 20th, 2009.  We will be a 10.

2818 |     Mr. SARBANES. Where are you now?

2819 |     Mr. WEINSTEIN. Somewhere in between.  I won't give it a

2820 | number.  But we have a way to go, but we will get there.

2821 |     Mr. SARBANES. I applaud your confidence and I hope it is

2822 | well-founded, because we don't want these records to be lost.

2823 |     The last question I have, because I am running out of

2824 | time is, we have talked about these backup tapes, disaster

2825 | recovery tapes, very appropo term in this context, because

2826 | the loss of these e-mails strikes me as a disaster.  So it

2827  makes sense that they would be called disaster recovery

2828  tapes.

2829      My question is this: who has possession of those?  In

2830  other words, if we get to January of next year and the

2831  recovery process isn't finished, but there is still out there

2832  material from which you can conduct the recovery, where does

2833  that material go?  Who has possession of that?  Does the

2834  Archives take possession of whatever the apparatus is from

2835  which the recovery can be conducted?

2836      Mr. WEINSTEIN. I am going to let our expert on recovery

2837  tapes deal with that one.

2838      Mr. STERN. I can describe what happened in the Clinton

2839  Administration, because they did have to undergo a tape

2840  restoration project that started during the Administration

2841  and was not finished on January 20th of 2001.  And the Office

2842  of Administration continued to be responsible for that

2843  project. They rented an off-site facility up in Maryland.

2844  But the legal custody of the records and in fact those backup

2845  tapes did transfer to us.  So the tapes became ours on

2846  January 20th, the records became ours.  But the work was

2847  still done by OA through a contractor that we then

2848  coordinated with and helped supervise.  But they still did

2849  the work.  So if the same situation arose here and a recovery

2850  effort starts and is not completed, I assume it will be the

2851  same case.  The tapes will become our legal property, but

2852  still need to be worked on by OA until it is complete.

2853      Mr. WEINSTEIN. I have to stress, Congressman, that the

2854  financial responsibility for correcting the situation is the

2855  White House's, not NARA's.  It is the White House's.

2856      Mr. SARBANES. Thank you, Mr. Chairman.  I hope that

2857  supervision by NARA is good come post-January.  Thank you.

2858      Chairman WAXMAN. Thank you, Mr. Sarbanes.  Mr. Platts?

2859      Mr. PLATTS. Thank you, Mr. Chairman.  I would like to

2860  yield time to the Ranking Member, Mr. Davis.

2861      Mr. DAVIS OF VIRGINIA. Thank you.

2862      Ms. Payton, several of the witnesses we have spoken to

2863  have said that as far as they knew, Special Counsel

2864  Fitzgerald was satisfied with the results that he received

2865  from searches performed by the White House IT employees.  And

2866  none of the witnesses was aware of any plot to obstruct any

2867  Department of Justice investigation.  We asked former CIO

2868  Carlos Solari about whether Special Counsel Patrick

2869  Fitzgerald was satisfied with the White House production, and

2870  this is what we had to say: As far as I know, now, obviously

2871  I didn't have any first-hand knowledge with him, but through

2872  the attorneys on the White House side who were dealing with

2873  that, yes, otherwise, we would still be busy at it answering

2874  questions, or there would have been questions come back to us

2875  that say, we don't have the confidence you are providing us

2876  with everything we have asked for.  But that wasn't the case

2877 | at all.

2878 | McCloskey reiterated the same point regarding the Plame

2879 | electronics searches on at least three occasions during his

2880 | interview when he said they, the DOJ, were always asking for

2881 | more.  To my knowledge, the whole time I was there, we always

2882 | had everything they asked for.  In fact, I am certain of it.

2883 | The only thing I know is that there were no tapes missing.  I

2884 | do know that, and that everything DOJ wanted, we gave them

2885 | while I was there.  McCloskey continued, in everything that

2886 | they, the DOJ, asked us, we, which was the White House IT

2887 | office, gave them.  And all the feedback that I ever got was,

2888 | thank you, this is a ton of stuff, we appreciate it.  Now, of

2889 | course, maybe it takes a long time to realize that there is a

2890 | big gap in dates.  Maybe that is what he is referring to.  We

2891 | were very concerned to do this right and make sure that he

2892 | got everything that the DOJ had asked for.

2893 | John Straub, who was a former director of OA, said of

2894 | the searches, in nine times out of ten, it did not end up

2895 | being that something was missing.  It ended up being that we

2896 | weren't doing the search properly or the system wasn't

2897 | gathering the right information, or you were searching across

2898 | two systems, and it would find hits in one system and

2899 | wouldn't find it in another.  Then you go back and refine the

2900 | search terms and it found the same things.  It wasn't because

2901 | there were documents missing.

2902      Tim Campen, the former CIO on the Hill at the White

2903  House and Director of OA had the following conversation with

2904  the staff.  Do you recall any concerns during that time, the

2905  whole time that you were at the White House, these searches

2906  weren't producing all of the documents that were out there on

2907  any given subject?  His answer, I remember that always, we

2908  always asked ourselves that, are we finding everything.  I

2909  would ask that question and have debates about it,

2910  discussions about it, about the technical parameters of the

2911  searchers and of the accuracy of the billion searches that

2912  had to be created.  The general answer was yes, researching

2913  everything we can, and we think we have constructed the right

2914  kind of searches.  By the look of the volume of e-mails we

2915  are getting, we are doing something right, because we are

2916  producing an awful lot of this.

2917      Later Mr. Campen, when asked by the staff, so you are

2918  not aware of any evil right-wing plan to obstruct the Justice

2919  Department investigation, he replied no, no.  And

2920  specifically, with regard to Fitzgerald, Mr. Campen said no,

2921  I was always admonished and directed by White House counsel

2922  that this was a serious and full effort.  We were always told

2923  that through the spirit of this, we are complying with this.

2924      Ms. Payton, I know you weren't at the White House during

2925  these searches.  But are these statements consistent with the

2926  documentation you have reviewed in the course of your duties?

2927      Ms. PAYTON. It is consistent with the documentation, as

2928  well as conversations with the current staff. I have asked

2929  them if they know of any searches we did not satisfy, and

2930  other than the one which we eventually satisfied, the

2931  Fitzgerald one, they said they knew of none. So that is

2932  consistent.

2933      Mr. DAVIS OF VIRGINIA. Earlier when we discussed,

2934  certainly with the backups, we have every reason to believe

2935  at this point that we will be able to get the documents we

2936  seek, isn't that correct?

2937      Ms. PAYTON. Yes, sir.

2938      Mr. DAVIS OF VIRGINIA. Let me ask Mr. Stern, is it true

2939  that at least on two occasions, Sandy Berger had access to

2940  original, uninventoried, uncopied documents that he could

2941  have removed from the Archives without detection?

2942      Mr. STERN. I believe yes, he did have access to original

2943  documents.

2944      Mr. DAVIS OF VIRGINIA. So we have problems with records

2945  preservation at the National Archives, too.

2946      Ms. Payton, could you walk us through the process that

2947  you and your team are undertaking to inventory all the White

2948  House e-mail for each specific day?

2949      Ms. PAYTON. Sure. And I mentioned some of that in my

2950  opening remarks, and I'll just kind of briefly go over the

2951  beginning part of it and then give you more detail, because I

2952  didn't go through all the details.

2953        From a technology perspective, we have three phases that
2954  we are undertaking.  We are in the midst of phase one right
2955  now.  That phase is where we introduced the new technology,
2956  where we can actually read through the personal storage
2957  tables that are on the archive, and we can actually read
2958  through, read the name of the PST and from an inventory
2959  perspective, associate the e-mails that are in that PST with
2960  the components and the dates.

2961        We are also undertaking some research to look at
2962  weekends and holidays that may have low volume or zero days,
2963  because there may have been maintenance going on on the
2964  weekends.  The way that would work, and this is standard
2965  pretty much for exchange, is if you took mail servers out of
2966  rotation to do maintenance on them for the weekend, what
2967  would happen is your mail would be held.  So if it was being
2968  serviced Friday night and Saturday and it didn't come back
2969  online until Sunday, you don't receive it until Sunday.

2970        Well, the old tool, as well as the new tool, have a
2971  limitation where they could only track the received date.  So
2972  it could look like you have some messages ''missing,'' and
2973  you need the opportunity to be able to actually read it at
2974  the message level to see the sent and the received date.  So
2975  that process is underway.

2976        We are also looking at the network operations logs to

2977 see if there is any documentation around outages as well.

2978 And then when we finish that phase one, we will go through a

2979 QA process and share that with NARA to make sure they are

2980 comfortable with our methodology and our findings.  Again,

2981 since we haven't gone through the QA process, I am hesitant

2982 to give a lot of details around our findings.  But I can give

2983 you some trends.  We have identified roughly, somewhere in 10

2984 million or more e-mails than were identified as part of the

2985 2005 analysis, using the older tools.  Those were the best

2986 tools they had at the time, good work horses.  I am not sure

2987 the team knew at that time that those tools had those

2988 limitations.

2989      In addition, we have been able to work through the whole

2990 entire inventory, not just for the time period in question,

2991 because we are concerned about Presidential transition, we

2992 are doing from day one of exchange all the way through now

2993 and will continue to do that.  We have also identified, I

2994 think I mentioned it earlier--

2995      Chairman WAXMAN. Ms. Payton, the time has expired.

2996      Ms. PAYTON. Yes, sir.  I am sorry.  There are two more

2997 phases.

2998      Mr. DAVIS OF VIRGINIA. If you could put this back into

2999 writing, I think it would save the Committee's time.  But I

3000 want to get it on the record, Mr. Chairman.

3001      Chairman WAXMAN. I understand.

3002        Ms. PAYTON. Yes, because there are two more phases, and

3003  the third phase is actually sitting down with NARA to go over

3004  any remaining anomalies.

3005        Chairman WAXMAN. My problem is after you are finished

3006  with your phases, you will probably be out of office.

3007  Because this is going to take a lot of time.  The fact of the

3008  matter is, a lot of the staffers mentioned by Mr. Davis in

3009  his comments left the White House before you decided to abort

3010  the archiving system in 2006 that had been under development

3011  for three years, and after you made that decision, the White

3012  House failed to put an archiving system in place.

3013        To date, the White House still has not installed a new

3014  system.  The bottom line is that from 2002 to 2008, the White

3015  House has not had an adequate, functioning e-mail archiving

3016  system in place.  And now you have three or four phases to

3017  try to correct the problem that has been created.

3018        I will be happy to have you go on, if that is what Mr.

3019  Platts wants.  Well, Mr. Platts is not here any longer, but

3020  his time has expired.

3021        Mr. Davis, what do you wish to do?  You asked the

3022  question.  May she submit an answer?

3023        Mr. DAVIS OF VIRGINIA. Yes, you can submit it for the

3024  record.  But I think the point is that this is a lengthy

3025  process, this is a complicated, lengthy process and it just

3026  doesn't jump out at you.  This is not like a Google search.

3027    Ms. PAYTON. Correct.

3028    Mr. DAVIS OF VIRGINIA. And we have backups in this case

3029 that we can always get.  We can get the records if they don't

3030 get it by a certain time.

3031    Ms. PAYTON. And Mr. Davis, our early findings indicate

3032 that if we had done a restore based on the older analysis

3033 that had been done, we would have restored days that we have.

3034    Mr. DAVIS OF VIRGINIA. Let me ask you, you are not

3035 trying to run out the clock on the Committee, are you?

3036    Ms. PAYTON. No, sir.  We want to transition, the OCIO

3037 team is very focused and dedicated on this.  I speak for

3038 them, I speak for myself, we are very energized about getting

3039 to the bottom of this and transitioning the records over to

3040 NARA. This is something we want to get done.

3041    Chairman WAXMAN. The record can speak for itself,

3042 because a long time has already gone by without getting this

3043 information.  The Archives is concerned about it, Congress is

3044 concerned about it, and you may not be intending to run out

3045 the clock, but I do think you are aware that you don't have

3046 too much time before this Administration goes out of office.

3047    Ms. PAYTON. Yes.

3048    Chairman WAXMAN. Mr. Cummings, do you want to ask some

3049 questions?

3050    Mr. CUMMINGS. Yes, I do.

3051    Chairman WAXMAN. Before you begin, we have one item of

3052  business to complete.  Maybe we can do it quickly.  That is

3053  the motion to include in the record the interrogatories by

3054  Mr. McDevitt, we had a bit of a debate earlier, Mr. Davis, do

3055  you want to say anything more about that?

3056       Mr. DAVIS OF VIRGINIA. I will yield to Mr. Issa, but I

3057  just want to note that this, your witness that you are

3058  relying so much of your report on was given, I think, an

3059  accord that has not been given to other witnesses that

3060  request much of the same thing.  We did not have a chance to

3061  cross examine, and we think it would be a different record

3062  were that allowed.  We just want to put that on the record.

3063       Chairman WAXMAN. Mr. Issa?

3064       Mr. ISSA. Recognizing I still have five minutes of my

3065  own time, but look, you are going to put this in the record,

3066  you are going to put this in the record, Mr. Chairman.  But

3067  it sets a bad precedent to take an unsworn series of

3068  statements that we can't even ask the witness whether or not

3069  those were his own statements or not.  Perhaps in fact they

3070  were essentially pre-agreed answers that quite frankly might

3071  be further fleshed out for accuracy if we had this

3072  opportunity.

3073       If the gentleman were not still a full-time Federal

3074  employee, and for some reason was truly resisting, I would

3075  have a different attitude.  But we bring people in front of

3076  this Committee at their own expense often, this would be

3077  somebody who would be paid by the Federal Government to be

3078  sitting there today.  I really believe that we are doing an

3079  injustice to the long-term well-being of this Committee on a

3080  bipartisan basis by doing this today.

3081      Chairman WAXMAN. I would like to respond to you, I am

3082  concerned about this Committee and long-term considerations.

3083  As a result, when we asked Mr. McDevitt to come in for an

3084  interview, and he refused, we had a discussion on a

3085  bipartisan staff basis what to do.  Because we could have

3086  subpoenaed him to come in and answer questions.  Instead,

3087  both sides said, let's send him interrogatories, and even let

3088  the White House review the interrogatories.  On that basis,

3089  he was sent interrogatories, Republican and Democratic staff

3090  had input into those interrogatories.  When the Republican

3091  staff saw the answers to the interrogatories, we suddenly got

3092  this complaint, well, we didn't get a chance to cross-examine

3093  him, this is not fair, on and on and on.

3094      I just think that we operated in good faith.  We ought

3095  to include the answer to the interrogatories in the record.

3096  And the reason that Mr. McDevitt didn't want to come in in

3097  the first place is because the White House put such strong

3098  restrictions on what he could say that he didn't feel he

3099  could even say what he needed to say in a deposition.  That

3100  is how all this came about.

3101      So I would ask the members to support the motion to

3102  allow the interrogatories to be a part of the record.  Are we

3103  ready for the vote?

3104       All those in favor of the motion, say aye.

3105       [Chorus of ayes.]

3106       Chairman WAXMAN. Opposed, no.

3107       [Chorus of noes.]

3108       Chairman WAXMAN. The ayes appear to have it.

3109       Mr. ISSA. Mr. Chairman, reserving the right to question

3110  the quorum, I would just like the record to recognize that

3111  although you have said this was bipartisan, from this

3112  particular member's viewpoint, and from the staff that I am

3113  communicating with, we believe that it has not been and that

3114  this is a form of sandbagging, to deliver it.  Recognizing we

3115  don't have the votes, I would not assert the quorum, but

3116  recognizing that this is not with the support of any

3117  Republicans.

3118       Chairman WAXMAN. Well, I accept that, and let me say

3119  that I am going to talk further to both staffs, because we

3120  tried to accommodate the Republican staff throughout this

3121  whole process.  We even had the Republicans talk to Mr.

3122  McDevitt for an hour and a half, asking him any questions

3123  they wanted on Sunday night.  So we have tried to be

3124  accommodating.

3125       You are saying to me that your staff on the Republican

3126  side does not feel that is accurate.  I am going to pursue

3127  that with Mr. Davis, because we are not trying to sandbag

3128  anybody.  I am not going to apologize to anybody, because I

3129  don't feel that we have.  But I want to talk to staffs with

3130  Mr. Davis after the hearing is over, because I want these

3131  things not to be partisan, but to get the facts out.

3132       Mr. DAVIS OF VIRGINIA. Let me say to my friend, we have

3133  some EPA witnesses we hope you will give the same accounting

3134  to that you gave to this gentleman.  Thank you.

3135       Chairman WAXMAN. The vote has occurred and the Chair has

3136  heard the majority in the affirmative.  The Chair then calls

3137  the motion approved by the Committee, and the interrogatories

3138  will be made part of the record.

3139       [The referenced information follows:]


3140  ********** INSERT **********

3141          Chairman WAXMAN. Mr. Cummings, you are now recognized

3142   for your five minutes.

3143          Mr. CUMMINGS. Thank you, Mr. Chairman.

3144          Mr. Stern, I would like to ask you about your

3145   perspective on the White House's effort to get to the bottom

3146   of the problem of the missing e-mail.  The White House has

3147   known about this problem since 2005, from the time that

3148   Archives first learned about it, you repeatedly tried to get

3149   information from the White House, is that correct?

3150          Mr. STERN. Yes.

3151          Mr. CUMMINGS. Unfortunately the Archives wants to know,

3152   just like we do, what caused this problem and big it is, and

3153   what the White House plans to do about it.  Is that an

3154   accurate statement?

3155          Mr. STERN. Yes.

3156          Mr. CUMMINGS. The problem is, each time the Archives

3157   asks for an explanation, the White House promises that they

3158   have almost finished diagnosing the problem.  I call it

3159   paralysis by diagnosis.  The White House says, just give us a

3160   little more time, and we will tell you the results of our

3161   review.  But when the deadline arrives, the White House kicks

3162   the can farther down the road.

3163          For example, in 2007, you met with the White House

3164   officials to discuss the missing e-mails.  The White House

3165   said they would tell you the full extent of the problem in

3166    one month.  They didn't give you the details in June, did

3167    they?

3168        Mr. STERN. No.

3169        Mr. CUMMINGS. And at the end of June, the White House

3170    said they would get you your results by the end of the

3171    summer. They didn't give you their results at the end of the

3172    summer, did they?

3173        Mr. STERN. No.

3174        Mr. CUMMINGS. In October, going further down this road,

3175    the White House said they would have the results in six

3176    weeks. They didn't give you the results in November, did

3177    they?

3178        Mr. STERN. No.

3179        Mr. CUMMINGS. In fact, your own staff recognized the

3180    obvious pattern.  I just want to read from a summary your

3181    staff prepared of a meeting between Archives and the White

3182    House staff on October 11th, 2007.  I want you to pay close

3183    attention to this, Ms. Payton, since you said that you all

3184    were not running out the clock.  Well, I call it

3185    rope-a-doping.  And it states this.  This is the statement.

3186    ''We should note that this process was supposed to be

3187    completed by the end of June, then the end of September and

3188    the end of October in our previous briefings.  They are now

3189    saying that it will take about six weeks of work to have any

3190    results.''

3191        Now, Mr. Stern, it is now February, 2008.  Matter of

3192    fact, we are getting ready to go into March, and the White

3193    House still has not provided you those results, have they?

3194        Mr. STERN. No.

3195        Mr. CUMMINGS. Ms. Payton, it is your turn.  The White

3196    House has known about this e-mail archiving problem for

3197    almost two and a half years.  Yet despite repeated inquiries

3198    from Archives and this Committee, you still have not even

3199    produced a current inventory of the White House e-mails, is

3200    that correct?

3201        Ms. PAYTON. We--

3202        Mr. CUMMINGS. Have you produced an inventory?

3203        Ms. PAYTON. We have one that has not been through a

3204    quality assurance process yet for us to share with NARA.

3205        Mr. CUMMINGS. So it hasn't been, in other words, it has

3206    been created but nobody has seen it beyond--

3207        Ms. PAYTON. We need to go through a quality assurance

3208    process before we share the results.

3209        Mr. CUMMINGS. And when is that quality assurance process

3210    supposed to be completed?  Do you have any idea?

3211        Ms. PAYTON. First, we need to finish all the work in

3212    phase one.  So we have a preliminary inventory, we are still

3213    doing some work in phase one.  Then we will be doing our

3214    quality assurance analysis.  Our target, because the team and

3215    I sat down and went over this, this has been a much more

3216   complex process, and if NARA will remember, when we sat down

3217   in the summer, the team very optimistically said we wanted it

3218   to be done by this time frame and estimated that it would be.

3219   It has proved to be a lot more complex for a variety of

3220   reasons.  So it has taken us longer, because we are taking a

3221   lot of care, and it is bigger than we thought it was going to

3222   be.

3223        Mr. CUMMINGS. Well, certainly we want you to take care.

3224        Ms. PAYTON. The team and I sat down and we talked about

3225   our time frame as to when we would sit down with NARA and

3226   have completed phase one and phase two.  We are targeting the

3227   summer that we would actually sit down with them, we would

3228   have completed phase one, phase two and have all the

3229   remaining, if there are any anomalies left around low volume

3230   days or zero days, we would go over that with them.

3231        Mr. CUMMINGS. And what does summer mean?  Give me a

3232   date.

3233        Ms. PAYTON. In the June, July time frame.

3234        Mr. CUMMINGS. All right.

3235        Ms. PAYTON. So the first phase, as we complete it and QA

3236   it, we are going to sit down and go over with NARA.  The

3237   second phase, it will be the same thing, we will do a QA, go

3238   over it with NARA and then we will sit down and talk about if

3239   any remaining anomalies exist, what type of recovery effort

3240   needs to be done.

3241        Mr. CUMMINGS. I just want you to clear up one thing real

3242    quick.  You said in your opening statement that after phase

3243    two of your study, if you found e-mails were missing, you

3244    would consult with Archives and restore from backup tapes.

3245    Can you confirm that this will be done before the end of this

3246    Administration?

3247        Ms. PAYTON. I cannot confirm that, and I have read the

3248    GAO report which has said that the previous Administration,

3249    it took longer than the Administration.  We hope with newer

3250    technology, but I just don't know the size of the recovery

3251    effort to give you an estimate to tell you whether or not it

3252    will be completed.

3253        Mr. CUMMINGS. We need a sense of urgency here.

3254        Ms. PAYTON. We absolutely have it, sir.

3255        Mr. CUMMINGS. We do?

3256        Ms. PAYTON. Yes.

3257        Mr. CUMMINGS. Oh.

3258        Chairman WAXMAN. Will the gentleman yield to me?

3259        Mr. CUMMINGS. Yes.

3260        Chairman WAXMAN. Over a year ago you got a letter from

3261    Dr. Weinstein, saying you have to get going with this thing,

3262    it is going to take a lot of time.  So you have the

3263    possibility of going to the backup tapes and all of that.

3264    But he said it is going to take at least a year for you to

3265    get all this information.  And still, we will have nothing on

3266  the RNC tapes where there are backups in boxes.  So I just

3267  must tell you that I find it hard to believe that you have

3268  any real sense of urgency when a whole year has been

3269  frittered away.

3270      Ms. PAYTON. We have not frittered it away.  We really

3271  have improved the overall inventory process, and it is

3272  something that will benefit future administrations, as well

3273  as if we had undertaken a recovery effort prior to doing this

3274  work.  We may have recovered days we didn't need to, as well

3275  as we might not have recovered days we might need to.

3276      Chairman WAXMAN. Well, this all remains to be seen, but

3277  I appreciate your position.

3278      Mr. Issa, you were recognized to pursue questions, but

3279  it was under the 15 minutes and Mr. Davis asked, so you are

3280  entitled to 5 minutes and I will recognize you for that

3281  purpose.

