**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No: 1:07-cv-01707 (HHK/JMF) |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) ) ) ) | |
| Defendants. | ) ) | |
| NATIONAL SECURITY ARCHIVE, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No: 1:07-cv-01577 (HHK/JMF) |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

<u>**DEFENDANTS' OPPOSITION TO CREW'S MOTION TO SHOW CAUSE WHY
DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT AND FOR SANCTIONS**</u>

<u>**INTRODUCTION**</u>

This is CREW's third attempt to manufacture supposed falsehoods, misleading

statements, and incomplete testimony in the January 15, 2008 Declaration of Theresa Payton.

Contrary to CREW's claims, Ms. Payton's declaration is completely consistent with her recent

Congressional testimony.  Ms. Payton's declaration therefore was, and remains today, truthful,

accurate, and responsive to the questions posed by the Court.

Having failed to acquire relief through its earlier two filings, CREW now seeks the extreme remedy of civil contempt.[1]  But CREW attacks Ms. Payton's declaration on the same grounds as it did in its earlier efforts.  Specifically, this time, CREW contends that testimony and documents disclosed from the February 26, 2008 hearing before House of Representatives Committee on Government Oversight and Reform ("Committee Hearing") confirm that Ms. Payton "knowingly submit[ted] false, misleading and incomplete answers to the questions the Court posed" by Order on January 8, 2008.  CREW's position is wholly without support and, in fact, is undermined by the material upon which CREW itself relies.

Even a cursory review of the testimony and documents, however, demonstrates that CREW has done nothing more than cobble together a story resting on an artificially-created conflict and a deliberate ignorance of the actual facts.  That story simply does not justify the extraordinary remedy of civil contempt.[2]  Rather, for more than a century, the law has been well-settled that civil contempt "is a severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct."  Cal. Paving Co. v. Molitor, 113 U.S. 609, 618 (1885).  This is particularly so given the long-standing presumption of good faith afforded to government affidavits, signed and submitted under penalty of perjury and attested to be "true and correct" as Ms. Payton has done here.  To justify civil contempt proceedings, CREW must therefore identify a clear and unambiguous order that has been violated and do so by clear and convincing evidence.  CREW's dissatisfaction with four

---

[1]  See Dkt. [49]; Dkt. [53].

[2]  As explained further below, CREW's request for criminal sanctions and for fraud should not be considered by this Court.

statements in Ms. Payton's declaration does not suffice.[3]  Ms. Payton, on behalf of the Office of

Administration, fully, completely and accurately complied with the terms of the Court's

January 8, 2008 Order.

First, CREW's perceived concerns about the description of a 2005 chart in paragraphs 10

and 11 of the declaration do not support civil contempt.  This Court's January 8, 2008 Order did

not seek information about the 2005 chart or request defendants to explain, describe or otherwise

mention at all the chart.  Because the Court did not issue a "clear and unambiguous" order

relating to the 2005 chart, no breach of such an order can possibly be established and no

contempt sanctions may lie.  Armstrong v. Executive Office of the President, 1 F.3d 1274, 1289

(D.C. Cir. 1993).  Whether or not the chart was accurate as written in 2005 is immaterial to the

inquiries the Court pursued in its January 8, 2008 Order.

In any case, CREW's concerns are without support.  Although CREW appears to rely on

the unsworn statements of persons who did not appear at the Committee Hearing, even those

statements do not support CREW's contention that Ms. Payton's declaration was false,

misleading or incomplete.  As Ms. Payton herself explained at the hearing  – an explanation

CREW inexplicably omits from its motion – her description of the chart is not at odds with the

statements of Mr. McDevitt or Mr. Straub.[4]

---

[3]  See Pl. CREW's Mot. to Show Cause Why Defs. Should Not be Held in Contempt and for
Sanctions ("CREW's Mot.") at 9 (challenging two statements about a 2005 chart in paragraphs
10 and 11 of the declaration); 12 (challenging statements in paragraphs 12c and 12d about
backup tapes and allegations of missing emails).

[4]  See CREW Mot. at 9-11; see also CREW Mot., Ex. 2 (Hr'g Tr. at 112:2648-113:2653
(Ms. Payton testifying, under oath, that she was aware of a team that had gathered data for the
chart, but that she had understood that they "did not work on the chart" itself)).

