# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY<br>AND ETHICS IN WASHINGTON,<br><br>        Plaintiff,<br><br>        v.<br><br>EXECUTIVE OFFICE OF THE<br>PRESIDENT, et al.,<br><br>        Defendants. | Civil Action No: 1:07-cv-01707 (HHK/JMF) |
| NATIONAL SECURITY ARCHIVE,<br><br>        Plaintiff,<br><br>        v.<br><br>EXECUTIVE OFFICE OF THE<br>PRESIDENT, et al.,<br><br>        Defendants. | Civil Action No: 1:07-cv-01577 (HHK/JMF) |

**EOP DEFENDANTS' RESPONSE TO MARCH 18, 2008 ORDER TO SHOW CAUSE**

EOP Defendants respectfully submit this Response to the Court's March 18, 2008 Order to Show Cause.

In its Order, this Court correctly observed that extending the scope of the November 12 preservation order in the manner proposed by plaintiff National Security Archive "could have significant effect on EOP," "bringing its daily operations to a halt." Or. at 2. For the reasons set forth in the attached Second Declaration of Theresa Payton, the Court's alternative proposal that EOP be require to "create and preserve a forensic copy of any media that has been or is being

used by any former or current employee who was employed at any time between March 2003 and October 2005" would itself impose significant burdens on the Office of Chief Information Officer ("OCIO") of the Office of Administration and the EOP FRA components.

As described in Ms. Payton's declaration, ordering a "forensic copy" of electronic media for EOP FRA components would require OCIO to outsource the project to a third-party vendor. 2d Decl. ¶ 7.  That process would likely trigger a potentially lengthy and costly procurement process.[1]  See id. ¶ 7.

More fundamentally, however, forensic copies of computer workstations are unlikely to capture residual data of emails sent or received between 2003 and 2005.  2d Decl. ¶¶ 4, 5.  The computer workstations used by EOP FRA component employees today are very unlikely to have been in use before October 2005, while any computer workstations used between March 2003 and October 2005 are unlikely to be in use today.  Id.  Nor is OCIO or any other EOP FRA component likely to possess or control the hard drives from computer workstations for that time period due to OCIO's computer replacement practice described in Ms. Payton's Second Declaration.  See id. ¶¶ 4-5.  As a result, a forensic copy capturing any "residual data" or "unallocated or slack space" on the current workstations is not likely to contain data generated

---

[1] In another case, the parties required months to submit requests for proposals to computer technicians for forensic work to be conducted on computers used by four employees of a party defendant, and then to receive bids by proposed contractors.  See Peskoff v. Faber, Civ. No. 04-526 (D.D.C.), Dkt. Nos. 68, 75.  Here, EOP FRA components currently employ hundreds of employees.  Creating forensic copies of each of their computer workstations would undoubtedly impose significant costs.  Those costs cannot be quantified at this time.  If the Court were to order defendants to obtain such cost data after considering defendants' arguments herein, defendants require and respectfully request additional time to submit requests for proposals and obtain cost estimates from third-party vendors.

between 2003 and 2005, let alone any email data from that period.[2]  Id,  And even if some older computer workstations were in use, finding them and copying their hard drives with the hope that the residual data contains relevant e-mail information would create an "awfully expensive needle to justify searching a haystack."  McPeek v. Ashcroft, 202 F.R.D. 31, 34 (D.D.C. 2001); see also 2d Decl. ¶¶ 5-6.  At base, the allegations set forth in NSA's motion are simply inadequate to order that kind of mandatory injunctive relief and impose those kinds of costs.  See Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (quoting Phillip v. Fairfield Univ., 118 F.3d 131, 133 (2d Cir. 1997)), aff'd, 159 F.3d 636 (D.C. Cir 1998) (when a movant seeks mandatory injunctive relief, i.e., an injunction that "would alter, rather than preserve, the status quo . . . the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction").

Even creating and preserving active data copies,[3] rather than forensic copies, of computer workstations would similarly impose significant time and cost burdens, which would far outweigh any marginal utility gained from creating and preserving those copies.  Copying the computer workstations of any EOP FRA employees who were employed at some point between March 2003 and October 2005 – without knowing whether any e-mail data would even exist on the active space of those hard drives – would require hundreds of hours of work by OCIO

---

[2]  Although forensic copies of older hardware are not made when technology is replaced, the user's profile settings and any .pst files in the profile on the hard drive are copied and transferred to new technology.  2d Decl. ¶¶ 4, 8.

