IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL SECURITY ARCHIVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1577 (HKK/JMF) |
| | ) | |
| EXECUTIVE OFFICE OF THE | ) | (Consolidated with |
| PRESIDENT, *et al.*, | ) | Civil Action No. 07-1707 (HKK/JMF)) |
| | ) | |
| Defendants. | ) | |
| | ) | |

PLAINTIFF NATIONAL SECURITY ARCHIVE'S REPLY ON
MARCH 18, 2008 ORDER TO SHOW CAUSE

After being ordered to show cause why Defendant EOP should not be ordered to create

and preserve a forensic copy of media used between March 2003 and October 2005 (through an

affidavit describing the costs and any other facts that would bear on any burden of preserving the

same), Defendant EOP failed to provide the Court with any of the facts it requested. Instead,

Defendant EOP has balked at the Court's Show Cause Order, providing only conclusory

statements regarding cost and burden, without the factual proof necessary to support a discharge

of the Order. The lack of EOP evidence alone requires the conclusion that it has not shown

cause and that the Order should issue. Its dearth of proof coupled with the additional revelations

of harm in Theresa Payton's Second Declaration — that the EOP has destroyed hard drives from

the relevant period, does not monitor or track its own hardware, and has no guidelines in place

for the retention or preservation of other media devices — further affirm the need for this Court

to extend the preservation order to protect these sources of media that the EOP itself has chosen

to callously neglect.

Notwithstanding the above, Plaintiff National Security Archive (the "Archive"), with this Response, seeks to provide the Court with factual evidence regarding the actual cost and burden of forensic copying. As the accompanying declaration establishes, leaps in forensic copying and imaging technology have rendered nominal the cost and burden of preserving media of the type envisioned by the Court. Thus, the minimal costs and burdens to Defendant EOP do not come close to outweighing the likelihood that the obliteration of data — from which the missing emails may be reconstructed — will result in irreparable harm to Plaintiffs. Plaintiff National Security Archive therefore requests that this Court enter an order requiring Defendant EOP to copy or image workstations and to preserve other external media.[1]

## ARGUMENT

## I. THE COST AND BURDEN OF FORENSIC COPYING IS NOMINAL COMPARED TO THE LIKELIHOOD THAT EMAIL DATA WILL BE OBLITERATED

In its Response to March 18, 2008 Order to Show Cause ("EOP Response") [07-1707 Docket # 64-1] (Mar. 21, 2008), Defendant EOP did not provide the Court with any factual proof to support its allegations that preserving email data by copying or imaging workstations would be so costly and burdensome as to outweigh the risk. For example, EOP did not provide the Court with basic facts such as the number of workstations at EOP or the number of workstations per component, the estimated number of hours per workstation to copy or image, or the estimated cost per workstation. Furthermore, Defendant EOP did not provide the Court with other facts, such as the result of a spot-check or random sampling, to support its allegations that copying or imaging of workstations would be fruitless. Instead, EOP makes only conclusory allegations — such as "significant time and cost burdens," EOP Response at 2-4, and "hundreds

---

[1] The Archive still seeks depositions in aid of an extension of the Preservation Order. Courts have ordered such depositions in similar instances to ascertain the nature of government information systems. *Alexander v. FBI*, 188 F.R.D. 111, 118-19 (D.D.C. 1998) (Lamberth, J.).

of hours of work," Second Payton Decl. ¶ 10 — without a shred of factual support. EOP's Second Declaration appears to be based solely on guesswork and conjecture, rather than upon informed inquiry. Therefore, and as discussed further below, EOP's allegations of cost and burden should be ignored in their entirety.

Rather than leave the record completely vacant in this regard, Plaintiff Archive provides the Court with the factual support it seeks regarding the type of email data that is likely to reside on individual workstations at EOP, as well as the cost and time associated with copying and preserving this data. As described below and in the accompanying Declaration of Al Lakhani ("Lakhani Decl."), the relative costs and burdens to Defendant EOP of copying this data are minimal compared to the likelihood that such copying will protect data not otherwise found on EOPs backup tapes.

### A. If Forensic Copying/Imaging is Not Ordered, There is a High Likelihood that Email Data will be Obliterated

As the accompanying Declaration of Al Lakhani provides, it is likely that all emails sent or received between March 2003 and October 2005 are not on the backup tapes.[2] Lakhani Decl. ¶¶ 5-14. Furthermore, it is likely that emails missing from the backup tapes can be found on workstations and other external storage devices. Lakhani Decl. ¶¶ 15-19.[3]

### B. The Cost of Forensic Copying or Imaging is Nominal

As further provided in the Lakhani Declaration, the costs associated with copying or imaging these other sources of missing emails is not only quantifiable, but is also nominal.

---

[2] It is also apparent, *see* Lakhani Decl. ¶ 13, that EOP's message-level method of archiving does not preserve all sender, recipient, and other information, such as workgroup distribution lists, which agencies are required to preserve under the FRA, as the Court of Appeals held in *Armstrong v. Executive Office of the President*, 1 F.3d 1274 (D.C. Cir. 1993).

[3] As the Lakhani Declaration explains, there are certain systematic mechanisms by which Defendants could have increased the probability that all emails would be preserved. Despite having four opportunities to allege that they have enabled these mechanisms (in two Declarations by Ms. Payton, and her written and oral testimony before Congress), it is clear that they have not been enabled.

Lakhani Decl. ¶¶ 20-26. If necessary, the Court can further reduce these costs to Defendant EOP by ordering targeted copying or imaging, such as the copying or imaging of workstations retired between March 2003 and October 2005, or only the copying and imaging of the workstations and media devices of high level officials within EOP.[4]

## C. Defendant's Representations of Cost and Burden are Without Factual Support and Must Thus be Ignored

This Court ordered EOP to "show cause . . . why it should not be ordered to create and preserve a forensic copy of any media" at issue, and stated that showing cause means "describing the costs that would be incurred and any other facts that would bear on the burden of such an obligation." Order at 3 [07-1707 Docket #62] (Mar. 18, 2008). Yet EOP responds that "costs cannot be quantified at this time," and that if "the Court were to order defendants to obtain such cost data . . . defendants require and respectfully request additional time to submit requests for proposal and obtain cost estimate from third-party vendors." EOP Response at 2 n.1. But the Court *already* ordered that EOP's "response *must* include an affidavit describing the costs that would be incurred," Order at 3, and yet Theresa Payton's Second Declaration fails to address cost in anything other than the most conclusory terms, and makes no effort to provide the Court with even a numerical estimate. *See* Second Payton Decl. ¶ 7 ("what would likely be a lengthy and costly government procurement process"); *id.* ("The precise duration of the procurement process, as well as costs associated with that process, are not presently knowable, but they must be expected to be substantial . . .").[5]

---

[4] For example, as the Lakhani Decl. provides, the cost of creating a forensic copy of one workstation is between $50 and $250 and takes less than a half an hour. Lakhani Decl. ¶ 25. Thus, the total cost and time to EOP of creating forensic copies of the workstations of the top 50 EOP employees determined to have emails from the relevant time period is $2,500 and 25 hours.

