IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, ) ) ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No: 1:07-cv-01707 (HHK/JMF) |
| ) | |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., ) ) ) | |
| Defendants. ) | |
| NATIONAL SECURITY ARCHIVE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No: 1:07-cv-01577 (HHK/JMF) |
| ) | |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., ) ) ) | |
| Defendants. ) | |

**DEFENDANTS' RESPONSES TO AND REQUEST FOR RECONSIDERATION
OF THE FIRST REPORT AND RECOMMENDATION ON
PLAINTIFF NSA's MOTION TO EXTEND TRO/PRESERVATION ORDER**

**INTRODUCTION**

Plaintiff NSA's latest request for expanding the Court's preservation order strays from

the core issues presented in the consolidated complaints. Although the complaints simply (1)

ask whether defendants should notify the Attorney General of any "unlawful removal . . . or

destruction of records" to initiate recovery action, 44 U.S.C. § 3106, and (2) question whether

defendants' record-keeping practices are adequate under the Federal Records Act ("FRA"),

plaintiff would sidetrack the Court on questions only marginally relevant, if at all, to the issues

presented in the consolidated complaints. Indeed, no fewer than twenty-one filings have been

exchanged, and five court orders have been issued, in response to motions for temporary

injunctive relief, expedited discovery, and expansion of an order already in place. Each of those

voluminous filings boils down to one rather straightforward issue: even if, as plaintiffs allege,

some emails do not now exist in the EOP .pst file stores[1], has the Court been assured that it will

be able to order effective relief later? The answer is undeniably yes. The disaster recovery

back-up tapes under court-ordered preservation will allow the Court to order effective relief, if

necessary, going forward.

As a result, NSA cannot demonstrate the "certain, great and actual" injury necessary to

justify additional injunctive relief, Wisc. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985),

let alone the "extreme or serious damage" required to obtain the mandatory injunction it requests

here. Judicial Watch v. Dep't of Commerce, 501 F. Supp. 2d 83, 91 (D.D.C. 2007). Yet,

plaintiff would have the inquiry detoured from an appropriate analysis of the Court's ability to

provide relief, to an improper analysis of how best to preserve likely duplicate and triplicate

copies of emails, if in fact, those copies can be harvested through an extremely burdensome,

time-consuming and disruptive process. The Court's reconsideration of the straightforward issue

presented in NSA's latest motion should compel this Court to amend the conclusions reached in

---

1 "EOP .pst file stores" are the .pst files stored on the EOP Network from the Office of
Administration's email "archiving process" described in paragraph 5 of the Declaration of
Theresa Payton [48-2]. A "personal storage table," or ".pst," file is the file type used to store
electronically selected email messages sent or received via Microsoft Outlook.

the April 24, 2008 First Report and Recommendation ("First Report")[2] and to deny relief on NSA's Motion to Extend TRO/Preservation Order and for Depositions [58].

## BACKGROUND

Under the FRA, agency heads must provide for "economical and efficient management of the records of the agency." 44 U.S.C. § 3102. The FRA does not require an agency to "save 'every scrap of paper,'" Armstrong v. EOP, 1 F.3d 1274, 1287 (D.C. Cir. 1993), but simply those "to the extent required to document the organization, functions, policies, decisions, procedures and essential transactions of the agency." 36 C.F.R. § 1220.14 (2002) (emphasis added). Moreover, the FRA provides only limited remedies for the unlawful removal or destruction of federal records. The D.C. Circuit instructs that injunctive relief can be sought, if at all, only by the government through the FRA's detailed and exclusive administrative enforcement system. See Defs.' Resp. to March 18, 2008 Or. to Show Cause [64] at 4 (citing Armstrong v. Bush, 924 F.2d 282, 294 (D.C. Cir. 1991)).

---

2 For the reasons set forth in the First Report, defendants' opposition to the motion, and in this filing, this Court appropriately concluded that expedited discovery and court-supervised depositions are not justified under the law. See First Report at 8-9. Defendants do not challenge that conclusion.

Against this backdrop of the FRA's actual requirements and the nature of the remedy it provides, plaintiff's focus on the intricacies of technical questions about "slack space," "forensic copying," "remote querying," and ".pst files" misses the mark. The only relevant question before the Court is an "extremely narrow" one about the Court's ability, if necessary, to preserve its ability to afford effective relief on the merits.[3] Or. [11] at 2 (Oct. 19, 2007). This question has been addressed -- on numerous occasions – and resolved by the Court's November 12, 2007 Order. The disaster recovery back-up tapes in the Office of Administration's "possess[ion] or . . . custody or control," Or. [18] at 2 (Nov. 12, 2007), "should contain substantially all the emails sent or received in the 2003-2005 time period," Decl. of Theresa Payton [48-2] ¶ 12d (Jan. 15, 2008) ("Payton Decl."), and are under court-ordered preservation. Or. [18] at 2. The Court has satisfied any need to ensure itself the ability to afford effective future relief, and that should be the end of the matter.

It is therefore remarkable that NSA continues to ask this Court to consider imposing extreme injunctive relief that would impose significant burdens on the Office of Administration ("OA"), while providing no marginal benefit to the plaintiffs or the Court. The history of plaintiffs' repeated requests for injunctive relief illuminates just how far plaintiffs have strayed from the Court's initial inquiry about preserving its ability to provide effective relief. In relevant part, after the Court ordered defendants to preserve its disaster recovery backup tapes, see Or. [18] at 2 (Nov. 12, 2007), plaintiffs raised unsupported doubts about the completeness of the

---

3  Even then, plaintiffs have provided no evidence to establish the predicate condition for any concern about the Court's ability to afford relief:  that there are missing emails to justify its request for injunctive relief.  See, e.g., Defs.' Opp'n to Mot. for TRO [4]; Defs.' Obj. to report

–4–

disaster recovery back-up tapes and sought, among other things, expedited discovery on this and other issues.  In response, this Court explained that "[t]o the extent that the missing emails are contained on the back-ups preserved pursuant to Judge Kennedy's order, there is simply no convincing need to expedite discovery."  Mem. Or. [46] at 3 (Jan. 8, 2008).  "If the missing emails are not on those back-ups," this Court posited, "emails that might now be retrievable from email account folders or 'slack space'" would be considered for preservation.  Id.  Thus, the Court requested a "<u>small amount of information</u> not currently in the record," and posed four questions to obtain that small amount of information.  Id. at 4 (emphasis added).

