**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No: 1:07-cv-01707 (HHK/JMF) |
| | ) |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) ) |
| | ) |
| Defendants. | ) |
| NATIONAL SECURITY ARCHIVE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No: 1:07-cv-01577 (HHK/JMF) |
| | ) |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) ) |
| | ) |
| Defendants. | ) |

**EOP DEFENDANTS' LOCAL RULE 72.3(b) OBJECTIONS TO THE
MAGISTRATE JUDGE'S FIRST REPORT AND RECOMMENDATION ON
PLAINTIFF NSA's MOTION TO EXTEND TRO/PRESERVATION ORDER**

**INTRODUCTION**

Plaintiff NSA's latest request for expanding the Court's preservation order strays from the core issues presented in the consolidated complaints. Although the complaints simply (1) ask whether defendants should notify the Attorney General of any "unlawful removal . . . or destruction of records" to initiate recovery action, 44 U.S.C. § 3106, and (2) question whether defendants' record-keeping practices are adequate under the Federal Records Act ("FRA"),

plaintiff has repeatedly attempted to sidetrack the Court on questions only marginally relevant, if at all, to the issues presented in the complaints. Indeed, no fewer than twenty-one filings have been exchanged, and five court orders have been issued, in response to motions for temporary injunctive relief, expedited discovery, and expansion of an order already in place. Each of those voluminous filings boils down to one rather straightforward issue: even if, as plaintiff alleges, some emails do not now exist in the EOP .pst file stores,[1] has the Court been assured that it will be able to order effective relief later? The answer is undeniably yes. The approximately 60,000 (and growing) disaster recovery back-up tapes under court-ordered preservation will allow the Court to order effective relief, if necessary, going forward.

As a result, plaintiff cannot demonstrate the "certain, great and actual" injury necessary to justify additional injunctive relief, Wisc. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985), let alone the "extreme or serious damage" required to obtain the mandatory injunction it requests in its Motion to Expand the TRO/Preservation Order [58]. Judicial Watch v. Dep't of Commerce, 501 F. Supp. 2d 83, 91 (D.D.C. 2007). Thus, the recommendations in the April 24, 2008 First Report and Recommendation ("First Report") that would require the EOP defendants to (1) search for, collect, and copy .pst files through a remote query process from computer workstations and (2) collect any portable media that may contain emails from 2003 to 2005 from personnel at EOP FRA components, are entirely without basis in fact and unsupported in law

---

[1]    "EOP .pst file stores" are the .pst files stored on the EOP Network from the Office of Administration's email "archiving process" described in paragraph 5 of the Declaration of Theresa Payton [48-2]. A "personal storage table," or ".pst" file is the file type used to store electronically selected email messages sent or received via Microsoft Outlook.

under the four-factor test for injunctive relief required by the D.C. Circuit.[2]  A de novo analysis

of NSA's latest motion to expand the terms of the November 12, 2007 order should compel this

Court to reject the two recommendations reached in the "First Report."[3]  See LCvR 72.3(c)

(requiring de novo review of portions of report to which a non-movant objects).  At base,

expansion of the November 12, 2007 order is unjustified.  This Court must therefore deny NSA's

Motion to Extend TRO/Preservation Order and for Depositions [58].

        This Court need not consider the recommendations in the First Report now, however,

because the EOP defendants requested on May 5, 2008 that the Magistrate Judge reconsider the

---

[2]        The Magistrate Judge does not in the First Report discuss the four-factor test required for
preliminary injunctive relief, just as NSA failed to address the standard in its motion.  EOP
defendants submit that the Magistrate Judge erred in his analysis, which appears to make the
burden calculus dispositive of the inquiry into the propriety of extraordinary injunctive relief.
That is not the appropriate test.  See also Defs.' Resp. to March 18, 2008 Or. [64] (March 21,
2008).  He fails, for example, to analyze the jurisdictional hurdles set forth in Defendants'
Consolidated Motion to Dismiss.  See Serono Labs, Inc. v. Shalala, 158 F.3d 1313, 1317-18
(D.C. Cir. 1998) (noting that failure to establish a substantial likelihood of success on the merits
"effectively decides the preliminary injunction issue" and vacating preliminary injunction where
plaintiff was not likely to succeed on the merits and the remaining factors were either "a wash"
or "inextricably linked to the merits").  The Magistrate Judge also fails to address that the public
interest is ill-served by imposing onerous burdens on the EOP defendants – taking government
employee time and taxpayer dollars from other pressing needs – and by enmeshing this Court in
the wasteful task of issuing duplicative orders.  Cf. McPeek v. Ashcroft, 202 F.R.D. 31, 34
(D.D.C. 2001) ("When employees are thus diverted from their ordinary duties, the function of
the agency suffers to the detriment of the taxpayers." ).