3282      Mr. ISSA. Thank you, Mr. Chairman.

3283      I am going to follow up where the Chairman left off.

3284  Mr. McDevitt is not here, and that is unfortunate, because

3285  there are things that I am confused about, and Ms. Payton, I

3286  am hoping you can straighten it out for us.  He was the chief

3287  information officer while he was at the White House, is that

3288  right?

3289      Ms. PAYTON. Excuse me?

3290      Mr. ISSA. Mr. McDevitt was employed by the Office of the

3291  Chief Information Officer and his primary responsibility was

3292  to manage the electronic records systems of the White House,

3293  is that right?

3294      Ms. PAYTON. He was to manage the new archiving platform,

3295  that is correct.

3296      Mr. ISSA. But essentially, he was the guy that used the

3297  tool that wouldn't see any e-mail box that had more than

3298  32,000 e-mails in it, right?  So the tool that failed was his

3299  tool that he used earlier, is that right?

3300      Ms. PAYTON. I don't believe that tool reported up

3301  through Steve.  But I am not sure.

3302      Mr. ISSA. But at the time that tool was in use, it was a

3303  flawed tool, and that was more than 18 months ago.  So when

3304  he said, for example, that there are 400 days of lost

3305  information, that is wrong, because he has been gone for 18

3306  months and doesn't know.  When he says that e-mails could be

3307  deleted, he apparently doesn't know that there is a tracking

3308  log in the Microsoft operating system, so he doesn't know

3309  that you can't delete with impunity, that it is trackable.

3310      He obviously doesn't know that the tool that you used

3311  earlier was flawed and the tool you are using now is at least

3312  better.  We will never know if it is flawed until a later

3313  generation.  But it catches many of the lost documents that

3314  the previous tool didn't.  Is that roughly correct?

3315      Ms. PAYTON. That is roughly correct, yes.

3316    Mr. ISSA. I want to hit a couple of other points.  And I

3317  don't want to delve too much into software, but I think it is

3318  fair that we recognize that software moves on and that

3319  archiving in the digital age is not as easy as it might seem

3320  to the public, and hopefully this hearing is good for the

3321  public to understand.

3322    The Clinton Administration used Lotus Notes, right?

3323    Ms. PAYTON. Yes.

3324    Mr. ISSA. Lotus Notes no longer exists, right?  It is no

3325  longer supported.

3326    Ms. PAYTON. It is no longer supported.  Some groups may

3327  still use it, but it is no longer supported.

3328    Mr. ISSA. I wouldn't want to do business with somebody

3329  still using Lotus Notes or still using wooden wagon wheels.

3330  If I understand correctly, though, certainly I checked with

3331  the House of Representatives, we can no longer support it for

3332  members who want to stay on it.  I assume that the robust

3333  tool you are now using to go through and recapture the PSTs

3334  deconflict the fact that PSTs often have multiple PSTs and

3335  you don't want to have 40,000 copies of the same e-mail, so

3336  you have to take care of the duplicates.  Those tools didn't

3337  exist for Lotus Notes, in all likelihood, because it was on

3338  its way out by the time the Clinton Administration was on its

3339  way out, is that roughly correct?

3340    Ms. PAYTON. My understanding is that the way, because

3341  they have a limited de-dupe process for ARMS, and it had to

3342  be built.  That is my understanding.

3343      Mr. ISSA. Okay.  So here we have a situation where the

3344  Clinton Administration is on a platform that has to be phased

3345  out.  Simply, they lost the war of who is going to supply

3346  e-mails.  A period of time goes on in which yes, we are

3347  dealing, to Dr. Weinstein's concern, with getting good

3348  archives, but we are also dealing with the fact that I can't

3349  play my Beta Max tapes any more, either, and I can't seem to

3350  find anybody who has a Beta Max player any more.  And in a

3351  matter of a couple of years, it is going to be hard for me to

3352  play my high definition DVDs that were on the platform that

3353  now is being phased out.

3354      This is one of the challenges that I gather, for Dr.

3355  Weinstein, that you face that is going to be difficult for

3356  you as an archivist going into the future, no matter who is

3357  in the White House and no matter how hard they try, is that

3358  correct?

3359      Mr. WEINSTEIN. Yes, sir.

3360      Mr. ISSA. Okay.  So certainly, the House of

3361  Representatives needs to begin making sure you are funded,

3362  and that is part of what we do in oversight, fund it to deal

3363  with ever-evolving technologies where archiving isn't just

3364  putting them away, it is being able to retrieve it, is that

3365  right?

3366         Mr. WEINSTEIN. And to migrate where necessary.

3367         Mr. ISSA. Okay. I am deeply disappointed, Mr. Chairman,

3368    that we do have a split in our otherwise bipartisan effort to

3369    deal with the archiving and preservation of our Nation's

3370    records, and particularly the office of the President. I am

3371    sorry that as of today, Mr. McDevitt is not made available to

3372    us. I would hope that in spite of the vote that occurred

3373    that you would reconsider and allow for us to bring up some

3374    of these points with a gentleman who I believe is at least

3375    misguided as to the tools, capability and ongoing work by the

3376    White House as to the White House's responsibility.

3377         Last but not least, Mr. Chairman, I think what you are

3378    doing is going to prove in retrospect to be shameful as to

3379    the RNC, that in fact, if we have no reason to believe that

3380    private correspondence done outside of the White House is

3381    inappropriate and are not willing to do so up front, we

3382    should not have members of the White House administration

3383    here in order to ask them questions about the RNC that is not

3384    within their purview.

3385         Chairman WAXMAN. The gentleman's time has expired. I

3386    want to recognize the last questioner, I believe.

3387         But we have a lot of evidence that the RNC e-mails

3388    involve Government responsibility, because a good number of

3389    the e-mails from Karl Rove's account were to Government

3390    agencies. We asked the RNC for the number of dot gov e-mails

3391  from his e-mail site.  And we saw that a good number of them

3392  were done.

3393       You want to assume otherwise.  I am not surprised at the

3394  partisanship.  I have come to expect it.  But I would hope

3395  that something like this would not engender the partisanship

3396  that we have seen.  The Republicans are attacking Mr.

3397  McDevitt, who worked at the Republican White House, you are

3398  attacking everybody else and you don't believe the truth

3399  about the RNC e-mails.  Well, we will be glad to show you the

3400  documentation that we have, but we have a vote on, so I want

3401  Mr. Burton to have his full five minutes, and he is

3402  recognized at this time.

3403       Mr. BURTON. Thank you, Mr. Chairman.  I yield to my

3404  colleague.

3405       Mr. ISSA. And I will only use one of his minutes, but

3406  Mr. Chairman, although you spoke on time that doesn't exist

3407  under the rules of this Committee, I do want to continue

3408  working on a bipartisan basis.  This White House will close

3409  up and we will be looking to preserve all the records that

3410  fall within the Act.  Today, I am afraid we did not move

3411  further toward it.  Candidly, Mr. Chairman, constantly asking

3412  about Karl Rove, Karl Rove, Karl Rove, who clearly had a

3413  reason to be involved in many things which would have been

3414  inappropriate begs the question of whether or not we have any

3415  real evidence other than ''we didn't find e-mail traffic at

3416 the White House, therefore they must have been doing

3417 Government work on private sites.''

3418     Mr. Chairman, I have to tell you, I have little doubt

3419 that if we asked for the staff members of this Committee on

3420 both sides of the aisle to provide to us all of their outside

3421 information that we would in fact learn a great deal.  Mr.

3422 Chairman, we don't have that right within this Committee, and

3423 we should not try to create it.

3424     I yield back to the gentleman.

3425     Mr. BURTON. Mr. Chairman, we have a vote on.  I yield my

3426 time.

3427     Chairman WAXMAN. Thank you.  I just want to make a

3428 closing comment and will afford the other side an opportunity

3429 for a closing comment.

3430     The Congress is not required under any law to keep our

3431 e-mails the way the White House has had that requirement

3432 under the Presidential Records Act.  I think it is

3433 appropriate and I hope all members of Congress would think it

3434 is appropriate that that law be adhered to, whether it is

3435 this White House or any other White House.

3436     I must say, what I have learned today, which is, this

3437 hearing is about this Presidential Records Act, I am quite

3438 disturbed.  We have been asking questions about what happened

3439 to these White House e-mails that were sent through the RNC

3440 e-mail accounts, including messages sent by key advisors to

3441 the President during decisive periods of the Administration.

3442 We have established there are two boxes of backup tapes

3443 stored at the RNC.  These backup tapes may contain the

3444 missing e-mails. Dr. Weinstein, the archivist, has said that

3445 it is essential that these records be restored.

3446     Yet we have learned there appears there is no effort, no

3447 effort to recover the missing RNC e-mails.  And the only

3448 e-mails that we want are those that relate to Government

3449 business.  All the evidence we have received says that these

3450 e-mails are a vital part of the historical record of this

3451 White House.  Yet the White House has not asked the RNC to

3452 reconstruct the backup tapes, and it has not asked for the

3453 backup tapes so they could reconstruct them themselves.

3454     The effect is that the historical record will have major

3455 holes.  This may save the White House from embarrassment, but

3456 it is an enormous disservice to the American people for the

3457 historical record.  While there has been more effort to

3458 recover the missing e-mails from the White House, I am glad

3459 to hear that Ms. Payton has been working hard to recover

3460 these e-mails, and I am glad she has found e-mails that were

3461 previously missing.  But in this area, too, I continue to

3462 have greave concerns.

3463     There is a certain way to recover the missing e-mails;

3464 that is to restore the backup tapes.  The Archives have been

3465 asking the White House to do this for nearly a year, but the

3466  White House won't do this.  The result is that it is

3467  impossible to have confidence in what the White House is

3468  doing.  We know from the Plame case that the only way the

3469  White House could recover key e-mails was using the backup

3470  tapes.  But the White House is resisting this practical step.

3471      It is important to remember what this hearing is about.

3472  It is not about Sandy Berger, it is not about a California

3473  waiver, it is not about whether Clinton did it or didn't do

3474  whatever.  It is important to know that this hearing is about

3475  getting a complete record of what happened inside the Bush

3476  White House.  This will never occur unless the White House

3477  recovers the deleted RNC e-mails.  But we learned today that

3478  this is not happening.  It is a major disappointment and I

3479  think a clear violation of the law.

3480      Mr. Davis is not here.

3481      Mr. ISSA. He left me to close, Mr. Chairman.

3482      Chairman WAXMAN. Okay, the gentleman is recognized.

3483      Mr. ISSA. Mr. Chairman, I want to close in the most

3484  positive and bipartisan way possible, because I believe that

3485  there was a great deal of good done here.  I think we learned

3486  as a Committee that the statute requires adequate, according

3487  to the Archivist, records.  We learned from Dr. Weinstein

3488  that in fact, we are going to, even though we are not at a 10

3489  day that regularly, at the end of an Administration, that

3490  there is this going from a 2 or a 3 up to a 10 in the gaining

3491    of records and that there was a high confidence that we would

3492    get to that 10 by the inauguration of the next President.

3493         I personally have no doubt that Ms. Payton or a

3494    successor will be in fact still employed on those last few

3495    things that may need to be done in a digital age.  But I am

3496    also pleased to see the skill and the understanding, although

3497    expressed in phase, clearly that there is a process necessary

3498    to deliver all the information that is required by the

3499    Archivist and requested by this Congress, and that we will

3500    get there, but we will get there as close to or below the $15

3501    million fee that we could spend if we simply threw everything

3502    at it.

3503         So while I share with the Chairman a disappointment that

3504    weeks, months and even a year can go by in this process, I

3505    certainly will hope very much that we all understand that it

3506    can take that long to get this information, and that this is

3507    not something that is devious, at least as far as I can see,

3508    that in fact, Ms. Payton, in good faith, is working toward

3509    that and she has the confidence of the Archivist that

3510    progress is being made.  I think that is what we can take

3511    away from this hearing on a bipartisan basis.  I yield back.

3512         Chairman WAXMAN. That concludes our business for today.

3513    I thank all the witnesses for your very generous time here

3514    with us.  The Committee stands adjourned.

3515         [Whereupon, at 1:15 p.m., the committee was adjourned.]

**EXHIBIT 3**

HENRY A. WAXMAN, CALIFORNIA,
CHAIRMAN

TOM LANTOS, CALIFORNIA
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
JOHN F. TIERNEY, MASSACHUSETTS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
BRIAN HIGGINS, NEW YORK
JOHN A. YARMUTH, KENTUCKY
BRUCE L. BRALEY, IOWA
ELEANOR HOLMES NORTON,
  DISTRICT OF COLUMBIA
BETTY McCOLLUM, MINNESOTA
JIM COOPER, TENNESSEE
CHRIS VAN HOLLEN, MARYLAND
PAUL W. HODES, NEW HAMPSHIRE
CHRISTOPHER S. MURPHY, CONNECTICUT
JOHN P. SARBANES, MARYLAND
PETER WELCH, VERMONT

TOM DAVIS, VIRGINIA,
RANKING MINORITY MEMBER

DAN BURTON, INDIANA
CHRISTOPHER SHAYS, CONNECTICUT
JOHN M. McHUGH, NEW YORK
JOHN L. MICA, FLORIDA
MARK E. SOUDER, INDIANA
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
MICHAEL R. TURNER, OHIO
DARRELL E. ISSA, CALIFORNIA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
VIRGINIA FOXX, NORTH CAROLINA
BRIAN P. BILBRAY, CALIFORNIA
BILL SALI, IDAHO
JIM JORDAN, OHIO

ONE HUNDRED TENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY  (202) 225–5051
FACSIMILE  (202) 225–4784
MINORITY  (202) 225–5074

www.oversight.house.gov

## MEMORANDUM

### February 26, 2008

**To:**    **Members of the Committee on Oversight and Government Reform**

**Fr:**    **Democratic Committee Staff**

**Re:**    **Supplemental Information for Full Committee Hearing on White House E-mails**

On Tuesday, February 26, 2008, at 10:00 a.m., in room 2154 of the Rayburn House Office Building, the full Committee will hold a hearing entitled "Electronic Records Preservation at the White House." This memo provides supplemental information for members regarding the status of the Committee's investigation into the loss of official e-mail.

## EXECUTIVE SUMMARY

The Committee has been investigating White House compliance with the Presidential Records Act. In preparation for this hearing, the Committee received more than 20,000 pages of internal e-mails and other documents from the White House and the National Archives and Records Administration. The Committee also interviewed or received written answers to questions from six current or former officials in the White House responsible for preserving White House records.

The documents and interviews raise serious questions about the White House's compliance with the Presidential Records Act, which requires the White House to preserve e-mails documenting the "activities, deliberations, decisions, and policies" of the President. The information the Committee has received shows:

- **The White House has not had a reliable system for preserving White House e-mails since 2002, when the White House made the decision to stop using the Automatic Records Management System (ARMS) used by the Clinton White House.** Steven McDevitt, an official in the White House Office of the Chief Information Officer from September 2002 through October 2006, informed the Committee that during his time at the White House, "the process by which email was being collected and retained was primitive and the risk that data would be lost was high." As early as January 2004, the

National Archives warned the White House that it was "operating at risk by not capturing and storing messages outside of the email system." An internal White House "discussion document" from October 2005 states: "There is operational risk in current email storage management processes. Lost or misplaced archives may result in an inability to meet statutory deadlines."

- **Until mid-2005, the system that the White House used for preserving e-mails had serious security flaws.** According to Mr. McDevitt, "In mid-2005 ... a critical security issue was identified and corrected. During this period it was discovered that the file servers and the file directories used to store the retained email ... were accessible by everyone on the EOP network." Mr. McDevitt informed the Committee that the "potential impact" of this security flaw was that there was "[n]o verification that data retained has not been modified."

- **The White House has refused to cooperate with efforts by the National Archives to ensure the preservation of White House e-mails.** On May 1, 2007, the Archivist of the United States, Allen Weinstein, wrote White House Counsel Fred Fielding that "it is essential that the White House move with the utmost dispatch both in assessing any problems that may exist with preserving emails ... and in taking whatever action may be necessary to restore any missing emails." On May 6, 2007, a senior official in the National Archives wrote the Director of the White House Office of Administration to "request that you ... determine whether instances of alienation of Federal records actually occurred and then notify us of your findings." These requests and multiple similar requests were ignored. According to a September 5, 2007, memorandum to Dr. Weinstein from the General Counsel of the Archives:

    > we still have made almost zero progress in actually moving ahead with the important and necessary work that is required for a successful transition. ... [O]ur repeated requests ... have gone unheeded. ... Of most importance, we still know virtually nothing about the status of the alleged missing White House e-mails.

- **The process of recovering missing e-mails from RNC servers and White House back-up tapes has not begun.** Beginning in April 2007, the Archives urged the White House to start recovering missing White House e-mails stored on back-up tapes maintained by the Republican National Committee (RNC) and the White House. In his May 1, 2007, letter, the Archivist advised Mr. Fielding that such "a 'restoration' project can easily take more than one year to complete." Despite repeated requests from the Archives, these efforts have not yet begun. Moreover, the RNC has informed the Committee that it has no intention of trying to restore missing White House e-mails.

At this point, the full extent of the missing White House e-mails cannot be determined. There appear to be two main sources of missing e-mails. First, over 80 White House officials, including many of the most senior officials in the White House, regularly used RNC e-mail accounts. The RNC, however, has preserved no e-mails for over 50 of these officials and has saved few e-mails for the other officials from before fall 2006.

2

Second, an analysis of the White House e-mail system in 2005 identified over 700 days in which a component of the Executive Office of the President had an unusually low number of e-mails preserved on White House servers, including 473 days in which a component had no preserved e-mails. According to the analysis, there are 12 days of no e-mails for the President's immediate office and 16 days of no e-mails for the Vice President's office. The 2005 analysis was prepared by a team of 15 White House officials and contractor personnel supervised by Mr. McDevitt.

The White House is now disputing the accuracy of the 2005 analysis. In briefings with Committee staff, the White House has asserted that it has located at least some e-mails for each of the no-e-mail days for the White House Office as well as for five of the 16 no-e-mail days for the Office of the Vice President. The White House, however, has refused to share many other details with the Committee. At a meeting with the White House in October 2007, the Archives expressed doubts about the reliability of the new analysis being prepared by the White House. According to the notes of this meeting:

> We expressed great concern that the process was moving so slowly, and that we were very skeptical that the report results from the new tool could completely eliminate the possibility of messages missing from the collections system. We pointed out that some type of restoration project would inevitably be necessary if significant doubt remained that messages had not been collected, and that they should begin planning for such a project by requesting funding for the current FY.

The difficulties the White House encountered in recovering e-mails for Special Counsel Patrick Fitzgerald also undermine its claim that the journaling system was adequate. According to documents provided and shown to the Committee, the journaling archive system contained no e-mails from the Office of the Vice President for important dates: September 30, 2003, to October 6, 2003. In an effort to recover the e-mails, the White House restored backup tapes for these days. These backup tapes also contained no journaled e-mails or .pst files for those dates for the Office of the Vice President. The only e-mails that could be recovered and provided to the Special Counsel were e-mails that the White House was able to restore from the personal e-mail accounts of officials in the Vice President's office.

The Committee's investigation into the extent of the missing White House e-mails has been complicated by a lack of cooperation from the White House. The Committee requested documents from the White House on December 20, 2007. Since that time, the White House has produced only a small number of documents, including no documents from either of the White House hearing witnesses, Theresa Payton, Chief Information Officer, and Alan Swendiman, Director of the Office of Administration. The White House also has withheld an unknown number of documents without any claim of executive privilege. In addition, the White House directed the National Archives to withhold various documents relating to White House actions, for which the Committee issued a subpoena.

## I.    REQUIREMENTS OF THE PRESIDENTIAL RECORDS ACT

The Presidential Records Act was passed in 1978 in the aftermath of Watergate.  The Act makes clear that the President's records belong to the American public, not to the President or his advisors.  The Act requires the President to:

> take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of his constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are maintained as Presidential records.[1]

The Act also gives important powers and responsibilities to the National Archives and Records Administration, which is headed by the Archivist of the United States, Allen Weinstein.  The Archivist's primary responsibility arises at the end of a president's term of office, when he is to "assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President."[2]

In addition, the Archivist has limited authority over the preservation of presidential records during a President's term.  Although the Act gives the President full authority over the management of records during his term, the President is required to obtain the views of the Archivist prior to disposing of any "Presidential records that no longer have administrative, historical, or evidentiary value."  The Archivist does not have the authority under the Act to prevent the disposal of these records.  He may, however, consult with Congress and require the President to submit a disposal schedule to the appropriate congressional committees 60 days prior to the proposed disposal.[3]

## II.    THE INADEQUATE WHITE HOUSE E-MAIL ARCHIVING SYSTEM

Interviews and documents reviewed by the Committee show that the White House abandoned its e-mail archiving system in 2002 and relied instead on a temporary, ad hoc, manual system.  These interviews and documents also show that top White House officials were warned repeatedly by their own technical staff and by the National Archives that operating without an archiving system posed serious dangers, such as the risk of data loss, the risk of tampering, and the inability to verify that systems were working properly.  Despite these warnings, the White House aborted efforts to put in place a new e-mail archiving system.

According to Theresa Payton, the White House's current Chief Information Officer, most White House employees used the Lotus Notes e-mail system when the Bush Administration took office in January 2001.  E-mails from this system were archived through the Automatic Records Management System (ARMS), which had been in place since the previous administration.  In 2002, however, the White House decided to switch (or "migrate") from the Lotus Notes e-mail

---

[1]  44 U.S.C. § 2203.

[2]  44 U.S.C. § 2203.

[3]  44 U.S.C. § 2203.

system to the Microsoft Exchange e-mail system. This migration started in 2002 and was completed in 2004.[4]

According to Ms. Payton, when the White House migrated to its new e-mail system, it abandoned the ARMS archiving system. Instead, the White House began an ad hoc process called "journaling." Under this process, a White House staffer or contractor would collect from a "journal" e-mail folder in the Microsoft Exchange system copies of e-mails sent and received by White House employees. After retrieving copies of these e-mails, the White House staffer or contractor would then manually name and save them as ".pst" files on various White House servers.[5]

The new system for preserving White House e-mails had serious flaws. In one e-mail, an Archives official wrote: "I refer to it as a 'message collection system' even though we all understand that it hardly qualifies as a 'system' by the usual IT definition."[6] Carlos Solari, who was the Chief Information Officer for the White House at the time, described the journaling process as a "temporary" solution, and as a "short-term situation" that was not considered by the White House as a "a good long-term situation."[7]

Steven McDevitt, a senior official in the White House Office of the Chief Information Officer from September 2002 through October 2006, provided the Committee an extensive description of the problems with the White House system:

> There was a great deal of concern about proceeding with the migration to Outlook/Exchange without having an adequate email records management solution in place. … There were four types of risk that were discussed on a number of occasions within management ranks … :
>
> Incomplete Data — The process by which email was being collected and retained was primitive and the risk that data would be lost was high. …
>
> Data Reconciliation — … There is no way to guarantee that all records are retained in their complete and unmodified state. …
>
> Public Perception — Given the issues that occurred during the prior administration, it should warrant extra caution on the part of the EOP before making any changes to the email retention process. Additional system problems would create a public perception

---

[4] Briefing from Theresa Payton to Staff, House Committee on Oversight and Government Reform (Oct. 10, 2007).

[5] *Id.*

[6] E-mail from Sam Watkins to Theresa Payton (Nov. 6, 2007) (NARA Bates No. 001634 to 001635).

[7] Interview of Carlos Solari by Staff, Committee on Oversight and Government Reform (Feb. 7, 2008).

that the EOP was unwilling or unable [to] retain records that were required under current law. ...