Second, CREW fundamentally misapprehends the import of a document about "the planned activities to recover Office of Vice President email[.]"[5]  CREW Mot. at 13.  In fact, the document does not contradict Ms. Payton's sworn testimony that the Office of Administration does "not know if any emails were not properly preserved in the archiving process"[6] or that the "emails sent or received in the 2003-2005 time period should be contained on existing back-up tapes."  CREW Mot., Ex. 1 (Payton Decl. ¶¶ 12c, 12d).  On the contrary, the document supports, not undercuts, Ms. Payton's representation that disaster recovery back-up tapes functioned as they should have in 2005; where the Office of Administration was unable to locate at that time .pst files corresponding to archived emails for a specified time period for the Office of Vice President ("OVP"), the Office of Administration was able to recover emails for the week in question from the disaster recovery back-up tapes themselves.

----

[5]  As an initial matter, the document about emails from the Office of Vice President is not at issue in this litigation because Vice Presidential emails are governed by the Presidential Records Act, not the Federal Records Act, and are therefore not "emails said to be missing that are the subject of this lawsuit."  See 44 U.S.C. § 2207 ("Vice-Presidential records shall be subject to the provisions of this chapter in the same manner as Presidential records.").

[6]  In any case, whether any emails were not properly archived goes to the very merits of plaintiff's first four causes of action.  See, e.g., SEC v. Bilzerian, 112 F. Supp. 2d 12, 17 n.6 (D.D.C. 2000) ("A civil contempt proceeding is not a retrial of the original controversy and does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed.").  Particularly given that a motion to dismiss the claims is currently pending, it would be especially improper for CREW to seek, in effect, an answer to the merits of its claims now.  At base, whether emails were properly archived between 2003 and 2005 is immaterial to what media should be preserved for recovery purposes even assuming arguendo that at least some emails were not properly archived.

To be clear, the emails were not restored from individual mail boxes on computers, as CREW suggests, but from the disaster recovery back-up tapes.[7] The documentary evidence adduced at the Committee Hearing – attached even as exhibits to CREW's motion – bears out the fact that OA recovered emails from approximately 70 individual OVP mailbox locations on the disaster recovery back-up tapes. This is consistent with Ms. Payton's understanding as she set forth in her declaration, <u>see</u> Decl. ¶¶ 6-8, 12(d) ("the backup tapes should contain substantially all the emails sent or received in the 2003-2005 time period"), and as she testified at the Committee Hearing. <u>See</u> CREW Mot., Ex. 2 (Hr'g Tr. at 90:2087-2089 ("70 mailboxes were restored and 17,000 emails")). There is no reason to doubt the accuracy of Ms. Payton's declaration, and, in fact, every reason to credit her statements and afford them the presumption of good faith to which they are entitled. CREW's unsupported allegations do not alter this conclusion, despite its efforts to engineer conflicts by selectively excerpting snippets from documents presented at the Committee Hearing.

Finally, even if CREW had established cause for sanctions  – an unsupported notion that should be rejected unequivocally – the specific sanctions recommended and requested by CREW

---

[7] <u>See</u> CREW Mot., Ex. 2 (Hr'g Tr. at 88:2040-2045 (Mr. Tierney questioning: "So after not finding [OVP] e-mails [in pst files], the White House went to <u>backup tapes</u> and ultimately recovered the emails for those days. These were provided to the Special Counsel. Is this pretty accurate so far? Ms. Payton: Yes.").

Indeed, it is only because of CREW's allegations that emails were not properly archived that it could file a request for and obtain a preservation order for back-up media. Now, CREW incredibly suggests that the then-inability to locate .pst files on the back-ups somehow "proves" that the disaster recovery backup tapes themselves are deficient. But because the emails were recovered from the disaster recovery tapes, the opposite is true. CREW's circular reasoning certainly provides no basis for its requested relief.

are unavailable.  It is clear under this Circuit's law that compensatory fines for attorneys' fees and expenses are not available as a civil remedy against the government.  Although CREW has styled its motion as one seeking contemplated sanctions, what it really seeks is expedited merits discovery.  As this Circuit has instructed, such "remedies" are not appropriate in a civil contempt context.  See, e.g., SEC v. Bilzerian, 112 F. Supp. 2d 12, 17 n.6 (D.D.C. 2000) ("A civil contempt proceeding is not a retrial of the original controversy and does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed.").