[3]  Unlike forensic copying of all EOP FRA component workstations, OCIO has in-house capability to create snapshot copies of hard drives.  See 2d Decl. ¶ 8.

personnel. See 2d Decl. ¶¶ 9, 10. "When employees are thus diverted from their ordinary duties, the function of the agency suffers to the detriment of the taxpayers." McPeek, 202 F.R.D. at 34. As explained in Ms. Payton's January 15, 2008 Declaration and in her Committee Hearing testimony, this concern is especially heightened here because OCIO employees are currently engaged in a comprehensive effort to inventory all EOP emails in order "to determine whether there may be anomalies in Exchange email counts for any particular days resulting from the potential failure to properly archive emails for the 2003-2005 time period." Jan. 15, 2008 Decl. ¶ 11. Each task imposed on OCIO therefore diverts it from those significant efforts and adversely impacts the priorities of the office. See 2d Decl. ¶ 10.

Requiring either snapshot or forensic copies of the computer workstations, in order to restore and preserve any allegedly missing e-mails, would exceed the jurisdictional bounds of the FRA as well. As set forth in defendants' motion to dismiss, any Court order requiring the retrieval of records exceeds the permissible scope of judicial relief under the FRA. See Defs.' Mot. to Dismiss at 12-13. The Court of Appeals has held that the FRA precludes APA claims seeking this sort of injunctive relief because under the FRA such relief can be sought, if at all, only by the government through the FRA's detailed and exclusive administrative enforcement system. See Armstrong v. Bush, 924 F.2d 282, 294 (D.C. Cir. 1991). Unlike the preservation order requiring defendants to preserve disaster recovery back-up tapes and maintain the status quo, any order requiring mandatory injunctive relief through the restoration, retrieval and preservation of other data would violate the jurisdictional proscriptions of the FRA.

Any of these steps would thus impose significant costs for speculative, marginal value. In the balancing analysis contemplated by the Court, the "irreparable harm faced by the

plaintiffs," Or. at 2-3, lacks evidentiary basis.  As an initial matter, it is simply incorrect that the Office of Administration does not possess back-ups tapes for back-ups of the EOP Network before October 2003.  Rather, in October 2003, the Office of Administration began to preserve all disaster recovery back-up tapes that existed on that date, including back-up tapes predating October 2003.  And, even the 2005 chart plaintiff relies upon recalls only one red-message (or zero) e-mail count date for the March 2003 to October 2003 period, which related to the e-mail count for the Office of Vice President, a PRA entity that is not the subject of suit here.  See NSA Mot., Ex. 7 at 6 (Sept. 12, 2003).  The alleged absence of back-up tapes for the March 2003 to October 2003 period therefore cannot justify the "draconian" measure of creating forensic or other copies of computer workstations on the hope that e-mail data exists, particularly when the chart plaintiff relies on identifies only one red-message date for that period, and then for a PRA entity.

Nor has plaintiff shown that the back-up tapes are missing any e-mails for the period between October 2003 and October 2005.  Ms. Payton stated in her declaration and confirmed during her Committee Hearing testimony that she had "every reason to believe" that emails would be recoverable from the disaster recovery back-up tapes.  See NSA Mot., Ex. 4 (Hr'g Tr. at 121:2862-124:2937 (noting that email restore for OVP mailboxes had been successful, and Ms. Payton agreeing under oath that "certainly with the backups, we have every reason to believe at this point that we will be able to get the documents we seek"); id. at 59:1325-60:1327 (testifying that she is "very confident" that backup tapes may be used to recover email data); id. at 61:1358-1368 (same)).  In order to prove that "extreme or very serious damage will result" to justify mandatory injunctive relief, plaintiff must prove a "clear" entitlement to relief.  See, e.g.,

Judicial Watch, Inc. v. Dep't of Commerce, 501 F. Supp. 2d 83, 91 (D.D.C. 2007) ("[B]ecause the plaintiff seeks a mandatory injunction that would alter the status quo, the plaintiff must demonstrate beyond the familiar 4-part test for injunctive relief that he is 'clearly' entitled to the relief he seeks, or 'extreme or very serious damage will result.'").  To support such relief, plaintiff would have to show "clearly" (1) that e-mails were not properly archived in the October 2003 to October 2005 time frame; (2) that those e-mails are absent from disaster recovery tapes for that period; and, finally, (3) that the hard drives will bear that e-mail information.[4]  Plaintiff wholly fails to do so.

      Finally, the OCIO continues to investigate the allegations that "e-mails have not been properly archived." Or. at 2.  At the Committee Hearing, Ms. Payton described OCIO's pending inventory process of archived .pst files and explained that "roughly 17 million e-mails . . . ha[d] not [been] attributed to a component" through Phase One of OCIO's process, meaning that 17 million .pst files had been located and remained to be counted for a component for the 2003-2005 period.  NSA Mot., Ex. 4 (Hr'g Tr. at 88:2049-89:2054).  She testified about the "promising trends" of the analysis, including the OCIO's identification of "more e-mails for that exact time period that was looked at in 2005 than was previously identified." Id. at 44:951-954.  Indeed, she stated that the OCIO had located e-mails within Exchange "for days that were previously red." Id.