[5] *See also* Second Payton Decl. ¶ 7 ("significant burden"); *id.* ("what would likely be a lengthy and costly government procurement process"); *id.* (duration and cost of project "are not presently knowable, but they must be expected to be substantial"); *id.* ¶ 8 (even copying active data "can be complex and time consuming"); *id.* ¶ 10

EOP's bald assertions that costs cannot be quantified and are not presently knowable are disingenuous. First, the costs can be quantified; the Archive was able to quantify them. Second, EOP and OA have been able to provide detailed affidavits in the past attesting to the time and expense of conducting even more complicated procedures than the one at issue here. *See Alexander v. FBI*, 188 F.R.D. 111, 116-18 (D.D.C. 1998) (Lamberth, J.) (EOP and OA submitted two declarations describing in detail the cost and time likely to be incurred in order to restore back-up tapes and search for emails).

In ruling on a motion for injunctive relief, courts require "supporting documentation," not simply "a conclusory and empirically dubious proposition." *Columbia Hospital for Women Foundation v. Bank of Tokyo-Mitsubishi, Ltd.*, 15 F.Supp. 2d 1, 5 (D.D.C. 1997) (Kollar-Kotelly, J.). The Archive has demonstrated the risk that FRA-regulated emails will be obliterated. Even though this information is in the peculiar possession and control of Defendants, the Archive has supported its claims for relief with statements by different White House spokespersons and by Ms. Payton's various – and varying – sworn statements, and has demonstrated the magnitude of the injury it faces in its Complaint and the Declaration of Thomas Blanton. [07-1707 Docket # 42-2.]

Simply put, EOP has not articulated any specific facts that would allow the Court to weigh the asserted burden against the risk of irreparable harm to the Archive. Instead of answering the Court's questions, EOP merely argues that the Archive is seeking a mandatory injunction that would alter the status quo, and therefore must meet a higher burden by showing that it is "clearly" entitled to such relief. EOP Response at 3, 6-7. While the propriety of the

---

(continued...)

(copying active data "would require hundreds of hours of work by OCIO staff and management personnel" and would "divert significant resources").

Order contemplated by the Court has already been demonstrated, the Archive is not, in any event, subject to the stricter standard advocated by Defendants.

***Defendant EOP's Stricter Standard Argument is Wrong***

Defendants argue that because the Archive seeks injunctive relief, "the burden-benefit analysis of creating forensic copies should be more demanding than the analysis relevant to considering <u>discovery</u> demands." EOP Response at 6 n.4. They cite no authority for this proposition other than *Peskoff v. Faber*, 244 F.R.D. 54, 59 (D.D.C. 2007) (Facciola, J.), which says no such thing. *Peskoff* impliedly recognizes that EOP would certainly have a preservation obligation in the discovery context because, "[a] preservation obligation may arise from many sources, including common law, statutes, regulations, or a court order in the case," and because "a party is not permitted to exploit the routine operation of an information system to thwart discovery obligations by allowing that operation to continue in order to destroy specific stored information that it is required to preserve." *Id.* at 60 (*citing Disability Rights Council of Greater Washington v. WMATA*, 242 F.R.D. 139, 146 (D.D.C. 2007) (Facciola, J.) (quoting Fed. R.Civ. P. 37, Advisory Committee Note (2006 amendments))). The United States is subject to the same preservation obligations as other litigants, and indeed, "while [it should] not enter[] into the calculus here, a good argument can be made that, as the enforcer of the laws, the United States should take this duty more seriously than any other litigant." *United Medical Supply Co., Inc. v. United States*, 77 Fed. Cl. 257, 274 (Fed. Cl. 2007) (Allegra, J.).

It is certainly *not* the case, as EOP argues, that its preservation obligation would somehow be *less* in this case, where the obligation flows directly from a statute, the FRA, and not from the Federal Rules, and where the records to be preserved are the very *res* around which the entire case centers, and not merely evidence of an alleged violation of duty. If anything, the

preservation expectation should be higher when the records at issue are the subject of the claim for relief, rather than discoverable evidence related thereto. Moreover, in a case of civil discovery, courts can at least fashion some remedies for spoliation of records, such as adverse inferences or even default judgments. But in this suit there are no alternative remedies to be had; if the records are destroyed, much of the case is mooted. That the Court has proposed a compromise solution that is less burdensome to Defendants does not somehow entitle them to impose a stricter burden on Plaintiff. And, in fact, it can be argued that the Defendant government is subject to a stricter preservation standard than that which it argues against.

**_The Order Contemplated By the Court Does Not Constitute a "Retrieval"_**

Defendants' argument that the Order contemplated by the Court amounts to a "retrieval" and therefore "exceeds the permissible scope of judicial relief under the FRA," EOP response at 4, is hardly new and not the least bit convincing; Defendants have advanced it elsewhere in this case, and other courts have rejected the notion that they cannot order preservation of the very records at issue in an FRA case pending adjudication on the merits. *See Citizens for Responsibility & Ethics in Washington v. DHS*, Civil Action No. 06-883, 2007 U.S. Dist. LEXIS 91901, at *30 n.15 (D.D.C. 2007) (Lamberth, J.) ("in some circumstances the Court may, temporarily, order an agency to preserve records until the Archivist is able to ensure that federal records are not destroyed."); *Armstrong v. Executive Office of President*, 810 F.Supp. 335, 349 (D.D.C. 1993) (Richey, J.) (enjoining defendants "from removing, deleting, or altering information on their electronic communications system until such time as the Archivist takes action . . . to prevent the destruction of federal records, including those records saved on backup tapes."); *aff'd.*, Armstrong *v. Executive Office of President*, 1 F.3d 1274, 1288 n.12 (D.C. Cir. 1993) ("Similarly unpersuasive is the appellants' argument that the district court should not have

enjoined the defendant agencies from destroying any electronic records until new guidelines were in place.").