EOP defendants responded on January 15, 2008 with a declaration from Ms. Theresa Payton, Chief Information Officer for the Office of Administration.  Among other things, Ms. Payton explained that email sent or received between 2003 and 2005 should be on the disaster recovery back-up tapes under court-ordered preservation.  See Payton Decl. ¶ 12(c); <u>see also</u> <u>id.</u> ¶ 12(d) (explaining that "the back-up tapes should contain substantially all the emails sent or received in the 2003-2005 time period," which are the emails that are the subject of the lawsuit).

On March 11, plaintiffs CREW and NSA requested additional emergency relief, contending that Ms. Payton's declaration contradicted earlier-sworn testimony provided before the Committee on Oversight and Government Reform on February 26, 2008.  <u>See, e.g.</u>, Pl. CREW's Mot. for Or. to Show Cause [57]; Pl. NSA's Emergency Mot. for TRO [58].  Plaintiffs each alleged, in some form, that OA knew emails were missing from the EOP .pst file stores and

_____

and Recommendations [12].

were not contained on backup tapes, and that OA was destroying, or permitting destruction of, other potential repositories of such emails.[4]  See, e.g., NSA Em. Mot. [58] at 2.

Although defendants established that plaintiffs' doubts were unsupported and contradicted by the record, see Defs.' Opp'n to NSA's Emergency Mot. [60]; Defs.' Opp'n to Mot. to Show Cause [61], and that the disaster recovery tapes resolved any concerns about the Court's ability to afford relief, this Court ordered the EOP defendants to show cause "why it should not be ordered to create and preserve a forensic copy of any media that has been used or is being used by an former or current employee who was employed at any time between March 2003 and October 2005."  Mem. Or. [62] (March 18, 2008).  Within three days, the EOP defendants submitted the Supplemental Declaration of Theresa Payton, proving that no benefit would be gained by forcing OA to make forensic copies of computer workstations, and that further relief was unwarranted.  See EOP Defs.' Resp. to March 18, 2008 Or. [64].  Plaintiff

---

[4] In doing so, plaintiffs relied, in part, upon the unsworn written statements of Mr. Steven McDevitt, a former OA employee, and a chart prepared by Mr. McDevitt that purportedly reflects the days for which emails are missing from EOP .pst file stores for various components. The plaintiffs ignored, however, Ms. Payton's sworn Congressional testimony that discredited Mr. McDevitt's unsworn testimony, see NSA Mot., Ex. 4 (Hrg't Tr. at 44:950-45:975 (describing three-phase process, including "promising trends" of being "able to identify and locate e-mails with exchange for days that were previously red"); 44:955-956 ("There are, in this phase one, some days that still show as red.  That is where phase two is going to come in."); 88:2049-89:2054 ("We still have, roughly, 17 million emails as we are going through this first pass that we have not attributed to a component, and in our phase two we will have enhanced technology which will allow us to read those messages at a lower level and attribute those to a component.|"). Indeed, members of the Committee acknowledged that such emails may not, in fact, be missing, pointing to OA's intensive, ongoing multi-phased efforts to examine and identify by component the existence of millions more emails than what the chart showed.  see, eg., id. at 18:376-379 ("Last Friday, she briefed the Committee staff that the 473 day gap has been reduced to 202.  So a substantial portion of the missing emails appear not to be missing at all, just filed in the wrong digital drawer.  The restoration recovery process continues and should

NSA responded to the Supplemental Declaration, claiming that Ms. Payton's statements were not truthful, complete or accurate, and submitting a declaration by a purported e-discovery "expert" who had no apparent personal knowledge of OA practices or policies and no apparent expertise in governmental issues not found in the commercial sector.[5]  See NSA's Resp. to Or. [65]; Declaration of Al Lakhani ("Lakhani Decl.").

In the Memorandum Order and First Report and Recommendation ("First Report"), this Court potentially recommends additional extreme injunctive relief.  Specifically, the First Report recommends that the "EOP be ordered to search the workstations, and any .pst files located therein, of any individuals who were employed between March 2003 and October 2005, and to collect and preserve all e-mails sent or received between March 2003 and October 2005."  First Report at 6 (emphases added) ("Workstation Recommendation").  The Court has also

_____

continue.").

[5]  For the reasons discussed below, this Court should disregard and strike the Lakhani Declaration submitted by NSA on March 25, 2008 [65-3] ("Lakhani Decl.").  Mr. Lakhani lacks any personal knowledge of the Office of Administration's practices or policies.  Mr. Lakhani avers, for example, that he does "not believe that all emails sent or received between October 2003 and October 2005 could be preserved on backup tapes[.]" Lakhani Decl. ¶ 6.  Mr. Lakhani provides such testimony "based on [his] personal knowledge," despite his lack of personal involvement with the creation of disaster recovery tapes for the 2003-2005 time period, lack of access to the disaster recovery tapes, and absence of discussions with anyone within the Office of Administration or the OCIO.  Accordingly, Mr. Lakhani's speculation should be given no weight, especially in light of Ms. Payton's unequivocal statements – based on discussions with her staff and personal knowledge gained in her role as the Chief Information Officer for the Office of the Chief Information Officer – that the "backup tapes should contain substantially all the emails sent or received in the 2003-2005 time period."  Payton Decl. ¶ 12(d); see also Kos Pharm. v. Andrx Corp., 369 F.3d 700, 719 (3d. Cir. 2004) ("District courts must exercise their discretion in 'weighing all the attendant factors, including the need for expedition,' to assess whether, and to what extent, affidavits or other hearsay materials are 'appropriate given the character and objectives of the injunctive proceeding.'") (internal citation omitted).

recommended that EOP be ordered to issue a "collection" notice to its employees and to collect and preserve "any media" in EOP's employees' possession that "may contain e-mails sent or received between March 2003 and October 2005, . . ." Id. at 7 ("Collection Notice Recommendation").

In addition to these recommendations, this Court has ordered the EOP defendants to provide responses to the following questions on or before May 5, 2008:

1.    "How many current EOP employees were employed at any time between March 2003 and October 2005?" First Report at 3.

2.    "How many hard drives are in the possession or custody of EOP that were in use between March 2003 and October 2005?" Id.

3.    "[W]hether all back-up tapes created between March 2003 and October 2003 have been preserved – and, to the extent that they have not, to state the specific dates within that period for which no back-up tapes exist." Id. at 8.