[3]        For the reasons set forth in the First Report, EOP defendants' opposition to the motion,
EOP defendants' request for reconsideration, and in this filing, the Magistrate Judge
appropriately concluded that expedited discovery and court-supervised depositions are not
justified under the law.  See First Report at 8-9.  EOP defendants do not challenge that
conclusion.  NSA filed limited objections to the Magistrate Judge's recommendation to deny
deposition relief on May 8, 2008 [71].  EOP Defendants intend to respond shortly to NSA's
limited objection because the Magistrate Judge appropriately concluded that no discovery is
permissible.

two recommendations set forth in the First Report, in part based on the additional information

provided to him about the approximately 60,000 disaster recovery back-up tapes (and

continually growing cache of tapes) preserved under the November 12, 2007 Order.  See EOP

Defs.' Responses and Request for Reconsideration [70].  The Magistrate Judge has not yet ruled

on the request for reconsideration.  In order to preserve arguments for appeal, however, see

LCvR 72.3, EOP defendants submit these objections, but respectfully request that the Court

abstain from issuing any order based on the First Report until the Magistrate Judge has had an

opportunity to consider EOP defendants' request for reconsideration.  Indeed, the Magistrate

Judge himself contemplates issuing a Second Report and Recommendation, and judicial

economy would be well-served by having all recommendations before the Court before

considering NSA's motion for preliminary injunctive relief.  See First Report at 4.

## BACKGROUND

### I.     The Federal Records Act

In order to put the recommendations of the First Report in context, a brief review of the

Federal Records Act is appropriate.

The provisions of the FRA were enacted to establish "standards and procedures to assure

efficient and effective records management."  44 U.S.C. § 2902.  Those standards and

procedures were prescribed to attain "[a]ccurate and complete documentation of the policies and

transactions of the Federal Government" and for the "[j]udicious preservation and disposal of

records."  Id. § 2902(1), (5).  Consistent with these goals, the head of each Federal agency is

tasked to "make and preserve records containing adequate and proper documentation of the

organization, functions, policies, decisions, procedures, and essential transactions of the

agency[.]" Id. § 3101. Balanced against these obligations, agency heads are charged to provide

for "economical and efficient management of the records of the agency." Id. § 3102.

Accordingly, the FRA does not require an agency to "save 'every scrap of paper,'" Armstrong v.

EOP, 1 F.3d 1274, 1287 (D.C. Cir. 1993), but simply those "to the extent required to document

the organization, functions, policies, decisions, procedures and essential transactions of the

agency." 36 C.F.R. § 1220.14 (2002) (emphasis added).

      The reach of the FRA depends in part on whether a document is a "record" within the

meaning of the FRA. 44 U.S.C. § 3301. Documentary materials are considered "records"

subject to preservation when they meet two conditions: they are (1) "made or received by an

agency . . . under Federal law or in connection with the transaction of agency business; and

(2) are "preserved or are appropriate for preservation as evidence of agency organization and

activities or because of the value of the information they contain." See 36 C.F.R. § 1222.34(b).

Although electronic mail messages may meet the definition of records, id. § 1222.34(e), emails

that are considered "personal papers," like other documents that are personal, do not have to be

preserved. Id. § 1222.36 (defining personal records to include "personal correspondence . . . that

are not prepared or used for, or circulated or communicated in the course of, transacting

Government business," as well as "materials relating solely to an individual's private affairs . . .

that do not relate agency business"). Similarly, duplicate or identical copies of documents that

have been preserved may be deleted as documents with "no continuing value." See, e.g., id.

§ 1234.32(d)(2) (any copies of emails remaining in users' in-boxes are considered non-records if

a copy has been preserved); § 1222.34 (defining non-records to include duplicates and extra

copies of documents).