User Accountability — The approach of simply storing email message in .pst files provides no mechanism or audit trail that tracks changes to data files or the activities performed by users or system administrators.[8]

According to Mr. McDevitt, he brought his concerns to the attention of senior officials at the White House, including "White House Counsel Harriet Miers and members of her staff."[9]

## A.    **Risk of Data Loss**

The documents received by the Committee show that the White House was repeatedly warned that its system for preserving e-mails was inadequate. An early warning occurred in January 2004 from the staff of the National Archives. According to a summary of a January 6, 2004, meeting between White House and Archives staff:

EOP has been converting from Lotus Notes to Microsoft Xchange over the past two years. ... **Messages in Xchange are NOT being captured in ARMS or any other system external to Xchange. ... The NARA team emphasized that EOP was operating at risk by not capturing and storing messages outside the email system.**"[10]

These risks were reiterated in an internal White House "discussion document" from October 2005. According to this document:

There is operational risk in current email storage management processes. Lost or misplaced email archives may result in an inability to meet statutory requirements. ... Standard operating procedures for email management do not exist. Automated tools that support the email archive process are not robust. The current version ... is prone to failure. ... Searches of email in response to statutory requirements may not be complete, creating legal and political risk.[11]

A November 14, 2005, memorandum from Mr. McDevitt to John Straub, the Acting Chief Information Officer and the Director of the Office of Administration, similarly warned of

---

[8] Letter from Steven McDevitt to Rep. Henry A. Waxman (Feb. 21, 2008) (Attachment 1, at 7).

[9] *Id.* (Attachment 2, at 7).

[10] National Archives and Records Administration, *Summary of Jan. 6, 2004, meeting with EOP re ECRMS at Archives II* (undated) (NARA Bates No. 000643 to 000644) (emphasis in original).

[11] *Email Archive Process Risk Mitigations: Discussion Document* (Oct. 25, 2005). In his responses to the Committee, Mr. McDevitt stated that he believed he "was involved in the creation of this document but do not recall the specific purpose of the presentation." Letter from Steven McDevitt to Rep. Henry A. Waxman (Feb. 21, 2008) (Attachment 2, at 12).

the "potential loss of emails" and an "inability to meet statutory requirements."[12]  According to the memorandum:

> The current email archive process depends on manual operations and monitoring, standard operating procedures do not exist, automated tools that support the email archive process are not robust, and there is no dedicated archive storage location.[13]

## B.    Risk of Tampering

White House officials were also warned that the ad hoc system they relied on in place of an archiving system subjected White House records to tampering.  According to Mr. McDevitt, one of the risks he discussed with senior management within the Office of the Chief Information Office and the Office of Administration was "user accountability."  Mr. McDevitt wrote the Committee:

> The integrity of the data could be called into question because it was not possible to ensure that inappropriate action, either intentional or unintentional, could not occur. ... The potential impact:  No verification that data retained has not been modified or what activities have been performed by system users or administrators.[14]

In his answers to questions from the Committee, Mr. McDevitt also revealed that in 2005, "a critical security issue was identified and corrected."[15]  According to Mr. McDevitt:  "the file servers and the file directories used to store the retained email .pst files were accessible by everyone on the EOP network."[16]  He explained that this security breach would have allowed any White House official to review the e-mails of any other White House official without being detected.[17]

## C.    Inability to Verify System Functionality

White House officials were also warned of a host of problems associated with the inability to verify that the e-mail system was working properly.  For example, Mr. McDevitt explained that "files were scattered across various servers on the EOP network" and that "[t]here

---

[12]  Memorandum for John Straub from Steven McDevitt, MS Exchange Electronic Mail Archival Process Standard Operating Procedures (Nov. 14, 2005) (HOGR6OA-010532 to 010533).

[13]  *Id.*

[14]  Letter from Steven McDevitt to Rep. Henry A. Waxman (Feb. 21, 2008) (Attachment 1, at 7).

[15]  *Id.* (Attachment 1, at 9).

[16]  *Id.* (Attachment 1, at 9).

[17]  Telephone conversation between Steven McDevitt and Staff, House Committee on Oversight and Government Reform (Feb. 24, 2008).

was no consistently applied naming convention for the component .pst files."[18]  Mr. McDevitt also warned that without a "mechanism to reconcile against what was originally retained by the system," it was impossible to be sure "that all records are retained in their complete and unmodified state."[19]

### D.    Aborted Efforts at New Archiving System

According to interviews and documents reviewed by the Committee, the White House has aborted efforts to put in place a new e-mail archiving system over the past six years.

In 2002 and 2003, White House officials tried to modify the previous e-mail archiving system, ARMS, to work with the new e-mail system, Microsoft Exchange.  White House officials told Committee staff that they attempted to develop a program to "interface" between the two, but they ultimately determined it was not technically feasible.[20]

In 2003, the White House began working on a new e-mail archiving system called the Electronic Communications Records Management System (ECRMS).  The White House awarded Booz Allen Hamilton a contract to begin designing a system in 2003 and awarded Unisys a task order under an existing contract to test and implement the system.  During his interview with Committee staff, Carlos Solari, the Chief Information Officer during this time, stated that the ECRMS was of "high importance."[21]

Mr. McDevitt, the program manager responsible for developing the system, described the extensive planning and testing that went into the project.  He stated that the project started with an "initial draft of the Concept of Operations" in 2002, which was "reviewed and approved by OA Counsel, White House Office of Records Management and White House Counsel" early the next year.[22]  Following that review, the White House developed a statement of work to "complete a detailed systems requirements specification, evaluate commercial off the shelf products and propose solutions that meet the government requirements."[23]  Booz Allen Hamilton was awarded this contract and began its work in late 2003.  According to Mr. McDevitt, in the spring of 2004, the contractor completed its work and recommended a combination of two commercial off-the-shelf products to serve as the ECRMS system.

---

[18]  Letter from Steven McDevitt to Rep. Henry A. Waxman (Feb. 21, 2008) (Attachment 2, at 1).

[19]  *Id.* (Attachment 1, at 7).

[20]  Briefing from Theresa Payton to Staff, House Committee on Oversight and Government Reform (Oct. 10, 2007).

[21]  Interview of Carlos Solari by Staff, Committee on Oversight and Government Reform (Feb. 7, 2008).

[22]  Letter from Steven McDevitt to Rep. Henry A. Waxman (Feb. 21, 2008) (Attachment 2, at 10).

[23]  *Id.*

According to Mr. McDevitt, this design was presented to the White House Counsel, the White House Office of Records Management, and counsel in the Office of Administration "for their concurrence" in the spring of 2004. With Unisys serving as the contractor for the implementation phase, the White House undertook "[s]ystem configuration, testing and tuning" through 2005. In early 2006, standard operating procedures were developed. In March 2006, the White House Counsel, the White House Office of Records Management, and OA counsel were briefed on the system, and in July of 2006, they were briefed "on the search and retrieval capabilities of the ECRMS solution." Mr. McDevitt stated that the project was "ready to go live" on August 21, 2006.[24]

Despite this extensive testing and preparation, the White House never implemented ECRMS. According to documents obtained by the Committee, the current Chief Information Officer, Theresa Payton, aborted the project in the fall of 2006. The Committee has obtained notes from an October 11, 2007, meeting between Ms. Payton and officials from the National Archives stating that Ms. Payton rejected the system because "[t]he system would require 18 months to ingest the existing backlog of messages in the Microsoft Xchange system" and "[t]he system offered users no option to distinguish between Presidential records and political or personal materials."[25]

Officials from the National Archives expressed concern with Ms. Payton's decision to abort the ECRMS archiving system. According to notes from the meeting with Ms. Payton, the Archives staff "had participated in the development of requirements for ECRMS."[26] The Archives staff observed that "the decision to drop the requirement to distinguish between Presidential and personal/political messages was made by OA counsel early in the development of ECRMS."[27] With respect to Ms. Payton's argument regarding the time required to ingest the existing backlog of messages, the National Archives staff responded that the process "would still have left time to complete before transition."[28]

When told that ECRMS had never been implemented, Carlos Solari, Mr. Payton's predecessor as Chief Information Officer, expressed surprise. Mr. Solari stated that he "absolutely" believed that the system would be implemented. He said he thought the "system got finished" and was "puzzled" as to why ECRMS had been rejected.[29]

---

[24] *Id.* (Attachment 2, at 10-11).

[25] National Archives and Records Administration, *Record of Meeting: 10/11/2007, 2:00-3:30 p.m., OA Conference Room, G Street NE Offices* (Undated) (NARA Bates No. 001628 to 001631).

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] Interview of Carlos Solari by Staff, Committee on Oversight and Government Reform (Feb. 7, 2008).

Mr. McDevitt left the White House in October 2006.[30] He explained that one reason for his decision to leave the White House was the decision by Ms. Payton to abort the ECRMS system.[31]

Although this decision to abort the ECRMS e-mail archiving system was made in 2006, to date the White House has failed to put in place any other archiving system. According to Theresa Payton, the White House has under development a new system using a commercial off the shelf product.[32] As of the date of this memo, the Committee has not been informed that the system has been implemented.

## III.    LACK OF COOPERATION WITH THE ARCHIVES

Documents obtained by the Committee show that despite multiple efforts by the National Archives to gather information about the loss of White House e-mails, White House officials denied that any problems existed, delayed providing requested information, and failed to respond to inquiries. One Archives official wrote in an October 2007 e-mail:

> The Office of Administration, the component of EOP through whom we are attempting to gain detailed technical information, has been extremely guarded in their responses, and all communication has been conducted under a patina of legal caution. Whenever we solicit specific technical information, they reply for the most part that they are still in the process of conducting inventories.[33]

Over the course of the last two years, two distinct but related problems regarding White House e-mail became public. First, in February 2006, press accounts reported that the White House failed to properly archive e-mails to or from certain components in the White House. Second, in March 2007, the Oversight Committee revealed that White House officials used e-mail accounts controlled by the Republican National Committee, which had a policy of deleting e-mails after 30 days. In both cases, the National Archives sought information from the White House without success.

The following is a chronology of attempts by the Archives to understand the extent of the missing White House e-mails and related developments:

**February 2, 2006:** News accounts reported that the Special Counsel investigating the outing of CIA agent Valerie Plame Wilson discovered gaps in the process by which the

---

[30] Letter from Steven McDevitt to Rep. Henry A. Waxman (Feb. 21, 2008) (Attachment 1, at 1).

[31] Telephone conversation between Steven McDevitt and Staff, House Committee on Oversight and Government Reform (Feb. 24, 2008).

[32] Briefing from Theresa Payton to Staff, House Committee on Oversight and Government Reform (Oct. 10, 2007).

[33] E-mail from Robert Spangler to David Kepley (Oct. 1, 2007) (NARA Bates No. 001785).

White House archived its e-mails.[34]  In response to these reports, two officials from the National Archives spoke to Jenny Brosnahan in White House Counsel's office.  The Archives officials told Ms. Brosnahan that if presidential records were destroyed, "they should let the archivist know because under the PRA they are supposed to inform the Archivist before any disposal of record."[35]

**February 6, 2006:**  Counsel for the White House Office of Administration spoke to the General Counsel of the National Archives.  The OA Counsel told the Archives Counsel that the White House "believed that the emails existed and could be accounted for."[36]  This does not appear to have been an accurate assertion.  As discussed in part III, an internal White House analysis in 2005 had shown that there were hundreds of days in which e-mails appeared to be missing from components of the Executive Office of the President.

**February 6, 2007:**  Officials from the National Archives met with officials from the White House's office of the Chief Information Officer to "discuss NARA's need for knowledge of OA electronic email and other electronic systems managed by OA."[37]  According to the chronology of White House meetings developed by Archives staff, at this meeting, the White House officials gave "no indication that there is a problem with any missing emails."[38]

**March 26, 2007:**  The Oversight Committee sent letters to the RNC and the Bush-Cheney '04 campaign requesting information about the use of political e-mail accounts by White House officials and directing these organizations to halt any deletions of these e-mails.[39]  The next day, the General Counsel for the Archives informed Archives staff that the Archives "will contact the White House Counsel's Office to discuss further."[40]

**April 12, 2007:**  The General Counsel of the National Archives wrote to Chris Oprison, a White House Associate Counsel:

---

[34]  *See, e.g., White House Fails To Archive E-Mail; Issue in CIA Leak Case,* New York Sun (Feb. 2, 2006).

[35]  E-mail from Nancy Smith to Sharon Fawcett (Feb. 2, 2006) (NARA Bates No. 001507).

[36]  National Archives and Records Administration, *Chronology of White House Meetings* (NARA Bates No. 01637 to 01641).

[37]  *Id.*

[38]  *Id.*

[39]  Letter from Rep. Henry A. Waxman to Mike Duncan, Chairman, Republican National Committee (Mar. 26, 2007); Letter from Rep. Henry A. Waxman to Marc Racicot, Former Chairman, Bush Cheney '04 (Mar. 26, 2007).

[40]  E-mail from Gary Stern to Jason Baron et al. (Mar. 27, 2007) (NARA Bates No. 001531 to 001532).

Chris, following up on our conversation several weeks ago about White House emails, we appreciate, as noted in the press, that your office is taking steps to investigate whether PRA records were created or received on non-White House email systems, and if so, to take all measures to recover and preserve them. As you know, under Section 2203 of the PRA, the President may not dispose of Presidential records without first obtaining the written views of the Archivist. It has also been normal practice for the White House to inform NARA of any unauthorized destruction of Presidential records.[41]

**April 13, 2007:** A nonprofit group called Citizens for Responsibility and Ethics in Washington (CREW) released a report alleging that after conducting an inventory in 2005, the White House found hundreds of days with no e-mail sent from or received by various White House components.[42] Asked about these allegations that day, White House Press Secretary Dana Perino stated that she "wouldn't rule out that there were a potential 5 million emails lost."[43] It was only after the release of the CREW report that the White House acknowledged to the Archives that e-mails could be missing from its servers.

**April 25, 2007:** The White House Counsel met with "key members of NARA's senior staff" to update them on "current issues relating to White House emails."[44] At the meeting, the National Archives requested a copy of the spreadsheet associated with the 2005 analysis of potential e-mail losses.[45] The Archives staff also advised the White House that "it is essential that you begin an email restoration project from the backup tapes as soon as possible."[46]

**May 1, 2007:** The Archivist, Allen Weinstein, wrote a letter to the White House Counsel, Fred Fielding, about the missing White House e-mails. In the letter, Dr. Weinstein wrote:

---

[41] E-mail from Gary Stern to Chris Oprison (Apr. 12, 2007) (NARA Bates No. 001540).

[42] Citizens for Responsibility and Ethics in Washington, *Without a Trace* (Apr. 2007); *see also White House: Millions of E-Mails May Be Missing,* CNN (Apr. 13, 2007).

[43] The White House, *Press Gaggle by Dana Perino and Dr. Ali Al-Dabbagh, Spokesman for the Government of Iraq* (Apr. 13, 2007).

[44] Letter from Allen Weinstein to Fred Fielding (May 1, 2007) (NARA Bates No. 001428 to 001429).

[45] Memorandum from Gary Stern to Allen Weinstein, Bush 43 Transition, et al. (Sept. 5, 2007) (NARA Bates No. 001626 to 001627). *See also* Letter from Allen Weinstein to Fred Fielding (May 1, 2007) (NARA Bates No. 001428 to 001429) (indicating that the Fred Fielding attended an April 25, 2007, meeting with Archives staff).

[46] E-mail from Gary Stern to Emmet Flood and Christopher Oprison (June 20, 2007) (NARA Bates No. 001624).

We believe it is essential that the White House move with the utmost dispatch both in assessing any problems that may exist with preserving emails on the Executive Office of the President email system, and in taking whatever action may be necessary to restore any missing emails. NARA has gone through three Presidential transitions involving the transfer of electronic records and, in each of these transitions, we experienced some problems with this issue. Based on this previous experience and similar problems experienced by prior Administrations, a 'restoration' project can easily take more than one year to complete.

… [I]t is extremely important that NARA staff begin meeting as soon as possible with relevant staff of the Office of Administration (OA). In order to ensure a successful migration of both presidential and federal electronic records to NARA, we need to acquire a clear knowledge of the current White House electronic systems and the current plans of OA for … restoration of any non-archived emails.[47]

**May 6, 2007:** Paul Wester, the director of the Modern Records Programs at the National Archives, wrote to Alan Swendiman, the director of the White House Office of Administration, "concerning the possible loss of Federal records of the federal agency components of the EOP that are required to be maintained on the White House email system."[48] Mr. Wester wrote: "We request that you look into this matter to determine whether instances of alienation of Federal records actually occurred and then notify us of your findings."[49]

**May 21, 2007:** The General Counsel of the National Archives and other Archives officials met with Chris Oprison, an Associate White House Counsel, and several other senior White House officials to "get a briefing … on the status of the problem relating to alleged missing White House emails."[50] According to notes summarizing the meeting:

Chris Oprison explained that they believe the problem relates to gaps in emails on the EOP system from late 2003 to late 2005, but they could not assure that the problem does not extend beyond that timeframe, and even into the present. They first became aware of the issue of gaps in emails, i.e., not being properly archived, in 2005. …

---

[47] Letter from Allen Weinstein to Fred Fielding (May 1, 2007) (NARA Bates No. 001429 to 001429).

[48] Letter from Paul M. Wester, Director, Modern Records Programs, National Archives and Records Administration, to Alan Swendiman, Director, Office of Administration, Executive Office of the President (May 6, 2007) (NARA Bates No. 000430).

[49] *Id.*

[50] E-mail from Gary Stern to Allen Weinstein (May 23, 2007) (NARA Bates No. 001620 to 001622).

Within the next month they are going to complete an audit of the PST files to determine the full extent of the problem. But they also stated that they expect to have an action plan ready by the end of the summer. We asked that they brief us when the audit is complete, and not wait for the action plan.

We asked if they could give us any more specifics on what they know so far: e.g., volume of missing email; whether it is particular to specific "buckets" representing particular EOP offices; does it involve both federal and presidential emails? They said they could not at this point answer any of these questions.[51]

The meeting also discussed the problem of the missing RNC e-mails. The White House officials assured the Archives staff that this problem was being addressed and the e-mails would be captured in a "separate restoration effort":

We then asked about the RNC email issue. They are working with the RNC and looking at this issue. They stated that the RNC server is now fixed so that this will not happen again, and that the RNC has the old servers. They are exploring how they will capture the Presidential record emails. ... This will be a separate restoration effort from the EOP email restoration.[52]

**June 20, 2007:** The General Counsel for the Archives wrote to the White House Counsel's office asking for an "email update." In that e-mail, he wrote: "you have stated that emails appear to be missing from the White House from the time period of late 2003 through late 2005, although you have not been able to provide any estimate of how many emails are actually missing." He reminded the Counsel's office that "on May 21, we were informed that the OA CIO audit of the missing email situation should be completed in about 4 weeks." He stated that it is "imperative" that the Archives be updated on the progress of the investigation into both these e-mail losses and White House progress into planning for a recovery of presidential records from the RNC.[53] The e-mail renewed the Archives' request that the White House commence restoration of missing e-mails from the backup tapes.

**June 29, 2007:** In an e-mail summarizing a meeting with the new General and Deputy Counsel of the White House Office of Administration, the General Counsel of the Archives writes:

We did note that during the last two years NARA had experienced a notable drop off in open communication and interaction with OA. We also touched on the

---

[51] *Id.*

[52] *Id.*

[53] E-mail from Gary Stern to Emmet Flood and Christopher Oprison (June 20, 2007) (NARA Bates No. 001624).

issue of the missing White House email. ... [T]hey still have not completed their review ... and therefore still had nothing concrete to report to us.[54]

**September 5, 2007:** The General Counsel of the National Archives sent a memorandum to the Archivist about the status of the missing White House e-mails and the "Bush 43 Transition." According to the memorandum:

We ... had a further opportunity to discuss the email and transition related issues that we have discussed on numerous occasions, including when you, I, and others met with Fred Fielding in late April and in your letter to Fielding of May 1, 2007. Despite a number of very positive meetings and discussions since then, ... we still have made almost zero progress in actually moving ahead with the important and necessary work that is required for a successful transition. Even our simple and rather mundane request that the White House provide us with formal authorization to begin move planning ... has lain dormant for months.

More significantly, our repeated requests to begin office-by-office meetings to scope out and inventory the volume, formats, and sensitivities of the PRA records that will be transferred to the National Archives has gone unheeded. ...

Of most importance, we still know virtually nothing about the status of the alleged missing White House emails. We have not received a written response to our May 5, 2007, letter regarding alleged missing Federal record emails. And as we stressed to the White House last spring, it is vital that any needed backup restoration project begin as soon as possible, in order that it be completed before the end of the Administration.[55]

**October 10, 2007:** Michael Kurtz, the Assistant Archivist for Records Services, wrote to all White House offices that create federal records to request that they "look into whether any electronic mail records of your agency maintained on the White House email system were lost or alienated, as has been widely reported."[56]

**October 11, 2007:** A meeting was held with staff from the National Archives and the White House Chief Information Officer, Theresa Payton. According to a record of this meeting prepared by the Archives, the White House informed the National Archives that its analysis of the missing e-mail problem had been delayed and there would be "no

---

[54] E-mail from Gary Stern to Jason Baron et al. (June 29, 2007) (NARA Bates No. 001625)

[55] Memorandum from Gary Stern to Allen Weinstein, Bush 43 Transition, et al. (Sept. 5, 2007) (NARA Bates No. 001626 to 001627).

[56] Letter from Michael J. Kurtz, Assistant Archivist for Records Services, to John Walters, Director of National Drug Control Policy (Oct. 10, 2007) (NARA Bates No. 001807 to 001808).

results before the end of November at the earliest." According to the Archives' meeting record:

> We expressed great concern that the process was moving so slowly, and that we were very skeptical that the report results from the new tool could completely eliminate the possibility of messages missing from the collections system. We pointed out that some type of restoration project would inevitably be necessary if significant doubt remained that messages had not been collected, and that they should begin planning for such a project by requesting funding for the current FY.[57]

**October 15, 2007:** The General Counsel for the Archives updated the Archivist on the unsuccessful attempts by the Archives to review the "2005 OA Report/Chart ... on problems with White House email system."[58] According to the General Counsel:

> We have repeatedly asked to see this report, and have been ignored, or, more recently, told it is hard to comprehend and of little value. White House has shown copies to House Oversight Committee and DOJ.[59]

**October 22, 2007:** Sam Watkins, a member of the Archives staff who attended the October 11, 2007, meeting with the White House wrote to Theresa Payton renewing his request for an opportunity to view the 2005 analysis:

> We are certainly willing to participate in the analysis of the data related to the "missing emails," but we are still trying to figure out how we can help without an understanding of what the "2005 report" says. Obviously, the report must give some indication that there was a problem, or we would not be in this situation.[60]

**October 31, 2007:** The National Archives staff were finally "afforded a brief opportunity to view a paper copy" of the spreadsheet prepared in 2005 listing hundreds of days of missing White House e-mail. They were not permitted to retain a copy.[61]

---

[57] National Archives and Records Administration, Record of Meeting (Oct. 11, 2007) (NARA Bates No. 001628 to 001630).

[58] E-mail from Gary Stern to Donna Gold and Allen Weinstein (Oct. 15, 2007) (NARA Bates No. 001631 to 001633).

[59] *Id.*

[60] E-mail from Sam Watkins to Theresa Payton (Oct. 19, 2007) (NARA Bates No. 001795).

[61] E-mail from Sam Watkins, National Archives and Records Administration, to Theresa Payton (Nov. 6, 2007) (NARA Bates No. 001634 to 001635).