This Court should deny CREW's motion and terminate CREW's seemingly unending requests for the same relief it has repeatedly requested.  This Court should not have to indulge yet another round of briefing on CREW's request for expedited discovery.  The time for briefing CREW's motion for expedited discovery has closed and the parties have fully and completely provided their arguments.  CREW's most current motion must be denied.

## BACKGROUND

### I.     January 8, 2008 Order

Plaintiffs filed motions for expedited discovery, purportedly in part to determine "what back-ups of EOP emails still exist and how their preservation is ensured."  NSA Mot. For Expedited Discovery [5] at 7.  In an Order dated January 8, 2008, this Court acknowledged defendants' pending motion to dismiss plaintiffs' complaints, characterizing it as "not without merit, as evidenced by a recent decision in which Judge Richard J. Leon dismissed a similar case after holding that the court lacked jurisdiction to prevent the unlawful removal or destruction of records protected by the Federal Records Act."  Or. [46] at 3 n.3.  The Court continued that "particularly where, as here, there is a pending motion to dismiss," there "is simply no

convincing reason to expedite discovery" to the extent that "the missing emails are contained on the back-ups preserved pursuant to Judge Kennedy's order[.]" Id. at 3.  But because the Court remained concerned about "a small amount of information not currently in the record," the Court ordered defendants to file a sworn declaration within five business days answering four questions:

> 1.  Are the back-ups [as defined in the November 12, 2007 Order] catalogued, labeled or otherwise identified to indicate the period of time they cover?
>
> 2.  Are the back-ups catalogued, labeled or otherwise identified to indicate the data contained therein?
>
> 3.  Do the back-ups contain emails written and received between 2003-2005?
>
> 4.  Do the back-ups contain the emails said to be missing that are the subject of this lawsuit?

Id. at 4.  The Court concluded that it would "proceed to resolve the Motion after receipt of defendants' answers." Id.

## II.     January 15, 2008 Declaration

Defendants complied with the Court's order by providing a truthful and accurate sworn declaration from Theresa Payton, the Chief Information Officer in the Office of Administration, based on her personal knowledge and information gained from her staff, that was responsive to the Court's Order.  Decl. ¶ 2.  In addition to directly addressing the Court's questions, and in order to provide greater contextual explanation, Ms. Payton provided background information about the Office of Administration and the Office of the Chief Information Officer ("OCIO").  Ms. Payton also described the "EOP's disaster recovery system," the Office of Administration's

compliance with good business practices in backing up the EOP Network onto disaster recovery back-up tape media, and specifically testified that the "purpose of the [disaster recovery back-up tapes] created and maintained by OA is to create a 'snapshot' of the EOP Network . . . at the point in time of the back-up." Id. ¶ 7. She explained that "the snapshot captures all email information present on the EOP Network" in at least three locations: "the journals, the .pst archives, and the customer mailboxes at the time the back-up is created." Id. After discussing some limitations in this disaster recovery system, Ms. Payton testified that "this limitation in the disaster recovery back-up process is consistent with industry standards for these types of disaster recovery systems." Id.

    In addition to responding to the Court's four questions, Ms. Payton also described plaintiffs' claims and the Office of Administration's efforts to replicate or affirm the correctness of a 2005 chart created by a former employee within the OCIO; OCIO's reservations about the chart's reliability; and the "apparent lack of supporting documentation" for the chart. Id. ¶¶ 10, 11. Because, among other things, the Office of Administration was unable to replicate the chart's results and due in part to the "apparent lack of supporting documentation," Ms. Payton referenced the Office of Administration's "independent effort to determine whether there may be anomalies in Exchange email counts for any particular days resulting from the potential failure to properly archive emails for the 2003-2005 time period. That process is underway and we expect the independent assessment to be completed in the near term." Id. ¶ 11. Although Ms. Payton's testimony about plaintiffs' claims did not impact the concerns identified by the Court in its January 8, 2008 Order – because even assuming arguendo the existence of "missing emails," the

Court was concerned only about the back-up tapes – Ms. Payton provided additional context for her ensuing responses to the Court's specific requests for information.

Finally, Ms. Payton responded to each of the Court's questions about the universe of disaster recovery back-up tapes covered by the Court's November 12, 2007 Order.  In pertinent part, Ms. Payton testified that "emails sent or received in the 2003-2005 time period should be contained on existing back-up tapes" and that "in view of [OA's] practice of preserving all such back-up tapes from October 2003 to the present, the back-up tapes should contain substantially all the emails sent or received in the 2003-2005 time period."  Id. ¶¶ 12c, 12d.