---

[4] Because plaintiff's request is for mandatory injunctive relief, the burden-benefit analysis of creating forensic copies should be more demanding than the analysis relevant to considering discovery demands.  See, e.g., Peskoff v. Faber, 244 F.R.D. 54, 59 (D.D.C. 2007).

Despite the "promising trends," plaintiff relies on its unconfirmed allegation of missing e-mails to justify the extraordinary remedy it seeks. Yet, this Circuit has instructed that the power to issue such preliminary injunctions "should be sparingly exercised," Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (quotation marks omitted), and only when the movant proves that injury is "certain, great and actual - not theoretical - and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." Wisc. Gas Co., 758 F.2d at 674 (emphasis added). Bare allegations, which are all that plaintiff relies on to seek emergency relief, are insufficient to prove irreparable injury. See id.; see also Roth v. Rufus, 2003 WL 25152300, *1 (D.D.C. June 2, 2003) (same).

Put simply, plaintiff cannot justify its request that OCIO and EOP FRA components incur significant time and resource expense on the mere possibility (however unlikely) that some useful material may be restored. Because the allegation of missing e-mail from archives is unconfirmed, because the allegation of missing e-mails from back-up tapes is conjectural, and because the computer workstations are unlikely to house significant, if any, relevant material the costs of a forensic copy process would far outweigh any speculative benefits. Cf. McPeek, 202 F.R.D. at 34 ("A fairer approach borrows, by analogy, from the economic principle of 'marginal utility.' The more likely it is that the backup tape contains information that is relevant to a claim or defense, the fairer it is that the government agency search at its own expense. The less likely it is, the more unjust it would be to make the agency search at its own expense. The difference is 'at the margin.'").

## **CONCLUSION**

For the reasons set forth above, the Court's March 18, 2008 order to show cause should be discharged and NSA's Emergency Motion to Extend TRO/Preservation Order and for Depositions [58] denied.

Respectfully submitted this 21st day of March, 2008.

>JEFFREY S. BUCHOLTZ
>Acting Assistant Attorney General
>
>JEFFREY A. TAYLOR
>United States Attorney
>
>ELIZABETH J. SHAPIRO
>Assistant Branch Director
>
>/s/ Helen H. Hong
>HELEN H. HONG (CA SBN 235635)
>TAMRA T. MOORE (DC 488392)
>Trial Attorney
>U.S. Department of Justice, Civil Division
>P.O. Box 883, 20 Massachusetts Ave., NW
>Washington, D.C.  20044
>Telephone: (202) 514-5838
>Fax: (202) 616-8460
>helen.hong@usdoj.gov
>
>Counsel for Defendants

**CERTIFICATE OF SERVICE**

    I hereby certify that on March 21, 2008, a true and correct copy of the foregoing EOP Defendants' Response to March 18, 2008 Order to Show Cause was served electronically by the U.S. District Court for the District of Columbia Electronic Document Filing System (ECF) and that the document is available on the ECF system.

/s/ Helen H. Hong
HELEN H. HONG

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY<br>AND ETHICS IN WASHINGTON,<br><br>      Plaintiff,<br><br>    v.<br><br>EXECUTIVE OFFICE OF THE<br>PRESIDENT, et al.,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>) Civil Action No: 07-cv-01707<br>)<br>)<br>)<br>)<br>)<br>) |
| NATIONAL SECURITY ARCHIVE,<br><br>      Plaintiff,<br><br>    v.<br><br>EXECUTIVE OFFICE OF THE<br>PRESIDENT, et al.,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>) Civil Action No: 1:07-cv-01577<br>)<br>)<br>)<br>)<br>)<br>) |

**SECOND DECLARATION OF THERESA PAYTON**

I, Theresa Payton, declare as follows:

   1.  My name is Theresa Payton and I currently hold the position of Chief Information Officer (CIO) in the Office of Administration (OA), Executive Office of the President (EOP). In this capacity, I am responsible for providing strategic and operational leadership within the Office of the Chief Information Officer (OCIO). I have held the position of CIO in OA since May 2006.

2.   I submit this Second Declaration pursuant to the Order of Magistrate Judge John M. Facciola dated March 18, 2008.  The statements contained herein are based on my personal knowledge and upon information made available to me by members of my staff in the performance of my official duties.

3.   The Court has ordered the EOP to "show cause in writing . . . why it should not be ordered to create and preserve a forensic copy of any media that has been used or is being used by any former or current employee who was employed at any time between March 2003 and October 2005."  The Court states that "forensic copies" of workstations currently and formerly used by employees of EOP FRA components could capture (1) any e-mail data that was not "properly archived between March 2003 and October 2003, during which time no back-up tapes exist"; or (2) any email data that was not properly archived between October 2003 and October 2005 "to the extent that those e-mails are not, as plaintiffs allege, contained on the back-up tapes."  In responding, the defendants have been directed to "describ[e] the costs that would be incurred and any other facts that would bear on the burden of such an obligation."