Furthermore, the relief requested by the Archive – a halt to the destruction of all email data on all media – is clearly prohibitory in nature, and is not an affirmative, or mandatory, injunction. "The person named in a mandatory injunction must undo the wrong or injury with which he or she is charged," whereas a "prohibitory injunction requires a party to desist from doing certain acts in order to preserve the status quo." 42 Am. Ju. 2d Injunctions §§ 4, 5. It is well recognized that forensic copying is simply a means to ensure the prevention of the obliteration of files; it ensures preservation of the status quo. "'Preservation' is to be interpreted broadly," and "includes taking reasonable steps to prevent the partial or full destruction . . . of such material, as well as negligent or intentional handling that would make material incomplete or inaccessible." *In re National Security Agency Telecommunications Records Litigation*, MDL Docket No. 06-1791 (VRW), 2007 WL 3306579, at *1 (N.D. Cal. 2007). If it would be unduly burdensome to preserve such material by quarantining it, preservation can be accomplished by "arrang[ing] for the preservation of complete and accurate duplicates or copies of such material." *Id*. at *2.

In issuing the Show Cause Order, the Court acknowledged that the purpose of forensic copying would be "[p]reserving whatever remains of this data," and that irreparable harm to the Plaintiff will occur if emails that are not in the archive or on back-ups are allowed to be obliterated. Order at 2-3 (citing Report and Recommendation [07-1707 Docket #11] (Oct. 19, 2007); *and Serono Labs, Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998) (setting forth traditional standard for TRO and not requiring any heightened showing)). EOP has utterly failed

to articulate the nature or magnitude of the burden that it claims is so great as to bar preservation of the emails that form the subject matter of this suit.

## II.  EOP'S OTHER BURDEN ARGUMENTS ARE SIMILARLY UNSUPPORTABLE

### A.  The EOP Cannot Use a Lengthy Procurement Process as an Excuse

In addition to its unsupported allegations of in-house cost and labor, Defendant EOP makes unsupported allegations regarding the "lengthy and costly procurement process" associated with outsourcing the project to a third-party vendor.  EOP Response at 2.  However, as discussed below, Defendant EOP need not engage in any procurement process, let alone a "lengthy and costly" one.  Given the circumstances, this Court may order Defendant EOP to "hire an independent computer forensics expert" or to confer with the adverse party to obtain a suitable expert.  *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 281 (E.D. Va. 2001); *Peskoff v. Faber*, 244 F.R.D. 54 (D.D.C. 2007) (Facciola, J.) (ordering parties to collaborate with Court in issuing request for proposal seeking bids from qualified forensic computer technicians).[6]

### B.  The EOP Cannot Use its Practice of Recycling Hardware as an Excuse

Furthermore, EOP cannot get out of its preservation obligation by claiming that it has either destroyed hardware or is unable to track the user or location history of any given EOP

---

[6] Furthermore, as a factual matter, Defendant EOP fails to mention or take into account the Mega 3 contract it already has in place with three area vendors to perform this type of work at GSA rates, streamlining for it the procurement process should it be forced to invoke one.  It has been reported that under this Mega 3, 6-year umbrella contract, the Department of Justice may submit task orders for services to be bid on by the three vendors.  *See* Wilson P. Dizard, III, "Justice Taps 3 to vie for $950M in case management work," FEDERAL COMPUTER WEEK (June 19, 2007), *available at* http://www.fcw.com/online/news/103028-1.html (last visited Mar. 25, 2008) (attached as Exhibit A).  The DOJ vendors are CACI International, Labat-Anderson Aspen Systems and Lockheed Martin, the first two of which have expertise in computer forensic services.  *See* CACI International, Inc. Press Release, "CACI Awarded $48 Million Knowledge Management Task Order With Securities and Exchange Commission," (Sept. 25, 2007), *available at* http://www.caci.com/about/news/news2007/09_25_07_NR.html (last visited Mar. 25, 2008) (attached as Exhibit B) *and* Labat-Anderson Aspen Systems website, *available at* http://www.labat.com/litigation.htm (last visited Mar. 25, 2008) (attached as Exhibit C).

computer workstation.[7] Second Payton Decl. ¶ 6. As the Lakhani Declaration provides, however, industry best practices dictates the use of an asset tracing system, such as labeling each workstation with a barcode, to keep track of an organization's IT assets. Lakhani Decl. ¶¶ 19. Furthermore, the fact that EOP may have retired workstations between March 2003 and October 2005 underlines the need for those workstations to be located and preserved: a workstation retired during that time is more likely to have relevant data intact because the workstation has not been turned on or used since it was shelved. *See* Lakhani Decl. ¶ 18.

In any event, the Court should not take into account any burden claimed by EOP that is due solely to EOP's prior failure to preserve federal records and maintain an orderly information system.[8] As this Court has previously noted in the discovery context, "I am anything but certain that I should permit a party who has failed to preserve accessible information without cause to then complain about the inaccessibility of the only information that remains. It reminds me too much of Leo Kosten's definition of chutzpah: 'that quality enshrined in a man who, having killed his mother and his father, throws himself on the mercy of the court because he is an orphan.'" *Disability Rights Council*, 242 F.R.D. at 147 (footnote omitted).

---

[7] Notably, EOP's assertion that it replaces one-third of its workstations each year and yet has no records from which it can easily determine the vintage of the computers suggests either that insufficient inquiry has been made by its declarant about EOP's computer replacement program or that there may still be many computers in use from the relevant period.

[8] In this case, the EOP has had knowledge that its email losses were a concern since at least as early as the criminal investigation in the Valerie Plame matter commenced and a litigation hold was put on EOP's recycling of backup tapes (on or around October 2003). Further, EOP officials have repeatedly been called to meet with congressional committee staff to address the state of their email losses. Moreover, this suit was commenced in September 2007 and counsel for each Plaintiff immediately brought preservation concerns to the attention of counsel for the Defendants. *See* Exhibits 2-5 to Memorandum in Support of Plaintiff's Motion for Leave to Serve Expedited Discovery Requests and to Compel Rule 26(f) Conference [07-1577 Docket #5] (Oct. 26, 2007) (referring to correspondence regarding preservation obligations).