In the remainder of this brief, EOP defendants turn first to the request for reconsideration of the First Report, followed by responses to the questions posed in the First Report, as described more fully in the Third Declaration of Theresa Payton ("3d Payton Decl.") (attached as Exhibit 1).

## REQUEST FOR RECONSIDERATION OF THE FIRST REPORT

There is no factual or legal basis for granting additional injunctive relief. The relief already granted by the Court's November 12, 2007 Order, requiring the preservation of all back-

up tapes, alleviates any potential harm raised by plaintiffs.  Ms. Payton's declaration of

January 15, 2008, is clear, supported by her sworn Congressional testimony, uncontradicted by

credible evidence, and entitled as a general matter to great weight.  See Elec. Frontier Found. v.

U.S. Dep't of Justice, 517 F. Supp.2d 111, 117 (D.D.C. 2007) (presumption of good faith in

agency declarations).  The additional details provided in her Third Declaration, as well as the

clarification about the disaster recovery back-up tapes below, affords no room for additional

concerns.  There should be no question that the additional relief sought by NSA and

recommended in the First Report is not warranted given the relief already granted by the Court's

November 12, 2007 Order requiring the preservation of backup tapes.

## I.  The Court's November 2007 Order Requiring Preservation of Backup Tapes Resolves Any Alleged Concerns About the Court's Ability to Afford Effective Relief

Significantly, injunctive relief is not appropriate where "the record does not show with

any clarity" that irreparable harm will result.  See District 50, United Mine Workers of Am. v.

Int'l Union, United Mine Workers of Am., 412 F.R.D. 165, 167 (D.C. Cir. 1969) (reversing grant

of preliminary injunction for inadequate showing of irreparable injury).  Not only is there a lack

of "clarity" that irreparable harm will result here[6], but there is an unambiguous declaration that

proves otherwise.  Ms. Payton has stated that "emails sent or received in the 2003-2005 time

period should be contained on existing back-up tapes."  Payton Decl. ¶ 12(c).[7]  The Payton

---

6  This is particularly true given that all trends in OA's multi-phased analysis point to millions of
additional emails that have been properly saved, but simply "mis-filed" (and, thus, not reflected
on the McDevitt chart), and that these same emails may still be maintained in user in-boxes or
sent folders.

7  See also id. ¶ 12(d); Defs.' Opp'n to NSA's Emergency Motion to Extend TRO [60] at 5-6;

Declaration is entitled to the great deference ordinarily accorded to agency or component declarations. As explained in prior filings (and incorporated fully here), no contradictions exist. See Defs.' Opp'n to NSA's Emergency Motion to Extend TRO [60] at 5-6; Defs.' Opp'n to CREW's Mot. to Show Cause [61] at 18-19; EOP Defs.' Resp. to March 18, 2008 Or. To Show Cause [64] at 4-6; see also Wisc. Gas Co., 758 F.2d at 674 ("Despite these well-settled principles, the petitioners have premised their motions for stay upon unsubstantiated and speculative allegations of recoverable economic injury . . . [T]his allegation is purely hypothetical and will not be considered by this court."). The preservation of the disaster recovery back-up tapes assure that effective relief may be afforded going forward. The Court's previous order requiring OA to preserve all disaster recovery back-up tapes in its possession, custody or control should allay any concerns about being able to afford relief in the event that the court should ultimately find relief warranted. As explained above, the FRA requires nothing more for the Court to assure itself of an ability to afford relief and plaintiffs' complaints support no further relief.

The recommendations in the First Report rise and fall on the validity of the Court's assumption that the disaster recovery backup tapes do not contain email data from March 2003 to October 2003. See First Report at 7. Because defendants make clear that the universe of

---

Defs.' Opp'n to CREW's Mot. to Show Cause [61] at 18-19 (explaining that back-up tapes should contain all emails sent or received between 2003-2005); EOP Defs.' Resp. to March 18, 2008 Or. to Show Cause [64] at 4-6; NSA Mot., Ex. 4 (Hr'g Tr. at 121:2862-124:2937 ("certainly, with the backups, we have every reason to believe at this point that we will be able to get the documents we seek"); id. at 59:1325-60:1327 (Payton "very confident" that back-up tapes may be used to recover email data); id. at 61:1358-1368 (same).

back-up tapes covered by the November 12, 2007 Order should contain emails sent or received between March 2003 and October 2003, the recommendations necessarily fall. Accordingly the recommendations contained in the First Report should be amended.

Any confusion about what back-up tapes are being preserved by the Office of Administration is easily clarified. <u>See</u> First Report at 8. In October 2003, the Office of Administration stopped recycling disaster recovery back-up tapes. Payton Decl. ¶ 12c. Thus all tapes that were in the Office of Administration's possession in October 2003, which includes tapes to which data was written as early as May 23, 2003, have been – and will continue to be – preserved. <u>See</u> 3d Payton Decl. ¶ ¶ 9-11. And as discussed more fully in defendants' response to the third question of the First Report, <u>see</u> <u>infra</u>, there are approximately 438 disaster recovery back-up tapes to which data was written between May 23, 2003 and September 29, 2003. <u>Id.</u> ¶ 11. In any event, NSA's allegations about missing emails for the March 2003 to October 2003 time period identifies only one day – September 12, 2003 – as a day with potentially "no email counts" and even then only for a PRA entity that is not subject to suit here.[8] <u>See</u> EOP Defs.' Resp. [64] at 5.

By the very nature of the disaster recovery backup tapes used by OA during this relevant time period, email information predating even March 2003 should be contained on the existing library of disaster recovery back-up tapes. That is because disaster recovery back-up tapes capture the "files saved on the server, such as, for example, email databases and/or email

---

[8] Even for the FRA components that plaintiff alleges have an abnormally low email count for certain days within this time period in August 2003, the emails may well be within the millions not previously identified on the McDevitt chart but which have been identified through OA's

environment information." Payton Decl. ¶ 6. The purpose of the disaster recovery back-up tapes , therefore, is to create a snapshot that "captures all email information present on the EOP Network in the journals, the .pst archives, and the customer mailboxes at the time the back-up is created." Id. ¶ 7. A full set of disaster recovery backup tapes created in October 2003, for instance, should contain email information present on the EOP network, including Exchange servers, at the time of the backup, whatever their creation date. Such a backup should also include email messages residing in a user's inbox, sent folder, trash box, folders saved in the mailbox, as well as email information in the journals and .pst files stores. Accordingly, the disaster recovery backup system in use by EOP is not designed to capture just that email information created during the 24 hours preceding a backup, or since the last full set of backup tapes were created, but should capture emails sent or received in March 2003, for example, still residing on the EOP network in October 2003. See 3d Payton Decl. ¶ 12.