To facilitate economical and efficient preservation of records, agency heads and the Archivist are directed by the FRA to promulgate guidelines for disposal of non-records and schedules for records authorized for disposal. See 44 U.S.C. §§ 3302, 3303, 3303a. But the FRA does not demand absolute compliance with its prescriptions. Rather, as the D.C. Circuit "recognize[d], of course, the determination of whether a variety of particular documents or computer entries are, in fact, records must be made by agency staff on a daily basis, and some innocent mistakes are bound to occur. Consequently, the fact that some record material may have been destroyed does not compel a finding that the guidelines are arbitrary and capricious." Armstrong v. EOP, 924 F.2d 282, 297 n.14 (D.C. Cir. 1991). Indeed, Congress's command to balance the economies of records management against the interest in preserving records cannot tolerate any alternative conclusion. See, e.g., Rogers v. Peck, 199 U.S. 425, 436 (1905) ("Statutes should be given a reasonable construction with a view to make effectual the legislative intent in their enactment.").

The FRA also incorporates enforcement mechanisms for the unlawful removal or destruction of records that should otherwise have been preserved. See, e.g., 44 U.S.C. § 3106. If the head of the agency becomes aware or has reason to believe any "actual, impending, or threatened unlawful removal, defacing, alteration, or destruction of records in the custody of the agency" has occurred, she, along with the Archivist, may "initiate action through the Attorney General for the recovery of records[.]" Id. This administrative scheme is exclusive; a court cannot itself order the recovery or retrieval of records that may have been removed or destroyed, but must instead rely on the detailed processes set forth in the FRA and initiated by the agency heads, Archivist and Attorney General. See Armstrong, 924 F.2d at 294. Thus, relief under the

FRA would trigger, at most, obligations for defendants to initiate action through the Attorney

General, see Armstrong, 924 F.2d at 296, who would, in turn, determine what action was

appropriate under the circumstances. 44 U.S.C. § 3106. A court therefore cannot order the

recovery or retrieval of any records. Similarly, it follows from the D.C. Circuit's analysis of the

FRA and the Administrative Procedure Act that whether the Attorney General pursues – and

how or from what media he seeks to restore – any missing records is unreviewable as a matter

committed to his sole discretion. See Heckler v. Chaney, 470 U.S. 821, 833 (1985); 5 U.S.C.

§ 701(a)(2).

## II.    Plaintiff's Motion and the Magistrate Judge's Memorandum Order and First Report and Recommendation

Against the backdrop of the FRA's actual requirements and the nature of the remedy it

provides, plaintiff's focus on the intricacies of technical questions about slack space, forensic

copying, remote querying, .pst files on computer workstations, and the like misses the mark.

The only material question on preliminary injunctive relief before the Court is an "extremely

narrow" one about the Court's ability, if necessary, to afford effective relief on the merits. Or.

[11] at 2 (Oct. 19, 2007). This question has been addressed – on numerous occasions – and

resolved by the Court's November 12, 2007 Order. See also Defs' Opp'ns and Resps. to Court

Ors. at Dkt. Nos. 5, 12, 16, 48, 60, 61, 64, 65. The approximately 60,000 (and growing) disaster

recovery back-up tapes in the Office of Administration's "possess[ion] or . . . custody or

control," Or. [18] at 2 (Nov. 12, 2007), "should contain substantially all the emails sent or

received in the 2003-2005 time period," Decl. of Theresa Payton [48-2] ¶ 12(d) (Jan. 15, 2008)

("Payton Decl."), and are under Court-ordered preservation. The Court has thus satisfied any

need to ensure for itself the ability to afford effective future relief, and that should be the end of

the matter.  See, e.g., Elec. Frontier Found. v. U.S. Dep't of Justice, 517 F. Supp. 2d 111, 117

(D.D.C. 2007) (presumption of good faith in agency declarations).

 Notwithstanding, on March 11, plaintiffs CREW and NSA requested additional

emergency relief, contending that Ms. Payton's declaration was inconsistent with her earlier-

sworn testimony provided before the Committee on Oversight and Government Reform on

February 26, 2008.  See, e.g., Pl. CREW's Mot. for Or. to Show Cause [57]; Pl. NSA's

Emergency Mot. for TRO [58].  Plaintiffs each alleged, in some form, that OA knew emails were

missing from the EOP .pst file stores and were not contained on backup tapes, and that OA was

destroying, or permitting destruction of, other potential repositories of such emails.[4]  See, e.g.,

NSA Em. Mot. [58] at 2.