## IV.    EXTENT OF THE MISSING E-MAILS

At this point, it is not possible to quantify the extent of the missing White House e-mails, but it appears that the problem is significant and has two separate components: (1) White House e-mails sent using RNC e-mail accounts that were destroyed by the RNC, and (2) White House e-mails sent using official White House e-mail accounts that were not archived. The White House's own analysis from 2005 identified over 700 days when there were either no e-mails for a component of the Executive Office of the President or significantly fewer e-mails than predicted in the White House archive system.

In recent meetings, the White House has disputed the extent of the e-mails missing from the White House servers. However, documents that the White House provided and showed to Committee staff for review show that the archive system did not preserve e-mails from the Office of the Vice President that were sought by Special Counsel Patrick Fitzgerald.

### A.    White House E-mails Missing from RNC Accounts

In June 2007, the majority staff of the Oversight Committee issued an interim report of an investigation into the use of RNC e-mail accounts by White House officials.[62] This report found that more than 88 White House officials had e-mail accounts maintained by the RNC or the Bush Cheney '04 campaign, and many officials used these political accounts extensively. White House officials with RNC e-mail accounts included senior White House personnel, such as Karl Rove, the former Senior Advisor to the President; Andrew Card, the former White House Chief of Staff; and several directors of the White House Office of Political Affairs. In some cases, White House personnel used RNC accounts almost exclusively, thus circumventing the official government e-mail system.[63]

The RNC deleted most of these e-mails pursuant to a "document retention" policy under which e-mails more than 30 days old were deleted. One indication of the scale of the loss of White House e-mail is the fact that the RNC has retained no e-mail messages for 51 of the 88 White House officials with RNC e-mail accounts. Moreover, even for White House officials for whom the RNC has e-mail records, these records appear to be incomplete. Of the 37 officials for whom the RNC has retained e-mails, only 15 have any e-mail records that date from before 2006.[64]

The case of Mr. Rove provides an example of the extent of the missing e-mail. The RNC preserved only 130 e-mails sent by Mr. Rove prior to November 2003, and it preserved no e-

---

[62] More information regarding the Committee's investigation is available in a report prepared by Majority Staff, *Interim Report: Investigation of Possible Presidential Records Act Violations* (June 2007) (online at http://oversight.house.gov/documents/20070618105243.pdf).

[63] Interview of Scott Jennings by Staff, Committee on Oversight and Government Reform (Oct. 9, 2007).

[64] Majority Staff, Committee on Oversight and Government Reform, *Interim Report: Investigation of Possible Presidential Records Act Violations* (June 2007).

mails sent to Mr. Rove during President Bush's first term. For the period that the RNC does have records, however, Mr. Rove was a prolific user of his RNC e-mail account. In 2007, Mr. Rove frequently sent more than 100 e-mails per day and received over 200 e-mails.[65]

There is also evidence that many of the e-mails sent through RNC e-mail accounts involved official government business. In total, the RNC preserved 140,216 e-mails sent or received by Karl Rove; over half of these e-mails (75,374) were sent to or received from individuals using official ".gov" e-mail accounts. Of the 674,367 White House e-mails preserved by the RNC, 240,922 (36%) were sent to or received from government e-mail accounts. In response to requests by the Committee, federal agencies provided partial inventories of White House e-mails sent to the agencies through RNC e-mail accounts. These e-mails involved official appointments, federal grants, and other official business.[66]

There does not appear to be any active process for recovering the deleted RNC e-mails. At a briefing in May 2007, the RNC provided Committee staff with an accounting of the various systems on which e-mail might be saved. In addition to e-mails saved on active RNC servers and individuals' computers and blackberry devices, the RNC has retained a number of back-up tapes. Several of these tapes contain data from early 2007, and an additional two boxes of back-up tapes contain data from earlier periods.[67] However, the RNC has not undertaken any effort to recover records from these tapes. The White House has also made no efforts to obtain the back-up tapes from the RNC or recover data from them.[68]

### B. White House E-mails Missing From White House Accounts

Congress, the National Archives, and the public first learned about a potentially large loss of White House e-mails from White House servers in April 2007, when CREW released a report describing the potential e-mail loss.[69] The White House, however, had known about this problem for several years. Officials told Committee staff at an October 2007 briefing that the White House first discovered a problem in August or September of 2005. This discovery led to a broader analysis of the .pst file storage process led by Steven McDevitt, a senior official in the White House Office of the Chief Information Officer.[70]

---

[65] *Id.*

[66] *Id.*

[67] Briefing by Rob Kelner and Eric Friedberg for Staff, Committee on Oversight and Government Reform (May 11, 2007).

[68] Telephone conversation between Rob Kelner and Majority Staff, Committee on Oversight and Government Reform (Feb. 25, 2008).

[69] Citizens for Responsibility and Ethics in Washington, *Without a Trace* (Apr. 2007); *see also White House: Millions of E-Mails May Be Missing,* CNN (Apr. 14, 2007).

[70] Briefing by Theresa Payton for Staff, Committee on Oversight and Government Reform (Oct. 10, 2007).

According to Mr. McDevitt, he led a team in analyzing what he believes to have been "over 5,000 .pst files" to determine what data was preserved in each file and whether any data was missing.[71] This analysis found over 700 days with low or no e-mail for any one of 12 components of the White House between January 2003 and August 2005.

According to a copy of a spreadsheet provided to this Committee by the White House, there were 473 days during this period in which a component of the EOP had no e-mails preserved on the servers, as well as 229 in which a component had an unusually low number of e-mails preserved on the servers.[72] The spreadsheet shows 12 days of missing e-mail for the White House Office, 16 for the Office of the Vice President, and 103 days for the Council of Economic Advisers.[73]

According to Mr. McDevitt, more than a dozen people were involved with this analysis, and the results were independently validated.[74] John Straub, the Director of the Office of Administration at this time, told Committee staff that he oversaw the effort. Mr. Straub told Committee staff that he was "consumed by this" issue of what he called "misplaced files" and worked closely with Mr. McDevitt to locate the missing e-mails.[75] Documents that were shown to Committee staff yesterday indicate that the White House Counsel's office was aware of these issues and met frequently with Mr. McDevitt's team. For example, on November 21, 2005, Mr. McDevitt sent "the current version of the Exchange Message Analysis Spreadsheet" to Associate White House Counsel Bob Hoyt. On December 5, 2005, Mr. Straub met with the White House Counsel's office and Joe Hagin, Deputy White House Chief of Staff, regarding "issues that have arisen with the e-mail system." Both Mr. McDevitt and Mr. Straub told the Committee that they briefed White House Counsel Harriet Miers regarding their analysis.[76]

Since reports of the missing e-mails became public in April 2007, Committee staff have received several briefings from the White House. On May 29, 2007, Keith Roberts, the Deputy General Counsel of the Office of Administration, told Committee staff that the days of low and no e-mail found in the 2005 analysis were from the time period when .pst files were created manually. He stated that human error or generator or electrical problems could have led to these missing days. He said, however, that the 2005 analysis had been a quick examination of the

---

[71] Letter from Steven McDevitt to Rep. Henry A. Waxman (Feb. 21, 2008) (Attachment 2, page 3).

[72] *EOP Exchange Environment — All Components: Summary — Messages Per Day* (Feb. 6, 2006) (HOGR6OA-000002-C to 000024-C).

[73] *Id.*

[74] Letter from Steven McDevitt to Rep. Henry A. Waxman (Feb. 21, 2008) (Attachment 2, at 4 and 6).

[75] Interview of John Straub by Staff, Committee on Oversight and Government Reform (Feb. 15, 2008).

[76] Interview of John Straub by Staff, Committee on Oversight and Government Reform (Feb. 15, 2008); letter from Steven McDevitt to Rep. Henry A. Waxman (Feb. 21, 2008) (Attachment 2, at 7).

problem, and that the White House was conducting a more comprehensive analysis.[77] Around the same time, Mr. Roberts briefed officials at the National Archives and told them that the new analysis would be completed within the next month.[78]

In October 2007, Committee staff were briefed again by White House officials. At this briefing, staff were told that the Office of the Chief Information Officer had tried to recreate the findings from the 2005 analysis and was unable to do so.[79] Committee staff have been briefed twice since that time. In these briefings, current White House CIO Theresa Payton explained that the White House is using a new tool for conducting the analysis of e-mails and has found approximately 100 .pst files with names that do not match their contents.[80]

On February 22, 2008, Theresa Payton shared some preliminary findings from this new analysis. According to Ms. Payton, the new analysis had identified 23 million more e-mails for this period than the 2005 analysis. She also told Committee staff that her office had found e-mails for some of the days identified in the 2005 analysis as having no e-mails preserved. Although she could not quantify how many e-mails were found for these days, she said that some e-mails had been found for all of the missing days for the White House Office, the Office of Policy Development, and the Office of Management and Budget. Similarly, some e-mails had been found for five of the 16 missing days for the Office of the Vice President. However, she stressed that these findings are preliminary and that the analysis will not be completed until sometime in March.[81]

Although the current effort may uncover some e-mails that were not included in the 2006 analysis, other documents provided to the Committee by the White House indicate that there have been serious problems using the archiving system to recover White House e-mails. One of these documents, dated January 20, 2006, describes efforts by the Office of the Chief Information Officer to "recover Office of Vice President email from the target period of September 30, 2003 to October 6, 2003."[82]

---

[77] Briefing by Keith Roberts and Emmet Flood for Staff, Committee on Oversight and Government Reform (May 29, 2007).

[78] E-mail from Gary Stern to Allen Weinstein (May 23, 2007) (NARA Bates No. 001620 to 1622).

[79] Briefing by Theresa Payton, William Reynolds, Emmet Flood and Elizabeth Medaglia for Staff, Committee on Oversight and Government Reform (Oct. 17, 2007).

[80] Telephone briefing by Theresa Payton and Emmet Flood for Staff, Committee on Oversight and Government Reform (Feb. 14, 2008); Telephone briefing by Theresa Payton and Emmet Flood for Staff, Committee on Oversight and Government Reform (Feb. 22, 2008).

[81] Telephone briefing by Theresa Payton and Emmet Flood for Staff, Committee on Oversight and Government Reform (Feb. 22, 2008).

[82] E-mail from Susan Crippen to Steven McDevitt and Jaime Borrego (Jan. 23, 2006) (HOGR6OA-010581 to 010584).

According to this document, even after restoring backup tapes, the White House team was unable to find any journal files or .pst files for the Vice President's office during this period. The team's first effort involved restoring from the backup tape "the file servers that were used to store .pst filed during the target period." This search uncovered "no messages ... that filled the gap." The team next restored from the backup tape the "server that contained the journal mailboxes for the target period." According to the document, the "journal mailboxes were examined and no messages for the target period were present in the journal mailbox."[83] The team then restored from the backup tape the personal mailboxes of officials in the Vice President's office and recovered messages from 70 individual users.[84]

According to a document dated just four days later that was shown to Committee staff, but not provided to them, the White House team recovered 17,956 e-mails from these individual mailboxes on the backup tape and used these as their basis to search for e-mails responsive to the Special Counsel's request. A restoration of personal mailboxes from a backup tape does not recover any e-mails deleted by the user before the backup tape was made. The fact that the White House could not find .pst files or journal files on backup tapes from this time period raises questions about the likelihood that these files will be found during the current search.

Although the Archives has repeatedly urged the White House to commence restoring e-mails from its backup tapes, the White House has refused to start this process. The only restoration of e-mails from backup tapes that has occurred is the restoration of the e-mails responsive to Mr. Fitzgerald's request.

## V.    LACK OF COOPERATION WITH THE COMMITTEE

The Committee's investigation into the extent of the missing White House e-mails has been complicated by a lack of cooperation from the White House. On December 20, 2007, the Committee issued document requests to the National Archives and the White House Counsel on issues related to e-mail preservation, the development of e-mail archiving systems, and preparation for the 2009 transition.

More than two months after the Committee made its request, the White House appears to have produced only a small percentage of the documents that it believes to be responsive to the request. In addition, the White House is withholding, without an assertion of Executive Privilege, an unknown number of documents that are described as being deliberative. Just yesterday, the White House made accommodations for Committee staff to review some percentage of those withheld documents. However, there are more that have not been shown to Committee staff.

In addition, the White House directed the National Archives to withhold a range of documents that contained White House equities. The National Archives was unwilling to release these documents to the Committee without White House approval. As a result, the Committee was forced to issue a subpoena to the Archives on February 20, 2008, to obtain the documents.

---

[83] *Id.*

[84] *Id.*

# EXHIBIT 4

# Email Archive Process
## Risk Mitigation

**Discussion Document**
**October 25, 2005**

HOGR6OA-01O551

# Executive Summary

- There is operational risk in current email storage management processes. Lost or misplaced email archives may result in an inability to meet statutory requirements.

- This risk can be mitigated. However, several steps must be taken over time to close exposures to risk.
  - Implement procedures.
  - Update the Mail Attender tool.
  - Implement system monitoring.
  - Implement a dedicated email archive.
  - Upgrade Exchange servers to Exchange 2003.
  - Capture emails directly and continuously with ECRMS.

- Senior management authorization is required to proceed with risk mitigation recommendations.

- There are significant benefits to the recommendations.
  - Reduces the frequency of error typical of manual processes.
  - Closes exposure to risk by isolating the email archive from data and file storage.
  - Provides safeguards to assure the integrity of the process.
  - Manages data with vendor supported technologies.

HOGR6OA-010552

# There is operational risk in current email storage management processes.



HOGR6OA—010553

# Lost or misplaced email archives may result in an inability to meet statutory requirements.

- The email archive process depends on manual operations and monitoring.
  - Institutional knowledge is held be a single administrator
  - The administrator must launch each process and monitor to completion
- Standard operating procedures for email management do not exist
- Automated tools that support the email archive process are not robust
  - The current version of Mail Attender is prone to failure
  - Naming requirements are not fully supported
- Archive process are not monitored with system management tools
  - System management tools can be used to alert when a process fails
  - Completeness of the archive process can be monitored as well
- There is no "dedicated" archive location.  Emails have been stored in various locations
  - Storage locations are created whenever there is available space, at the direction of the operator
  - Searches of email in response to statutory requirements may not be complete, creating legal and political risk

For Official Use Only

HOGR6OA–010554

4

# This risk can be mitigated.

- Implement interim procedures
    - Daily archive v. system administrator defined periodicity
    - Standard naming conventions
    - Designated storage location(s)
- Update Mail Attender
    - Automated scheduling of the .pst creation and storage process
    - Better and consistent naming support
    - More reliable performance
- Use Microsoft Operation Manager (MOM) system management software to monitor each process and validate the integrity of the entire process
    - Alert the messaging team and NOC when the process fails so that remedial action can be taken immediately
- Implement a dedicate system that is intended for email archive, search and record management functions
    - Using vendor supported technologies to replace tools such as Find It will improve the quality of service
- Systematically- eliminate manual processes and potential points of failure from the process

HOGR6OA–010555

# However, several steps...

- Release 1
  - Implement procedures
  - Update Mail Attender



HOGR6OA-010556

# …must be taken…

- **Release 2**
  - **Implement system monitoring**



HOGR6OA–010557

# …over time…

- Release 3
  - Implement dedicated email archive



HOGR6OA–010558

# ...to close exposures to risk.

- Release 4
  - Upgrade Exchange servers to Exchange 2003 (for "enveloping" capability)
  - Capture emails directly and continuously with ECRMS



HOGR6OA–010559

# Senior management authorization is required to proceed with risk mitigation recommendations.

- Procedures, tool upgrades and storage management decisions can be made by OCIO.

- Conversion of old emails to the ECRMS platform is time consuming.  During the conversion process, the current storage volume and the ECRMS (Centerra) storage volume will need to be searched.
    - OCIO currently searches multiple volumes with Lotus Notes Mail and MS Exchange email platforms.

- Use of the ECRMS platform requires management authorization.
    - "Release 3" uses the ECRMS platform for archiving. No change to search tools is implied.
    - "Release 4" stores the email directly. Current search tools used on .pst files will need to be replaced.  However, the *Find It* tool is not a vendor supported product and should be replaced.

- Failure to mitigate operational risks may result in an inability to comply with statutory requirements.

For Official Use Only

10

HOGR6OA–010560

# There are significant benefits to the recommendations.

- Reduces the frequency of error typical of manual processes.

- Closes exposure to risk by isolating the email archive from data and file storage that is managed to support production applications where data is more volatile.

- Provides safeguards to assure the integrity of the process.
    - System monitoring
    - Audit processes
    - Business rules and controls

- Manages data with supported technologies.

For Official Use Only

11

HOGR6OA-010561

November 14, 2005

MEMORANDUM FOR JOHN STRAUB
                       ACTING CHIEF INFORMATION OFFICER

FROM:          STEVEN MCDEVITT
                     DIRECTOR, ARCHITECTURE AND ENGINEERING
                     DIRECTORATE

SUBJECT:      MS Exchange Electronic Mail Archival Process Standard Operating
                     Procedures

**Purpose:** To obtain approval

1. to implement new "interim"Standard Operating Procedure (SOP) for the MS Exchange Electronic Mail Archival Process, and

2. to implement a longer term risk mitigation plan for the email archive process

Both improves the integrity of the email archival process and reduces risk that is inherent in the process.

**Background:** The Executive Office of the President (EOP) is required by law to retain email records for search and archive as either Federal or Presidential records. The current email archive process depends on manual operations and monitoring, standard operating procedures do not exist, automated tools that support the email archive process are not robust, and there is no dedicated archive storage location. As a result, the current process and lack of storage management limitations result in potential loss of emails. Lost or misplaced email archives in turn result in an inability to meet statutory requirements.

**Related Acquisitions/Projects:** Both the "interim" procedure and the longer term risk mitigation plan rely on related projects.

- The interim procedure requires that Mail Attender be upgraded to the current version. Mail Attender has been purchased by the IS&T organization. The SIS Branch of IS&T is responsible for testing and implementing the new version with the business the that are described in the SOP for MS Exchange Electronic Mail Archival. Implementation will result in automated scheduling of daily archival for each components email to the Storage Area Network (SAN).

- The procedure also requires system monitoring of the archive process. The SIS Branch of IS&T is responsible for implementation of system monitoring. System monitoring will allow the data center operations staff to assure that the email archival process runs successfully every night.

HOGR60A–010532

- The long term risk mitigation plan relies on the implementation of the Electronic Communication Record Management System (ECRMS) as a dedicated storage volume for email archive. This will isolate email archives from other storage management decisions.

- Full implementation of ECRMS requires the all MS Exchange servers be upgraded to the 2003 version of MS Exchange. This will allow envelop journaling and the elimination of Mail Attender from the archive process. By simplifying the process and tool set, the integrity of the process will be enhanced.

**Funding Profile:** None.

- Mail Attender has been purchased.
- Microsoft Operations Management (MOM) can be used to monitor the process.
- Funding for ECRMS is established in the ECRMS budget.

**Recommendation:** The Acting Chief Information Officer approves and directs the

- use of the attached Standard Operating Procedure for MS Exchange Electronic Mail archiving, and
- implementation of ECRMS.

Approved: _____  Disapproved: _____  Date: _____

Comments:

13

HOGR6OA−010533

November 14, 2005

MEMORANDUM FOR JOHN STRAUB
                          SPECIAL ASSISTANT TO THE PRESIDENT AND
                          DIRECTOR, OFFICE OF ADMINISTRATION

FROM:              JOHN STRAUB
                          ACTING CHIEF INFORMATION OFFICER

SUBJECT:          MS Exchange Electronic Mail Archival Process Standard Operating
                          Procedures

**Purpose:** To obtain approval to implement new process X that improves the Y support effort...

**Background:** Provide a brief description of the situation or events leading to the purpose of the memorandum and any cost detail or trade-offs (e.g. impact if not approved...or $$ saved). Describe the basic requirement or shortfall of the customer group that is the basis for the procurement or action.

**Related Acquisitions/Projects:** Provide a brief description of other related acquisitions that either affect the decision associated with this memo, or that this memo will impact other projects or acquisitions. Indicate if this procurement is a piece of a larger system or has follow-on costs (e.g. sustainment)...otherwise state "None." (Greg – ECRMS).

**Funding Profile:** NA

**Recommendation:** The OA Director approves the use of the attached Standard Operating Procedure for MS Exchange Electronic Mail archiving.

Approved: _____ Disapproved: _____ Date: _____

Comments:

HOGR6OA–010534

**From:**     Nancy Smith
**To:**       Sharon Fawcett
**Date:**     2/2/06 11:56:09 AM
**Subject:**  The newspaper article on Vice Presidential email for 2003

Sharon:
I wanted to let you know that Jason and I called Jenny Brosnahan to ask her if she knew anything about the following quote in today's paper:

But the prosecutor added: "In an abundance of caution, we advise you that we have learned that not all e-mail of the Office of Vice President and the Executive Office of the President for certain time periods in 2003 was preserved through the normal archiving process on the White House computer system."

Jason and I told Jenny that this was just an informal call. Jenny said she did not know anything but would check with the lawyer who is responding to Libby requests.

There was a general discussion of what the White House obligations would be to inform if 1) there had been an accidental disposal, 2) there has been no disposal but they were not archived in the ECRMS system, and 3) if some of these emails were federal record rather than Presidential.

We informed Jenny that if they found out 1) had occurred that they should let the Archivist know because under the PRA they are supposed to inform the Archivist before any disposal of record. If 2) was the situation and these emails exist but have not been archived they are under no obligation because there has been no disposal, but that we would appreciate a heads up on this and that we might have expertise to assist them if they need to do a restoration project. If 3) was the situation and some of these were federal and there was a disposal, then NARA could have regulatory authority in this situation.

Jenny is checking and said she will call us back. As far as she knows nothing has occurred. As you know this is a sensitive issue because it is not at all clear what if anything has happened and what authority NARA has and, therefore, this information should be held closely. We will let you know as soon as we hear anything else.
Nancy


**CC:**        GaryM Stern;  Jason Baron

001507

15

## CHRONOLOGY OF WHITE HOUSE MEETINGS

NARA has had many contacts and meetings with the White House over the last six years for the purpose of providing guidance and assistance in terms of Presidential Record Act issues. NLMS has daily contact with White House staff offices and often responds gives informal guidance on records issues or has regular meetings with these Offices. The following is a description of the types of meetings NARA has had with the White House, with more detail provided on those meetings specifically dealing with the email system. An * by other meetings indicates that the primary purpose of the meeting was a discussion of an electronic record system.

**1. Transition Meetings:**

NARA staff including N, ND, NGC, NL and NLMS had several meetings with the Bush Transition Team, including Judge Gonzales, to go over Presidential Records Act issues in November 2000 – January 2001.

**2. Briefings for New White House Counsels and Associate Counsels on PRA Issues:**

NARA staff, including NL, NLMS and NGC, have had a series of briefings during the last six years to go over PRA issues. We have briefed all new Counsels to the President and Associate Counsels dealing with the PRA. In January and February 2001, NGC and NLMS responded to questions from the White House Counsel's Office concerning its issuance of PRA guidance, which was issued in February 2001. In January 2005, at the request of the White House Counsel, NARA provided comments and suggestions for updating the PRA guidance. White House Counsel issued new guidance in June 2006.

**3. Meetings with NSC\*:**

NARA staff including NGC and NLMS have had series of meetings over the past six years with the National Security Council's Access and Management Directorate going over their email and other electronic systems, offering advice on what should be consider NSC PRA records, and getting updated briefings from NSC on their electronic systems. We last met with NSC on 12/7/2006 regarding their new systems. From NARA, Nancy Smith, Kate Dillon-McClure, Jason Baron, and Sam Watkins met with Bill Leary and John Ficklin of NSC, and Phil Droege or WHORM.