## III.    Plaintiffs' Repeated Motions Challenging the Declaration

Almost immediately after defendants submitted Ms. Payton's declaration, plaintiffs NSA and CREW renewed their requests for expedited discovery and specifically requested a hearing to air their grievances.  Indeed, the plaintiffs submitted no fewer than three filings challenging the testimony of Ms. Payton.

### A.    NSA's January 17, 2008 Filing [50]

NSA claimed that Ms. Payton's declaration "leaves unanswered key information sought by the Court in its effort to ascertain whether discovery is necessary to ensure the preservation, in recoverable form, of all the lost e-mails at issue in this case."  NSA Resp. to Decl. [50] at 1-2.

First, NSA asserted that the Declaration "fails to answer . . . whether the back-ups are the only potential repository of all the e-mails said to be missing that are the subject of this lawsuit." Id. at 2.  Second, NSA claimed that the "Declaration does not even purport to definitively answer the question of whether the back-up tapes at issue contain the universe of e-mails in question" because Ms. Payton "merely" declared that the "back-up tapes should contain substantially all

the emails sent or received in the 2003-2005 period." Id. at 3 (emphasis in original). Finally, NSA suggested that the declaration left open questions about preservation of some undefined set of "pre-October 2003 back-ups" and whether the back-ups in OA's possession were preserved in "conditions that will permit their eventual use." Id. at 4, n.3. Accordingly, NSA requested "a hearing be held prior to resolution of the Motion." Id.

**B.     CREW's January 17, 2008 Filing [49]**

CREW, too, challenged Ms. Payton's declaration in an 8-page filing two days after the declaration was filed. See CREW's Resp. to Defs.' Notice of Filing [49]. First, CREW attacked what it perceived to be "limitations and gaps in the Payton Declaration," allegedly due, in part, to Ms. Payton's competence to respond in full to the Court's questions. Id. at 3. Second, CREW erroneously assumed that back-ups existing "only" to October 2003 means that "no back-up copies . . . of missing email for the period of March to October 2003" exist. Id. Of course, back-ups preserved since October 2003 contain snapshots of everything – including journaled and .pst emails dating before October 2003 – that existed on the EOP Network at the time of the October 2003 back-up process. Nonetheless, CREW claimed in its response that the absence of back-up tapes before October 2003 "raises a very 'time-sensitive' need for expedited discovery." Id.

In its motion, CREW then – as it does now – challenged Ms. Payton's testimony about the 2005 chart. CREW then – as it does in its current motion – claimed that the declaration testimony about the "apparent lack of supporting documentation," "submitted under penalty of perjury, is completely at odds with the thousands of pages of documents, including 'spreadsheets and related documents,' that OA has already acknowledged having." Id. at 5. CREW also challenged Ms. Payton's testimony that the OA continued to investigate whether any emails

were not properly archived between 2003 and 2005. Pointing then – as it does in its current motion – to documentation that OVP emails were not allegedly preserved through the normal archiving process, CREW concluded that "Ms. Payton's statements suggesting uncertainty on this point cannot be reconciled with these prior statements, leading inescapably to the conclusion that either Ms. Payton has not testified truthfully to this Court or she testified without full knowledge." Id. at 7-8.

> ### C.    CREW's January 23, 2008 Filing [53]

Evidently seeking to bring its January 17 filings to the Court's attention again, CREW filed yet another filing after defendants submitted Ms. Payton's declaration. CREW elaborated on the perceived deficiencies noted in its January 17, 2008 filing, asserting that "Ms. Payton's declaration does not provide sufficient clarity for this Court to conclude confidently that the missing emails are contained on the back-up copies that defendants have represented they are preserving." CREW's Mem. In Support of NSA's Request for Hearing [53] at 2. Specifically, CREW complained that the back-up copies may not be the "best repository for the missing emails" and that Ms. Payton did not adequately describe the journaling process (even though the Court had not even asked about the EOP Network's journaling process). Id. at 3. Accordingly, CREW requested that the Court grant a request "for a hearing before resolving the motions for discovery."