**Regular Replacement of Computer Workstations**

4.   As an initial matter, computer workstations used by EOP Federal Records Act (FRA) component employees during the relevant time period covering March 2003 to October 2005 are unlikely to be in use today.[1]  Subject to, among other things, budgetary considerations and customer scheduling conflicts, it has been OA's goal to conduct an IT "refresh" program to replace up to one-third of EOP workstations each

---

[1] The Court's Order also mentions hardware other than workstations (*e.g.* "hard or external drives, CDs, DVDs, jump, zip, hard, or floppy disks").  OCIO does not have a formal process to provide such media to its customers or users, nor does it have any process in place for tracking or monitoring the use of such media.  This is left to the discretion of the user and the components to track and manage.

year. The replacement is necessary in order to run updated software, reduce ongoing maintenance, and enhance security assurance. When workstations are at the end of their lifecycle and retired from the EOP Network under the refresh program, the hard drives are generally sent offsite to another government entity for physical destruction in accordance with Department of Defense guidelines. As stated below in paragraph 8, as part of a refresh, OCIO will make a copy of the current user's active data on the current computer hard drive to move to the new computer hard drive. This may include the data contained in a profiles folder[2]. In addition, if a user saved .pst files in their profile, those .pst files should be copied over.

     5.     Although there may be exceptions, it is expected then, that the vast majority of computer workstations used during the relevant time period would have been replaced approximately every three years in connection with this refresh program. A small number of EOP computers in use before October 2005 may nonetheless still be in use today. Identifying, locating, and surveying these computers presents significant logistical challenges for OA. As I understand it, the OCIO does not maintain a detailed historical log or other record tracking the precise user or location history of any given EOP computer workstation.

     6.     The OCIO is, however, able to remotely query computer workstations currently in use on the EOP Network to detect technical characteristics from which it may infer generally how long a particular workstation has been available for use in the EOP, and whether it may have been used before October 2005. The query process is time

---

[2] A Microsoft Windows user "profile" describes the Windows configuration for a specific user, including the user's environment and preference settings. The user profile contains those settings and configuration options specific to the user, such as installed applications, desktop icons, and color options.

consuming and labor intensive and even then the results of the query process will be difficult to use to identify the user history of that particular computer workstation.

### Burden of Providing "Forensic Copies"

7. Even if computer workstations used during the relevant time period are identifiable and locatable, making "forensic copies" (as that term is defined by the Court) of the workstations that may or may not contain residual data of emails would impose a significant burden on OA. The OCIO has not had a practice of making "forensic copies" of computer workstations. Ordering a "forensic copy" of electronic media would require OA to outsource the project and commence what would likely be a lengthy and costly government procurement process for one or more outside contractors possessing the requisite technical resources and capabilities. And, as with any procurement project, in addition to outside resources, OA resources would be needed in order to effectively manage the effort. The precise duration of the procurement process, as well as costs associated with that process, are not presently knowable, but they must be expected to be substantial given the sensitivity and significance of such a project.

8. Moreover, putting aside "forensic copies", I am aware that OCIO is able to copy the active data on a computer hard drive, which may include the data contained in a profile folder[3] as well as any .pst files saved on the hard drive. Copying the hard drive as described here would usually require less effort than a "forensic copy". Even so, the hard drive copy process, which the OCIO is equipped to perform, can be complex and time consuming, depending on the volume of material within each folder on the hard drive and the number of folders to be copied.

---

[3] See footnote 2.

9. An Order that the OCIO must copy potentially relevant active data from the cited time period, would require it to survey each and every workstation that potentially could contain "profile" folders and other active files of users, or identify and approach each and every user of a subject workstation during the relevant time period. These steps would be necessary in order to ascertain whether any users may have saved .pst files to a hard drive for that relevant time period. To complete this effort, it might require contacting and using the workstations currently assigned to individual users, which likely would adversely impact the ability of the users to perform their duties.

10. As I understand it, an Order requiring defendants to make a copy of all active data on workstations containing profiles from the relevant time period would require hundreds of hours of work by OCIO staff and management personnel. Such an effort would inevitably divert significant resources from the OCIO functions and projects relating to core administration operations such as user support, monitoring information security, providing application support, project management, federal records management, and continuing with the current email inventory re-baseline efforts for the Presidential transition.

//

//

//

//

Executed the 21 day of March, 2008.

*[signature]*
THERESA PAYTON
Chief Information Officer
Office of Administration, Executive
Office of the President