## III. THERE ARE ADDITIONAL EFFICIENT MEANS THAT SHOULD BE UNDERTAKEN TO PRESERVE THE DATA AT RISK

### A. A Preservation Hold Should Be Placed on External Media Devices That May Contain Email Data

In a footnote to her Second Declaration, Ms. Payton states that with respect to that part of the Court's Show Cause Order that mentions hardware other than workstations,[9] the "OCIO does not have a formal process to provide such media to its customers or users, nor does it have any process in place for tracking or monitoring the use of such media." Second Payton Decl. ¶ 4 n.1. As this Court has already observed, individuals frequently save emails to such media devices. *See* Transcript of Hearing Before Magistrate Judge Facciola [07-1707 Docket #5-3] (Oct. 17, 2007) at 9:19-25, 10:2-11. That the OCIO chooses to turn a blind eye to the use of these devices by its employees does not relieve it of its obligation to preserve the evidence contained thereon. *See Disability Rights Council*, 242 F.R.D. at 147 (failure to make information readily accessible should not provide party with an automatic excuse to avoid producing it).

Furthermore, preserving the email data on these external media devices can be done with little burden or cost to OCIO. Ms. Payton's office can simply send a preservation memorandum to all EOP employees, asking them to search their offices for any external media device that may contain email data, to send such media devices to OCIO for preservation and storage, and to certify that they have done so. Should an employee have a continuing need for the external media, the cost of duplicating its contents is nominal.[10]

Similarly, EOP should query personnel about hard copies of emails. The common practice in many federal agencies with respect to retention of email continues to be printing and

---

[9] Specifically, the Order defines "media" as "an 'object or device, such as a disc, tape, or other device, on which data is stored.'" Order at 3 (quoting THE SEDONA CONFERENCE GLOSSARY (2d ed.) at 23).

[10] *See* Lakhani Decl. ¶¶ 24-26.

11

saving hard copies of emails. To the extent this practice remains, those hard copy emails should likewise be searched for and preserved.

Thus, at the very least, OCIO should be ordered to search for and preserve hard copies of emails and external media devices that may contain emails.

### B. OA Should Be Ordered to Remotely Query Workstations

Also in her Second Declaration, Ms. Payton states that the OCIO is able to remotely query computer workstations to determine information related to the time period in which the workstation was in use. Second Payton Decl. ¶ 6. Again, without any factual support for her allegations regarding cost and burden, Ms. Payton states that the process is "time consuming and labor intensive." *Id.* Again, at a minimum, Defendant EOP should be ordered to perform this remote query and create a forensic copy of any of the workstations determined to be in use at any time during the relevant period.

## CONCLUSION

For the foregoing reasons, and those cited in Plaintiff National Security Archive's Emergency Motion to Extend TRO/Preservation Order and for Depositions, Defendant EOP should be ordered to copy or image workstations and other external media containing email data. A Proposed Order is attached.

Respectfully Submitted,

DATED: March 25, 2008

*Attorneys for Plaintiff The National Security Archive*

/s/ Sheila L. Shadmand
JOHN B. WILLIAMS (D.C. Bar No. 257667)
SHEILA L. SHADMAND (D.C. Bar No. 465842)
THOMAS A. BEDNAR (D.C. Bar No. 493640)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
202.879.3939

MEREDITH FUCHS (D.C. Bar No. 450325)

THE NATIONAL SECURITY ARCHIVE
The Gelman Library
2130 H Street, N.W., Suite 701
Washington, D.C., 20037
202.994.7059

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 25th day of March, 2008, I caused a copy of the foregoing

PLAINTIFF NATIONAL SECURITY ARCHIVE'S REPLY ON MARCH 18, 2008 ORDER

TO SHOW CAUSE to be served electronically by the United States District Court for the

District of Columbia's Electronic Case Filing ("ECF") and that this document is available on the

ECF system.

                                           /s/     Sheila L. Shadmand
                                           Sheila L. Shadmand

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL SECURITY ARCHIVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1577 (HHK/JMF) |
| | ) | |
| EXECUTIVE OFFICE OF THE | ) | (Consolidated with |
| PRESIDENT, *et al.*, | ) | Civil Action No. 07-1707 (HHK/JMF)) |
| | ) | |
| Defendants. | ) | |
| | ) | |

## [PROPOSED] ORDER

Upon consideration of Defendant Executive Office of the President's Response to

Court's March 18, 2008 Order to Show Cause [62], and Plaintiff National Security Archive's

Reply thereto, and based on the applicable law and the entire record herein, it is hereby

ORDERED, that Defendant Executive Office of the President send a preservation

memorandum to all employees no later than March 28, 2008, requiring that they search for any

hard copy emails or external media device in their control that may contain email data from

March 2003-October 2005, to send any such devices or copies to Defendant Office of

Administration for preservation, and to certify that they have searched for and preserved all such

devices and copies; and it is further

ORDERED, that Defendant Office of Administration shall be required to remotely query

all computer workstations on its network to determine information about which workstations

were in use during the period relevant to this case; and it is further

ORDERED, that Defendant Executive Office of the President shall create and preserve a

forensic copy of any media, including workstations, that has been used or is being used by any

former or current employee who was employed at any time between March 2003 and October

2005, and such additional or alternative relief the Court deems proper.

    SO ORDERED.


_____
Magistrate Judge John M. Facciola       March _____, 2008

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| | ) | |
| NATIONAL SECURITY ARCHIVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1577 (HKK/JMF) |
| | ) | |
| EXECUTIVE OFFICE OF THE | ) | (Consolidated with |
| PRESIDENT, *et al.*, | ) | Civil Action No. 07-1707 (HKK/JMF)) |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DECLARATION OF AL LAKHANI

I, Al Lakhani, declare as follows:

1.      My name is Al Lakhani and I am a Managing Director at Alvarez & Marsal Dispute Analysis & Forensic Services, LLC ("A&M-DAF").  Within A&M-DAF I am the National Practice Leader for the Forensic Technology & Data Mining practice.  I specialize in assisting clients with a variety of issues involving electronic discovery, computer forensics, and data mining.

2.      I have practiced as a consultant for more than ten years.  During my tenure I have led several investigation and litigation assignments involving large volumes of backup tapes, email and file archives, email and file servers, PC hard drives, a variety of external storage devices[1], and databases.  I have assisted clients running a variety of email systems including Microsoft Exchange, Lotus Domino, and Novell Groupwise.  I have developed and implemented electronic discovery methodologies as well as provided oversight and recommended improvements on existing electronic discovery methodologies.

3.      I have been published and have been asked to speak on topics related to electronic discovery.  I graduated from the University of Texas at Austin with a bachelor's degree in Management Science and Information Systems.

4.      I submit this declaration on behalf of the plaintiff National Security Archive ("the Archive") pursuant to the Order of Magistrate Judge John M. Facciola dated March 18, 2008.  The statements contained in this declaration are based on my personal knowledge and documents filed in this litigation[2].