All said, these facts should allay any concerns about "missing" emails being unavailable on the disaster recovery back-up tapes if the Court determines that further relief is warranted. That would, at most, trigger obligations for the defendants to initiate action through the Attorney General, see Armstrong, 924 F.2d at 296, who would, in turn, determine what action was appropriate under the circumstances. 44 U.S.C. § 3106. By contrast, plaintiff would effectively have the Court "jump the gun" by harvesting additional media now. Because NSA has not demonstrated a credible basis for relief beyond the November 12, 2007 Order, further relief is unjustified and without basis in law.

---

ongoing multi-phase .pst file inventory process.

**II.  Defendants Request Reconsideration of the Two Recommendations in the First Report**

      For the reasons discussed above, the November 12 Order and the disaster recovery back-up tapes being preserved under it obviate any need for further relief.  Because the absence of irreparable injury, alone, is adequate to deny preliminary relief, see Wisc. Gas Co., 758 F.2d at 674, the Court is not required to analyze the other three factors in determining the propriety of injunctive relief.

      The First Report, however, recommends additional extreme injunctive relief that would yield marginal benefits at best, while imposing substantial burdens and disruptions on the EOP defendants.  In the Workstation Recommendation, the First Report contemplates a "remote query" process for the collection, and then in-house copying of all located .pst files.  First Report at 5.  The Collection Notice Recommendation would require EOP employees to relinquish and surrender any portable media for EOP entities to preserve.  In effect, the First Report requires defendants to locate, collect, take charge of, copy and preserve any email data – even if that data is likely already to be contained in the EOP .pst file stores and stored on the disaster recovery back-up tapes, may still be in user in-boxes, could be quadruplicate copies, and may not even be federal records.  That search would create the proverbial "awfully expensive needle to justify searching a haystack."[9]  McPeek v. Ashcroft, 202 F.R.D. 31, 34 (D.D.C. 2001).

      At bottom, even the FRA has not been held to require perfect, 100% preservation of all email records.  See Armstrong, 924 F.2d at 297 n.14.  And the FRA certainly does not require

---

[9]  This is particularly so given defendants' pending motion to dismiss on threshold justiciability and jurisdictional grounds.

that quadruplicate, triplicate or even mere duplicate copies of emails be preserved and maintained.  See, e.g., 36 C.F.R. §§ 1234.32(d)(2), 1222.34.  Yet plaintiffs' continuing demands and the recommendations in the First Report, suggest that defendants must hunt down and harvest each and every byte of email data that may exist from the 2003 through 2005 time period.  These petitions are made even though the disaster recovery back-up tapes should contain substantially all relevant emails, and even though plaintiffs have not established that EOP's .pst file stores of the emails themselves are deficient.  And these demands have been lodged without regard for whether the bytes of data contain a quadruplicate copy of, or a personal message that is not, a "record" under the FRA.  If the FRA provides room for "innocent mistakes" in records preservation in the first instance, Armstrong, 924 F.2d at 297 n.14, and does not require preservation of duplicates, it is unreasonable to require perfect (and indeed multiply-redundant) Court-ordered preservation of all bytes of email data as backups now.  The disaster recovery back-up tapes suffice.

The problems presented by the recommendations in the First Report are further heightened because they would require the EOP defendants to remotely query current workstations for .pst files and surrender all portable media, so that the EOP defendants may copy and preserve or maintain any email data themselves, rather than simply instructing defendants to issue periodic notices reminding employees to save email data.  See First Report at 7.  The First Report never explains why preservation notices would be inadequate, particularly when there is a suggestion in the First Report that a duty to separately preserve such files, if any, may be

fulfilled by issuing a "written legal hold (including a preservation notice to persons likely to have relevant information)." First Report at 7 n.6.

  The burdens that would be imposed by the Workstation and Collection Notice Recommendations would be significant. The First Report suggests that the "burden on EOP to conduct" a "focused and automated" search for .pst files and then to "copy .PST files located therein" would impose minimal burdens in "terms of cost, labor, and employee downtime."[10] First Report at 5. That is simply untrue. The process for the Workstation Recommendation alone is extensive and time consuming. These proposed burdens are only magnified when considering the time these tasks would take away from the EOP FRA defendants' other pressing tasks and plaintiffs' continuing attempts to trench on the important prerogatives of Executive Branch components. Cf. Loving v. United States, 517 U.S. 748, 757 (1996) ("[I]t remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another."). Without doubt, some employees, including the OCIO leadership team, would be diverted from their pressing and important tasks of providing EOP components with unified enterprise services, coordination of compliance for mandated compliance programs, and safeguarding the EOP Network. Payton Decl. ¶ 6. The responsibilities of OCIO personnel are already extensive. This is especially true as the

---

[10]  For this conclusion, the Court relies in part on the Lakhani Declaration, which was offered by Mr. Lakhani without any personal knowledge of the Office of Administration's technical capabilities and system. Mr. Lakhani's estimations about the costs and burdens associated with forensic imaging, copying and write-block copying are inaccurate. Lakhani Decl. ¶¶ 20-26. Mr. Lakhani's estimates appear to be associated with private, commercial applications, rather than the efforts required to copy files for computer workstations connected to the sensitive EOP Network.

Presidential transition approaches.  See 3d Payton Decl. ¶¶ 3, 14. In addition to considerations of labor and employee downtime, which are obviously immense, costs that would be required by the Court's recommendation would include, at the least, obtaining additional electronic storage capacity for .pst files that would be copied and stored.  McPeek, 202 F.R.D. at 34 ("When employees are thus diverted from their ordinary duties, the function of the agency suffers to the detriment of the taxpayers." ).