 Although EOP defendants established that plaintiffs' doubts were unsupported and

contradicted by the record, see Defs.' Opp'n to NSA's Emergency Mot. [60]; Defs.' Opp'n to

Mot. to Show Cause [61], and that the disaster recovery tapes resolved any concerns about the

Court's ability to afford relief, this Court ordered the EOP defendants to show cause "why it

should not be ordered to create and preserve a forensic copy of any media that has been used or

---

[4] For their allegations, plaintiffs appear to rely upon the unsworn written statements of
Mr. Steven McDevitt, a former OA employee, and a chart prepared by Mr. McDevitt that
purportedly reflects the days for which emails are missing from EOP .pst file stores for various
components.  Plaintiffs do not acknowledge the manifestly incomplete nature of Mr. McDevitt's
own work, which appears to identify "missing days" without categorizing by component
hundreds of thousands of email messages within the relevant time period.  More importantly, in
recommending the drastic and exceptional preliminary relief sought here, the Magistrate Judge
appears to have ignored altogether the efforts of the OA—currently underway—to account for
all emails through an exhaustive inventorying of the electronic email .pst file stores.  See 3d
Payton Decl., Ex. 1.

is being used by a former or current employee who was employed at any time between March

2003 and October 2005."  Mem. Or. [62] (March 18, 2008).  Within three days, the EOP

defendants submitted the Supplemental Declaration of Theresa Payton, showing that forcing OA

to make forensic copies of computer workstations would be extremely burdensome, would not

yield a commensurate benefit, and that further relief was unwarranted.  See EOP Defs.' Resp. to

March 18, 2008 Or. [64].  Plaintiff NSA responded to the Supplemental Declaration, claiming

that Ms. Payton's statements were not truthful, complete or accurate, and submitting a

declaration by a purported e-discovery "expert" who had no apparent personal knowledge of OA

practices or policies and no apparent expertise in governmental issues not found in the

commercial sector.[5]  See NSA's Resp. to Or. [65]; Declaration of Al Lakhani ("Lakhani Decl.").

---

[5]     For the reasons discussed below, this Court should disregard and strike the Lakhani
Declaration submitted by NSA on March 25, 2008 [65-3] ("Lakhani Decl.").  Mr. Lakhani lacks
any personal knowledge of the Office of Administration's practices or policies.  Mr. Lakhani
avers, for example, that he does "not believe that all emails sent or received between October
2003 and October 2005 could be preserved on backup tapes[.]" Lakhani Decl. ¶ 6.  Mr. Lakhani
provides such testimony "based on [his] personal knowledge," despite his lack of personal
involvement with the creation of disaster recovery tapes for the 2003-2005 time period, lack of
access to the disaster recovery tapes, and absence of discussions with anyone within the Office
of Administration or the Office of the Chief Information Officer ("OCIO").  Accordingly,
Mr. Lakhani's speculation should be given no weight, especially in light of Ms. Payton's
unequivocal statements – based on discussions with her staff and personal knowledge gained in
her role as the Chief Information Officer for the Office of Administration – that the "backup
tapes should contain substantially all the emails sent or received in the 2003-2005 time period."
Payton Decl. ¶ 12(d); see also Kos Pharm. v. Andrx Corp., 369 F.3d 700, 719 (3d. Cir. 2004)
("District courts must exercise their discretion in 'weighing all the attendant factors, including
the need for expedition,' to assess whether, and to what extent, affidavits or other hearsay
materials are 'appropriate given the character and objectives of the injunctive proceeding.'")
(internal citation omitted).

In the First Report, the Magistrate Judge recommends substantially more.  First, he recommends that the "EOP be ordered to <u>search</u> the workstations, and any .pst files located therein, of any individuals who were employed between March 2003 and October 2005, and to <u>collect</u> and <u>preserve</u> all e-mails sent or received between March 2003 and October 2005."  First Report at 6 (emphases added).  He contemplates a "remote query" process for the collection, and then in-house copying of all located .pst files.  <u>Id.</u> at 5 ("Workstation Recommendation").  Second, he recommends an order requiring EOP to collect "any media" in its employees' possession that "may contain e-mails sent or received between March 2003 and October 2005, and for EOP to collect and preserve all such media."[6]  <u>Id.</u> at 7 ("Collection Notice Recommendation").