On January 18, 2007, White House Counsel informs NGC and NLMS that the NSC RMS has gone down for about a twenty-four hour period. Bill Leary, NSC Senior Directorate for Access Management says that NSC is doing everything it can to get their IT support to recover the information from backup tapes. Recently Bill Leary called NLMS to say that NARA should be receiving a report on the final outcome of this situation.

001637

**4. Meetings with the White House Photo Office\*:**

NLMS along with NHV have had several meetings with the White House Photo Office on the electronic system controlling and holding digital copies of the Bush White House Photos.  The last meeting in which NH participated occurred on 6/18/2004.

**5.  Meetings with White House and Department of Justice and the Secret Service regarding the WAVES and other Secret Service White House electronic systems\*:**

NARA staff including NGC, NLMS and NWM have had a series of meeting on the status of the WAVES and other Secret Service electronic systems governing access to the White House, the White House compound and the Vice President's house.  NARA has also given written input on this issue.

**6.  Meetings with White House Office of Records Management:**

NLMS along with NHV staff have had a series of meetings over the past six years giving WHORM assistance on PRA issues and their electronic RMS system.

**7.  Meetings on Disposal of Presidential and Vice Presidential Bulk Mail:**

NLMS and NGC staff have had a series of discussion and meeting with White House and the Office of the Vice President Counsel, the Director of White House Office of Records Management, and the Correspondence Unit staff on disposal of Presidential and Vice Presidential textual and electronic bulk mail and faxes.  In a series of letters between the Archivist and White House and OVP Counsel, approval to dispose of Presidential and Vice Presidential textual and electronic bulk mail and faxes was given after retaining a sample by the Archivist in 2001, 2002, and 2005.  NLMS staff sample this mail at the White House on a weekly basis.

**8.  Meetings with the White House Gift Office:**

NLMS staff have had a series of meetings with the White House Gift Office providing them guidance on their electronic database and dealing with electronic transfer of this information to the NLMS iO database.  Additionally, NLMS staff have provided briefings for each new head of the Bush White House Gift Office, guidance on gifts and disposal of gifts.  NLMS and NGC have also met with the Associate White House Counsels who deal with gift issues.

**9.  Meetings with White House Counsel and the Department of Justice on input on EO 13233:**

From the fall of 2001 forward N, ND, NGC,NL and NLMS have had a series of meetings, written and oral discussions regarding advice on EO 13233, changes to EO 13233, and implementation of EO 13233.

001638

### 10. Meetings with WHCA on White House TV and Film*:

NLMS staff have had several meeting with James Vankeuren on the WHCA's electronic system controlling and describing White House TV and Film materials.

### 11. Meeting with the Vice President's Staff:

NGC and NLMS have had several meetings with the Office of the Vice President's staff on Vice Presidential records issues.

### 12. Meetings with the President's Foreign Intelligence Advisory Board Staff:

NGS and NLMS have had several meetings providing PFIAB advice on Presidential Records Act issues.

### 13. Meetings and Input to OA on the Bush Email Systems*:

NARA staff, including ND, NGC, NLMS, NWM, NWME, and NHV, have had a series of meetings and conversations with OA on the Bush email systems. Most of these meetings have been composed of a smaller sub-set of the NARA EOP team. Various members of NARA staff have had either meetings or discussions regarding OA IT issues and the OA schedule throughout this period. The following is a non-inclusive list of meetings between NARA and OA staff on the White House email system:

- On February 13, 2001, a NARA team consisting of NHV, NWM, and NLMS met with OA/IST to discuss NARA-OA Targeted Assistance.

- Between November 2001 and February 2002, NHV had preliminary discussions with various OA and WHORM staff, including Jim Wright, Lee Clay, Nell Doering, Tony Barry, Terry Good, Bob Spangler, and Sharon Whitt, regarding the broad, high level requirements for a replacement to the ARMS system.

- On November 6, 2002, NHV met with Carlos Solari (acting CIO) and five other EOP representatives regarding the difficulties EOP was having implementing records management with Microsoft Xchange and other issues.

- On March 20, 2003 NARA met with OA to get an update on the new EOP IT systems, and discuss other EOP records issues.

- On April 22, 2003 OA and NARA staff meet discussing electronic records management for the EOP including ARMS redesign and other RM tools, their enterprise architecture review, and other systems upgrades. NARA attendees at this meeting included ND, NGC, NLMS, NWM, and NHV. OA staff included Tim Campen, Carlos Solari, Lee Clay, Steve McDevitt, and Markus Most.

001639

4

- On May 6, 2003, at the request of the EOP, NARA provided comments on the ECRMS Concept of Operations document. ECRMS was the designation given for the system designed to replace ARMS.

- In 2004, members of the EOP team including NHV, NWM, NLMS, and NGC had a series of meetings with OA to discuss their email systems (ARMS and Legato), their plans to change from ARMS to ECRMS and also gave input on various documents OA circulated to NARA for comment:

  - On January 6, 2004 two members of OA staff, Keith Regatts, the Project Manager, and Markus Most, the then OA Records Manager, came to Archives II with their EOP contractors to meet with NARA staff to gather requirements from NARA for their new system to collect, preserve and transfer to NARA electronic messages. On January 21, 2004, Keith sends Sam Watkins the draft ECRMS requirement listing for NARA's review and comment.

  - On February 2, 2004, NARA met with OA and White House staff at OA for what was called an ECRMS Stakeholder Review Session with NARA. This meeting included discussion of a variety of emails issues including the Legato/Xchange interface with ARMS, as well as NARA's response to EOP's "metadata management" alternative proposal, segregation of Federal from Presidential email, the default bucket, and NARA's position on EOP electronic calendars. NARA staff included ND, NGC, NLMS, NWM, and NHV.

  - On February 12, 2004, NARA provided comments to the EOP on the ECRMS requirements.

  - On May 13, 2004, NARA provided the EOP with comments on the ECRMS System Design Description document.

  - May – June 2004, NARA responds to EOP questions regarding snapshots of EOP hard-drives.

  - No meetings took place in 2005 and 2006. Essentially, development of ECRMS was delayed after the 2004 election.

- On February 2, 2006, NGC and NLMS called Associate White House Counsel Jenny Brosnahan to ask her if she knew anything about the quote in the paper that said that "in an abundance of caution, we advise you that we learned that no all e-mail of the Office of the Vie President and the Executive Office of the President for certain time period in 2003 was preserved through the normal archiving process on the White House computer system." Jenny said that she did not know anything but would check with the lawyer responsible for responding to Libby requests. On February 6, 2006, NGC spoke with OA Counsel Vic Berson, who

001640

clarified that they did not believe there was not a loss of email, but rather they believed the email were not sent into ARMS, or an equivalent electronic recordkeeping system; they believed that the emails existed and could be accounted for.

- In the fall of 2006, NARA re-initiates effort to meet with OA to discuss status of ECRMS and related issues.

  - On February 6, 2007, ND, NLMS, NGC, NHV, NWM meet with OA CIO Theresa Payton and OA staff to discuss NARA's need for knowledge of OA electronic email and other electronic systems managed by OA. OA explains that ECRMS is not being implemented, and therefore emails are no longer being preserved in a formal electronic recordkeeping system (and NARA will thus likely receive emails in multiple formats). OA gives NARA no indication that there is a problem with any missing emails.

- On March 29, 2007, NGC and NLMS call Associate White House Counsel Chris Oprison regarding news reports about the possibility of PRA emails not being saved on personal/political accounts.

- On April 14, 2007, NGC calls Chris Oprison to request a briefing on further press reports on White House emails.

001641

From:       GaryM Stern
To:         Baron, Jason; Bellardo, Lewis; Constance, John; Cooper, Susan; Fawcett, Sharon;
McMillen, David; Smith, Nancy; Weinstein, Allen
Date:       3/27/07 1:23:47 PM
Subject:    White House Emails

In case you haven't yet seen it, today's WashPost has a story, reprinted and linked below, that Chairman
Waxman is requesting the RNC and the Bush-Cheney '04 campaign to preserve emails that may be
Presidential records. Waxman's letters are on the Committee website, also linked below, and ask,
among other questions: "What agreements, if any, has the RNC entered into with the White House, the
National Archives, or other government agencies regarding the e-mail accounts
maintained by the RNC that have been used by White House officials."

I am not aware that NARA has ever been contacted by these political organizations on this issue.

By way of background, last week Waxman's staff called John's office wanting "to know what sort of
regulations does NARA have for incumbent Presidents; what guidance do we give White House staff on
Presidential records." (See attached email.) I spoke with the staffer, Anna Laitin, to explain that under
the PRA we do not have a formal, statutory role in records management of the incumbent, but that we do
provide informal guidance (and I sent her the transition document on the PRA that we prepared for the
incoming Bush Administration).

She explained the Committee's concern that WH staff may be using non-government email accounts to
conduct government business. I stated that if that occured, then they should preserve such email either
by printing it out or forwarding it to their government account.

As we routinely do when this sort of issue arises, we will contact the White House Counsel's Office to
discuss further.

Thanks,
Gary

http://oversight.house.gov/story.asp?ID=1225

http://www.washingtonpost.com/wp-
dyn/content/article/2007/03/26/AR2007032601979.html?nav=hcmodule

GOP Groups Told to Keep Bush Officials' E-Mails
Democrat Cites Investigation of Firings

By R. Jeffrey Smith
Washington Post Staff Writer
Tuesday, March 27, 2007; A03

A Democratic House committee chairman yesterday told the Republican National Committee and the
Bush-Cheney '04 campaign to retain copies of all e-mails sent or received by White House officials using
e-mail accounts under their control, raising the political stakes in the congressional inquiry into U.S.
attorneys' firings.

Rep. Henry A. Waxman (D-Calif.) said his broadly written request was based on evidence that White
House officials -- particularly aides to top political adviser Karl Rove -- have used their politically related e-
mail accounts to hide the conduct of official business regarding the prosecutor firings and other matters
being investigated by Congress.

"The e-mails of White House officials maintained on RNC e-mail accounts may be relevant to multiple
congressional investigations," Waxman wrote to the group's chairman, Mike Duncan, adding that as

001531

"governmental records" they are subject to preservation requirements and "eventual public disclosure."

Waxman, chairman of the Oversight and Government Reform Committee, said he also expects Duncan and Marc Racicot, the former Bush-Cheney campaign chief, to arrange a briefing on how their groups control and preserve such e-mails. A spokeswoman for Duncan, Tracey Schmitt, said of Waxman's letter, "We're reviewing it and will take appropriate action." Racicot did not return a phone call.

The request by a Democratic lawmaker for access to records kept by a rival party's campaign offices has a precedent: In the mid-1990s, when the same committee was under Republican control and investigating alleged campaign finance abuses by the Clinton White House, it demanded and obtained hundreds of pages of Democratic campaign records and communications.

"This is a classic congressional document-preservation warning," said University of Baltimore law professor Charles Tiefer, a former deputy and acting counsel to the House from 1984 to 1995. He said failure to comply could expose the groups to possible obstruction charges.

Yesterday's request was based, Waxman said, on at least three White House officials' use of Republican Party-affiliated e-mail accounts for some of their work in recent years, as well as on reports that Rove routinely uses his RNC e-mail account for business.

Waxman noted for example that J. Scott Jennings, the White House deputy director of political affairs, used a "gwb43.com" e-mail account last August to discuss the replacement of the U.S. attorney for Arkansas, Bud Cummins, according to e-mails released to Congress by the White House.

Barry Jackson, a deputy to Rove, in 2003 used a "georgewbush.com" e-mail account to consult with Neil G. Volz, then an aide to lobbyist Jack Abramoff, about nominating one of Abramoff's Indian tribe clients for a Medal of Freedom, according to a copy of an e-mail. Abramoff is now serving a prison sentence for bank fraud, and Volz plead guilty to conspiracy charges last year.

Susan B. Ralston, while she was executive assistant to Rove, similarly used "georgewbush.com" and "rnchq.org" e-mail accounts to confer in 2001 and 2003 with Abramoff, her former boss, about matters of interest to Abramoff's clients.

In a related e-mail, an Abramoff aide said Ralston had warned that "it is better to not put this stuff in writing in [the White House] . . . email system because it might actually limit what they can do to help us, especially since there could be lawsuits, etc."

Abramoff's response, according to a copy of his e-mail, was: "Dammit. It was sent to Susan on her rnc pager and was not supposed to go into the WH system."

Waxman said the exchange indicated that in some instances, White House officials were using nongovernmental accounts "specifically to avoid creating a record of communications" that are nonetheless·subject to the committee's jurisdiction.

001532

Record of meeting

10/11/2007, 2:00-3:30pm, OA Conference Room, G Street NW Offices

Participants:
    EOP: Theresa Payton (EOP CIO), Will Reynolds, Liz Medaglia (OA Counsel), Chris Oprison (WH Counsel), Alan Swendiman (OA) (for last portion)
    NARA: Sam Watkins (NH), Bob Spangler (NWME), Jason Baron (NGC)

Theresa Payton provided a description of the process used to collect and store messages when the EOP began the move to Microsoft Xchange in 2002. Per this description, any message sent or received by a user was recorded immediately in two different locations: the user's mailbox on the active Xchange system, and the Xchange Journal (arranged by mail store and organization) with access available only to administrators. On a periodic basis, an administrator copied these journal files to a PST file. They have not found documentation of how this process was executed, recorded, or verified, or how often the copy took place, or was supposed to take place.

We asked if anyone had brought to the meeting the so-called "2005 report," which we understand constitutes an Excel spreadsheet of some sort. No one had a copy available. We asked if Theresa had reviewed an electronic version of the 2005 report (as metadata consisting of formulas or other information might prove useful). She indicated she had not reviewed an electronic version out of a concern that doing so would in some way compromise the integrity of the document. We specifically requested that OA provide NARA with a copy of the 2005 report, in electronic form, and any related documentation that could be recovered. EOP representatives took that request under advisement.

In 2004, Mail Attender was introduced to automate the copy process. Although the process was apparently scheduled to take place daily, they do not seem to have logs or other records verifying this. At about this time, two software utilities were introduced to the process: "Findit" and "CMDFI". "Findit" is a custom legal search tool developed by Microsoft to allow them to search the data in response to queries. "CMDFI" generates statistics from the repository

001628

PST files. Both were written in Visual Basic 6, which may have "memory leak" problems.

"CMDFI" is the program that was used to create the report which apparently indicated that they had missing emails. The report flagged "red days" as those days when few to no messages are saved for an organizational PST. They believe that the low numbers are at least partially attributable to a flaw in the "CMDFI" tool. The more problematic aspect of the PST integrity checking is the logic of the methodology: they apparently have run this CMDFI tool to "evaluate" PSTs but they are not tying that evaluation back to any system logs or back to the original source of the messages. In essence, they are only comparing the volume of messages on any given day to other similar days, to see if there are any anomalies. For example, a total of 500 messages on a working Wednesday for OMB would be an anomaly if OMB normally accumulated an average of 5000 messages on working Wednesdays.

They are still in the process of developing a new tool to produce a new count of these messages. They are now awaiting clearance for a contractor to be hired. They expect the development and report process to take 6-9 weeks after the contractor is on board. We should note that this process was supposed be completed by the end of June, the end of the summer, and the end of October in our previous meetings. They are now saying that it will take about six weeks of work to have any results, and that further work is dependent upon an FBI clearance process being completed immediately for one assigned contractor. That means no results before the end of November at the earliest.

We expressed great concern that the process was moving so slowly, and that we were very skeptical that the report results from the new tool could completely eliminate the possibility of messages missing from the collection system. We pointed out that some type of restoration project would inevitably be necessary if significant doubt remained that messages had not been collected, and that they should begin planning for such a project by requesting funding for the current FY. We indicated that such a restoration project could cost on the order of $25 million, and pointed out that any unused funds could easily be returned to the Treasury. We recommended that they pursue funding for the project prior to determining the exact nature and extent of the missing messages problem. Ms. Payton indicated that she

001629

refers funding issues to the head of OA, Alan Swendiman, who was present at that point in the meeting, but made no comment.

Ms. Payton also provided some of the history of the ECRMS development effort. The system was to pilot in the fall of 2006, but was cancelled for two primary reasons:

1) The system would require 18 months to ingest the existing backlog of messages in the Microsoft Xchange system. We pointed out that that would still have left time to complete before transition if it had worked out properly. Ms. Payton indicated that the normal types of delays associated with implementing such a system would have prevented completion in time for transition.

2) The system offered users no option to distinguish between Presidential record and political or personal materials. This would result in a large amount of inappropriate material being transferred to NARA intermixed with the Presidential records. In response we stated that NARA certainly supported the segregation of Presidential records from personal and political communications, and that we had received large quantities of this material in the past, i.e. in the email records of the Clinton administration. We also pointed out that NARA had participated in the development of requirements for ECRMS, and that the decision to drop the requirement to distinguish between Presidential and personal/political messages was made by OA counsel early in the development of ECRMS.

Ms Payton also provided us with a brief status of the development of the new system to collect, store, and transfer electronic messages of the EOP. The system is being developed in Documentum, and is scheduled for a "minipilot" in November, 2007. When we asked about the new system's ability to ingest the vast numbers of emails stored in PST files, she and Will Reynolds indicated that they believed the system could ingest the files rapidly, but it was not clear that the ingestion would be completed before transition.

001630

# *National*
## *Archives*

Archivist of the United States                                    *Washington, DC 20408*

May 1, 2007

The Honorable Fred Fielding
Counsel to the President
The White House
Washington, DC  20500

Dear Fred:

Thank you for taking the time out of your crowded schedule to have lunch with me last Wednesday.  I greatly enjoyed our conversation.

I also wanted to thank you for meeting with key members of NARA's senior staff that same morning.  They appreciated the update on current issues relating to White House emails.  We believe that it is essential that the White House move with the utmost dispatch both in assessing any problems that may exist with preserving emails on the Executive Office of the President email system, and in taking whatever action may be necessary to restore any missing emails.  NARA has gone through three Presidential transitions involving the transfer of electronic records and, in each of these transitions, we experienced some problems with this issue.  Based on this previous experience and similar problems experienced by prior Administrations, a 'restoration' project can easily take more than one year to complete.

Additionally, given both the extensive volume of White House emails that NARA will need to ingest at the end of the Administration – much more than in any previous Administration – and the complexity of migrating electronic records, it is extremely important that NARA staff begin meeting as soon as possible with relevant staff of the Office of Administration (OA).  In order to ensure a successful migration of both presidential and federal electronic records to NARA, we need to acquire a clear knowledge of the current White House electronic systems and the current plans of OA for both restoration of any non-archived emails and transfer of the preserved emails to a new system.  NARA remains available to provide you and the Office of Administration with our expertise and appropriate guidance, as we have previous Administrations, as you work to solve any problems.

My staff is also available to work closely with you and other relevant White House officials in preparing for the January 2009 Presidential transition.  As NARA staff has mentioned in previous meetings, we believe that now is the time to begin regular meetings in order to discuss a variety of issues including:  1) when to begin formal move planning, including meeting with the military;  2) the need to scope out and inventory the

(continued on page two)

001428

The Honorable Fred Fielding
May 1, 2007
page two


volume of materials that will be transferred to the National Archives at the end of the Administration for deposit into the George W. Bush Presidential Library; 3) establishment of a project site for storage of these records until the Library is built; 4) White House needs for NARA staff in assisting with the move; and 5) other issues that will require White House assistance in order for NARA to physically carry out the move.

Please feel free to discuss these coordination issues with Gary M. Stern, General Counsel, and Nancy Smith, Director of Presidential Materials.

Thank you again for your support and assistance.

Sincerely,

ALLEN WEINSTEIN
Archivist of the United States

001429

27

| | |
|---|---|
| From: | GaryM Stern |
| To: | Flood, Emmet T.; Oprison, Christopher G. |
| Date: | 6/20/07 3:27:57 PM |
| Subject: | Email Update |

Emmet and Chris:

The current press coverage about the use by White House staff of the RNC email system compels us to inquire again, since our meeting with you and Fred Fielding on April 25, about the status of that situation and your review into the allegations about emails missing from the White House system. You have stated that emails appear to be missing from the White House system from the time period of late 2003 through late 2005, although you had not been able to provide any estimate of how many emails are actually missing.

When we met again with Chris and OA on May 21, we were informed that the OA CIO audit of the missing email situation should be completed in about 4 weeks. Chris also noted that there were approximately 27,000 backup tapes covering that time period.

We have advised you on both occasions that it is essential that you begin an email restoration project from the backup tapes as soon as possible, so that it can be completed before the end of the Administration.

It is imperative that we be updated as soon as possible on the state of any missing emails from the White House system and the plan to recover them from the backup tapes, as well as any plans to recover presidential record emails from the RNC? We would be happy to meet with you at your earliest convenience to discuss this issue, or can talk by phone.

I look forward to hearing from you soon.

Thanks,
Gary


CC:         Baron, Jason;  Bellardo, Lewis;  Fawcett, Sharon;  Smith, Nancy

001624

28

**From:**       GaryM Stern
**To:**         Weinstein, Allen
**Date:**       5/23/07 10:48:30 AM
**Subject:**    WH Email Meeting

Allen, here are our notes from Monday's meeting.  Let us know if you have any questions.

Thanks.


**CC:**         Baron, Jason;  Bellardo, Lewis;  Fawcett, Sharon;  Smith, Nancy;  Spangler, Robert;  Watkins, Sam;  Wester, Paul

001620

Notes of May 21, 2007, Meeting with White House on Email Issues:

NARA attendees:

Lew Bellardo
Gary M. Stern
Sharon Fawcett
Nancy Smith
Sam Watkins
Bob Spangler

White House attendees:

Chris Oprison, Associate White House Counsel
Al Lichtman, Associate White House Counsel
Phil Droege, Director, White House Office of Records Management (WHORM)
Teresa Payton, Office of Administration Chief Information Officer
Linda Gambatesa, Deputy Assistant to the President for Management Administration and
      Oval Office Operations
Al Swindeman, Director, Office of Administration
Liz Medalia, General Counsel, Office of Administration
Keith Roberts, Deputy General Counsel, Office of Administration

Primary purpose of the meeting was to get a briefing from Office of Administration on the status of the problem relating to alleged missing White House emails from the EOP email system.

Chris Oprison explained that they believe the problem relates to gaps in emails on the EOP system from late 2003 to late 2005, but they could not assure that the problem does not extend beyond that timeframe, and even into the present. They first became aware of the issue of gaps in emails, i.e., not being properly archived, in 2005.

Their current process is that they are using Microsoft Exchange and then saving these emails to Personal Information Store (PST) file.[1] They also have disaster recovery tapes, i.e., backup tapes. They have identified approximately 27,000 such backup tapes covering that period, and they have not been recycling tapes since 2003. Their current belief is that the problem occurs only in the PST files that are supposed to be saving emails from MS Exchange/Outlook.

---

[1] "PST" refers to a "Personal Information Store" file, an export of a single individual's mailbox from the email system. My understanding is that in lieu of ARMS-managed email like we have received in the past, EOP plans to supply PST files as a primary means of email export and transfer. It is in situations where that PST export process may not have been properly executed that backup tapes would be used instead. The backup tapes would include the entire server-based information store (i.e., *everybody's* email), so the equivalent of individual PST files would have to be exported from those backups in a separate reconstruction effort.

001621

They stated that they currently do not believe that the ARMS emails, dating mostly from 2001-2003, have this gap problem (and ARMS continues to ingest the very small amount of LotusNotes emails that continue to be in operation).

Within the next month they are going to complete an audit of the PST files to determine the full extent of the problem. But they also stated that they expect to have an action plan ready by the end of the summer. We asked that they brief us when the audit is complete, and not wait for the action plan.