### IV.    Committee Hearing Testimony and Documents

On February 26, 2008, Ms. Payton testified and answered questions in a hearing before the House Committee on Oversight and Government Reform that lasted over three hours for all of the testimony on "Electronic Records Preservation at the White House." Ms. Payton, like the

other witnesses testifying at the hearing, provided testimony under oath.  <u>See</u> CREW Mot., Ex. 2

(Hr'g Tr. at 25:544-547 (administration of oath)).  In pertinent part, Ms. Payton testified about

OCIO's efforts to inventory all archived emails (.psts) for 2003-2005 and some of the

preliminary results indicating that the results of the 2005 chart were not accurate.  <u>Id.</u> at 44:933-

45:974.  Ms. Payton also expressed confidence that emails confirmed to be missing after OCIO

completed its inventorying process could be recovered from disaster recovery back-up tapes.

<u>See</u> CREW Mot., Ex. 2 (Hr'g Tr. at 121:2862-124:2937 (noting that a past email restore had

been successful, and Ms. Payton agreeing under oath that "certainly with the backups, we have

every reason to believe at this point that we will be able to get the documents we seek"); <u>id.</u> at

59:1325-60:1327 (testifying that she is "very confident" that backup tapes may be used to

recover email data); <u>id.</u> at 61:1358-1368 (same)).  The Committee also released the unsworn

interrogatory responses of Steven McDevitt, and the Democratic Committee Staff's

memorandum on "Supplemental Information for Full Committee on White House E-mails."

## <u>ARGUMENT</u>

### I.     The Civil Contempt Power

Courts have inherent power to enforce compliance with their lawful orders through civil

contempt.[8]  <u>Armstrong</u>, 1 F.3d at 1289.  For more than a century, however, the law has been

---

[8]  CREW also states in a footnote without factual support that criminal contempt sanctions or sanctions for "fraud on the court" may be available, as well as imposition of fees and costs under 28 U.S.C. § 1927.  Perfunctory arguments, however, need not be addressed by the Court.  <u>See</u> <u>Ry. Labor Exec. Ass'n v. U.S. R.R. Ret. Bd.</u>, 749 F.2d 856, 859 n. 6 (D.C.Cir.1984) (refusing to resolve an issue "on the basis of briefing which consisted of only three sentences ... and no discussion of the relevant . . . case law"); <u>Hutchins v. District of Columbia,</u> 188 F.3d 531, 539-40 n. 3 (D.C.Cir.1999) (en banc) (refusing to consider a "cursory argument[ ]" raised in a footnote); <u>United States v. South,</u> 28 F.3d 619, 629 (7th Cir.1994) ("Ours is an adversary system, and it is

well-settled that civil contempt "is a severe remedy, and should not be resorted to where there is

fair ground of doubt as to the wrongfulness of the defendant's conduct." Molitor, 113 U.S. at

618.   "In light of the [contempt] remedy's extraordinary nature, courts rightly impose it with

caution." Joshi v. Prof'l Health Servs., Inc., 817 F.2d 877, 879 n.2 (D.C. Cir. 1987).  As the

Supreme Court has held, "the very amplitude of the power is a warning to use it with discretion,

and a command never to exert it where it is not necessary or proper." Gompers v. Buck's Stove

& Range Co., 221 U.S. 418, 451 (1911).  Indeed, in order to prevent abuses of the contempt

power and to protect those on whom the potent authority may be visited, Congress has long

regulated the exercise of the contempt power by statute.  See 18 U.S.C. § 401 (providing that a

court of the United States shall have the power to punish only certain acts as contempt, including

"[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command"); In re

---

up to the party seeking relief to sufficiently develop his arguments." (citations and quotation
marks omitted)).

In any event, CREW provides no support for any contention that Ms. Payton made any
statement to the Court that she "did not, at the time, believe . . . to be true."  In re Grand Jury
Proceedings, 117 F. Supp. 2d 6, 28 (D.D.C. 2000).  Moreover, at least three of the challenged
statements (about the creation of the 2005 chart, accuracy of the 2005 chart, and whether any
emails are missing) were not "material to the issue to be determined by the Court" in its
January 8, 2008 Order.  See id. (statement must be material for imposition of criminal sanctions).
And CREW's claim – refuted below – that the declaration was incomplete, intentionally
misleading or "misleading by negative implication" is simply inadequate for the imposition of
criminal sanctions.  Id. (for criminal sanctions, willful violation of court order must be proved by
clear and convincing evidence); see also United States v. Young, 107 F.3d 903, 907 (D.C. Cir.
1997) (same).