---

[1] A variety of external storage devices including CDs, DVDs, thumb drives, floppy disks, zip disks, etc.
[2] EOP Defendants' Response to March 18, 2008 Order to Show Cause and attached Second Declaration of Theresa Payton [Docket # 64] (March 21, 2008)
Memorandum Order [Docket # 62](March 18, 2008)("Show Cause Order")
Opposition to National Security Archive's Emergency Motion to Extend TRO/Preservation Order and for Depositions [Docket # 60](March 14, 2008)
Emergency Motion to Extend TRO/Preservation Order and for Depositions, and accompanying Declaration of Sheila L. Shadmand and attached Exhibits 1-14 [Docket # 58] (March 11, 2008)
Response to Declaration of Theresa Payton [Docket # 50](March 17, 2008)
Notice of Filing, Declaration of Theresa Payton [Docket # 48](January 15, 2008)
Memorandum Order [Docket # 46] (January 8, 2008)
Reply to Motion to Expedite Service of Discovery Requests and to Compel Rule 26(f) Conference [Docket # 20] (November 21, 2007)

5.      Ms. Payton states in her first declaration[3], "*Prior to October 2003 and continuing through 2005 and to the present, this office has regularly created back-up tapes for the EOP Network, which includes the system's email servers.  Consistent with industry best practices relating to tape media management for disaster recovery back-up systems, these tapes were recycled prior to October 2003.*"  Based on this statement backup tapes created prior to October 2003 have been recycled and therefore user mailboxes, journal recipient mailboxes, and personal storage files ("PSTs") that were stored on these backup tapes have been destroyed.

6.      Ms. Payton's further states, "*In October 2003, this office began preserving and storing all backup tapes and continues to do so.  For that reason, emails sent or received in the 2003-2005 time period should be contained on existing back-up tapes.*"  However, I do not believe that all emails sent or received between October 2003 and October 2005 could be preserved on backup tapes based on the information I have reviewed.

INCOMPLETE PRESERVATION OF EMAILS BETWEEN OCTOBER 2003 AND OCTOBER 2005

7.      In his response to Chairman Waxman's interrogatories Mr. McDevitt states[4], "*The initial email retention process involved a manual process of copying messages from the*

---

Order [Docket # 18] (November 12, 2007)
Opposition to Motion to Expedite Service of Discovery Requests and to Compel Rule 26(f) Conference [Docket # 16] (November 9, 2007)
Motion to Expedite Service of Discovery Requests and to Compel Rule 26(f) Conference [Docket # 5 07-1577](October 26, 2007)
Objection to Report and Recommendation [Docket # 12] (October 23, 2007)
Report and Recommendation [Docket # 11] (October 19, 2007)
[3] Notice of Filing, Declaration of Theresa Payton [Docket # 48]
[4] Exhibit 8 to Declaration of Sheila L. Shadmand in Support of Emergency Motion to Extend TRO/Preservation Order and for Depositions [Docket # 58]

*Exchange journals to .pst files for storage and retention.*"  A monotonous manual process introduces human error.  Therefore, without detailed email logs that match up the counts of emails in the journal recipient mailboxes with the total counts of emails in the various exported PST files, it is not possible to ensure that all emails sent or received between October 2003 and October 2005 have been successfully exported and therefore preserved.

8.      In his response to Chairman Waxman's interrogatories Mr. McDevitt states, "*At some point, this process was partially automated using a utility designed for this purpose. The Mail Attender utility was used to automatically copy email message from the journals to the .pst files on a regular basis.*"  Mail Attender is a product from the company Sherpa Software.  I have used a similar product from Sherpa Software called Discovery Attender. Certain earlier versions of Discovery Attender contained bugs that often created empty and corrupted PST files.  Given that both Mail Attender and Discovery Attender use the same framework called Microsoft Data Access Components ("MDAC"), it is highly likely that the same bugs that I faced in Discovery Attender could be prevalent in the earlier versions of Mail Attender. Furthermore, the information I have reviewed does not state when Mail Attender was first deployed or how it was used to "partially automate" the archiving of emails.  Therefore, without detailed email logs that match up the counts of emails in the journal recipient mailboxes with the total counts of emails in the various exported PST files and the date of deployment for Mail Attender, it is not possible to ensure that all emails sent or received between October 2003 and October 2005 have been successfully exported and therefore preserved.

9.      In his response to Chairman Waxman's interrogatories Mr. McDevitt states, "*In mid-2005, prior to the discovery of the potential email issues, a critical security issue was identified and corrected.  During this period it was discovered that the file servers and the file directories used to store the retained email .pst files were accessible by everyone on the EOP network.*"  This type of unrestricted and untraceable access to PST files creates the risk of entire deletion of PST files and/or modification of the emails within the PST files.  Without knowing the extent to which any deletion or modification was performed to a PST file, it is not possible to ensure that all emails sent or received between October 2003 and October 2005 have been successfully preserved.

10.      In his response to Chairman Waxman's interrogatories Mr. McDevitt states, "*The initial set of actions was simply to organize and inventory the .pst files used for EOP email records retention and to put in place a formal process to manage these files.  The primary issue was the .pst files were scattered across various servers on the EOP network.*" Without a complete inventory of PST files created it is not possible to determine if certain PST files are missing from the various servers on the Executive Office of the President ("EOP") network.  Therefore, it is not possible to ensure that all emails sent or received between October 2003 and October 2005 have been successfully preserved.

11.      In his response to Chairman Waxman's interrogatories Mr. McDevitt states, "*I began to notice a few anomalies with these files.  These included....inconsistent naming of files that made it difficult to determine the associated component and date to which the file was associated.*"  A major drawback of inconsistent file naming is that more than one file with the same name could be created.  When these files are copied from one location to another

manually it is highly likely that files with the same name are overwritten due to human error.  Given that files could be accidentally overwritten it is not possible to ensure that all emails sent or received between October 2003 and October 2005 have been successfully preserved.

12.    In the response to Chairman Waxman's interrogatories, Mr. McDevitt's states, "*If my recollection is correct, at that time there were over 5,000 .pst files with an average size of approximately 2 Gigabytes.*"  A common limitation of an American National Standards Institute ("ANSI") based .PST file is that it has a maximum size limit of 1.937 GB.  Therefore, if emails totaling more than 1.937 GB are copied into a PST file, the excess emails are lost.  Unless there are programmatic or manual checks to ensure that emails totaling more than 1.937 GB are not copied into a PST file, it is not possible to ensure that all emails sent or received between October 2003 and October 2005 have been successfully preserved.