Similarly, requiring employees to give up portable media devices would require employees to alter their working practices.  The recommendation covers any portable media, whether a laptop, external hard drive, flash drive or floppy disk.  Requiring employees to surrender that media could impose significant administrative burdens and thwart their ability to provide effective service as a government employee.  The EOP defendants, too, would potentially have to bear storage and inventorying burdens of collecting the external media from its employees, copying and returning the media so the employees continue to have access to their data, and safeguarding it during the pendency of the litigation.[11]

The FRA does not require the imposition of such onerous burdens, and particularly so when the Court's concerns about affording effective relief have already been addressed.  The disaster recovery back-up tapes are adequate.  But most fundamentally, the D.C. Circuit's stringent test for injunctive relief unambiguously rejects the imposition of these additional

---

[11]  Of course, those burdens depend on the number of employees who have portable media devices containing .pst files of emails between March 2003 and October 2005.  But any incremental burden, given the minimal benefit, is too much burden to support plaintiffs' instant request.

burdens because the November 12 Order resolves any concerns.  See, e.g., Emily's List v. Fed. Election Comm'n, 362 F. Supp. 2d 43, 51 (D.D.C. 2005) (preliminary injunction "is considered an extraordinary remedy" that should "be granted only upon a clear showing of entitlement").

Even a minimal burden would be outweighed by the absence of any utility to be gained from the recommended .pst file harvesting and copying process.  As explained above, the .pst files are likely to be triplicate or quadruplicate copies of emails already contained on network .pst file stores and on the disaster recovery back-up tapes.  And even then, it is unknown whether the .pst files would contain emails that are considered records, as opposed to personal files not subject to preservation under the FRA.

Even if the Court were to conclude that preserving .pst files on computer workstations and on portable media was proper – a conclusion unsupported by the record and contradicted by the facts – requiring the EOP defendants to harvest and copy over the files themselves is unprecedented.  Indeed, it would contradict the well-established rule that "[a]n injunction should be narrowly tailored to remedy the specific harm shown."  Aviation Consumer Action Project v. Washburn, 535 F.2d 101, 108 (D.C. Cir. 1976).  Although unwarranted, periodic instructions to EOP defendant employees to preserve any .pst files would adequately address any concerns about "losing" .pst files (however irrelevant or immaterial).

Finally, requiring harvesting and copying of .pst files would exceed the jurisdictional bounds of the FRA.  The Court suggests that an expanded order would simply maintain the status quo by ensuring that the "res – i.e., e-mails – are not deleted prior to the resolution of defendants' dispositive motions."  First Report at 2.  But as an initial matter, the disaster

–17–

recovery back-up tapes adequately assure the Court that it will be able to provide full and effective relief. Therefore, under the FRA, any of the .pst files that constitute duplicate copies of emails are not to be considered records under the FRA. Moreover, as set forth in defendants' motion to dismiss, any Court order requiring the <u>retrieval</u> of records exceeds the permissible scope of judicial relief under the FRA. <u>See</u> Defs.' Mot. to Dismiss at 12-13. The Court of Appeals has held that the FRA precludes APA claims seeking this sort of injunctive relief because under the FRA such relief can be sought, if at all, <u>only by the government</u> through the FRA's detailed and exclusive administrative enforcement system. <u>See</u> <u>Armstrong v. Bush</u>, 924 F.2d 282, 294 (D.C. Cir. 1991). Only if the Attorney General initiates action may the Attorney General determine what repository of email information – if any – he will consult for any restoration or retrieval of records.

Accordingly, the EOP defendants respectfully request that the Court reconsider the recommendations in the First Report and grant no further injunctive relief.

## <u>RESPONSES TO QUESTIONS IN THE FIRST REPORT</u>

Defendants submit responses to the questions posed in the First Report at pages 3 and 8. <u>See generally</u> 3d Payton Decl. However, for the foregoing reasons, it remains defendants' view that such responses are not required in order for the Court to conclude that forensic copying or imaging is unjustified under the law and should not be required here.[12] Nonetheless, defendants respectfully respond:

---

[12] Requiring forensic copies of computer workstations would not only impose an incredible burden, but also constitute affirmative, mandatory injunctive relief that would alter the status quo. <u>See</u> First Report at 2-3; <u>see also</u> <u>District 50, United Mine Workers of Am. v. Int'l Union,</u>

Question 1:       How many current EOP employees were employed at any time between March 2003 and October 2005?

Response:        There are 583 individuals currently working at an EOP FRA agency who worked at an EOP FRA agency at some time between March 1, 2003 and October 31, 2005.[13]  Of this figure, 524 are included as employees of an EOP FRA agency. The remaining 59 are included because, although contractors and not federal employees, they worked at an EOP FRA agency during the referenced time and currently work at an EOP FRA agency.  See 3d Payton Decl. ¶ 4.

Question 2:       How many hard drives are in the possession or custody of EOP that were in use between March 2003 and October 2005?

Response:        OA is not able to answer this question, as it does not now, and has not in the time referenced in the question, tracked the location of individual hard drives to individual users.  OA has been able, however, to determine the number of computer workstations currently hooked up to the EOP Network that are older workstation models that could have been used in the March 2003 to October 2005 timeframe.  There are 545 workstations that may have been used in an EOP FRA component in the relevant time period.  That does not mean that the hard-drive in the workstation was in use at the same period. See 3d Payton Decl. ¶¶ 5-8.

Question 3:       To resolve any ambiguities once and for all, EOP is ordered to inform the Court on or before May 5, 2008, whether all back-up tapes created between March 2003 and October 2003 have been preserved – and, to the extent that they have not, to state the specific dates within that time period for which no back-up tapes exist.

---

United Mine Workers of Am., 412 F.R.D. 165, 167 (D.C. Cir. 1969) (noting that the status quo is the "last uncontested status which preceded the pending controversy"); Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (quoting Phillip v. Fairfield Univ., 118 F.3d 131, 133 (2d Cir. 1997)), aff'd, 159 F.3d 636 (D.C. Cir 1998) (when a movant seeks mandatory injunctive relief, i.e., an injunction that "would alter, rather than preserve, the status quo . . . the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction").  Thus, plaintiffs must establish a heightened showing of irreparable harm, which they do not come close to establishing.  Even on the "ordinary" showing of injury required for prohibitory injunctive relief, plaintiffs fail to establish any entitlement to relief for the reasons set forth above.  Forensic imaging is not necessary to provide the Court an opportunity to afford effective relief, if required.

[13]  These figures are current as of April 26, 2008.

Response:     OA is preserving 438 disaster recovery back-up tapes that were written to between March 1, 2003 and September 30, 2003.  Of those 438 tapes, the earliest date on which data was written on any of the 438 tapes is May 23, 2003.  The latest date that data was written is September 29, 2003.  In total, OA is presently preserving approximately 60,000 disaster recovery back-up tapes, and that number is growing.  See 3d Payton Decl. ¶¶ 9-11.