## <u>ARGUMENT</u>

The First Report recommends that EOP defendants locate, collect, take charge of, <u>copy</u> and preserve any email data – even if that data is likely already contained in the .pst file stores and stored on the disaster recovery back-up tapes, may still be in user in-boxes, could be quadruplicate copies, and may not even be federal records.  That search would appear to seek an "awfully expensive needle to justify searching a haystack."[7]  <u>McPeek v. Ashcroft</u>, 202 F.R.D. 31,

---

[6]     The Magistrate Judge further contemplates ordering in a Second Report "forensic copying" of computer workstations in use between 2003 and 2005, to trawl for any residual data of emails created or received in that time frame, even though EOP defendants explained that it is unlikely that forensic copying will be of <u>any</u> marginal benefit.  <u>See id.</u> at 4.  EOP defendants were ordered to submit answers to three additional questions by May 5, 2008.  EOP Defendants provided a declaration on May 5, the contents of which are incorporated here in full.

[7]     This is particularly so given defendants' pending motion to dismiss on threshold justiciability and jurisdictional grounds, and given that plaintiffs' allegations of missing emails therefore remain just that:  mere allegations.

34 (D.D.C. 2001).  The utility to be gained, if any, from the email data harvest is marginal at best because the 60,000 (and growing) disaster recovery back-up tapes dating back to May 23, 2003 should contain the email data from 2003 (and before) through 2005 (and after).  <u>See</u> Third Declaration of Theresa Payton ("3d Payton Decl.") [69] ¶¶ 9-11.

Further, even the FRA has not been held to require perfect, 100% preservation of all email records.  <u>See</u> <u>Armstrong</u>, 924 F.2d at 297 n.14.  And the FRA does not require that quadruplicate, triplicate or even mere duplicate copies of emails be preserved and maintained once a copy has been preserved.  Nor does the FRA require preservation of <u>all</u> email messages, whether personal or not, if they are not records within the meaning of the FRA.  Yet plaintiffs' continuing demands and the Magistrate Judge's questions, orders and First Report, suggest that EOP defendants must hunt down and harvest each and every byte of email data that may exist from the 2003 through 2005 time period.  These petitions are made even though the disaster recovery back-up tapes should contain substantially all relevant emails, and even though plaintiff has not established that the .pst file stores of the emails themselves are deficient.  And these demands have been lodged without regard for whether the bytes of data contain a quadruplicate copy of or a personal message that is not required to be preserved under the FRA.  Because the FRA provides room for "innocent mistakes" in records preservation in the first instance, <u>Armstrong</u>, 924 F.2d at 297 n.14, and does not require preservation of duplicates, it is patently unreasonable to require perfect (and indeed multiply-redundant) Court-ordered preservation of all bytes of email data as backups now.  The disaster recovery back-up tapes suffice.

The problems presented by the recommendations in the First Report are heightened because the Magistrate Judge would require the EOP defendants to remotely query current

workstations for .pst files and require employees to "surrender" all portable media, so that the EOP defendants may copy and preserve or maintain any email data themselves. See First Report at 7. The First Report never explains why preservation notices would be inadequate, particularly when the Magistrate Judge himself suggests that a duty to preserve may be fulfilled by issuing a "written legal hold (including a preservation notice to persons likely to have relevant information)." First Report at 7 n.6. These proposed burdens are only magnified when considering the time these tasks would take away from the EOP defendants' other pressing tasks, and plaintiff's continuing attempts to trench on the important prerogatives of Executive Branch components. Cf. Loving v. United States, 517 U.S. 748, 757 (1996) ("[I]t remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another."). The FRA does not require the imposition of such onerous burdens, and particularly so when the Court's concerns about affording relief have already been addressed. Most fundamentally, the D.C. Circuit's stringent test for injunctive relief unambiguously rejects it. See, e.g., Emily's List v. Fed. Election Comm'n, 362 F. Supp. 2d 43, 51 (D.D.C. 2005) (preliminary injunction "is considered an extraordinary remedy" that should "be granted only upon a clear showing of entitlement").

The continuing excursions to gather any and all bytes of email data – and incursions on EOP defendants' limited resources – cannot be characterized as benign or to materially advance the Court's stated purpose for issuing any injunction. Compare Report and Recommendation [11] at 3 (Oct. 19, 2007) ("[T]he injunction will not injure the government or burden it in any way."). EOP defendants respectfully urge this Court to reject the recommendations in the First Report and to remain faithful to the strict test for affording extraordinary injunctive relief.