We asked if they could give us any more specifics on what they know so far: e.g., volume of missing email; whether it is particular to specific "buckets" representing particular EOP offices; does it involve both federal and presidential emails? They said that they could not at this point answer any of these questions. We asked them to confirm currently how many emails systems existed for Bush EOP emails. They said there are two ARMS/Lotus Notes and the PST/Microsoft exchange systems.

We then asked about the RNC email issue. They are working with the RNC and looking at this issue. They stated that the RNC server is now fixed so that this will not happen again, and that the RNC has the old servers. They are exploring how they will try to capture the Presidential record emails. RNC has a list of people to which this issue would speak, back to 2002. This will be a separate restoration effort from the EOP email restoration.

They also stated that they were talking to EOP stakeholders to determine whether to implement Documentum as the prospective records management application for email. Sam offered to work with them on reviewing requirements and concept of operations documentation.

Chris asked what was NARA's bottom line interest? We said that at the end of the Administration, we wanted a complete set of Bush emails in a format that we could accept into ERA. We stressed that if they determine they need to do tape restorations projects (TRP) to recover missing emails, it needs to begin as soon as possible, so that they could complete it before the end of the Administration. Chris noted that a restoration project that involved de-duplication would be extremely expensive. We noted that Congress can fund the restoration project, just as it did during the Clinton Administration. Sam also offered that he still had contacts with the persons and contractors who did the Clinton TRP.

We agreed that even while the audit of the email system is ongoing, we should move ahead as quickly as possible with meetings for transition planning, including a specific meeting with the photo office, given the unusually large size of the digital photo collection (up to 100 terabytes). [The transition meeting is tentatively scheduled for the week of June 4.]

001622

Paul Wester - Meeting with OA Counsel

**From:**        GaryM Stern
**To:**          Baron, Jason; Bellardo, Lewis; Brewer, Laurence; Fawcett, Sharon; Kurtz, Michael;
Smith, Nancy; Thomas, Adrienne; Weinstein, Allen; Wester, Paul
**Date:**        6/29/2007 11:44:10 AM
**Subject:**     Meeting with OA Counsel

On Wednesday, Jason and I met with the new General and Deputy Counsel to the EOP Office of Administration: Liz Medaglia and Andrew Turley, respectively. Prior to being in private practice, Liz was a former Assistant U.S. Attorney in D.C. (They met us at A1, so we could also give them and their interns a tour of the rotunda.) Its purpose was as a meet and greet and general overview of the PRA and FRA as they relate to OA and the EOP, particularly with respect to White House emails and other electronic records, and the transition.

Overall, the meeting went well as a starting point for open communication. We did note that during the last two years NARA had experienced a notable drop off in open communication and interaction with OA. We also touched on the issue of the missing White House email, on which Liz continued to say that they still have not completed their review, and it likely won't be done until the end of the summer; and therefore they still had nothing concrete to report to us on what, if anything, is actually missing and would need to be restored.

We raised that they need to carefully and completely label and provide documentation for all backup tapes and other electronic objects that may end up being transferred to us at the end of the Administration. And we said that for ERA we need to know as soon as possible the projected volume of electronic records, including email. Liz also inquired about any technical requirements NARA intends to impose as part of the ingest or accessioning process into ERA (formatting concerns we would have, issue of encrypted files, etc.). Appropriate people in NH, NL and NW should talk about this and we'd be happy to be part of the conversation as well.

Let us know if you have any questions.

001625

From:       GaryM Stern
To:         Gold, Donna;  Weinstein, Allen
Date:       10/15/2007 2:53:32 PM
Subject:    What NARA Needs from White House on Transition.doc

Allen, per your request, attached is a bullet memo on the issues that are currently pending with the White
House relating to transition.  We have raised all of these issues with them repeatedly, and on some of
them we are finally beginning to see a little progress, as noted in the current status line.  Let us know if
you would like to meet or otherwise discuss further.

Also, per your request, on Friday I told Mike Farren that you would like to have a meeting with Fred
Fielding for this week, including if Fred wanted to come to A1.  Mike agreed that a meeting would be good
(he himself having previously suggested doing it at A1), and said he would check on Fred's availability for
this week and next.

Given how slow they can be to respond, I think it makes very good sense for you/Donna to contact him as
well, particularly if you want to try to get a meeting for this week.

I hope this is helpful.

Thanks,
Gary


CC:         Baron, Jason;  Bellardo, Lewis;  Cooper, Susan;  Fawcett, Sharon;  Kurtz, Michael;
Smith, Nancy;  Thomas, Adrienne;  Wall, Debra

001631

### What NARA Needs from the White House on Transition

1. WH Approval to work with TRANSCOM; key issue is what size planes will be available – if C5 Transports (the largest plane) are not available, then many more flights will be necessary:

   **Current Status:** WH said at Friday, Oct. 12 meeting that it has nearly completed its internal, senior level transition planning structure, and can then focus on this and related issues.

   **Background:** Because this is the first time that TRANSCOM is doing this for NARA (in the past, the Army did the work), we want to begin working with them as soon as possible.

2. IT Inventory for PRA systems

   **Current Status:** WH said at Friday, Oct. 12 meeting that it would get us the inventory early this week.

3. Schedule of PRA office-by-office meetings to review specific IT systems and textual holdings:

   **Current Status:** WH agreed at Friday, Oct. 12 meeting to beginning scheduling these meetings this week.

   **Background:** WH asked NARA to provide it with update transition timeline.

4. Bush43 Library Holdings:

   a. Estimated total volume of textual records for Library Architects
   b. Estimated total volume of PRA electronic records for ERA
   c. PRA commissions
   d. Will Vice President's records be coming to Bush43 Library?
   e. Estimated volume of personal materials, including pre-presidential records, 2000 and 2004 campaign and inaugural records, etc.

   **Current Status:** We should start to get this information from office-by-office meetings, but would prefer an overall number now.

   **Background:** Library architects need this information.

5. Need clarification on what types of information/documents would be excluded from transfer to NARA as non-Presidential record:

   **Background:** NARA has repeatedly stated that we would likely want copies of electronic records that are in different formats. NARA would also like to receive

001632

personal and political non-records, for eventual donation by the President. It's expensive for the President to hold these records personally; personal/political records are what make Presidential Libraries unique and distinguishable as separate facilities.

6. 2005 OA Report/Chart (in electronic form), and any supporting documentation, on problems with White House email system.

**Current Status:** On Friday, Oct. 12 phone call, Mike Farren and Chris Oprison said that NARA could see this report, and should arrange to do so at the next meeting with OA.

**Background:** We have repeatedly asked to see this report, and have been ignored, or, more recently, told it is hard to comprehend and of little value. White House has shown copies to House Oversight Committee and DOJ.

7. NARA strongly recommends that the WH begin planning for a backup tape email restoration project now, including seeking appropriations from Congress, even before it has the final answer. The cost for such a restoration project will likely be in the tens of millions of dollars.

**Current Status:** OA is still reviewing process for testing email system, and does not anticipate completing the testing until late November, at the earliest.

**Background:** Missing WH emails is now the subject of two recently filed lawsuits, by CREW and National Security Archive, and a pending motion for a temporary restraining order (TRO). NARA IT staff (and counsel) have had two recent meetings with OA IT staff (and counsel) on this issue.

8. Need final decision on location of Library.

**Background:** NARA is reviewing lease options in Dallas, and intends to sign lease in late November. Need assurance from WH that this is the appropriate location before signing lease.

001633

From:      GaryM Stern
To:        Flood, Emmet T.;  Oprison, Christopher G.
Date:     6/20/07 3:27:57 PM
Subject:    Email Update

Emmet and Chris:

The current press coverage about the use by White House staff of the RNC email system compels us to inquire again, since our meeting with you and Fred Fielding on April 25, about the status of that situation and your review into the allegations about emails missing from the White House system. You have stated that emails appear to be missing from the White House system from the time period of late 2003 through late 2005, although you had not been able to provide any estimate of how many emails are actually missing.

When we met again with Chris and OA on May 21, we were informed that the OA CIO audit of the missing email situation should be completed in about 4 weeks.  Chris also noted that there were approximately 27,000 backup tapes covering that time period.

We have advised you on both occasions that it is essential that you begin an email restoration project from the backup tapes as soon as possible, so that it can be completed before the end of the Administration.

It is imperative that we be updated as soon as possible on the state of any missing emails from the White House system and the plan to recover them from the backup tapes, as well as any plans to recover presidential record emails from the RNC?  We would be happy to meet with you at your earliest convenience to discuss this issue, or can talk by phone.

I look forward to hearing from you soon.

Thanks,
Gary


CC:        Baron, Jason;  Bellardo, Lewis;  Fawcett, Sharon;  Smith, Nancy

001624

**From:**      GaryM Stern
**To:**        Oprison, Christopher G.
**Date:**      4/12/2007 4:59:16 PM
**Subject:**   WH Email and PRA Guidance

Chris, following up on our conversation several weeks ago about White House emails, we appreciate, as noted in the press, that your office is taking steps to investigate whether PRA records were created or received on non-White House email systems, and if so, to take all measures to recover and preserve them. As you know, under section 2203 of the PRA, the President may not dispose of Presidential records without first obtaining the written views of the Archivist. It has also been normal practice for the White House to inform NARA of any unauthorized destruction of Presidential records.

As always, we at NARA are available to provide your office our expertise and guidance on the PRA, including the issue of distinguishing between PRA records and non-record political materials. We would be happy to work with you as you are developing new guidance on this issue.

Let me know if we can be of help.

Thanks,
Gary

Also, we would still very much appreciate your sending us a copy of the updated records guidance that Harriet Miers issued, superceding the Gonzales guidance of Feb. 2001, and any other such guidance.

Let me know if we can be of further assistance.

Thanks.


GARY M. STERN
General Counsel
National Archives and Records Administration
8601 Adelphi Road, Suite 3110
College Park, MD  20740-6001




CC:        Smith, Nancy

001540

**From:** Robert Spangler
**To:** Kepley, David
**Date:** 10/1/2007 2:41:26 PM
**Subject:** Fwd: Re: Federal Records and ERA

David:     cc: Sam Watkins, NGC, NWME mgt.

In my opinion, with regard to EOP e-records, the volume thereof, and the split between Federal and Presidential, the only reasonable answer at this point is: we don't know.

The Office of Administration, the component of EOP through whom we are attempting to gain detailed technical information, has been extremely guarded in their responses, and all communication has been conducted under a patina of legal caution.  Whenever we solicit specific technical information, they reply for the most part that they are still in the process of conducting inventories.

I also have heard the estimate below of 400-600 million emails but, given the way we've gotten information from them, I wouldn't be surprised if the real figure is much more or much less.  In addition, there's much confusion about the format of email (and other e-records) they intend to supply, so it's hard to know how a given count of records will translate into volume, e.g., how will attachments be handled?

Sam Watkins has been in more meetings than I have (I've really only been in the email discussion), and may know more about the issue of expected volume for other record types.

Sorry I don't know more at this point, but I'm not sure that more can be known right now!

Thanks

Bob

38

May 6, 2007

Mr. Alan R. Swindeman
Director
Office of Administration
Executive Office of the President
Washington, DC  20503

By Fax:  202-456-6512

Dear Mr. Swindeman:

Based on recent press reports and a meeting that the Deputy Archivist of the United States and
NARA General Counsel had with the Counsel to the President, I am writing concerning the possible
loss of Federal records of the federal agency components of the EOP that are required to be
maintained on the White House email system.

We request that you look into this matter to determine whether instances of alienation of Federal
records actually occurred and then notify us of your findings.  If you conclude Federal records were
alienated without proper authorization, we request that you furnish us with a report as required and
described under 36 CFR 1228.104 (Reporting Damage to, Alienation, and Unauthorized Destruction
of Records).  Your report should include a statement about the safeguards established to prevent
further loss of records.

We look forward to your response and thank you for your cooperation.  If you have any questions,
please contact Laurence Brewer of the Life Cycle Management Division at ██████████ or at
██████████

Sincerely,


PAUL M. WESTER, JR
Director
Modern Records Programs


Official File - NWML
Reading File - NWML
Information Copy – NWM

cc:      Fischer (NWML)
         Langbart (NWML)

S:/correspondence/unauthorizeddestruction-eop.3May07.doc
Wf/jpc
File: 1301-1b  Disposal – unauthorized (Executive Office of the President)

001430

OCT 1 0 2007

Mr. John P. Walters, Director
Office of National Drug Control Policy
Executive Office of the President
Washington, DC 20503

Dear Mr. Walters:

001807

We also request that you look into whether any electronic mail records of your agency maintained on the White House email system were lost or alienated, as has been widely reported. If Federal records were improperly disposed of, please furnish us with a report as required under 36 C.F.R. § 1228.104 (copy enclosed). We had written to OA concerning this matter on May 6, 2007 (copy enclosed). However, because OA no longer handles records management under the FRA for the Federal agencies within EOP, your agency is now directly responsible for responding to NARA on this matter.

We look forward to working with you. If you have any questions, please contact Laurence Brewer, Director, Life Cycle Management Division, at ██████████ or at ██████████

Sincerely,


MICHAEL J. KURTZ
Assistant Archivist for
Records Services – Washington, D.C.

Enclosures


cc: Fischer
Hawkins

Official file - NWML
Reading file - NWML
Reading file - NW

File: 1301-1a Executive Office of the President

S:/correspondence/EOP Drug Control
Drafted by Nashorn/jpc 10/05/07

001808

41

**From:**        Sam Watkins
**To:**          Fawcett, Sharon;  Kurtz, Michael;  Morphy, Martha;  Smith, Nancy;  Stern, GaryM
**Date:**        Mon, Oct 22, 2007 11:58 AM
**Subject:**     Fwd: Followup to meeting of 10/11/2007

Here's what I sent to Theresa Payton as followup to the "whiteboard" meeting on the missing email issue.
Just trying to keep everyone posted.  Please "hold close," per request of EOP.  Thanks

Sam Watkins
Director, Product Management
National Archives & Records Administration
█████████████

>>> Sam Watkins 10/19/07 9:45 PM >>>
Theresa,

We wanted to thank you for the "whiteboard" session we had last week in which you explained some
aspects of the methodology and history of collecting emails within the EOP in the current administration.
Bob, Jason, and I certainly have a better understanding of how the process has worked, and what
additional controls you have put in place in the past two years, even if you were not yet in the position to
share with NARA any real specifics on the nature and scope of the alleged WH missing email problem.

We are certainly willing to participate in the analysis of the data related to the "missing emails," but we are
still trying to figure out how we can help without an understanding of what the "2005 report" says.
Obviously, the report must give some indication that there was a problem, or we would not be in this
situation.  As we stated in our meeting last week, we would like to be able to review the report, preferably
in its original electronic spreadsheet format, along with any related documentation you have been able to
uncover, so that we can better understand the nature of the problem.   Then, when you have completed
the new counts of the PSTs, we would be able to compare the original results to the new results.

BTW, has the clearance process completed?  Have you been able to finish work on the new tool and start
the counting and analysis process again?

I understand that you have been on leave this week, and I hope you enjoyed some time off.  Please let me
know when and how we can review the 2005 report & anything related to it.

Thanks again.


Sam Watkins
Director, Product Management
National Archives & Records Administration
█████████████


CC:           Baron, Jason;  Spangler, Robert

001705

| From: | Crippen, Susan M. |
|---|---|
| Sent: | Monday, January 23, 2006 1:19 PM |
| To: | McDevitt, Steven; Borrego, Jaime |
| Cc: | Reynolds, William D. |
| Subject: | RE: Updated MST Presentation |
| Attachments: | Exchange MST Activity Plan 20060120 v01.doc |

SIS has "filled in" the blanks.

**From:** McDevitt, Steven
**Sent:** Monday, January 23, 2006 11:18 AM
**To:** Borrego, Jaime; Reynolds, William D.; Crippen, Susan M.
**Subject:** Updated MST Presentation

Someone needs to fill in some of the blanks.

Steven McDevitt
Executive Office of the President
Office of Administration

Subject:        Exchange MST Activity Plan

Date:           Monday, November 28, 2005 (Updated Friday, January 20, 2006)

---

The following outlines the planned activities to recover Office of Vice President email from the target period of September 30, 2003 to October 6, 2003:

1. Environment information gathering activities

   a. In the lab environment, restore the ██████████████████ from backup tapes from the target period. This will provide technical staff with an accurate configuration of the server and Exchange environment for the target period. (Estimate: 2 days)

   b. Perform a set of queries against this restored ████████████. This includes identifying all registered Exchange servers, all user objects and associated components, and all user mail stores and storage groups. This information will be used to determine which servers need to be restored to recover .PST files, journal mailboxes and Exchange servers from the target period. (Estimate: 1 day)

   > The environment information gathering activities were successfully completed. As a result, it was determined that the Exchange server used to support the OVP mailboxes was ████████████ and the Journal Mailbox server that was used during the target period was OVP_JOURNAL.

---

Note: At this point there are three paths that will be followed:

1. Recovery of servers that were used to store .PST files for the target period.

2. Recovery of the Exchange servers used as the journal mailbox servers for the target period.

3. Recovery of Exchange servers that contained the mailboxes of the components in question for the target period.

| Exchange MST Activity Plan | Friday, January 20, 2006 |
|---|---|
| | Page: 2 |

2. Identify and restore the servers that contain data from the target period.

    a. Identify and restore the servers that were used to store the .PST files (estimate 3 - 5 days per server).

    b. Identify and restore Exchange journal mailbox servers for appropriate component (estimate 1 day per server).

    c. Identify and restore Exchange servers for the appropriate component (estimate 5 to 10 days per server).

3. Step 1 – Recovery of .PST files that contain message data from the gaps identified.

    a. Perform analysis on the .PST file to determine the components, users and the data range of the messages.

    b. If messages are found for the target component, users and dates, then further analysis is required to determine if these .PST files were included in the search activities during the target period.

    c. If the .PST files are recovered for the entire target period, steps 2 and 3 may not be necessary.

> Analysis of the files contained on the file servers that were used to store .PST files during the target period was performed and no messages were found that filled the gap of missing messages for the target period.

45

| Exchange MST Activity Plan | Friday, January 20, 2006 |
|---|---|
|  | Page: 3 |

4.  Step 2 – Recover messages from the journal mailboxes.

    a.  Initialize restored Exchange journal servers in lab environment.

    b.  Configure and verify Exchange server operation and connectivity.

    c.  Verify the existence of messages in the journal mailbox, and that the journal mailbox contains messages for the target users / components for the target period.

    d.  If messages are found for the target period, create .PST files from the journal mailbox. Further analysis is then required to determine if these messages were included in the search activities during the target period.

    e.  If the journal mailbox messages are recovered for the entire target period, step 3 may not be necessary.

> The server that contained the journal mailboxes for the target period was successfully restored. This was from a backup that was performed on 10/21/2003. The journal mailboxes were examined and no messages for the target period were present in the journal mailbox.

5.  Step 3 – Recover messages from individual user mailboxes.

    a.  Once the restore of the Exchange servers is complete, verify the existence of the user mailboxes.

    b.  Export mail messages from the all target user mailboxes. These user mailboxes should contain all messages that existed in the mailbox at the time of the backup. This export process would include the inbox, sent, and delete items folders as well as all personal folders of the user.

> The Exchange server that contained the OVP mailboxes for the target period was restored from a backup that was performed on 10/21/2003. OA Human Resources produced a list of active OVP staff for the target period. This list was reviewed and confirmed by OVP.
>
> The Exchange server that contained the OVP mailboxes was restored. This was from a backup that was performed on 10/21/2003. The email from the target period was extracted from each of the 70 OVP mailboxes and copied to a .PST file.

(Draft) EOP-OA-OCIO – For Official Use Only

| | |
|---|---|
| **From:** | "Payton, Theresa M." < |
| **To:** | "Sam Watkins" <■■■■■■■■■■>, "Turley, F. Andrew" >, "Medaglia, M. Elizabeth (Liz)" "Reynolds, William D." < , "Crippen, "Oprison, Christopher G." |

**Date:** 11/7/07 10:14:23 PM
**Subject:** RE: Follow-up

Sam,
Just wanted to let you know that I received your note and we're having discussions about when the next meeting will be.

Thanks for sending your questions and thoughts ahead of time so we can review. The next time we get together, it would be good to discuss your note below along with the action plan and the RACI (Responsible, Accountable, Consulted, Informed) model so we can assign tasks and owners for the next steps.

Hope you are doing well and that everyone has a safe holiday on Veterans' Day. Semper Fi.

Thanks,
TP

-----Original Message-----
From: Sam Watkins ■■■■■■■■■■■■■■
Sent: Tuesday, November 06, 2007 1:58 PM
To: Turley, F. Andrew; Medaglia, M. Elizabeth (Liz); Reynolds, William D.; Crippen, Susan M.; Payton, Theresa M.; Oprison, Christopher G.
Cc: GaryM Stern; Jason Baron; Nancy Smith
Subject: Follow-up

Theresa,

We missed you at last week's OA transition meeting with representatives of the CFO's office held on October 31, 2007. We now have a better understanding of the systems used by the office of the OA CFO, and what Presidential records may be generated by those systems now that OA is a PRA organization. We look forward to future meetings with representatives of other elements of OA. We suggest that it would be helpful, now that OA considers itself a Presidential component of the EOP, if in the next meeting we had a general discussion of the functions that OA uniquely performs for the President as opposed to OA's monitoring or passing off on other agencies functions. This general discussion would assist us in giving better advice as to which of the OA IT systems are creating Presidential records.

We (Gary Stern, Jason Baron, Nancy Smith, and I) were also afforded a brief opportunity to view a paper copy of the 2005 spreadsheet or chart (what has been referred to by some as the "2005 report") that first raised concerns about the "message collection system." I refer to it as a "message collection system" even though we all understand that it hardly qualifies as a "system" by the usual IT definition. Nevertheless, our brief review of the chart suggests a number of ideas relating to how you might approach determining whether there is a

001634

clearance of the person who will be able to apply the new forensic tool you have acquired).

1) On the chart, many files are identified as "issue" files, which I believe means the chart tool could not identify in which organizational PST the file should be deposited. We recommend that you examine some of these files to see if a closer look could determine what organizational element was appropriate.

2) Specific days for certain organizations show no messages collected/stored. We recommend that you run a search of the message system for anything for those days in that organization. If such a search produced a positive result, it would be a clear indication that the original chart was flawed (unless the messages have somehow been added since the original chart was run).

3) As we mentioned when we last met with you on Oct. 11, 2007, you also may be able to ascertain the meaning of the data elements in the chart by examining the spreadsheet in electronic form (for metadata in the form of formulas, comment fields, or other audit data on its creation that might exist). For example, the chart has a column labeled "expected" or "projected" number of messages for an organization for a particular day. The spreadsheet formulas might reveal where this number came from. Also, we will need some type of "expected numbers" with which to compare the results of your next chart generated with the new tool.

4) We have also mentioned this before, but it bears repeating: you could do some type of partial restore of messages from backup tapes, e.g., for a one day or one week time period, to allow you to compare the results against the chart. We are not suggesting initiating a full tape restoration project, but rather taking a sample to ascertain the scope of the problem.

5) Given that there appears to be a continuing level of confusion, or loss of institutional memory, as to the origination of the 2005 chart and its purpose, we agree with Chris's suggestion that it would be useful for someone to contact the original authors/requestors of the chart to ask questions about its nature and meaning, the methodology used to produce it, the shortcomings or flaws you have noted, and whether they prepared any additional or related documentation about the issue (and if so, where is it filed).

I hope these ideas are helpful, and would be happy to assist in following up or carrying out any of them. We look forward to continuing with our OA meetings and assume that another meeting will be scheduled soon.