Finally, to the extent CREW seeks criminal sanctions against defendant federal
components, the "United States, as a sovereign, is immune from suit save as it consents to be
sued . . ., and the terms of its consent to be sued in any court define that court's jurisdiction to
entertain the suit."  United States v. Sherwood, 312 U.S. 584, 586 (1941) (citations omitted); see
also In re Sealed Case, 192 F.3d 995, 1000 (D.C. Cir. 1999) (noting, but not having to conclude
or rely on conclusion that, "we know of no statutory provision expressly waiving federal
sovereign immunity from criminal contempt proceedings").

McConnell, 370 U.S. 230, 233-34 (1962); Nye v. United States, 313 U.S. 33, 44-48 (1941); In re

Brown, 454 F.2d 999, 1002 (D.C. Cir. 1971).

Accordingly, civil "contempt will lie only if the putative contemnor has violated an order

that is clear and unambiguous . . . and the violation must be proved by 'clear and convincing'

evidence." Armstrong, 1 F.3d at 1289 (citations omitted); see Teamsters Local Un. No. 96 v.

Washington Gas Light Co., 466 F. Supp. 2d 360, 362 (D.D.C. 2006) (rejecting contempt motion

because of absence of clear and unambiguous order and providing that "ambiguities in the

underlying order should be resolved in favor of the alleged contemnor"); SEC v. Showalter, 227

F. Supp. 2d 110, 120-21 (D.D.C. 2002). As the Supreme Court has explained:

> The judicial contempt power is a potent weapon. When it is founded upon a
> decree too vague to be understood, it can be a deadly one. Congress responded to
> that danger by requiring that a federal court frame its orders so that those who
> must obey them will know what the court intends to require and what it means to
> forbid.

Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76 (1967)

(discussing Fed. R. Civ. P. 65(d) regarding injunctions).

Civil contempt is a remedial device used to achieve compliance with an order of the court

that is being violated, see Showalter, 227 F. Supp. 2d at 120-21, and contempt sanctions can be

avoided by prompt compliance with the order. See Petties v. District of Columbia, 888 F. Supp.

165, 169 (D.D.C. 1995).[9] The purpose of civil contempt "is not to punish but to exert only so

much authority of the court as is required to assure compliance." SEC v. Bankers Alliance

---

[9] Given the pendency of defendants' motion to dismiss, it bears noting that civil contempt
sanctions do not survive any ultimate conclusion that the Court lacks jurisdiction over the
claims. See, e.g., United States v. Catholic Conference v. Abortion Rights Mobilization, Inc.,
487 U.S. 72, 76 (1988); United States v. Mine Workers, 330 U.S. 258, 295 (1947).

<u>Corp.</u>, 881 F. Supp. 673 (D.D.C. 1995). In addition, courts have held that civil contempt fines are not available against the United States and its officials under the doctrine of sovereign immunity. <u>See</u> <u>United States v. Horn</u>, 29 F.3d 754, 763, 765 n.13, 767 (1st Cir. 1994) (citing cases); <u>United States v. Waksberg</u>, 881 F. Supp. 36, 39–41 (D.D.C. 1995) (June Green, J.), <u>vacated and remanded on other grounds,</u>112 F.3d 1225 (D.C. Cir. 1997). <u>But see</u> <u>Am. Rivers v. U.S. Army Corps of Eng'rs</u>, 274 F. Supp. 2d 62, 69 (D.D.C. 2003) (Kessler, J.) (rejecting assertion of sovereign immunity with respect to coercive, as opposed to compensatory, contempt fines).

## II.    **Defendants Did Not Violate the Court's January 8, 2008 Order**

Defendants fully complied with this Court's directive that they file a "sworn declaration" answering the Court's four specific questions about labeling of back-up tapes and the contents of the back-up tapes. Accordingly, CREW's claim that defendants violated the "clear and unambiguous" terms of the Court's January 8, 2008 Order is without weight. No contempt sanctions are therefore available.

Moreover, three of the challenged statements – about Ms. Payton's description of a 2005 chart and its genesis, as well as OA's knowledge about any failures in the archiving process between 2003 and 2005 – are wholly irrelevant to the inquiries pursued by the Court in its Order. Plaintiffs and the Court, in fact, had to <u>presume</u> that plaintiffs' allegations about "missing emails" were correct in order to fashion preservation relief in the first instance. CREW therefore seeks "expedited discovery" for the purposes of supporting its first four causes of action, rather than determining what additional preservation order, if any, should be issued. By faulting Ms. Payton's declaration on these grounds, CREW makes clear that its requests for expedited

discovery is not about preservation, but is instead a request for merits discovery that goes to the very heart of its allegations. That is simply improper, particularly in the context of the "severe" remedy of civil sanctions.