13.    An EOP document made available to and made public by Chairman Waxman's Oversight Committee[5] includes a presentation slide with the heading, "*...to close exposures to risk.*"  This presentation further states, "*Upgrade Exchange servers to Exchange 2003 (for "enveloping" capability).*"  With Exchange 2003 and Exchange 2000 SP3, Microsoft introduced a new "envelope-level" capability as part of their journaling feature.  However, based on this EOP document it is clear that this envelope-level journaling capability was not enabled on the EOP network; instead message-level journaling was enabled.  Message-level journaling does not capture messages where recipients were blind carbon copied

---

[5] Exhibit 6 to Declaration of Sheila L. Shadmand in Support of Emergency Motion to Extend TRO/Preservation Order and for Depositions [Docket # 58]

(Bcc), recipients that received automated replies, and recipients whose emails were automatically forwarded. Additionally, message-level journaling does not capture the list of email addresses that received an email sent to distribution group[6]. Since envelope-level journaling was not enabled, it is not possible that all emails sent or received between October 2003 and October 2005 have been successfully captured.

14.    Based on reasons provided regarding the loss of emails in paragraphs seven through 13 of this declaration, and the fact that Ms. Payton's Congressional testimony and two declarations do not address a resolution to the procedural and technical issues faced by this email archiving process, it is highly likely that emails sent or received between October 2003 and October 2005 have not been successfully preserved via the journaling and export to PST file processes.

FULL RECOVERY OF MISSING EMAILS

15.    It is certain that without envelope-level journaling, emails where recipients were Bcc'd, emails with automatic reply and forward, and emails sent via distribution lists were not captured. Other emails that were initially captured but due to procedural and technical issues were lost, also need to be re-captured.

16.    It is common practice for users to archive emails from their Exchange mailboxes to a separate PST file on their PC or an external storage device. Exchange users often use this "archiving" capability to manage the size of their Exchange mailbox.

---

[6] Distribution groups are created by companies to enable the mass emailing of information to certain pre-defined groups.

Organizations typically establish limits on the size of the user mailboxes and turn off delivery of email when these mailbox sizes are exceeded.

17.     To the extent users have archived emails, including those received as a Bcc recipient, received based on an the automatic reply and forward, or received as part of a distribution list, it is possible that these emails could be recovered from the user's PC or external storage devices. Therefore, in order to capture all emails sent or received between October 2003 and October 2005, it is necessary to capture all PST files from the user PCs and/or external storage devices.

18.     Ms. Payton states in her second declaration[7], "*When workstations are at the end of their lifecycle and retired from the EOP Network under the refresh program, the hard drives are generally sent offsite to another government entity for physical destruction in accordance with the Department of Defense guidelines.*"  Hard drives from the retired workstations can contain recoverable PST files to the extent the hard drives have been warehoused and not destroyed.  Therefore, if workstations and their hard drives were retired as a result of the termination of an employee, the hard drives should be retrieved and all PST files from these hard drives captured to ensure that all emails sent or received between October 2003 and October 2005 are captured.

19      An asset tracing system, which is often used by many organizations to keep track of their IT assets, can be used for the identification and recovery of hard drives that are warehoused as a result of the termination of the employee.  Industry best practices

---

[7] EOP Defendants' Response to March 18, 2008 Order to Show Cause and attached Second Declaration of Theresa Payton [Docket # 64]

often include labeling warehoused workstations and/or hard drives with a barcode label to facilitate the tracking of the asset.

MANAGING COSTS DURING THE RECOVERY OF EMAILS

20.    An EOP document made available to and made public by Chairman Waxman's Oversight Committee includes a presentation slide with the heading, "*This risk can be mitigated.*"  This presentation further states, "*Update Mail Attender; Automated scheduling of the .pst creation and storage process; Better and consistent naming support; More reliable performance.*"  In another EOP document labeled MEMORANDUM FOR JOHN STRAUB, Mr. McDevitt states under the FUNDING PROFILE sub-section, "*Mail Attender has been purchased.*"  Both these statements indicate that Mail Attender has been purchased by the Office of Administration ("OA").  However, an updated version of Mail Attender needs to be procured in order to improve the PST file archiving process.

21.    Mail Attender, as mentioned earlier, is a software product from the company Sherpa Software.  In addition to the current role that Mail Attender fills with the OA, the latest version has the capability to silently and remotely crawl a user's PC and report the number of PST files and certain metadata about the emails contained in these PST files. Additionally, Mail Attender also has the capability to copy the emails contained in these PST files to a central location while maintaining the integrity of the email message.  Since the OA already owns Mail Attender it is possible to create and automate a process by which emails from PST files stored on networked PCs are automatically located, inventoried, copied to a central location, and QC'd for accuracy.

22.     Given the fact that the OA currently owns a version of Mail Attender, it is highly unlikely that the OA would have to buy a full version of Mail Attender for all their 3,000 customers.  Instead, they might have to only purchase an upgrade for their current version of Mail Attender, which is typically significantly cheaper than having to purchase a full version.  However, in the event the OA has to purchase a full version, the total cost of the software for 3,000 users should be approximately $25,000.

23.     Retired hard drives (discussed in paragraph 18) and external storage devices such as USB drives, thumb drives, zip drives, writeable CDs and DVDs, etc. can change certain metadata when they are connected to a PC.  Therefore, data from these devices should be collected using a forensic collection method.  Depending on the type of data and the sensitivity of the collection, the following three paragraphs list the types of forensic collection methods that are available.

24.     Forensic imaging creates a "bit-by-bit" copy of the entire retired hard drive or external storage device using specialized forensic software such as Guidance Software's EnCase and AccessData's FTK.  This type of a forensic collection method allows the search of the unallocated space[8] as well as the recovery of any deleted files.  The typical cost of forensic imaging a 100 GB hard drive is between $400 and $1,000 and it takes approximately two to three hours to complete the imaging.  Imaging of smaller external storage devices can cost between $50 and $250 and take between 15 and 30 minutes.

---

[8] Unallocated space is space that is typically labeled "Free" by a PC's operating system. However, this space is often used by programs to write temporary user and system data. Deleted files are also part of unallocated space.

25.     Forensic copying, which is different than forensic imaging, also uses forensic software such as EnCase and FTK, but instead of creating a bit-by-bit copy of the entire hard drive or external storage device, it loads the device in "preview" mode and enables the extraction of the necessary files.  The typical cost of forensically copying PST files from a 100 GB hard drive is between $50 and $250.  Copying of PST files from smaller external storage devices such as thumb drives, zip drives, etc. can cost between $50 and $250. Depending on the size of the PST it can take 15 to 30 minutes to copy the file from a hard drive or an external storage device.  However, forensic copying does not capture unallocated space from the hard drive or the external storage device.