Moreover, by the very nature of the disaster recovery backup tapes used by OA during this relevant time period, email information predating even March 2003 should be contained on the existing library of approximately 60,000 disaster recovery back-up tapes.  That is because disaster recovery back-up tapes capture the "files saved on the server, such as, for example, email databases and/or email environment information."  Payton Decl. ¶ 6.  The purpose of the disaster recovery back-up tapes , therefore, is to create a snapshot that "captures all email information present on the EOP Network in the journals, the .pst archives, and the customer mailboxes at the time the back-up is created."  Id. ¶ 7.  A full set of disaster recovery backup tapes created in October 2003, for instance, should contain email information present on the EOP network, including Exchange servers, at the time of the backup, whatever their creation date.  Such a backup should also include email messages residing in a user's inbox, sent folder, trash box, folders saved in the mailbox, as well as email information in the journals and .pst files stores.  Accordingly, the disaster recovery backup system in use by EOP is not designed to capture just that email information created during the 24 hours preceding a backup, or since the last full set of backup tapes were created, but should capture emails sent or received in March 2003, for example, still residing on the EOP network in October 2003.  See 3d Payton Decl. ¶ 12.

These responses do not change the conclusion, however, that forensic copying of computer workstations should be rejected.  No benefit is likely, principally because the disaster recovery back-up tapes contain the information that would be required for the Court to provide effective relief in the future.  Moreover, as explained in the EOP Defendants' Response to the March 18, 2008 Order [64], forensic copying is unlikely to capture residual data of emails sent or received between 2003 and 2005.  See 2d Decl. of Theresa Payton [64-2] ¶¶ 4, 5.  At base, any forensic copy capturing any "residual data" or "unallocated or slack space" on the 545 current

workstations that could have been used by EOP FRA components during the relevant time frame is not likely to contain data generated between 2003 and 2005, let alone any email data from that period.  Id.  For those reasons, defendants respectfully request that the Court reject, in any Second Report and Recommendation, imposing the burdens of forensic copying computer workstations that may have been used between March 2003 and October 2005.

## CONCLUSION

For the reasons set forth above, defendants request that the Court reconsider the recommendations in the First Report and respectfully request that NSA's Emergency Motion to Extend TRO/Preservation Order and for Depositions [58] be denied.

Respectfully submitted this 5th day of May, 2008.

<div style="margin-left:40%">

GREGORY G. KATSAS
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

/s/ Helen H. Hong
HELEN H. HONG (CA SBN 235635)
TAMRA T. MOORE (DC 488392)
Trial Attorneys
U.S. Department of Justice, Civil Division
P.O. Box 883, 20 Massachusetts Ave., NW
Washington, D.C.  20044
Telephone: (202) 514-5838
Fax: (202) 616-8460
helen.hong@usdoj.gov

Counsel for Defendants

</div>

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2008, a true and correct copy of the foregoing Defendants' Responses to and Request for Reconsideration of the First Report and Recommendation on Plaintiff NSA's Motion to Extend TRO/Preservation Order was served electronically by the U.S. District Court for the District of Columbia Electronic Document Filing System (ECF) and that the document is available on the ECF system.


/s/ Helen H. Hong
HELEN H. HONG

EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No: 07-cv-01707 |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) ) ) | |
| Defendants. | ) ) | |
| NATIONAL SECURITY ARCHIVE, | ) ) | |
| Plaintiff, | ) ) | |
| v. (HHK/JMF) | ) ) | Civil Action No: 1:07-cv-01577 |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) ) ) | |
| Defendants. | ) ) | |

## THIRD DECLARATION OF THERESA PAYTON

I, Theresa Payton, declare as follows:

1.     My name is Theresa Payton and I currently hold the position of Chief Information Officer (CIO) in the Office of Administration (OA), Executive Office of the President (EOP). In this capacity, I am responsible for providing strategic and operational leadership within the Office of the Chief Information Officer (OCIO). I have held the position of CIO in OA since May 2006.

2.     I submit this Third Declaration in response to the Magistrate Judge John M. Facciola's Memorandum Order and First Report and Recommendation ("First

Report") dated April 24, 2008 and in connection with Defendants' Responses to and Request for Reconsideration of the First Report. The statements contained herein are based on my personal knowledge and upon information made available to me by members of my staff in the performance of my official duties.

3.      The Office of the Chief Information Officer (OCIO) provides around-the-clock technological support for all EOP components. OCIO provides both Federal and Presidential components with services such as production support, application development and support, intranet and office automation, email, disaster recovery services, support for continuity of Operations (COOP), Enterprise Architecture, Information Assurance, Federal Records Management, and technology assistance to the White House Office of Records management. As part of this support, OCIO manages the email accounts for the sensitive but unclassified network at the EOP for over 3000 customers. In addition to these responsibilities, we are currently preparing the people, process and technology for the Presidential transition to the next administration.

### Responding to the Court's Questions

A.      *Question 1: "How many current EOP employees were employed at any time between March 2003 and October 2005?"*

4.      Based on information from OA's Human Resources Division, I understand that there are 583 individuals who presently work at EOP FRA components who also worked in an FRA component sometime between March 2003 and October 2005.

B.      *Question 2: "How many hard drives are in the possession or custody of EOP that were in use between March 2003 and October 2005?"*

5.      As part of its core administrative responsibilities, OA delivers workstations, which include hard drives and CPUs, to the components. To my

2

knowledge, OA has not historically tracked hard drive information regarding assignments to individuals using a workstation within each component. Like security specialists elsewhere, between March 2003 and October 2005, OA did not have an established asset management process, which would have included activities such as tracking hard drive assignments within each EOP component.[1] OA does not know what hard drives these 583 individuals used during that timeframe or if the hard drives are still in existence. Accordingly, OA is unable to directly respond to the court's request for the number of hard drives that were in use between March 2003 and October 2005.

      6.     However, the closest proxy available to approximate the information requested by the Court is that OA has been able to identify 545 workstations, not hard drives, that may have been in use at the EOP between March 2003 and October 2005. OA used a research process to identify these workstations by which OA has manually reviewed manufacturer dates for workstation models and manually reviewed the network through a query process for older workstation models.[2] The results of this review were then cross-referenced to the EOP workstation serial number and then compared to a vendor report, generating a list of potential workstations that may have been in use at the EOP between March 2003 and October 2005. The limitations of this process should be noted, however. Of the 545 workstations, we are presently aware that 527 are in the possession of components that have technology staff and budget that allow them to move and configure assets to meet their component's mission. Therefore, OCIO would not

---

[1] Until recently, security specialists did not have access to rigorous standards and policies covering IT asset management. IT Asset management principles merge traditional financial practices with security concerns, such as the tracking and inventory of computer hard drives. *See, e.g.*, ISO/IEC 27002, *Information Technology-Security Techniques-Code of practice for Information Security Management* at Section 7 (*Asset Management*) (2005, amended 2007) (This new international ISO standard for Security Management includes extensive policies and guidelines governing the management of IT assets, ranging from inventory and classification to use, labeling, tracking, and handling).