I.      **The November 12, 2007 Order Alleviates Any Potential Irreparable Harm Required to Justify Additional Injunctive Relief**

The D.C. Circuit requires reversal of orders granting preliminary injunctions where "the record does not show with any clarity" that irreparable harm will result.  See District, 412 F.R.D. at 167 (reversing grant of preliminary injunction for inadequate showing of irreparable injury). Not only is there a lack of "clarity" that irreparable harm will result here, there is an unambiguous declaration to the contrary.  But lest there remain any doubt, EOP defendants reiterate: "emails sent or received in the 2003-2005 time period should be contained on existing back-up tapes."  Payton Decl. ¶ 12(c).[8]  This is true even though the emails may still be maintained in user in-boxes, are likely to have been stored in the .pst file stores, and though some emails may not even constitute "records" under the FRA.  This Court-ordered preservation of the set of disaster recovery back-up tapes, therefore, provides ample protection.  As explained above, the FRA requires no more and plaintiffs' complaints support no further relief.

Any confusion about what back-up tapes are being preserved by the Office of Administration is easily clarified.[9]  See First Report at 8.  In October 2003, the Office of

---

[8]      See also id, ¶ 12(d); Defs.' Opp'n to NSA's Emergency Motion to Extend TRO [60] at 5-6; Defs.' Opp'n to CREW's Mot. to Show Cause [61] at 18-19 (explaining that back-up tapes should contain all emails sent or received between 2003-2005); EOP Defs.' Resp. to March 18, 2008 Or. to Show Cause [64] at 4-6; NSA Mot., Ex. 4 (Hr'g Tr. at 121:2862-124:2937 ("certainly, with the backups, we have every reason to believe at this point that we will be able to get the documents we seek").

[9]      The recommendations in the First Report rise and fall on the validity of the Court's assumption that the disaster recovery backup tapes do not contain email data from March 2003 to October 2003.  See First Report at 7.  Because EOP defendants make clear that the universe of back-up tapes covered by the November 12, 2007 Order should contain emails sent or received between March 2003 and October 2003, the recommendations necessarily fall.  See 3d Payton Decl. ¶¶ 9-11.  Indeed, to the extent the Magistrate Judge continued to have questions about the

-13-

Administration stopped recycling disaster recovery back-up tapes.  Payton Decl. ¶ 12c.  Thus all

tapes that were in the Office of Administration's possession in October 2003, which includes

tapes to which data was written as early as May 23, 2003, have been – and will continue to be –

preserved.  See 3d Payton Decl. ¶¶ 9-11.  And as discussed more fully in EOP defendants'

response to the third question of the First Report submitted May 5, see EOP Defs.' Resp. [69],

there are approximately 438 disaster recovery back-up tapes to which data was written between

May 23, 2003 and September 29, 2003.  Id. ¶ 11.  And because NSA's allegations about missing

emails for the March 2003 to October 2003 time period identifies only one day – September 12,

2003 – as a day with potentially "no email counts," and even then only for a PRA entity that is

not subject to suit here, any concerns about "gaps" or "missing backup tapes" are unfounded.[10]

See EOP Defs.' Resp. [64] at 5.

　　　　Significantly, moreover, by the very nature of the disaster recovery backup tapes used by

OA during this relevant time period, email information predating even March 2003 should be

contained on the existing library of disaster recovery back-up tapes.  That is because disaster

recovery back-up tapes capture the "files saved on the server, such as, for example, email

_____

contents of the back-up tapes, it was inappropriate to impose the burdens of preserving
alternative potential repositories of emails without first clarifying any confusion.  The proper
course thus would have been to clarify the questions, only then determine whether alternative
orders would have been necessary, and finally to make recommendations about the appropriate
course.

[10]    Even for the FRA components that plaintiff alleges have an abnormally low email count
for certain days within this time period in August 2003, the emails may well be within the
hundreds of thousands of emails not previously categorized by component on the McDevitt
chart, but which have been identified through OA's ongoing multi-phase .pst file inventory
process.

databases and/or email environment information." Payton Decl. ¶ 6. The purpose of the disaster

recovery back-up tapes, therefore, is to create a snapshot that "captures all email information

present on the EOP Network in the journals, the .pst archives, and the customer mailboxes at the

time the back-up is created." Id. ¶ 7. A full set of disaster recovery backup tapes created in

October 2003, for instance, should contain email information present on the EOP network,

including Exchange servers, at the time of the backup, whatever their creation date. Such a

backup should also include email messages residing in a user's inbox, sent folder, trash box,

folders saved in the mailbox, as well as email information in the journals and .pst files stores.