Sam Watkins
Director, Product Management
National Archives & Records Administration

CC:          "GaryM Stern" <>, "Jason Baron" <>

001635

Summary of Jan 6, 2004, meeting with EOP re ECRMS at Archives II

Attendees:

EOP:
Keith Regatts – Project Manager
Markus Most – OA Records Officer

Booz Allen (EOP contractor):



NARA:
Jason Baron
Bob Spangler
Sam Watkins

Purpose:  The EOP has contracted with BAH to gather requirements from stakeholders and users for a new system to collect, preserve, and transfer to NARA, electronic messages.  The Electronic Communications Records Management System (ECRMS) will collect all forms of electronic messages and calendars.  Instant messaging currently is not allowed in the EOP, but they expect it will be in the future, and ECRMS will be designed to collect those messages when enabled.  The system will replace, expand, and enhance the collection currently performed by ARMS, and will be fully compliant with 5015.2.

Several issues re segregation of data by Presidential/Federal, and by EOP organizational element, dominated the meeting.  EOP would like to implement ECRMS as a "single instance" storage system, rather than the current "bucket scheme," which preserves one instance of each message in every appropriate agency "bucket."  Each message collected by ECRMS would appear only once in the entire system, but would be coded via database tables to identify what organization(s) sent and received the message.  These tables would make each message searchable by the organization code.

EOP understands that it must transfer Presidential and Federal data to NARA separately in order to accommodate NARA preservation processing requirements, and would build that segregation into the export/transfer process.  However, segregating the active data in ECRMS, either by agency or by PRA/FRA, onto separate media within the system will be very difficult.  EOP would like a decision from NARA as to whether this is necessary.  In addition, we need to be able to tell EOP whether we need the output for transfer separated simply by Presidential and Federal records, or if we require that the media for each organizational element must be distinct, i.e. OMB, WHO, OA, etc.  Jason's question: Is there value to being able to hold a tape in your hand and say "This is the email of the White House Office, January, 2004."?

000643

All data in the current ARMS system will be migrated into the new system.  EOP wanted to know if we would prefer that data to be transferred to the new system with attachments "hexified" as currently stored in ARMS, or if we would prefer them restored to the native format.  NARA agreed that we would prefer in native format, based upon our current transfer guidance and search capabilities.

Some attachments in the new system will not be searchable by text for obvious reasons: there is no text associated with digital photos, audio, or video files.  Virtually all textual material in the system, either in the message or in attachments, will be searchable, if it is in a standard format such as Word, WP, PDF, Excel, etc.

EOP will provide bulk email sampling capability in the system.  The NARA team suggested two sampling modes we would like to see included: a fully automated, randomized sampling conducted without requiring user intervention by either NARA or EOP; and a manual, targeted capability, which could be invoked by NARA in response to special circumstances.  EOP documented this as a NARA requirement.

EOP will include transfer testing as part of the acceptance of the system implementation. They will generate test output for NARA, and we will review/process to verify the acceptability of the output.

EOP has been converting from Lotus Notes to Microsoft Xchange over the past two years.  They did not say how far along they were in the process, but my impression is that they are nearing completion.  **Messages in Xchange are NOT being captured in ARMS or any other system external to Xchange, nor do they have plans to capture them prior to implementation of ECRMS.  I do not believe that ECRMS can be implemented in less than one year from today.  The NARA team emphasized that EOP was operating at risk by not capturing and storing messages outside the email system.**  This came up at the very end of the meeting, and we need to explore this much further in future meetings with the EOP team, although this is not a requirements issue for ECRMS since it will include the ability to collect these messages.

Schedule:  They expect the requirements and "solution design" to be completed by the end of May, 2004.  Then they plan to compete a separate contract for development and implementation, with work to begin in late 2004.

000644

**EXHIBIT 5**

February 21, 2008

By Email

Honorable Henry A. Waxman
Chairman
U.S. House of Representatives
Committee on Oversight and Government Reform
2157 Rayburn House Office Building
Washington, D.C. 20515-6143

Dear Mr. Chairman:

I am writing you in response to your request for answers to specific questions relevant to the Committee's investigation relating to whether the Executive Office of the President has complied with federal laws requiring the preservation of preservation and federal records.

I have provided my responses to your questions to Mr. Emmet Flood, Special Counsel to the President and to M. Elizabeth Medaglia, Office of Administration General Counsel. In recent weeks they have expressed to me their concerns about potential disclosures of deliberative discussions involving the participation of Office of the Chief Information Officer management, Office of Administration General Counsel, White House Counsel's Office and White House management. To address these concerns, I have provided my responses to them for their review. They have committed to me that they will review and identify any responses or other specific information that they wish to be redacted from my response prior to submission to the Committee. Any items they choose to redact should be addressed to them.

I realize that there are many complex issues related to this topic. If you or your staff have any additional questions, please feel free to contact me via email at ███████████████████ or via telephone anytime at █████████. Thank you for your time and attention in this matter.

Sincerely,

Steven McDevitt

**Responses from Steven McDevitt (Part 1 of 2)**
**February 21, 2008**

**General Background**

**1. During what time period did you work at the White House?**

I was employed in the Office of the Chief Information Officer (OCIO) in the Office of Administration (OA) in the Executive Office of the President (EOP) from September 2002 through October 2006.

**2. What position or positions did you hold at the White House? To whom did you report?**

From September 2002 through July 2003, I was an Information Technology Specialist – Project Manager (GS-2210-14) in the Concepts, Requirements and Systems Engineering Directorate (CR&SE) in the OCIO. During this period I reported to Mr. Layton Clay, the Director of CR&SE.

In July 2003, the OCIO was reorganized and the Architecture and Engineering (A&E) Directorate was created. I was promoted to the position of Director of the A&E as a Supervisor Information Technology Specialist (GS-2210-15).

From July, 2003 through January 2005, I reported to Mr. Carlos Solari, the Chief Information Officer (CIO).

From January 2005 through May 2006, I reported to Mr. John Straub, the Director of the Office of Administration and acting CIO.

From May 2006 through the end of my tenure in the OCIO, I reported to Ms. Theresa Payton.

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

**3. What were your primary job responsibilities?  If they changed over time, please describe your responsibilities over time.**

As an Information Technology Specialist – Project Manager (GS-2210-14), from September 2002 through July 2003, I was responsible for managing various systems development and systems implementation projects.  During this period, the majority of my efforts were focused on the implementation of a new records management system for the White House Office of Records Management.  The primary purpose of this system was to manage the paper records and document of the President and his staff.

During this time, I was also assign to begin the process of implementing an electronic records management system to manage the email and other electronic communications records throughout the EOP.

When I was promoted to the new position of Director of A&E my areas of responsibility increased significantly.  The primary responsibilities of A&E includes:

- Systems Engineering and Integration – Responsible for the development and implementation of numerous custom developed applications and the implementation of commercial-off-the-shelf (COTS) based solutions.

- Business Applications Support – Provided day-to-day management and support for a wide variety of applications that supported the mission of the components of the EOP.  There were approximately sixty-five applications that support the critical business needs of the EOP.

- Website Management and Support – The primary focus of this support was for whitehouse.gov.  This included a team of web content management staff, web designers and technology specialists.  Support for other websites was also provided.  Including omb.gov, results.gov, wmd.gov and other White House related sites.

- Enterprise Architecture – A&E was responsible for the development and maintenance of the Enterprise Architecture (EA) of the EOP.

**4. Did you have any staff who reported to you?  If so, please describe the size and role of your staff.**

As Director of A&E, I had between 8 and 13 staff reporting to me.  The staff was a mix of project manager, technical specialists, enterprise architect and web specialists.  All were Information Technology Specialists or Supervisory Information Technology Specialists (GS-2210) grades 9 through 15.

Mr. Steven McDevitt - February 21, 2008 – Page 2 of 10

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

**5. There were various contractors that worked with staff in the Office of the Chief Information Officer. Which contractors did you work with, and what was their role?**

The contractors that supported the mission of A&E included:

- Boeing – Enterprise architecture support for the development and maintenance of the EOP EA.

- Booz Allen Hamilton – Was awarded the contract for the implementation of the White House Office of Records Management, records Management system (RMS). They were also awarded the contract for the initial requirements analysis and solution selection for the Electronic Communications Records Management System (ECRMS)

- Lockheed-Martin – Support the for IntranetQuorum system used by the Office of Correspondence.

- MZM – Provided support for the implementation systems related to the email infrastructure.

- Systems Management and Engineering Inc. – Enterprise architecture support for the development and maintenance of the EOP EA.

- TKC Communications – Provided systems engineering and technical assistance support on a wide variety of systems development and systems implementation projects.

- Unisys – Provided systems analysis and systems implementation support. These were specific tasks under the larger multi-year information technology support contract that provided enterprise-wide services to the EOP. Unisys was tasked with the implementation and integration of the ECRMS system.

Mr. Steven McDevitt - February 21, 2008 – Page 3 of 10

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

**E-mail Systems and Archiving**

**6. The Committee understands that, at some point in 2002, the White House began a migration of e-mail systems, switching from Lotus Notes to a Microsoft Exchange system. Do you know when the decision was made to make this migration? What was the rationale for the change? When did the migration begin and when was it completed?**

There were multiple reasons for the desire to migrate from Notes to Exchange.

- Senior White House staff had a desire to migrate to Microsoft Outlook and Exchange because that is what they were used to on the campaign.

- The Outlook platform was widely used in commercial enterprises and provided better integration with the Microsoft Office suite of applications that was the standard within the EOP.

- Also, there were a number of features of Outlook that were not available in the Notes Mail environment.

The project to evaluate the migration to Outlook / Exchange began prior to the beginning of my employment with the EOP in 2002.

The migration for part of the Office of Administration occurred as early as September 2002. The reason I know this for certain is that when I began my employment, I was not provided a Notes Mail account, I was provided an Outlook/Exchange account.

**7. Was there any particular order dictating how the migration proceeded? Was the migration done component by component or on a more individual basis?**

With about two thousand people to migrate from Notes to Exchange, there was a formal process that was put in place to support the migration. As a general rule, the migration was done on a component by component basis with groups of individuals migrated at a time. The migration needed to be coordinated with the management of each component as it impacted email of each user.

I personally had no direct operational responsibility for this process. Detailed plans were created to support this migration. The OCIO should have detailed documentation on when each user or groups of users were migrated.

Those responsible for the planning and execution of the migration included Bruce O'Dell, the Deputy CIO during this period, Bart Hill, the Director of Information Systems & Technology and the OCIO email support team that provided operational support for the email systems.

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

**8. With the Lotus Notes e-mail system, the White House used an archiving system known as ARMS to preserve e-mails sent and received by White House staff. Are you familiar with this system? Were you aware of any concerns about the adequacy of the ARMS program? If so, please describe those concerns.**

I was not involved in the implementation of the ARMS system as it was implemented in 1994, prior to my employment with the EOP. My knowledge of the ARMS system was the result of the analysis that I performed in 2002 as part of the project to implement a long-term solution to support the email records management of the EOP.

The ARMS system is really a set of systems that were developed in 1994 to meet a court mandated need to preserve E-mail records. At the time these systems were implemented, no commercial-off-the-shelf (COTS) system to support email records management existed in the marketplace.

The ARMS system was implemented using the staff, contractors, resources and technologies that were present-at-hand within the EOP at that time. The system used simple operating system utilities for the data management, access, search and retrieval of data and the file system for the storage and access control of the data.

During the Clinton administration there were a number of significant problems with ARMS and the associated supporting systems. These problems or anomalies (Mail 2, Letter D and Multi-Host) resulted in situations where E-mail was not appropriately archived by ARMS. These issues were corrected and various project were completed to recover the email that was not archived. The GAO has produced reports documenting these issues and the resolution and corrective actions that were taken.

During my analysis of the ARMS system, a number of operational and non-functional risks and limitations were identified. These were documented in the Concept of Operations (CONOPS) document that I created in 2002. This document was reviewed by OCIO staff, OA Records Management, OA Counsel, the White House Office of Records Management and White House Counsel. This document was the basis for the project to implement a COTS solution to support the email records management of the EOP.

To reduce or eliminate these risks, the ECRMS CONOPS outlined the need to implement a system that utilized current commercially trusted technologies to support the email records management needs of the EOP.

It is also important to note that by 2002 there were a number of COTS products that provided effective email records management solution that were designed to support seamless integration with the Microsoft Exchange platform.

Mr. Steven McDevitt - February 21, 2008 – Page 5 of 10

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

**9. What was your role in planning how e-mails would be archived and preserved in the new system? Who else was involved with this and what were their roles?**

My role was to lead the effort to perform the analysis, selection a solution and implement the solution to support the effective records management of EOP emails. This project is referred to in various documents and presentations as ECRMS. For a period of time, the project had the name EARS. These two names refer to the same project.

In 2002, there were two other projects that This project began in late 2002 when it was recognized that the first two attempts to use the ARMS system to support the Microsoft Exchange environment could not be the long term solution to support the records management of EOP emails.

Prior to the initiation of the ECRMS project there were two attempts to continue to use the ARMS solution.

The first project was an attempt to modify Windows XP and Microsoft Outlook interface to support integration with ARMS. There were numerous technical issues that prevented this approach from being successful. The OCIO should have documentation on this project.

The second project was an attempt to use an email integration solution to manage and archive email messages using the ARMS environment. The approach was to use Legato EmailXtender solution to provide a mechanism for all Outlook / Exchange E-mails to be managed in ARMS. The project was abandoned as the poor performance of the solution prevented it from supporting day-to-day email message volume requirements.

I believe that Mr. Howard Sparks was responsible for both of these projects.

**10. How were e-mails sent to and from Microsoft Exchange accounts archived and preserved? Please describe the various steps involved and the individuals responsible for each step, including the process through which e-mails stored in journals were saved in .pst files.**

I was not directly involved in the management decision to proceed with the implementation of Outlook / Exchange. I also did not have any operational responsibility for the archiving of email in either the Notes or Exchange environments.

The initial email retention process involved a manual process of copying messages from the Exchange journals to .pst files for storage and retention. This process was to be performed on a regular basis.

At some point, this process was partially automated using a utility designed for this purpose. The Mail Attender utility was used to automatically copy email message from the journals to the .pst files on a regular basis.

The details regarding the standard operating procedures should be obtained from the IS&T Directorate within the OCIO.

Mr. Steven McDevitt - February 21, 2008 – Page 6 of 10

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

**11. As the migration took place, did you have any concerns about how e-mails were being archived and preserved under Microsoft Exchange? What were those concerns? Did you express them to anyone? When did you do this and with whom did you share your concerns?**

There was a great deal of concern about proceeding with the migration to Outlook / Exchange without having an adequate email records management solution in place. By early 2003, an entire year had been spent trying to identify a solution that would support the email records management requirements of the EOP. There were four types of risk that were discussed on a number of occasions within the management ranks of the OCIO and OA. This risks included:

- Incomplete Data – The process by which email was being collected and retained was primitive and the risk that data would be lost was high. In addition to this being a manual process, the risk was compounded by the fact that there was no mechanism to reconcile the messages that were retained in the .pst files and the messages that had been processed by the Exchange system. The potential impact: The system does not contain all required data.

- Data Reconciliation – The use of .pst files for warehousing email records does not provide a mechanism to reconcile against what was originally retained by the system. This is there is no way to guarantee that all records are retained in their complete and unmodified state. The potential impact: It cannot be demonstrated that the data in the system is complete.

- Public Perception – Given the issues that occurred during the prior administration, it should warrant extra caution on the part of the EOP before making any changes to the email retention process. Additional system problems would create a public perception that the EOP was unwilling or unable retain records that were required under current law. The potential impact: Increase scrutiny of the EOP and significant additional expense to correct any problems that might occur.

- User Accountability – The approach of simply storing email message in .pst files provides no mechanism or audit trail that tracks changes to data files or the activities performed by users or system administrators. The integrity of the data could be called into question because it was not possible to ensure the inappropriate action, either intentional or unintentional, could not occur. Or, if they did occur, the actions would be logged and the user who performed those actions could be identified. The potential impact: No verification that data retained has not been modified or what activities have been performed by system users or administrators.

Mr. Steven McDevitt - February 21, 2008 – Page 7 of 10

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

In early 2003, prior to the large scale rollout of Exchange, these concerns we often discussed within the management ranks of the OCIO and OA. People involved in these discussion include Tim Campen (OA Director), Carlos Solari (CIO), Bruce O'Dell (Deputy CIO), Bart Hill (IS&T Director), Jaime Borrego (Information Assurance (IA) Director) and myself.

The reason for my involvement in these discussions was that I was leading the effort to identify and implement the long-term email records management solution.

**12. Under this Exchange system, were you aware of any avenues through which e-mail archiving could have been circumvented? If so, please describe those avenues as well as any steps you or others took to prevent the loss of e-mails.**

Only those email messages sent and received using the EOP Outlook / Exchange and EOP Lotus Notes environments would be included in the EOP email retention process. Other avenues of electronic messaging included:

- Email message sent and received using non-EOP mobile devices (cell phones and PDA's) would not be retained within the EOP records.

- The use of non-EOP mobile devices to access other email service providers such as Hotmail, Gmail or Yahoo. These messages would not be retained with the EOP records.

- Peer-to-Peer Messaging, such as PIN-to-PIN Blackberry messages would not be retained within the set of EOP records.

- Use of non-EOP email sites from EOP computers, such as those hosted by political or other organizations. These records would not be retained within the set of EOP records.

The EOP Information Assurance Policy addressed each of these issues. Current OCIO employees should be able to address these questions.

Mr. Steven McDevitt - February 21, 2008 – Page 8 of 10

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

**13. During your time at the White House, was there every any system put in place to audit or verify that e-mails were archived and preserved correctly? If so, when was this system put in place? Who was in charge of this audit and verification?**

After the implementation of Microsoft Exchange in 2002 and 2003, and after the migration of users from Notes to Exchange began, there was no automatic audit system that was implemented to ensure that emails were archived and preserved.

It was also discovered in October of 2005 that there was no manual periodic accounting or reporting process.

After the issue of potential missing email was identified in October 2005, one of the corrective actions was to implement a standardized formal daily procedure to ensure that the daily process to copy email messages from the Exchange journals to .pst files occurred without error and was completed as defined by the standard operating procedure.

At the time, this process was conducted on a daily basis by staff that independent of the email operational support team. The results of this process would provide the basis of an audit trail that could be used to validate the number, size and number of messages retained in the inventory of .pst files.

**14. Who had access to the servers that held the archived Exchange e-mails? Did these servers have any extra security protections? Would these files ever be opened or modified — for example in a search for records? Who would have had access? Were there any protections to prevent them from being modified or deleted — either intentionally or accidentally?**

I had not operational responsibility for the email retention process and I do not know the answers to these questions.

Staff from the IS&T Directorate had operational responsibility for the EOP email systems and the email retention processes.

In mid-2005, prior to the discovery of the potential email issues, a critical security issue was identified and corrected. During this period it was discovered that the file servers and the file directories used to store the retained email .pst files were accessible by everyone on the EOP network.

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

**15. Was there any policy that prevented White House staff from accessing external e-mail accounts on their official White House computers?  Was this policy applied universally?**

In 2002 and 2003 the EOP Information Assurance Policy was drafted, reviewed and approved.  The policy was approved by each component within the EOP.

The purpose of the policy was to address the wide array of information security and information assurance requirements of the EOP.

Relating to email, this policy specifically prohibited the following:

- Use of non-EOP email environments was prohibited because it would not provide a means for supporting records management requirements.

- Use of encrypted email was prohibited because there was no facility to manage records retention of encrypted email.

- Use of peer-to-peer messaging was prohibited.

- The use of instance messaging environments was prohibited.

Questions and information requests on the applications of this policy should be addressed by current OCIO staff.

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

Responses from Steven McDevitt (Part 2 of 2)
February 21, 2008

**Potential Losses of E-mails**

**16. The Committee understands that, at some point in the fall of 2005, concerns arose at the White House that some e-mails may not have been properly archived. According to an e-mail exchange between you and Susan Crippen at the White House, it appears that those concerns may have first been raised on October 11, 2005. What precipitated these discussions about message storage issues? What was your role in these discussions, and who else was involved?**

Actually, I believe that I and some members of the OCIO management team suspected there were issues and we discussed these issues within the OCIO management meetings a week or so prior October 11, 2005.

It was reported by the email support team to the OCIO management team that there were some issues related to the processing of the Exchange journals and creation of .pst files for each EOP component. At the time it appeared that because of server / application reconfiguration errors that occurred in August 2005, all EOP email for most of August and September were retained as OA email. It did not appear that any email was missing or not retained, but rather it appeared that all EOP email was retained in a single set of OA .pst files and not the .pst files associated with each component. It was also reported that they email support team attempted to take corrective action to correct the issues, but where unable to fix the problem and separate out the email into their respective components.

This precipitated a series of discussion within OCIO management and staff about how the .pst files were managed and inventoried. It became clear that these files were not being effectively managed.

Some of the issues that became known include:

- The EOP email retention .pst files were scattered across various servers on the EOP network.

- There was no complete inventory of all .pst files

- The processing of the Exchange journals to create the .pst files did not always complete during the normal processing cycle.

- There was no separation of duties or audit controls in place to ensure that the processing of these was being performed on a consistent basis.

- There was no well documented process

- There was no consistently applied naming convention for the component .pst files.

- There was no daily review to ensure that all processing was completed correctly. This point was emphasized by the fact that over a month had gone by before it was discovered that there was a problem in August and September 2005.

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

**17. The White House informed Committee staff that these message storage issues may have been first discovered during a search for documents that found several weeks of e-mails for certain White House components had been stored in the wrong files. Does this match your recollection? What was the circumstance of this search, what was found to have been misfiled, and how was the issue resolved?**

Yes this does match my recollection. During my tenure in the OCIO, I was never directly responsible for performing email searches. I do not know about the circumstance of this particular search.

I do not believe that these misfiled email messages were ever separated out back to their associated components. The current OCIO staff should be able to answer this question.

**18. At some point, the White House appears to have expanded its search for misfiled e-mails. At this point, the Committee staff understands that you undertook an analysis of e-mails preserved from the Microsoft Exchange environment breaking down the analysis by each of 12 components of the White House. When and why did this process begin? Who worked with you on the process? How did you conduct the analysis?**

The process originated when it became apparent in October 2005 that OCIO staff and contractors were not effectively managing the .pst files used to retain the email records for the EOP. This set of issues was brought to the fore by the .pst file management problems that occurred in August and September of that year.

The initial set of actions was simply to organize and inventory the .pst files used for EOP email records retention and to put in place a formal process to manage these files. The primary issue was the .pst files were scattered across various servers on the EOP network. To the best of my recollection, these series of events included:

- Performed a search all servers on the EOP network for all .pst files to identify and locate all .pst files in the EOP environment
- Collect a data set that contains all relevant information about these files (Name, location, size, creation date, etc.)
- Create a secure and organized server environment in which these files could be stored.
- Copy all .pst files to this new secure and organized location
- Verify and validate that all actions to copy these files completed successfully.
- Create an inventory of all .pst files and verify all the information.

These activities were performed by a team of OCIO staff and contractors. Each step of the process was discussed and documented. The team met on a daily basis to plan activities and to report on actions that had been completed.

Mr. Steven McDevitt - February 21, 2008 – Page 2 of 15

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

In addition to this .pst file analysis, the team also began the development formal daily verification process that would support the effective management of these files and the process that created them.

While this process was taking place, I began to notice a few anomalies with these files. These included:

- .pst files that contained no data. The file size was zero bytes.

- Inconsistent naming of files that made it difficult to determine the associated component and date to which the file was associated.