In any case, Ms. Payton's statements in the declaration are not false, misleading or incomplete. CREW first challenges Ms. Payton's statement that the chart had been produced by a "former employee" of OCIO, citing to Mr. McDevitt's unsworn statement that a "team" of individuals had worked on the analysis. As Ms. Payton explained in response to questioning at the Committee Hearing, however, Ms. Payton understood – and still understands after speaking with team members – that while the other members had simply gathered underlying data, any "analysis" and chart creation was the product of Mr. McDevitt's efforts. CREW Mot., Ex. 2 (Hr'g Tr. at 113:2652-2654 (Ms. Payton testifying, under oath, that she was aware of a team that had gathered data for the chart, but that they "did not work on the chart")).

Furthermore, the statement is corroborated (not contradicted) by an unsworn statement by the very person upon whom NSA relies – Steven McDevitt – who informed Congress that he "was responsible for designing the chart[.]" CREW Mot., Ex. 5 ("Resp. from Steven McDevitt (Part 2 of 2)" at 4 (response to question 19)). Notwithstanding the efforts of the "team" working under Mr. McDevitt to gather data that may ultimately have populated Mr. McDevitt's chart, even Mr. McDevitt acknowledged that the chart was designed and created under his direction and leadership. See id. ("I . . . had a leading role in the definition and execution of the analysis."). CREW, like NSA, evidently fails to identify these statements in order to marshal support for its motion and otherwise impugn Ms. Payton's veracity. As stated in defendants' Opposition to NSA's "Emergency" Motion [60], incomplete characterization of fact does not

justify emergency relief.  As stated above, Ms. Payton's declaration was then, and remains today, truthful and accurate.  No conflict – other than those created by CREW – exists to justify the emergency relief CREW seeks.

Ms. Payton's statement about the "apparent lack of supporting documentation" for the 2005 chart is not cause for sanctions either.  That statement follows two other statements concerning the OCIO's "reservations about the reliability of the chart" and about her office having been "unable to . . . affirm the correctness of the assumptions underlying [the chart." Decl. ¶ 11.  Ms. Payton never stated that there was <u>no</u> documentation relating to the chart.[10]  She asserted a lack of supporting documentation in the context of her office's inability to confirm that chart's assumptions and, therefore, to rely on it.  Indeed, to date, OA has been unable to locate any narrative documentation explaining the assumptions or operating procedures for the creation of the 2005 chart or data collection, akin to the "Exchange MST Activity Plan" relied upon by CREW, which set forth an outline for recovering OVP emails in 2005.

Additionally, as Ms. Payton testified at the hearing, her office uncovered evidence of unreliability in the inventory tool used by Mr. McDevitt to generate the 2005 chart.  She testified that

> we felt it in the best interest to upgrade and update some of those tools and implement those tools around the records keeping inventory and statistical analysis process.  We are in the early phase.  We actually have three phases we are implementing for this.  We are in the early phase of that process, where we have just started to get some early results.  They have not had a quality assurance check on them, so the results are very preliminary and they are not conclusive. Some of the promising trends that we have been seeing is we have identified more e-mails for that exact time period that was looked at in 2005 than was previously

---

[10]  In fact, the OA produced many thousands of pages relating to the chart to the House Committee on Oversight and Government Reform.

> identified.  We have been able to identify and locate e-mails with an [E]xchange
> for days that were previously red.

CREW Mot., Ex. 2 (Hr'g Tr. at 44:942-955).  That inventorying process – to determine whether

emails were not properly archived from the EOP Network – continues.  The Office of

Administration is therefore today unable to conclude, just as Ms. Payton stated in her

declaration, whether the archiving process failed to capture any emails for the 2003 to 2005

period.