26.     "Write-block copying" is one way to extract the files from a hard drive or external storage device without the use of forensic software such as EnCase and FTK. Write-block copying uses a hardware device that is attached to a hard drive or external storage device to "freeze" the device into a read-only mode.  This enables the user to extract files without writing to the hard drive or external storage device.  The cost of one write-block device is between $250 and $500.  A write-block device can be used multiple times to extract PST files from hard drives or external storage devices.  However, write-block copying does not capture unallocated space from the hard drive or the external storage device.

I declare under penalty of perjury, the foregoing to be true and correct to the best of my knowledge.

Executed the 25th day of March, 2008.

_____
Al Lakhani
Managing Director
Alvarez & Marsal Dispute Analysis & Forensic Services, LLC

# EXHIBIT A

# FCWCOM

## TECH WATCH
# Mobile IT

OUR SITES    CURRENT ISSUE    SPOTLIGHT ON    SUBSCRIBE    BLOGS    WEBCASTS    INDUSTRY INSIGHTS    EVE

**SEARCH FCW**

> Advanced Search



**CURRENT PRINT ISSUE**

Federal Computer Week

FED 100 AWARDS

**Subscribe Now!**

**Table of Contents**

**NEWS TOPICS**

Business
BPM
CXOs
Columns
Columnists
Defense
E-Government
Elections 2008
Enterprise Architecture
Funding
Homeland Security
Health IT
IPv6
LOB
Management
Procurement
Privacy
Policy
Program Management
State and Local
Security
Technology
Telework
Workforce

## FCW.COM STORY

Print | E

## Justice taps 3 to vie for $950M in case management work

**By Wilson P. Dizard III**
**Published on June 19, 2007**

The Justice Department tapped three major information technology vendors to compete for task orders under a $950 million, six-year umbrella contract to provide automated litigation support services. DOJ could use the new agreements to help consolidate its diverse fleet of litigation case management systems.

CACI International, Labat-Anderson Aspen Systems and Lockheed Martin received awards earlier this month under the Mega 3 contract to provide the services. The companies will help operate and maintain the department's case management systems on an indefinite-quantity, indefinite-delivery basis, according to procurement documents and vendor notices.

Each company will have the opportunity to bid on task orders for work under the Mega 3 contract.

Justice formerly used Mega 2 systems support services contracts to help operate case management systems in the headquarters offices of its Civil, Antitrust, Civil Rights, Criminal, Environmental and Natural Resources divisions, as well as the Executive Office for U.S. Attorneys. The department's Tax Division is developing a separate litigation support program, according to procurement documents.

In addition, dozens of U.S. attorneys' offices nationwide have built and now operate their own separate case management systems.

DOJ is the lead agency for the litigation Case Management Line of Business (LOB) project sponsored by the Office of Management and Budget. The FBI, Justice's law enforcement arm, is building the Sentinel investigative case management system as the lead agency for OMB's investigative case management LOB project.

The Case Management LOB plan originally called for a third variety of case

**Comment**

**Click here to comment on this article**

**Related story links**

**The case management challenge**

**Newsletters**

You might also be interested in these FCW newsletters:

**Daily**

**To learn more, click here.**

**Latest News**

| FCW | GCN | Washtech |

The most recent manageme from FCW.com

**NIH researcher loses lapt 2,500 patients**

**Disaster action plan insp**

**EPA may have lost data i closures**

**DOD refines architecture**

**Contractors that accesse passport file named**

The latest technology news

**Leveraging the IT skills o of workers**

**Congressional watchdog**

**Air Force to upgrade netw**

**Data at rest? Rest easy**

**Beckstrom is NCSC direc**

The latest industry news fro WashingtonTechnology.cor

**Datapath to maintain Arm systems**

**More Topics**



**FCW SHORTCUTS**

Home
Letters to the Editor
Current Issue/Download
Print/Online Archives
Editorial Calendar

**INDUSTRY INSIGHTS**

management systems to be developed as a blueprint for federal agencies to handle administrative cases. The administrative case management project has been relegated to third place behind the other case management projects.

The department used the National Institutes of Health's CIO-SP2 contract vehicle for the procurement, according to information posted on the FedBizOpps.gov Web site.

CACI has been providing case management services to Justice since 1978.

CACI said one benefit DOJ would receive under the litigation case management project is the company's Online Mega Web Portal or OMEGA. It combines management and technical tools for CACI and the department, so the company's litigation support staff can receive tools to speed data collection, tracking and analysis.

OMEGA will provide Justice's case managers with "fast, secure and easy access to shared libraries, court calendars, project milestones and associated tools," CACI said.

"DOJ attorneys and staff also use OMEGA's powerful search capabilities to quickly and effectively scan through vast repositories of evidentiary material," the company said in an announcement.

Justice's awards to the three companies last one base year with five option years, according to procurement documents.

Odyssey Systems gets A

DCS wins Navy R&D wor

Legislators: DHS doing a
sharing

L-1 to buy Digimarc's ID

ADVERTISEMENT





Oracle Microsite
CA Microsite
GI:Network Management
PEO-EIS Catalog
Priority Report: IT
Security



**UPCOMING EVENTS**

The Federal 100 Awards Gala 2008
March 24, 2008

Knowledge Management 2008

**TOP JOBS** ON WASHINGTONPOST

Director, MMT Product Develop

Senior Interactive Web Designe

Marketing Manager /

# EXHIBIT B

# News Release



CACI International Inc · 1100 North Glebe Road · Arlington Virginia 22201

## CACI Awarded $48 Million Knowledge Management Task Order With Securities and Exchange Commission

### *Company to Provide Electronic Document Discovery and Computer Forensics Support*

Arlington, VA, September 25, 2007 - CACI International Inc (**NYSE:CAI**) announced today that it has been awarded an estimated $48 million task order, for one base year and four option years, to provide electronic document discovery (EDD) and computer forensics solutions to the Securities and Exchange Commission (SEC), Division of Enforcement. The competitive award was made by the General Services Administration's Federal Systems Integration and Management Center (FEDSIM) under the Millennia Lite contract vehicle. The contract increases the size and scope of EDD services the company has been providing to the SEC on other contracts and expands CACI's role to the new area of forensics. The award supports CACI's knowledge management area of business.