[2] This query process was explained in the declaration provided on March 21, 2008.

3

ordinarily know if hard drives had been reconfigured, removed or transferred to another workstation over time.

7.     Additionally, the normal maintenance and software upgrades significantly increase the likelihood that OA would need to pursue a rigorous forensics process to provide meaningful information from these 545 workstations. Our preliminary estimate based on initial market research indicates that the cost of performing this process for all 545 workstations would be extremely costly in the aggregate.[3] This estimate does not include additional direct and indirect costs such as OA staff, integration services, oversight, quality assurance, and delivering the output to the court. These financial and staff burdens are extraordinary.

8.     For example, if required to undertake some or all of the tasks implicated by the Court's First Report, numerous OCIO employees, including the OCIO leadership team, would be diverted from essential tasks of providing service to the EOP components, including planning for the Presidential transition. In some cases, leadership resources have spent 100 percent of their time dedicated to this inquiry rather than attending to other operational priorities.

**C.    Question 3: "[W]hether all back-up tapes created between March 2003 and October 2003 have been preserved – and, to the extent they have not, [] state the specific dates within that period for which no back-up tapes exist."**

9.     Upon review of the Court's First Report, OCIO took steps to respond to the inquiry on the number of disaster recovery back-up tapes created between March 1 and September 30, 2003. Given the method in which the back-up system provides information about the tapes, OCIO is not able to determine the specific creation date of

---

[3] A leading U.S. computer forensics producer suggested that costs would not only include forensic services per unit but also specialized software and services commitments. The producer provides to a wide range of Federal departments and agencies and has published formal pricing on the GSA schedule.

the tape (eg., first use) but can determine a date the tape was "written to" as it was used during this targeted timeframe.

10.    According to the disaster recovery back-up tape system, there are 438 disaster recovery back-up tapes that were written to between March 1 and September 30, 2003. The tapes – now totaling approximately 60,000 in number, and growing each month – have been preserved in a controlled-access tape vault since tape recycling stopped on October 1, 2003.

11.    Due to the disaster recovery back-up tape process, each of the 438 tapes is likely to contain data written to it on multiple days. The data written to it may also cover multiple days that were present on the EOP network when the backup was made. (For example, a file from 2001 present on a backed up server in the EOP network in 2003, would be found on a 2003 disaster recovery back-up tape). At this juncture, based on our due diligence, and according to the disaster recovery back-up tape system, the earliest date on which data was written on any of the 438 tapes is May 23, 2003; the latest date that data was written was September 29, 2003.

12.    Even without determining what specific information may be on those 438 tapes, a full set of disaster recovery backup tapes created in October 2003, for instance, should contain email information present on the EOP network, including Exchange servers, at the time of the backup, whatever their creation date. Such a backup should also include email messages residing in a user's inbox, sent folder, trash box, folders saved in the mailbox, as well as email information in the journals and .pst file stores. The disaster recovery backup system in use by EOP is not designed to capture just that email information created during the 24 hours preceding a backup, or since the last full set of

5

backup tapes were created, but should capture emails sent or received in March 2003, for example, still residing on the EOP network in October 2003.

13.    The burden associated with providing the court more detailed information regarding the content on the 438 tapes is extraordinary. This burden includes financial resources to fund additional equipment, make copies of the tapes, procure software, deliver integration services, and support staff. Significant senior management oversight will be needed to procure qualified resources to perform the work, retain the integrity of the tapes, manage the overall process and report back findings to the court upon completion. The burden also requires OA personnel that would need to be diverted from core mission and Presidential transition planning activities.

14.    Finally, the Court's proposals in the First Report would divert OA from its comprehensive, measured, process-driven, and cost-effective approach to address Federal Records Act compliance within the EOP for FRA components.[4] We expect OA's approach to be more accurate, and if any restoral process is ever required, the information gained from the approach will identify and focus the efforts on a targeted universe of tapes for restoral. We believe this approach balances the extraordinary financial and human resource burdens with a comprehensive plan to address these matters.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, the foregoing to be true and correct.

---

[4] For details regarding OA's approach, please refer to the written testimony provided to the House Committee on Oversight and Government Reform February 26, 2008. A copy of this written testimony is attached.

6

Executed the day of ___5___ May, 2008



THERESA PAYTON
Chief Information Officer
Office of Administration, Executive Office
of the President

**Testimony of Theresa Payton**

**Chief Information Office, Office of Administration**

**Before the**

**House Committee on Oversight and Government Reform**

**February 26, 2008**

Good morning Chairman Waxman, Ranking Member Davis, and members of the Committee on Oversight and Government Reform. I am Theresa Payton and I am the current Chief Information Officer (CIO) in the Office of Administration (OA) at the Executive Office of the President (EOP). I have been in this role since May 2006. I am glad to be here today to discuss the status of the White House efforts to preserve emails. I will summarize my remarks and ask that my full statement be included in the record.

Let me begin by saying that the Executive Office of the President is committed to maintaining a thorough and reliable archiving process for Presidential and Federal records. We believe that we have such a process currently in place. Work is underway to improve that process significantly and we fully expect such improvements to be implemented before the end of this Administration. We are also committed to having a robust and reliable system to quickly recover from any disasters that may affect the EOP network. We are confident that our disaster recovery system meets industry standards and has been responsibly managed. Before I discuss the EOP archiving process and disaster recovery system and address what I believe are the Committee's concerns regarding these activities, I would like to provide some background on my office and on the EOP email systems used by this Administration.

1

The Office of the Chief Information Officer (OCIO) provides around-the-clock technological support for all EOP components. OCIO provides components with services such as production support, application development and support, intranet and office automation, email, disaster recovery services, support for Continuity of Operations (COOP), Enterprise Architecture, Information Assurance, Federal Records Management, and technology assistance to the White House Office of Records Management. As part of this support, OCIO manages the email accounts for the sensitive but unclassified network at the EOP for over 3000 customers.