Accordingly, the disaster recovery backup process in use by EOP is not designed to capture just

that email information created during the 24 hours preceding a backup, or since the last full set

of backup tapes were created, but should capture emails sent or received in March 2003, for

example, still residing on the EOP network in October 2003. See 3d Payton Decl. ¶ 12. At base,

identifying a date on which data was last written to a disaster recovery back-up tape does not

determine what time period of data is captured on such a tape, because the tape will capture

earlier-created data that is present on the EOP Network at the time of the back-up.

Thus, the existence of email information predating the date of creation of a tape on the

existing library of disaster recovery back-up tapes should allay concerns about "missing" emails

being unavailable on the disaster recovery back-up tapes in the event that the Court should

ultimately find relief warranted. Plaintiff's concern about the absence of tapes created between

March 2003 and October 2003 is therefore unfounded. Plaintiff and this Court should be assured

that the disaster recovery back-up tapes being preserved will provide an opportunity for full

relief if warranted – which would be limited, in any event, to an order requiring defendants to initiate action through the Attorney General.

## II.    EOP Defendants' Objections to the Workstation Recommendation and the Collection Notice Recommendation

For all the reasons set forth above, expanding the scope of the November 12, 2007 Order is improper because plaintiff cannot establish irreparable harm.  EOP defendants therefore object to the Workstation and Collection Notice Recommendations.  See First Report at 4-7.  Any search for and collection of .pst files on hard-drives or portable media is unwarranted because the disaster recovery back-up tapes contain email information sufficient to obviate any claims of harm.[11]  Because the absence of irreparable injury, alone, is adequate to deny preliminary relief, see Wisc. Gas Co., 758 F.2d at 674, the Court is not required to analyze the other three factors in determining the propriety of injunctive relief.

Nonetheless, it is evident that the burdens that would be imposed by the Workstation and Collection Notice Recommendations would be significant.  The First Report suggests that the "burden on EOP to conduct" a "focused and automated" search for .pst files and then to "copy .PST files located therein" would impose minimal burdens in "terms of cost, labor, and employee downtime."[12]  First Report at 5.  That is simply not so.  The process for the Workstation

---

[11]    To seek this relief, plaintiff would have to show "clearly" (1) that e-mails were not properly archived in the March 2003 to October 2005 time frame; (2) that those e-mails are absent from disaster recovery tapes for that period; and (3) that the hard drives will bear that e-mail information.  Plaintiff altogether fails to do so.  Even then, as established above, recovery and retrieval of information is not appropriate relief for the Court to provide.

[12]    For this conclusion, the Court relies in part on the Lakhani Declaration, which was offered by Mr. Lakhani without any personal knowledge of the Office of Administration's technical capabilities and system.  Mr. Lakhani's estimations about the costs and burdens

Recommendation alone is extensive and time consuming.  These proposed burdens are only

magnified when considering the time these tasks would take away from the EOP defendants'

other pressing tasks.  McPeek, 202 F.R.D. at 34 ("When employees are thus diverted from their

ordinary duties, the function of the agency suffers to the detriment of the taxpayers." ).  Without

doubt, some employees, including the OCIO leadership team, would be diverted from their

pressing and important tasks of providing EOP components with unified enterprise services,

coordination of compliance for mandated compliance programs, and safeguarding the EOP

Network.  See Payton Decl. ¶ 4; 3d Payton Decl. ¶ 8.  The responsibilities of OCIO personnel are

already extensive.  This is especially true as the Presidential transition approaches.  See 3d

Payton Decl. ¶¶ 3, 14.  In addition to considerations of diversion of resources, which are

obviously immense, costs required by the Court's recommendation may include, at the least,

obtaining additional electronic storage capacity for .pst files that would be copied and stored.