- Obvious gaps in the date ranges represented in filenames of the file. As an example, one file may have been named "OA May 1-5" and another file "OA May 8-10" but there appears to be no file that represented May 6 and 7. This is just an illustrative example.

- There was a wide disparity of frequency of how often .pst files were created for each component.

- There was a wide disparity in size of files that represented similar periods of time.

Because of these issues and because there was no way to effectively determine what data was retained in each file, the team took on the task of performing an additional level of analysis.

If my recollection is correct, at that time there were over 5,000 .pst files with an average size of approximately 2 Gigabytes. Since each of these files contained messages one or more days and since it was not possible to determine what days were included in any given file, we needed to determine a method to perform this analysis. Prior to this effort, Microsoft had provided the EOP with a custom software application for performing searches on .pst files. This tool was commonly referred to as the "FindIt" tool.

Microsoft was contacted and was tasked to modify the FindIt tool so that it included the additional functionality of providing a message count for each day represented in a given .pst file. This process was performed on each .pst file in the inventory and the data was aggregated into a single data set. This is the data set that provided the basis for the analysis.

It took a couple week to perform the analysis on the thousands of .pst files. When the data was tabulated it became clear that a problem existed because there were days for which no email was retained. Extensive testing was performed at that time to ensure that the tools and the tabulation processed was performed correctly. An independent verification and validation was also perform by a different set of contractors to ensure that this analysis process was completed correctly and that the data was correctly analyzed and the accurately represented.

In addition to there being hundreds of days for which specific components had no email retained, there were a number of days for which it was clear that the number of emails retained was lower than expected.

There was a formal analysis to determine if the number of days for which the number of retained EOP emails was lower than what one would expect based on the email volume trends. The analysis determined that there was a clean pattern of email volumes. This analysis accounted for

Mr. Steven McDevitt - February 21, 2008 – Page 3 of 15

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

working days and non-working days (weekends and federal holidays). A multi-week moving average model was employed in various version of the analysis to account for normal fluctuations of normal email volume. Depending on the assumptions made in the analysis, the team identified hundreds of days for which the volume of email was inexplicably low.

Those who worked on this team are listed in response to question 19.

**19. The White House provided the Committee with a 23 page color chart titled, "EOP Exchange Environment — All Components," with the subtitle, "Summary — Messages per Day." It lists the total days with zero messages and low messages for 12 components of the White House, as well as the actual message count for each of these components for the period from January 1, 2003 to August 10, 2005. The copy provided to the Committee is dated Feb. 6, 2006, at 4:13 p.m. Were you involved in the creation of this chart? If so, what was your role? Who else was involved in the development and production of the chart?**

I was responsible for leading the team that created this chart. The chart to which you refer was the result of many weeks of analysis that involved over a dozen people. I was responsible for designing the chart and had a leading role in the definition and execution of the analysis.

To the best of my recollection, those involved in this effort, in addition to myself, included:

EOP Employees - Jaime Borrego (Acting IS&T Director), William Reynolds (Deputy Director, Information Assurance), Vic Bernson (OA General Counsel), Keith Roberts (Deputy OA Counsel), Howard Sparks (IS&T), Sue Crippen (IS&T), Bryan Reese (IS&T), Stephen Warshauer (IS&T), Keith Regatts (A&E), Aimee Felker (Director OA Records Management), Shaffers Rawlings (EOP Records Management)

Contractors - ███████ (Unisys), ███████████ (Unisys), ████████ (SRA) and various contractors whose names I cannot recall from Microsoft and SRA.

**20. Was this the final version of the chart? If not, when was the last version of the chart created?**

I reviewed the chart provided to the Committee and I am not able to determine if the version provided is the final version. There were many version of this analysis. Each version was identified with a unique version number. Different version of the analysis included different assumption about date ranges and thresholds.

I do not recall the exact number of versions of this analysis, but I believe it was between 12 and 20. What can be said is that what was provided to the Committee is just the analysis summary report, not the complete analysis.

The complete analysis was approximately 250 pages in length. It included the complete background data and trend analysis.

Mr. Steven McDevitt - February 21, 2008 – Page 4 of 15

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

**21. Please describe the steps you and others took to perform the analysis required for the production of this chart.   What types of files did you search?  Where did you look for these files?  Did you face any challenges related to files being misnamed, too large, corrupted, or having other such problems?**

In addition to the response to question 18.

During the process to organize and inventory the .pst files, there were a small number of files that appeared to be corrupted.  Additional analysis was performed on these files.  I do not recall the specific outcome of these analysis, but the data in there files were not for the periods for which data was missing.

**22. Each of the 12 components has a different start date on the chart and a different end date.  Can you explain why this is?**

Each component has a different start date because components were migrated from Notes to Exchange over a several month period.

The OCIO should have detailed list of users and the schedule of when users and components were migrated.

**23. Was this chart the only result of your analysis of messages from the EOP Exchange environment?  If not, did you produce any other briefing materials or documents that explained your methodology or findings?  What were those documents?**

There were numerous documents, PowerPoint presentations and other memoranda that described the analysis that was performed, the actions taken to correct the process and the recommendations to improve the processing of .pst files.  The team documented the details of each action taken to clean up and correct the identified issues.

There must be thousands of email messages between the team members that describe the actions of the team, the completion of specific tasks, analysis of issues and to provide status to OCIO management, OA Counsel and OA management.

This document contains sensitive network information of the Executive Office of the President.
Please treat it as sensitive and confidential.

**24. Did you or anyone with whom you worked, ever estimate the number of e-mails that might be missing? What was that estimate?**

Yes, there were a series of estimates based on various assumptions. On the low end, there were about 470 days (as reported by the Committee) days with missing email for individuals component in the EOP. If other assumptions were taken into account, that number increased to over 1,000 days of missing email. This is because of days for which Exchange was used prior to January 2003 and some issues that may be been associated with the emails retained during the August and September 2005 timeframe.

I do not recall the exact number of estimated missing email, but I believe it was greater than 1,000,000. This estimate did not include the days for which the number of retained emails was a statistically low number compared to the predicted number of email that should have been retained for a particular day.

The statistical prediction was based on a six-week moving average that separated working days from non-working days. Non-working days included weekend and federal holidays and days that traditionally have a low number of messages. An example of this type of day is the Friday after Thanksgiving. The use of a six week moving average also accounted for the natural seasonal fluctuations in email volume. An example of low volume are weeks during the month of August when the President is on vacation. Also, using this moving average allowed for accounting for spikes in email volume as a result of world events.

**25. Did anyone verify the findings of your analysis? If so, who performed that verification and when did it occur? What did the verification find?**

During this analysis process, a high level of formality and review was performed on every step of the process. The team performing the analysis met daily and in some cases multiple times per day. Each activity was documented either in meeting notes or in emails distributed to the entire team.

As stated in a previous response, an independent verification and validation was performed by a separate set of contractors who were not members of the team that was performing the analysis effort.

Mr. Steven McDevitt - February 21, 2008 – Page 6 of 15

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

**26. To whom did you present the results of your analysis?  When did the presentation or presentations occur?  Please describe in general what you told these individuals in these briefings and what materials you used.**

The results of this analysis, both in preliminary and final form were presented on various occasions to OA management and OA counsel.  I do not have any specific dates on when these meetings occurred, but they did occur often throughout the period of October 2005 through February 2006.

Outside of OA, there were other meetings with the purpose of presenting these issues to White House Management and White House Counsel and their staff.

The summary chart or other charts similar to it were used in the discussion along with other PowerPoint presentation that presented the critical facts and recommendations.  The briefing described the problem and presented various option to prevent the issues from recurring and to correct the problems that had occurred.

**27. The Committee understands that you and John Straub met with White House Counsel Harriet Miers to discuss issues related to e-mail preservation.  Did you discuss your analysis at this meeting?  Please describe when this meeting occurred, the agenda for the meeting, and your recollection of what was discussed.**

I participated in a number of meetings in December 2005 and January and February 2006.  Some of these meetings included White House Counsel Harriet Miers and members of her staff.  These meetings also included other White House management and OA Counsel staff.

Given the nature of these discussions, I will defer to the current White House staff to characterize these meetings.

**28. To your knowledge, were other presentations of the findings made when you were not in attendance?  Who made those presentations?  To whom did that person present the findings?**

I would assume that other presentations of the findings of the email analysis team were made when I was not present.  However, I cannot recall any specific details about any such presentations.

Mr. Steven McDevitt - February 21, 2008 – Page 7 of 15

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

**29. Was any analysis conducted to determine how e-mail files could have been lost? If so, who took the lead on that, and what was the determination?**

From October 2005 through August 2006, no analysis was conducted to determine the cause of these issues. No direction was given by OA management to undertake such an analysis.

The primary focus of the team addressing these issues was to create a proper inventory of .pst files, analyze these files to determine if issues related to email retention existed.

**30. Did the White House ever inform the National Archives of the results of your analysis? If so, when was this done? If not, did you or any others recommend that this be done?**

During my employment with the EOP, I do not recall if anyone at NARA was informed about these issues.

Sometime during the Summer of 2006, I was directed by the CIO that I was not allowed to discuss the potential email retention issues and the analysis that was performed by OCIO with the NARA staff. I was to inform any NARA staff who contacted me about these issues to direct all inquires about email records management to White House Counsel and White House Records Management.

During my employment at the EOP, I worked closely with NARA staff on a number of issues related to records management. I had established good working relationships with them. I received a number of inquiries from them and in each case I redirected their inquires to the White House. I was very clear to them that I was directed not to share information with them.

**Efforts to Develop New Archiving Systems**

**31. It appears that the White House took several steps toward developing a new system for archiving and managing e-mails during the Bush Administration, including a contract for Legato to build an Exchange Interface System that would enable the ARMS system to archive and manage Exchange e-mails. Were you involved in or aware of this contract? If so, what was your role in the preparation and oversight of the contract?**

I was not directly involved in the contract or the management of the work associated with the creation of the Exchange Interface using the Legato EmailXtender product. This project was managed by Mr. Howard Sparks. I was involved in the evaluation of the solution that was implemented. Once the solution was created and was being tested it became clear that the system would not meet the performance requirements necessary to support the daily volume of email processed by the EOP. In early 2003, this project was abandoned.

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

**32. What do you understand to be the results of this contract?  Was the Exchange-ARMS interface ever implemented?  Why or why not?**

It is my recollection that the interface was never fully implemented.  The testing of the initial capability indicated that it would not meet the performance requirements necessary to support the normal daily email volume of the EOP.

The failure of this approach (the use of EmailXtender to move email message into ARMS) created the situation where if the migration from Notes to Exchange were to proceed, there would be not automatic email records management functionality.  In spite of this situation, White House and OA management made the decision to proceed with the migration.

In order to meet basic records management requirements, White House and OA management also made the decision to retain all email messages processed through the EOP Exchange environment, using the Exchange journaling capability and copying message to .pst files for storage.


**33. It also appears that the White House took steps to develop a new electronic archiving system known as the Electronic Communications Records Management System, or ECRMS.  Were you involved in or aware of this contract?   If so, what was your role?**

**34. When was the concept for ECRMS first developed?  Who led the effort to plan for and design the system?  If contractors were involved, please describe which contractors worked on the effort, when they became involved, and what their role was.**

**35. It also appears that the Office of Administration prepared a Statement of Work for an E-mail Archive Retrieval System.  A draft Statement of Work, dated September 21, 2004, notes that, "the primary goal of this engagement is to provide EOP staff with a solution that allows them to archive, manage, search and retrieve E-mail they may want to store and preserve on a long-term basis."  EARS is described as being related to ECRMS.  You are listed as the author of this draft.  Was a contract issued for EARS?  If so, to whom was it granted, what was the time frame of the contract, and was the project implemented?**

[Combined response to questions 33, 34 and 35]

It was recognized by OA and CIO management in 2002 that the EOP needed a long term solution for email records management.  I was assigned the initial project management role in 2002.  In July 2003, the project was managed by various staff in the A&E Directorate.

Because of the issues related to email records management that had occurred in the past, a high level of scrutiny and caution was applied to this project.  This involved additional periods of review of various work products.  These reviews include White House and OA Counsel, White House Office of Records Management and OA Records Management.

Mr. Steven McDevitt - February 21, 2008 – Page 9 of 15

This document contains sensitive network information of the Executive Office of the President.
Please treat it as sensitive and confidential.

My recollection of some of the specific dates may be off. The rough chronology for the ECRMS implementation is as follows:

- November – December 2002 – The initial draft of the Concept of Operations (CONOPS) for the ECRMS system was completed.

- December 2002 through May 2003 – The ECRMS CONOPS was reviewed and approved by OA Counsel, White House Office of records Management and White House Counsel.

- April / May 2003 – The Statement of Work for the initial phase of the project was drafted and the procurement process began. The scope of this effort was to complete a detailed systems requirements specification, evaluate commercial-off-the-shelf products and propose solutions that meet the government requirements. The government would then select the solution that provided best fit to the EOP environment and the contractor would complete and delivery the design for the implementation of that solution.

- September 2003 – Vendor proposals were received and evaluated and a selection was made. Booz Allen Hamilton was awarded the contract for Phase 1 of ECRMS.

- November / December 2003 – Initial phase of the ECRMS project began.

- December 2003 – May(?) 2004 – Requirements analysis was completed by the contractor. COTS solutions were evaluated against those requirements. A recommendation was made by the vendor and the Government selected a the solution. The design for the implementation of the solution was created by the contract and delivered. The solution selected was a combination of two COTS products, MDY FileSurf and KVS Enterprise Vault

- April – May(?) 2004 – The solution design was presented to OA Counsel, White House Records Management and White House Counsel for their concurrence.

- June – September(?) 2004 – ECRMS Phase 2, the systems implementation began. It was decided that the current Unisys contract could be used to support the installation and configuration of the system. The procurement and installation of the hardware and software also occurred during this time.

- November 2, 2004 – Final configuration and completion of the File Plan used to archive records was drafted.

- January 2005 – October 2005 – System configuration, testing and tuning. Testing with large email volumes to ensure that system performance would satisfy the requirements. A number of issues were identified and the vendors corrected and testing continued.

- October 2005 – February 2006 – ECRMS project impacted as the contractor staff was supporting the clean up of the .pst file issues.

- January 2006 – March 2006 – Large volume testing continued. The ECRMS standard operating procedures were drafted and provided to staff for review and comment. Large scale testing was being performed using .pst files that contained OA email messages.

Mr. Steven McDevitt - February 21, 2008 – Page 10 of 15

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

- March 2006 - White House Counsel, White House Office of Records Management and OA Counsel provided a detailed briefing on the solution.

- July 2007 - White House Counsel, White House Office of Records Management and OA Counsel provided a detailed briefing on the search and retrieval capabilities of the ECRMS solution.

- August 21, 2006 – ECRMS ready to go live.

**36. Was ECRMS ever implemented?  What was the status of ECRMS when you left the White House?  Was there ever a pilot program to test the ECRMS system?  What is your understanding of why it was not implemented?   Who made the decision not to implement this system?**

The ECRMS system was ready to be implemented.  The hardware and software was procured, installed and configured.  Extensive testing was performed in 2005 and 2006.  This testing was performed to ensure that the system would work as designed and to ensure that it would support the performance requirements necessary to support the daily volume of EOP email.

When I left the OCIO in August 2006, the system was ready to be used.  The only remaining tasks were to obtain approval from the OA Director and the CIO.

**37. The White House also provided the Committee with documents indicating that you recommended changes to the e-mail archival process in November 2005.  In what appears to be a draft memorandum from you to John Straub, dated November 14, 2005, you recommend the adoption of Standard Operating Procedures for e-mail archiving as well as "system monitoring of the archive process" in the interim.  You also recommend a "long term risk mitigation plan" involving the adoption of ECRMS.  Did you provide such a memorandum to John Straub?  Why did you make these recommendations at this time? Were your recommendations approved?  What is your understanding of why these recommendations were or were not approved?**

It is my recollection that these recommendation were provided to the OA Director.  I made these recommendation because of the various situations that had occurred over the prior three years with respect to the management of EOP email records.  I felt that the procedures needed to be formalized and I also felt that if the appropriate resources were applied to the implementation of ECRMS, the project could be completed in a timely manner and could provide a good solution that would prevent the reoccurrence of these issues.

I do not recall the final disposition of these recommendations.

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

**38. A briefing document from October 2005 discusses the "operational risk in current email storage management processes." This document expresses concern that the current e-mail management systems may not meet the statutory requirements for document preservation and proposes several "risk mitigation" steps. Were you involved in the creation of this document? If so, please describe the purpose of the document, the individual or individuals who prepared it, and to whom it was presented.**

If my recollection is correct, I was involved in the creation of this presentation but I do not recall the specific purpose of this presentation.

I do not recall to whom it was presented.

**39. How was e-mail archived and preserved when you left the White House?**

When I left my employment with the EOP, the semi-automated process of daily processing of Exchange journal files using the Mail Attender utility was being performed. The daily manual process of validating that the .pst creation process completed successfully was being performed and the status was being reported to the OA Records Manager on a weekly(?) basis.

**40. What was the role of the National Archives in the process of planning for and developing new systems for archiving e-mail? Did officials with the Office of Administration or the EOP consult with officials at the Archives?**

The staff from the National Archives and Records Administration (NARA) were briefed a number of times in 2003, 2004 and 2005 about the approach for email records management.

**Searches of E-mails in Response to Investigative Requests**

**41. Were you ever involved in, or aware of, searches for e-mails in response to investigative requests? When? What was the subject matter? The most well known investigative request was for documents relating to the leak of the identity of CIA agent Valerie Plame. Were you involved in a search for documents responsive to this request? If so, what was your role?**

During my tenure at the EOP, I did not have any operational responsibility for the performance of email searches.

Mr. Steven McDevitt - February 21, 2008 – Page 12 of 15

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

**42. How did searches vary for e-mails saved in the ARMS system and for those sent and received through Exchange?  For e-mails saved on Exchange, did the Office of the CIO search files preserved on servers, on disaster recovery tapes, or elsewhere?  What was the basis for that decision?**

During my tenure at the EOP, I did not have any operational responsibility for the performance of email searches.

The OCIO has specific search procedures that describe how searches are to be performed in both the ARMS environment and using the .pst files used for email retention.  In both cases, the primary storage of these data set in on file servers in the EOP environment.

Searches are perform against these files.


**43. Do you recall any concerns that the searches were not picking up all of the responsive e-mails?  Or did you hear that the searches ever revealed errors in the way e-mails were preserved?  If so, how did you respond?**

The use of primitive search tools, both in the ARMS search and the search of the .pst files, was raised on a number of occasions.  The tools that were used were both slow and primitive compared to current off-the-shelf search technologies.

Each time a search was performed it consumed an enormous number of staff and contractor resources to set-up and perform the search.

The fact that both the ARMS and .pst file search processes did not search the email attachments was raised on a number of occasions.  At the time I believed that this was a short-lived problem as the ECRMS solution would provided fast and effective full search capabilities, including the search of attachments.

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

**44. At some point in late 2005 or early 2006, it appears that the White House alerted Special Prosecutor Patrick Fitzgerald that some e-mails may not have been provided to the prosecutor in response to his investigation. According to a January 23, 2006, letter from Mr. Fitzgerald to attorney representing former aide to the Vice President, Lewis Libby: "In an abundance of caution, we advise you that we have learned that not all email of the Office of the Vice President and the Executive Office of the President for certain time periods in 2003 was preserved through the normal archiving process on the White House computer system." According to court filings, the White House produced 250 pages of e-mails from the Office of Vice President to the Special Prosecutor in February 2006. When were you first made aware that not all e-mail responsive to the Special Prosecutor's investigation was preserved through the normal archiving process? Why weren't these pages included in the original document production? How were you made aware of this? What steps did the White House take to restore these e-mails? Where did these 250 pages of e-mails come from?**

During the period in October through December 2005, when the .pst file organization and analysis was occurring, it became known that some of the periods for which not email was present in the retained .pst files were the same periods for which Special Prosecutor Patrick Fitzgerald had subpoenaed the White House for emails related to his investigation.

Most critical were a set of days in early October 2003 where it appears that all email for the Office of the Vice President was missing. A detailed plan was developed to attempt to recover the email for this period.

This plan was prepared by the OCIO staff and presented to White House Counsel. I do not recall the specific details of this plan. A number of the activities identified in the plan were undertaken and to the best of my recollection, the email from the period in question was never recovered.

I worked with OA Counsel and White House Counsel on efforts to provide an explanation to the Special Prosecutor. This included providing a briefing to the Special Prosecutor's staff on this subject.

There was a parallel effort to attempt to recover all email from this period. The results of this effort were the 250 pages of email. However, I was not directly involved in this process and am unable to provide any details relating to the 250 pages of email.

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

**45. The Committee was provided with an e-mail exchange between you and Susan Crippen, with copies to Jaime Borrego and William Reynolds that attached an "Exchange MST Activity Plan" dated November 28, 2005 and updated on January 20, 2006. The attached plan states: "The following outlines the planned activities to recover Office of Vice President e-mail from the target period of September 30, 2003 to October 6, 2003." Was this search relevant to the Special Prosecutor's investigation? Why was this period targeted? What was the role of each of the individuals on this e-mail with regard to the activity plan?**

Yes, the attempt to recover these email was in response to the search associated with the Special Prosecutor's investigation.

The period was targeted because it was among the set of date which were of interest to the Special Prosecutor.

The individuals involved represented the OCIO management staff that was in place at that time. Susan Crippen was the Deputy Director of Information Systems and Technology, Jaime Borrego was the acting Director of Information Systems and Technology and the Director of Information Assurance, William Reynolds was the Deputy Director of Information Assurance and I was the Director of Architecture and Engineering. All the individuals identified were involved in both the activities to correct the .pst file management problems and with the activities associated with attempts to recover missing emails to support the response to the subpoena from the Special Prosecutor.

**Disaster Recovery Tapes**

**46. According to the White House, until October 2003, the EOP disaster recovery back-up tapes were recycled and were not preserved. Were you involved in this decision? To your knowledge, who was involved in this decision? Did anyone ever express any concerns to you about the decision to recycle all of the tapes? If so, what were the concerns and who expressed them to you? Did you have any concerns about this recycling of tapes? If so, please explain.**

During my tenure at the EOP, I did not have any operational responsibility for the management of backup tapes nor was I involved in decisions related to the recycling of backup tapes.

**47. The White House has also told Committee staff that this recycling was temporarily stopped several times — in February 2002, July 2002, and September 2003 — before it was permanently stopped in October 2003. Do you know why these stops occurred, and why they were temporary? Were these stop-recycle orders related to discovery that searches of the .pst folders were not producing all of the documents relevant to the search request?**

During my tenure at the EOP, I did not have any operational responsibility for the management of backup tapes.

Mr. Steven McDevitt - February 21, 2008 – Page 15 of 15

This document contains sensitive network information of the Executive Office of the President. Please treat it as sensitive and confidential.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) ) |
| | ) |
| Defendants. | ) |

Civil No. 07-01707 (HHK/JMF)

_____

| | |
|---|---|
| NATIONAL SECURITY ARCHIVE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) ) |
| | ) |
| Defendants. | ) |

Civil No. 07-01577 (HHK)

_____

### [PROPOSED] ORDER

The Court having considered plaintiff CREW's motion to show cause why defendants

should not be held in contempt and for sanctions, defendants' response and the entire record

herein, it is hereby

ORDERED that CREW's motion is GRANTED and it is further

ORDERED that defendants are hereby ordered to show cause at a hearing to be held on

_____ why they should not be held in contempt for violating Magistrate Judge John

M. Facciola's Memorandum Order of January 8, 2008.

Dated: _____

                                   _____
                                   HENRY H. KENNEDY, JR.
                                   United States District Judge