Finally, Ms. Payton's sworn testimony – entitled to a presumption of good faith – that the

back-up tapes should contain substantially all the emails received and generated on the EOP

Network between 2003 and 2005 is not undercut by the "Exchange MST Activity Plan"

document detailing OVP email restoration efforts.  At bottom, CREW appears to challenge the

very function of disaster recovery back-up tapes themselves (notwithstanding its initial position

that back-ups were critical).  In her declaration, Ms. Payton explained the disaster recovery

system in place for the EOP Network – as well as the commonly understood limitations of back-

up tapes themselves.  Ms. Payton reiterated at the Hearing that emails from 2003 to 2005 on the

EOP Network should be recoverable, if necessary, from the disaster recovery back-up tapes.  See

also CREW Mot., Ex. 2 (Hr'g Tr. at 121:2862-124:2937 (noting that previous email restore had

been successful, and Ms. Payton agreeing under oath that "certainly with the backups, we have

every reason to believe at this point that we will be able to get the documents we seek"); id. at

59:1325-60:1327 (testifying that she is "very confident" that backup tapes may be used to

recover email data); id. at 61:1358-1368 (same)).  The OVP restoration process does not conflict

with Ms. Payton's testimony.  On the contrary, it supports her testimony.  The emails were not

restored from individual mail boxes on computers as CREW suggests, but from the OVP

individual mailbox portions of the disaster recovery back-up tapes.  See also CREW Mot., Ex. 2

(Hr'g Tr. at 88:2040-2045 (Mr. Tierney questioning: "So after not finding the [OVP] e-mails [in

pst files], the White House went to backup tapes and ultimately recovered the e-mails for those

days.  These were provided to the Special Counsel.  Is this pretty accurate so far?  Ms. Payton:

Yes.").

### III.    The Remedies CREW Seeks Are Not Appropriate For Civil Contempt

Finally, the remedies CREW seeks are either compensatory in nature (e.g., attorneys'

fees and costs) and therefore unrecoverable, or not remedial as civil contempt requires.  The

purpose of civil contempt "is not to punish but to exert only so much authority of the court as is

required to assure compliance."  Bankers Alliance Corp., 881 F. Supp. at 673.  CREW seeks

instead, to exact compensatory fines barred by sovereign immunity or to exact the ultimate relief

it seeks in its underlying expedited discovery motion.  See United States v. Horn, 29 F.3d 754,

763, 765 n.13, 767 (1st Cir. 1994) (citing cases that compensatory civil sanctions are not

permitted against the United States); see also Bilzerian, 112 F. Supp. 2d at 17 n.6  (civil

contempt is not to obtain ultimate relief).  At a minimum, CREW's request for relief highlights

the true purpose of its contempt motion:  to repeat, once again, the merits of its underlying

dispute about a supposed need for discovery.  Invoking the Court's extraordinary powers as an

excuse to repeat arguments already made, however, is an irresponsible and improper

manipulation of the judicial process.  CREW has failed to satisfy its significant burdens to prove

that sanctions are at all appropriate.  Because defendants complied fully with the terms of the

Court's January 8, 2008 Order, CREW's motion to show cause must be denied.

## CONCLUSION

For the reasons set forth above, plaintiff CREW's motion to show cause why defendants should not be held in contempt and for sanctions must be denied.

Respectfully submitted this 14th day of March, 2008.

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

/s/ Helen H. Hong
HELEN H. HONG (CA SBN 235635)
TAMRA T. MOORE (DC 488392)
Trial Attorney
U.S. Department of Justice, Civil Division
P.O. Box 883, 20 Massachusetts Ave., NW
Washington, D.C.  20044
Telephone: (202) 514-5838
Fax: (202) 616-8460
helen.hong@usdoj.gov

Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2008, a true and correct copy of the foregoing

Defendants' Opposition to CREW's Motion to Show Cause Why Defendants Should Not Be

Held in Contempt and for Sanctions was served electronically by the U.S. District Court for the

District of Columbia Electronic Document Filing System (ECF) and that the document is

available on the ECF system.


/s/ Helen H. Hong
HELEN H. HONG

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) ) ) |
| Defendants. | ) ) |

Civil Action No: 1:07-cv-01707 (HHK/JMF)

| | |
|---|---|
| NATIONAL SECURITY ARCHIVE, | ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) ) ) |
| Defendants. | ) ) |

Civil Action No: 1:07-cv-01577 (HHK/JMF)

**[PROPOSED] ORDER DENYING CREW'S MOTION TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT AND FOR SANCTIONS**

Upon consideration of the papers filed by all the parties, it is hereby

ORDERED that CREW's Motion to Show Cause Why Defendants Should Not Be Held in Contempt and For Sanctions [57] be, and hereby is, DENIED.

Dated this ____ day of _____, 2008.

_____
HONORABLE HENRY H. KENNEDY
United States District Court Judge