As the SEC enforces regulations governing the securities industry, CACI's EDD solutions help the SEC convert electronic documents into formats that SEC attorneys can use to prepare their legal cases. CACI's computer forensics services provide the specialized tools and expertise necessary to systematically inspect a computer system and its contents for evidence, while also preserving the integrity of the original data. Computer forensics generally requires capabilities beyond normal data collection and preservation.

CACI, as one of the nation's premiere providers of litigation support services, has the demonstrated resources and expertise to convert large volumes of electronic material into required formats, effectively and on time. The company offers substantial expertise in electronically processing documents, creating litigation support databases and securely uploading files and records. Moreover, CACI has begun building a forensics practice to meet the growing demand for computer forensics support, and will provide the SEC with training and related services in this area as the agency pursues accreditation for its forensics laboratory.

According to Bill Fairl, CACI's President of U.S. Operations, "CACI offers the Securities and Exchange Commission proven solutions in electronic document discovery and forensics. We bring considerable expertise in converting data into formats the SEC can use to win cases and enforce the law."

CACI President and CEO Paul Cofoni said, "This award broadens the knowledge management services and solutions CACI delivers to the Securities and Exchange Commission and other law enforcement clients. It also provides a significant opportunity for CACI to develop a substantial forensics capability that we can offer to other clients in the law enforcement community. CACI is dedicated to providing innovative solutions for our clients' important missions."

CACI International Inc provides the IT and network solutions needed to prevail in today's new era of national security, intelligence, and e-government. From systems integration and managed network solutions to knowledge management, engineering, simulation, and information assurance, we deliver the IT applications and infrastructures our federal customers use to improve communications and collaboration, secure the integrity of information systems and networks, enhance data collection and analysis, and increase efficiency and mission effectiveness. Our solutions lead the transformation of national security and intelligence, assure homeland security, enhance decision-making, and help government to work smarter, faster, and more responsively. CACI is a member of the Fortune 1000 Largest Companies of 2007 and the Russell 2000 index. CACI provides dynamic careers for more than 10,600 employees working in over 120 offices in the U.S. and Europe. CACI is the IT provider for a networked world. Visit CACI on the web at **www.caci.com**.

http://www.caci.com/about/news/news2007/09_25_07_NR.html

*There are statements made herein which do not address historical facts and, therefore could be interpreted to be forward-looking statements as that term is defined in the Private Securities Litigation Reform Act of 1995. Such statements are subject to factors that could cause actual results to differ materially from anticipated results. The factors that could cause actual results to differ materially from those anticipated include, but are not limited to, the following: regional and national economic conditions in the United States and the United Kingdom, including conditions that result from terrorist activities or war; failure to achieve contract awards in connection with recompetes for present business and/or competition for new business; the risks and uncertainties associated with client interest in and purchases of new products and/or services; continued funding of U.S. government or other public sector projects in the event of a priority need for funds, such as homeland security, the war on terrorism or rebuilding Iraq; government contract procurement (such as bid protest, small business set asides, etc.) and termination risks; the results of government investigations into allegations of improper actions related to the provision of services in support of U.S. military operations in Iraq; individual business decisions of our clients; paradigm shifts in technology; competitive factors such as pricing pressures and/or competition to hire and retain employees (particularly those with security clearances); material changes in laws or regulations applicable to our businesses, particularly in connection with (i) government contracts for services, (ii) outsourcing of activities that have been performed by the government, and (iii) competition for task orders under Government Wide Acquisition Contracts ("GWACs") and/or schedule contracts with the General Services Administration; our own ability to achieve the objectives of near term or long range business plans; and other risks described in the company's Securities and Exchange Commission filings.*

# # #

**For investor information contact:**

David Dragics
Senior Vice President, Investor Relations
(866) 606-3471
***ddragics@caci.com***

**For other information contact:**

Jody Brown
Executive Vice President, Public Relations
(703) 841-7801
***jbrown@caci.com***

# EXHIBIT C



*Commitment to Quality*    *Reputation for Excellence*    contact us

home | sitemap | search

# LABAT-ANDERSON INCORPORATED
Managing operations, environment, and information through technology

## Litigation Support Services

**SERVICES**
information services
litigation support
facilities management
GSA schedules

**Litigation Support**
We draft motions and briefs, conduct legal research, support discovery, and assist in trial or negotiation preparations.

**Computer Forensics**
We provide a wide range of computer forensic services which include on-site image acquisition, media & network examination, restoration of deleted files, password recovery/file decryption, and resulting expert reports and courtroom testimony. LABAT employs certified, experienced examiners who use computer forensic industry standard tools and protocols to provide accurate, dependable results.



Matt Sherman
Jeff Maynard
Om Batra
Tony Nguyen

**Electronic Files Processing**
We provide flexible solutions to meet client needs in managing discovery document collections in native file format. LABAT can process native file collections for review or production, and subsequently convert only desired documents to a standard image format. Bypassing the scanning process, converting only selected documents, or managing discovery in native file format without conversion can all lead to substantial cost savings while meeting court mandates.

**Document Acquisition and Management**
We review, select, and organize documents for filing, scanning, file or document-level index-ing, microfilming, imaging, copying, or Bates numbering.

**Imaging**
We build document imaging systems that meet your specific needs. Search and view your evidence and document productions quickly and easily.

**Conversion**
Either alone or in conjunction with the installation of an imaging system, we convert backlogs of paper, film, or electronic documents.

**Database Creation**
We create open systems with controlled vocabulary development, database design and coding, conversion, database loading, quality control, and testing.

**Database Maintenance**
A full range of support includes training, user manuals and help systems, maintenance, backups, search and retrieval.

**Subject Experts**
When your project requires it, we supply subject experts in areas such as auditing, financial analysis, accounting, chemistry, medicine, law, engineering,

environmental compliance, technical writing, and translation.

**Pre-trial and Trial Support**
Whether local or around the world, we provide full on-site litigation support and coordination to allow your litigation team to focus on strategy.

**Investigative Services (Click for more)**
LABAT-ANDERSON can provide your private and government agencies with a full spectrum of an investigative support ranging from simple skip tracing to complex litigation.

**Administrative Systems Support**
We employ the latest technology in case management and tracking tools, project reporting, automated data processing, and local/wide area networking.

Click here to contact the Vice President of Litigation Support Services.

home | services | gsa schedules | employment | location | sitemap | search

Copyright © 2006
LABAT-ANDERSON INCORPORATED
8000 Westpark Drive, Suite 400, McLean, VA  22102
Phone: 703-506-9600