I have had numerous conversations with my staff and have reviewed OCIO documents pre-dating my arrival in May 2006. The portions of my written testimony relating to matters occurring before my arrival derive principally from those sources. It appears that the current Administration used Lotus Notes as its email platform at the beginning of the first term. By 2002, the decision was made to replace Lotus Notes with Microsoft Exchange. The transition from Notes mail to Exchange mail occurred over a two year period from 2002 through 2004.

From the start of the current Administration, the EOP has had a process for archiving email sent from or received by the EOP network. This archiving process has evolved over time as new technologies emerged and industry practices evolved. When Lotus Notes was the email platform, the archiving process relied on the ARMS system. ARMS was launched in 1994. At a general level, if a customer received email from outside of the EOP network (a non-EOP account), ARMS would archive the email during a scan of the customer's email account. If a customer sent or received email inside the EOP network using Lotus Notes, a copy of the email was sent to ARMS for archiving.

During the transition from Notes email to Exchange mail, the OCIO attempted to create a system to allow ARMS to serve the same archiving function for Exchange as it had for Lotus

2

Notes. This project, called EIS, was eventually abandoned due to various technical and system performance reasons. ARMS was a custom-designed application, and I understand that it was discovered that it just could not be effectively integrated with Microsoft Exchange—despite the best efforts of OCIO.

In place of ARMS, the OCIO developed an archiving process that used the journaling function inherent in Microsoft Exchange. Under that process, and in very general terms, whenever email is sent or received by an EOP Exchange customer, a copy of that email is automatically created and stored on a journal to which customers should not have access. Journaled emails are then archived on a separate server in what is referred to as a Personal Storage Table or "PST" file. This process today separates archived email by respective EOP component to facilitate preservation under the Federal Records Act or the Presidential Records Act.

We are aware that the Committee has expressed concerns about allegations that EOP emails were not properly archived between 2003 and 2005. I am aware of a chart created by OCIO staff in late 2005 to early 2006 that identifies dates and EOP components for which email counts were thought to be low or non-existent during the 2003-2005 time period. Since that time, the OCIO staff came to have reservations about the tool used to collect the data in the chart. OCIO thus hired a contractor to perform a comprehensive re-inventory of existing archived messages by component and date. This re-inventory effort is nearly complete. OCIO has also begun an analysis of potential anomalies. Once both the re-inventory and analysis are complete, we will have a separate team do a quality assurance review to confirm the accuracy of the results. This process of re-inventory, analysis, and quality assurance is complex, labor intensive, and time-consuming. At this stage, OCIO does not know if any emails were not properly preserved

3

in the archiving process. Once we complete our review, we will share the results with NARA. If there are any anomalies that cannot be resolved, we will work with NARA to discuss the details of a recovery effort and may seek additional help to ensure that the requirements of both the Presidential Records Act and the Federal Records Act are met during the transition of this Administration.

The EOP has continued to seek ways to improve the archiving process through new technology and updated procedures. For example, beginning in 2005, the OCIO undertook an internal review of record keeping procedures. OCIO made changes to and documented additional standard operating procedures as our internal review revealed areas where we could improve both the accuracy and performance of our archiving process.

After the transition to Microsoft Exchange, the EOP also considered implementing a hardware and software system called ECRMS (Electronic Communications Records Management System) in order to improve and expand the existing message archiving process already in place. However, in late 2006, after consulting staff in OCIO, I determined that ECRMS required additional investments and modifications if it was to fulfill the EOP's requirements for records management and archiving. While testing the process of loading email records into the ECRMS system, the team also found performance issues. For several reasons, including the need for additional modifications, the identified performance issues, and projected costs, the deployment of ECRMS was cancelled. Some of the hardware, software, and technical expertise gathered during the project were then used by OCIO for other projects.

The EOP is currently in the process of deploying Documentum$^{TM}$ and its platform extensions for records management, a DoD-approved system that meets NARA guidelines and will meet the EOP's requirements for records management and archiving. The Documentum$^{TM}$

system is widely used in the Federal Government and we expect will be less costly to implement than other systems considered, including ECRMS. We conducted a technology pilot in late 2007 to confirm that the technology will meet EOP requirements and we believe that the deployment of the Documentum$^{TM}$ system will meet the EOP's records management and archiving needs for the foreseeable future and will address many, if not all, of the alleged concerns raised about the current archiving process.

In addition to the archiving process to preserve emails, the EOP has had a disaster recovery system in place since the start of the Administration to backup our network for protection in the event of a catastrophe or system failure. The EOP Network has been and continues to be regularly backed up onto disaster recovery backup tapes as part of the EOP's disaster recovery system.

From April 2001 to October 2003, in accordance with industry standards and best practices, OCIO used a "Grandfather-Father-Son" approach to backups where three generations of full disaster recovery tapes were kept offsite. Under this approach, whenever a new generation of backups was created, the oldest set of tapes was available to be recycled.

We understand concerns have been raised that the recycling of backup tapes from 2001 to 2003 may have resulted in the loss of EOP emails. Let me be clear: whether or not disaster recovery tapes were recycled would not affect whether emails were preserved by the archiving process. The archiving process and disaster recovery system are separate functions with different purposes. The disaster recovery system is not the system designed to preserve and archive email communications. The disaster recovery tapes would, however, contain email information on the EOP system at the time of a backup, in addition to a backup copy of the email archives, as well as much other information. Therefore, in the event that an email was not

5

preserved by the archiving process, it may, nonetheless, be available on the disaster recovery tapes.

In September or early October 2003, OA ceased its practice of recycling disaster recovery tapes. OA continues to preserve its disaster recovery tapes to the present day. Since October of 2003, the OCIO has stored its backup tapes in a secured vault that meets the storage guidelines provided by the tape manufacturer and NARA. Of course, the EOP also continues to preserve emails through its normal archiving process, as it has since the start of the Administration.

In closing, I would like to reiterate that the OCIO is committed to maintaining a thorough and reliable archiving process for Presidential and Federal email records. We fully intend to complete our analysis of the archiving process, address any and all identified anomalies, and deploy the Documentum$^{TM}$ system as the EOP's email archiving and records-keeping solution for the foreseeable future. We look forward to continuing our partnership with NARA to ensure the EOP's Presidential and Federal email records are properly preserved throughout this and any future Administration and transitioned to NARA as appropriate.

Thank you. I will be glad to answer your questions.