Similarly, requiring employees to give up portable media devices may require employees

to alter their working practices.  The recommendation covers any portable media, whether a

laptop, external hard drive, flash drive or floppy disk.  Requiring employees to surrender that

media could impose significant administrative burdens and hinder their ability to provide

effective service as a government employee.  The EOP defendants, too, would potentially have

to bear storage and inventorying burdens of collecting the external media from its employees,

---

associated with forensic imaging, copying and write-block copying are inaccurate.  Lakhani
Decl. ¶¶ 20-26.  Mr. Lakhani's estimates appear to be associated with private, commercial
applications, rather than the efforts required to copy files for computer workstations connected to
the sensitive EOP Network.

copying and returning the media so the employees continue to have access to their data, and safeguarding it during the pendency of the litigation.[13]

Even a minimal burden would be outweighed by the absence of any utility to be gained from the recommended .pst file harvesting and copying process, or the recommended portable media collection. As explained above, these media are likely to be triplicate or quadruplicate copies of emails already contained in the .pst files stores and on the disaster recovery back-up tapes. And even then, it is unknown whether the .pst files would contain emails that are considered records, as opposed to personal files not subject to preservation under the FRA.

If the Court were to conclude that preserving .pst files on computer workstations and on portable media was proper – a conclusion wholly unsupported by the record and contradicted by the facts – requiring the EOP defendants to harvest and copy over the files themselves is unprecedented. Indeed, it would contradict the well-established rule that "[a]n injunction should be narrowly tailored to remedy the specific harm shown." Aviation Consumer Action Project v. Washburn, 535 F.2d 101, 108 (D.C. Cir. 1976). Although unwarranted, periodic instructions to EOP defendant employees to preserve any .pst files would adequately address any concerns about "losing" .pst files (however irrelevant or immaterial).

Finally, requiring harvesting and copying of .pst files would exceed the jurisdictional bounds of the FRA. The Magistrate Judge contends that he is maintaining the status quo by ensuring that the "res – i.e., e-mails – are not deleted prior to the resolution of defendants'

---

[13]     Of course, those burdens depend on the number of employees who have portable media devices containing .pst files of emails between March 2003 and October 2005. But any incremental burden, given the minimal benefit, is too much burden to support plaintiff's instant request.

dispositive motions," but it is likely that there is no additional "res" to protect here. First Report at 2. As an initial matter, the disaster recovery back-up tapes adequately assure the Court that it will be able to effective relief. Therefore, under the FRA, any of the .pst files that constitute duplicate copies of emails are not to be considered records (and therefore "res") under the FRA. Moreover, as set forth in defendants' motion to dismiss, any Court order requiring the <u>retrieval</u> of records exceeds the permissible scope of judicial relief under the FRA. <u>See</u> Defs.' Mot. to Dismiss at 12-13. The Court of Appeals has held that the FRA precludes APA claims seeking this sort of injunctive relief because under the FRA such relief can be sought, if at all, <u>only by the government</u> through the FRA's detailed and exclusive administrative enforcement system. <u>See</u> <u>Armstrong v. Bush</u>, 924 F.2d 282, 294 (D.C. Cir. 1991). Only if the Attorney General initiates action may the Attorney General determine what repository of email information – if any – he will consult for any restoration or retrieval of records. Plaintiff's motion and the recommendations in the First Report would, in effect, have this Court "jump the gun" by accumulating information now.

//


//


//


//

**CONCLUSION**

For the reasons set forth above, EOP defendants object to the Magistrate Judge's

Memorandum Order and First Report and Recommendation and respectfully request that NSA's

Emergency Motion to Extend TRO/Preservation Order and for Depositions [58] be denied.

Respectfully submitted this 12th day of May, 2008.

GREGORY G. KATSAS
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

/s/ Helen H. Hong
HELEN H. HONG (CA SBN 235635)
TAMRA T. MOORE (DC 488392)
Trial Attorney
U.S. Department of Justice, Civil Division
P.O. Box 883, 20 Massachusetts Ave., NW
Washington, D.C.  20044
Telephone: (202) 514-5838
Fax: (202) 616-8460
helen.hong@usdoj.gov

Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2008, a true and correct copy of the foregoing EOP Defendants' Local Rule 72.3(b) Objections to the Magistrate Judge's First Report and Recommendation on Plaintiff NSA's Motion to Extend TRO/Preservation Order was served electronically by the U.S. District Court for the District of Columbia Electronic Document Filing System (ECF) and that the document is available on the ECF system.

/s/ Helen H. Hong
HELEN H. HONG