**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 07-01707 (HHK/JMF) |
| | ) | |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| NATIONAL SECURITY ARCHIVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 07-01577 (HHK) |
| | ) | |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

_____

**PLAINTIFF CREW'S OPPOSITION TO DEFENDANTS' MOTION FOR
RECONSIDERATION AND DEFENDANTS' LOCAL RULE 72.3(b)
OBJECTIONS TO THE MAGISTRATE JUDGE'S FIRST REPORT
AND RECOMMENDATION**

**STATEMENT**

Defendants' latest filings in this case bring to mind the oft-repeated fairy tale of *The Emperor's New Clothes*. Like the charlatans hired by the emperor to provide him the finest suit of clothes, the White House here appears to believe that by saying something again and again this Court will believe it to be so. Thus, in its objections to Magistrate Judge Facciola's First Report and Recommendation the White House repeats the mantra at least eight times that its collection of backup tapes -- admittedly and glaringly incomplete -- "should" contain all of the

emails sent between 2003 and 2005.  Defendants' request for reconsideration of the First Report and Recommendation contains similar incantations that are similarly divorced from reality. Quite simply the emperor has no clothes and the story that the White House tells is yet another fairy tale.

The heart of this matter is the preservation order entered by this Court last November based on the conclusion that, absent such an order, "CREW would remain threatened with irreparable harm."  Report and Recommendation at pp. 2-3 (Document 11); Order of November 12, 2007 (Document 18) (adopting Report and Recommendation).  As issued, the preservation order requires the White House to preserve *all* media in its possession and control and created for purposes of data preservation "in the event of its inadvertent destruction."  Id.  The White House never appealed that order and, accordingly, is bound both by its terms and the premise on which it is based.

Newly available information, including the declarations of White House employee Theresa Payton, has now exposed the degree to which the preservation order fails to adequately protect the interests of the plaintiffs and, by proxy, the public.  The backup tapes that the White House is preserving -- the only data it claims falls within the scope of the Order -- are critically incomplete.  Just as troubling, we have no idea whether the backup tapes are even readable; White House efforts to extract information from backup tapes several years ago were stymied by unreadable tapes.  As a result, even with the existing preservation order in place, plaintiffs "remain threatened with irreparable harm."

The White House in response, having failed twice previously to demonstrate why expanding the preservation order would be unduly burdensome, argues that the central premise

for *any* injunctive relief is lacking: proof that any emails are missing. Moreover, the White House claims, all of the existing backup tapes *should* contain emails sent or received in the 2003-2005 time frame.

This supposition, however, is completely unsubstantiated and contradicted by the limited publicly available evidence. Also unsubstantiated is the White House's claim that expanding the preservation order will impose on it a burden that outweighs any harm to the plaintiffs from not having in place a more comprehensive and effective preservation order. In short, the White House asks the Court to accept rank speculation as a substitute for the evidence that this Court has properly demanded of it.

The resistance of the White House to an expanded preservation order suffers from many flaws. A White House that has little or no interest in safeguarding important historical evidence belonging to the American public and that shows a patent disdain for the rule of law and the orders of this Court is entitled to little or no deference. Ultimately, however, this Court can readily and properly conclude that an expanded preservation order is warranted based on several unassailable facts. First, plaintiffs will suffer irreparable harm absent the requested relief, a conclusion that this Court has already reached and that is not subject to further challenge by the White House. Second, the existing collection of backup tapes is critically incomplete. And third, there is no evidence in the record that expanding the preservation order would impose a burden on the White House. Taken as a whole these facts amply justify the expanded preservation order that Judge Facciola has recommended.

## FACTUAL BACKGROUND[1]

On October 19, 2007, after full briefing and a hearing on the merits, Judge Facciola issued a Report and Recommendation recommending that CREW's motion for a temporary restraining order be granted. Weighing the legal questions presented, the irreparable harm to CREW absent the requested relief and "the clear absence of any harm to the government," Judge Facciola recommended that the Court issue an order preventing the destruction of "backup media."  Report and Recommendation, pp. 4-5 (Document 11).

The White House duly filed objections to the report and recommendation (Document 12). Among other things, the White House argued that plaintiff had failed to demonstrate harm and the proposed order swept too broadly.  After considering these objections and the full record before it, this Court on November 12, 2007 issued an order (Document 18) requiring defendants to "preserve media, no matter how described presently in their possess[ion] or under their custody or control, that were created with the intention of preserving data in the event of its inadvertent destruction."  Id. at p. 2.  The Court also ordered defendants to "preserve the media under conditions that will permit their eventual use" and mandated that defendants "not transfer [this] media out of their custody or control without leave of this court."  Id.  Defendants never appealed this Order or sought reconsideration.

Subsequently plaintiff National Security Archive (the "Archive") filed an emergency motion to extend the preservation order and to permit the Archive to conduct depositions (Document 58).  Specifically, the Archive requested that the preservation order by expanded to

---

[1] This background section addresses only the most pertinent facts surrounding the present controversy.

require the White House to also preserve "[h]ard or external drives, CDs or DVDs, jump, zip, hard, or floppy disks, and any other media that may contain emails or email data."  Proposed Order (Document 58-3), p. 2.

In response, Judge Facciola issued a Memorandum Order on March 18, 2008 (Document 62) requiring the White House to "show cause . . . why it should not be ordered to create and preserve a forensic copy of any media that has been used or is being used by any former or current employee who was employed at any time between March 2003 and October 2005."[2] Memorandum Order at 3 (footnote omitted).  In issuing this order Judge Facciola expressly recognized the possibility that granting the requested relief "could have a significant effect on EOP."  Id. at 2.  Accordingly, he directed defendants to include in their response "an affidavit describing the costs that would be incurred and any other facts that would bear on the burden of such an obligation."  Id. at 3.  At the same time, however, Judge Facciola also recognized "that if e-mails have not been properly archived as plaintiffs allege, and copies of those e-mails do not exist on back-up tapes, then the obliteration of data upon which those e-mails may be reconstructed threatens the plaintiffs with irreparable harm."  Memorandum Order at p. 2.

In response, the White House submitted another declaration by Office of Administration ("OA") Chief Information Officer Theresa Payton (Document 64-2).  Ms. Payton did not describe the costs that would be incurred by expanding the preservation order, as Judge Facciola ordered.  Instead she stated only that OA would have to outsource the project of making forensic copies, which she described without explanation as "likely to be a lengthy and costly

---

[2] References herein to the "relevant time period" denote the period March 2003 to October 2005.

government procurement process . . ." Second Declaration of Theresa Payton ("2d Payton Decl.") at ¶ 7. Ms. Payton offered the alternative of copying the hard drives, a process that OA can perform but one that she described, again without explanation, as "complex and time consuming . . ." Id. at ¶ 8. The only other detail Ms. Payton offered was her "understand[ing]" that copying "all active data on workstations containing profiles from the relevant time period would require hundreds of hours of work . . ." Id. at ¶ 10.

Following this submission Judge Facciola issued a Memorandum Order and First Report and Recommendation on April 24, 2008 (Document 67) ("First Report"). Judge Facciola first noted that expanding the preservation order would not, as the White House contends, exceed the jurisdictional bounds of the Federal Records Act ("FRA") or alter the status quo. First Report at p. 2. An expanded preservation order, "[l]ike the preservation order requiring EOP to preserve back-up tapes, which EOP concedes does not violate the [FRA]," simply maintains the status quo "by further preserving the *res* of this litigation so that the relief sought by plaintiffs, if they are ultimately held to be entitled to it, is not illusory." Id.[3]

Second, Judge Facciola noted the "lack of precision" in the White House's response to his order to describe the costs that the White House would incur as a result of an expanded preservation order. Id. at p. 3. Therefore, Judge Facciola was "unable to conduct the necessary

---

[3] This conclusion fully accords with the D.C. Circuit's opinion in Armstrong v. Exec. Off. of the President, 1 F.3d 1274, 1288 (D.C. Cir. 1993), where in the face of a challenge similar to that raised by the White House here, the Court upheld an injunctive order requiring the defendant agencies to preserve all of their electronic records. As the Court found, "the district court used its discretion appropriately in insisting upon a full-scale method for preventing the records' destruction until the agencies came up with new, adequate records management guidelines to replace the ones voided by the district court's declaratory order." Id. at n.12. See also CREW v. Dep't of Homeland Security, Civil Action No. 06-883, 2007 U.S. Dist. LEXIS 91901, at *30 n.15 (D.D.C. 2007).

balancing test," and accordingly ordered defendants once again to provide "more precise

information concerning the costs of the proposed preservation order . . ." Id.  In addition, Judge

Facciola ordered defendants to answer two specific questions:

> 1.  How many current EOP employees were employed at any
> time between March 2003 and October 2005?
>
> 2.  How many hard drives are in the possession or custody of
> EOP that were in use between March 2003 and October 2005?

First Report at 3 (footnote omitted).

Third, Judge Facciola outlined an additional method of preservation that would not

require outsourcing and that would cause "minimal burden or disruption to EOP and its

employees." Id. at 4.  Specifically, remotely querying workstations and copying .pst files, which

can be done using an automated process that "could be constructed so as to copy only those e-

mails sent or received between March 2003 and October 2005," would result in only a

"minimal" burden on the White House "in terms of cost, labor, and employee downtime . . ."

Moreover, "no e-mails preserved as a result of this procedure would be read or produced unless

the plaintiffs prevail." Id.   Accordingly, Judge Facciola recommended

> that EOP be ordered to search the workstations, and any .PST
> files located therein, of any individuals who were employed
> between March 2003 and October 2005, and to collect and
> preserve all e-mails sent or received between March 2003
> and October 2005.

Id. at pp. 5-6.

Fourth, Judge Facciola noted that notwithstanding the common practice "for employees

to copy data from their workstations onto portable media," the White House had interpreted the

existing preservation order as excluding such data.  First Report at p. 6.  Accordingly, he

recommended that a preservation order issue "requiring the White House to collect from its employees any and all media that may contain emails sent or received in the March 2003 to October 2005 time period and to preserve all such media. Id. at p. 7. As Judge Facciola noted, "[t]his process is a common feature of modern litigation." Id. (footnote omitted).

Fifth, Judge Facciola discussed the lack of clarity as to "which back-up tapes are being preserved and stored by EOP." Id. at p. 8. This uncertainty stems from two contradictory assertions in Theresa Payton's first declaration: (1) that prior to October 2003 OA recycled backup tapes; and (2) that notwithstanding this backup tape destruction, "emails sent or received in the 2003-2005 time period should be contained on existing back-up tapes." First Report at pp. 7-8, *quoting* Payton Decl. at 6. Further adding to the confusion is the White House's subsequent proffer that it has backup tapes that predate October 2003. First Report at 8. Accordingly, Judge Facciola ordered the White House

> to inform the Court on or before May 5, 2008 whether all back-up tapes created between March 2003 and October 2003 have been preserved -- and, to the extent that they have not, to state the specific dates within that period for which no back-up tapes exist.

Id. [4]

The White House filed two responses to this report and recommendation. First, on May 5, 2008, the White House filed a response and request for reconsideration together with the Third Declaration of Theresa Payton ("3d Payton Decl.") (Document 69). The White House characterized the expansions to the preservation order that Judge Facciola recommends as

---

[4] Judge Facciola also recommended that the Archive not be given leave to take its requested depositions. First Report at pp. 8-9.

"additional extreme injunctive relief."  Defendants' Responses to and Request for

Reconsideration of the First Report and Recommendation on Plaintiff NSA's Motion to Extend

TRO/Preservation Order ("Ds' Resp."), p. 7.  The request for recommendation is based on the

blanket assertion of the White House that "[t]here is no factual or legal basis for granting

additional injunctive relief."  Id. at p. 8.  Going even further, the White House now claims that

the Court lacks *any* ability to afford relief because plaintiffs have produced no "evidence . . . that

there are missing emails . . ."  Id. at p. 4 (emphasis in original).  According to the White House,

the ability of this Court to expand its preservation order "rise[s] and fall[s] on the validity of the

Court's assumption that the disaster recovery backup tapes do not contain email data from March

2003 to October 2003."  Id. at p. 10.

      The White House also challenged the "remote query" option because it could yield only

"quadruplicate copies . . ."  Ds' Resp. at 13.  As for the proposed requirements that the White

House search .pst files and collect portable media devices with email during the relevant time

period, the White House claimed they would impose "significant" and "onerous burdens."  Ds'

Resp. at 15, 16.  The White House argued further that "[e]ven a minimal burden" would not be

justified here because it is likely to yield only duplicate copies.  Id. at 17.

      In addition, the White House challenged its obligation to respond to the Court's questions

based on "defendants' view that such responses are not required in order for the Court to

conclude that forensic copying or imaging is unjustified . . ."  Id. at 18.  Relying on Ms. Payton's

Third Declaration, defendants then offered truncated and wholly inadequate responses to the

Court's questions.  First, as to the question of how many EOP employees there were between

March 2003 and October 2005, the White House answered only as to individuals working at "an

EOP FRA agency," id. at 19, a limitation not included in the Court's order.[5]

As to the second question -- the number of hard drives in EOP's possession or custody during the relevant time period -- the White House claimed an inability to answer the question, but stated that 545 workstations"may have been used in an EOP FRA component . . ." Ds' Resp. at 19.[6] Again, the White House answered only as to workstations used by an "EOP FRA component," notwithstanding that the Court's order sought information as to all of EOP.

The White House's response to the third question -- whether all backup tapes created during the relevant time period exist and, if not, the specific dates for which there are no backups -- was equally incomplete. According to Ms. Payton, OA is preserving 438 disaster recovery backup tapes, the earliest of which is for May 23, 2003 and the latest of which is for September 29, 2003. 3d Payton Decl., ¶ 11. Unstated is whether there are any dates between May 23, 2003 and September 29, 2003, for which the White House has no backup tapes. Also unstated is whether there are any backup tapes for September 30, 2003.

One week after filing its request for reconsideration, the White House filed its Local Rule 72.3(b) objections to the First Report and Recommendation ("Ds' Objec.") (Document 72), largely repeating many of the arguments and rhetoric contained in its request for

---

[5] Moreover, as the Court is well aware, there is ongoing litigation about the agency status of OA. See CREW v. Off. of Administration, Civil No. 07-0964 (CKK). By unilaterally excluding those EOP components that the White House considers not to be subject to the FRA, the White House likely also has excluded information about OA.

[6] This limitation of workstations used in "EOP FRA components" was actually added by defendants' counsel; Ms. Payton's declaration refers only to EOP components. See 3d Payton Decl. at ¶¶ 5-8.

reconsideration.[7]  Again the central premise of the White House's objections is that the admittedly incomplete body of backup tapes "should" contain emails sent or received between March 2003 and October 2005.

## ARGUMENT

### I.  THAT PLAINTIFFS ARE THREATENED WITH IRREPARABLE INJURY ABSENT AN EXPANDED PRESERVATION ORDER IS ESTABLISHED HERE AS A MATTER OF LAW AND FACT.

#### A.  The White House's Failure to Preserve Backup Copies of The Missing Email Constitutes Irreparable Harm.

According to the White House, plaintiffs are not entitled to additional injunctive relief in the form of an expanded preservation order because they cannot satisfy the irreparable injury requirement for such relief.  In essence defendants seek to relitigate an issue this Court has already resolved and that defendants failed to challenge in a timely manner.  The law of the case doctrine forbids such a challenge.

As this Circuit has recognized, the "'[l]aw of the case doctrine' refers to a family of rules embodying the general concept that a court involved in later phases of a lawsuit should not re-open questions decided . . ." Crooker v. Piedmont Aviation, Inc., 49 F.3d 735, 739 (D.C. Cir. 1995).  Intended to foster judicial economy, the rule "forc[es] parties to raise issues whose resolution might spare the court and parties later remands and appeals." U.S. v. Rashad, 396 F.3d 398, 404 (D.C. Cir. 2005).  See also In Defense of Animals v. Nat'l Inst. of Health, 2008

---

[7] It is not at all clear why EOP filed two separate pleadings other than to avail itself of two bites of the proverbial apple.  LCvR 72.3(b) contemplates only the filing of objections to recommendations of a magistrate judge.  Moreover, given that Judge Facciola was charged only with issuing a report and recommendations and not a final order, a motion to reconsider makes no sense.

U.S. Dist. LEXIS 31978, *7 (D.D.C. 2008) ("'where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'") (*quoting* <u>Singh v. The George Washington Univ.</u>, 383 F.Supp.2d 99, 101 (D.D.C. 2005)).

As applied here, the law of the case doctrine precludes the White House from relitigating the issue of whether the "obliteration" of copies of the missing emails stored on "backup media" threatens plaintiffs with irreparable harm. <u>See</u> Report and Recommendation at p. 3; Order of November 12, 2007(adopting Report and Recommendation). This Court has already determined that such a threat is a "text book example of irreparable harm" that satisfies the harm requirement for injunctive relief. Report and Recommendation at 3. Having failed to appeal that order, the White House is barred from relitigating it here under the guise of a motion to reconsider and/or objections to the First Report and Recommendation.

For the same reasons, defendants cannot challenge what they have termed "the predicate condition for any concern about the Court's ability to afford relief," namely whether or not emails are even missing. Ds' Resp. at 4 n.3. The allegations of missing White House emails detailed in the plaintiffs' complaints are as yet unrebutted; defendants have not yet filed an answer or offered affirmative evidence that there are no missing emails.[8] This is not surprising given the multiple past admissions by the White House that emails are, in fact, missing. <u>See</u>,

---

[8] What the White House has offered falls far short of "<u>evidence</u>," specifically the statements of some Republican Committee members that they were told that some email may not be missing but "just filed in the wrong digital drawer." Ds' Resp. at 6 n.4. And while Theresa Payton testified months ago about "'promising trends' of being 'able to identify and locate e-mails" previously identified as missing, <u>id.</u>, the White House has offered no update. Perhaps the "promising trends" proved not to be quite so promising.

e.g., Letter from Special Counsel Patrick Fitzgerald to Counsel, January 23, 2006, p. 7 (attached

as Exhibit 5 to Plaintiff CREW's Response to Defendants' Notice of Filing (Document 32-2))

("we have learned that not all email of the Office of Vice President and the Executive Office of

President for certain time periods in 2003 was preserved through the normal archiving process

on the White House computer system."); Committee on Oversight and Government Reform,

Memorandum to Members of the Committee, Supplemental Information for Full Committee

Hearing on White House E-mails, February 26, 2008 (Exhibit 3 to Plaintiff CREW's

Memorandum of Points and Authorities in Support of Plaintiff's Motion to Show Cause Why

Defendants Should Not Be Held In Contempt), pp. 19-20  (describing multiple briefings from the

White House on missing email problem).

>    **B.  The Harm That Plaintiffs Will Suffer If Additional Sources of Backup
>         Copies Are Not Preserved Is Sufficiently Likely To Justify Expanding
>         The Preservation Order.**

The White House also challenges the sufficiency of the factual record that establishes the

"obliteration" threat plaintiffs face absent an expansion of the preservation order.  That the

White House's limited collection of 438 backup tapes is incomplete is not, however, a matter of

uncertainty or speculation.  The backup tapes definitively do not contain all of the missing email.

First, as outlined in CREW's memorandum in support of its motion to show cause why

defendants should not be held in contempt (Document 57-2) ("CREW's Show Cause Mem."),

the White House discovered several years ago that not only were all emails from the Office of

the Vice President missing on the server for the period September 30, 2003 to October 6, 2003,

but they were missing as well from backup tapes.  According to the White House's own internal

memorandum, OA used "a backup that was performed on 10/21/2003" to attempt to locate

emails for the period of September 30, 2003 to October 6, 2003 in response to a document

request from the Department of Justice.  Id. at 13.  In the end, the only emails the White House

could locate were those in the personal email accounts of officials in the vice president's office

that had not yet been deleted by the individual users by the time the backup was created.  Id. at

pp. 12-14.  Of note, those missing backup tapes include the date September 30, 2003, a date that

was conspicuously unaccounted for in Ms. Payton's Third Declaration.  See 3d Payton Decl. at ¶

11 ("the latest date that data was written was September 29, 2003.").

Second, despite multiple demands for more information, the White House has refused to

describe with more precision the contents of the backup tapes, insisting that the Court instead

accept defendants' speculation that the 438 tapes "should" capture emails sent or received

between March 2003 and October 2003.  Speculation, however, is no substitute for the facts that

the Court has requested defendants to provide, particularly in view of defendants' admission that

almost three months worth of backup tapes are missing (from March 1 through May 22, 2003)

and the inherent limitations of backup tapes.

Each backup tape that OA creates captures only those emails on the EOP Network "at the

point in time of the back-up."  Declaration of Theresa Payton ("Payton Decl.") (Document 48-2),

¶ 7.  Accordingly, email erased from individual mailboxes, that never made its way into .pst files

and/or that was erased from the server itself would not be captured on a backup tape.  And, of

course, any emails sent or received after a backup tape is created will not be on that tape.  See id.

Here, the Court mandated preservation of backup tapes because of the millions of emails

missing during a two and one-half year period and the hopes that at least some of those missing

emails would be on backup tapes.  Unknown at this point, however, is at what point those emails

went missing.  If they were erased or not captured *before* they were placed on the server, backup tapes would clearly be incomplete.  The likelihood of this is high.  For example, Steve McDevitt, a former OA employee who led the investigation into the missing emails, told the House Oversight Committee that "[i]n mid-2005, prior to the discovery of the potential email issues, a critical security issue was identified and corrected.  During this period it was discovered that the file servers and the file directories used to store the retained email .pst files *were accessible by everyone on the EOP network*."  Exhibit 5 to CREW's Show Cause Mem. at p. 11 (emphasis added).  In other words, anyone with access to the EOP network would have been able to delete any or all of the .pst files on the server that contained the so-called "archived" email.  Thus, preservation of just one set of backup tapes does not offer sufficient assurances that should plaintiffs prevail they will be able to attain full relief.

Also unknown is the extent to which the existing backup tapes are readable.  As outlined above, in at least one instance the White House was unable to use three weeks of backup tapes to locate documents in response to a Department of Justice document demand.  See Exhibit 4 to CREW's Show Cause Mem. at pp. 44-46.  It is CREW's understanding that the backup tapes for the period September 30, 2003 to October 20, 2003 were unreadable, which is why the first backup tape OA used was for the date October 21, 2003, notwithstanding the fact that the request sought emails from September 30, 2003.  OA has not been able to assure the Court that the existing collection of 438 dates is not similarly unreadable and therefore useless in locating the missing emails.

Third, the responses of the White House to the Court's questions about the existing backup tapes are glaringly incomplete.  While confirming the existence of 438 tapes for the

15

requested time period, the White House has not confirmed whether those tapes were made *for each day* between May 23, 2003 and September 29, 2003.  Nor has the White House accounted for September 30, 2003, the date that the Department of Justice informed the White House it was conducting its leak investigation and demanded that all potentially relevant documents be preserved.

###    C.  The Public Faces Extraordinary And Irreparable Harm Absent An Expanded Preservation Order.

Also glaringly absent from the White House's two briefs is any consideration of the public interest, beyond its bald statement that "the public interest is ill-served by imposing onerous burdens on the EOP defendants . . . and by enmeshing this Court in the wasteful task of issuing duplicative orders."  Ds' Objec. at p. 3 n.2.  Completely unaddressed is the historical significance of the missing emails and the considerable harm to the public if all steps are not taken to restore and preserve this historical legacy.

Distinguished historian Stanley Kutler, whose lawsuit was responsible for the public release of President Nixon's tapes, explains that "[w]hat is at stake is the integrity and completeness of the historical record."  Letter from Stanley Kutler to Anne Weismann, May 15, 2008 ("Kutler Letter") (attached as Exhibit 1).  These interests go well beyond "partisan or personal considerations"; "we owe a complete record to future generations."  Id.  In Professor Kutler's prophetic words, "[o]ur history counts, and everything must be done to preserve the documentary record, and make it accessible to all."  Id.  See also Oral Statement of Paul Brachfeld, Inspector General, National Archives and Records Administration, before the Senate Homeland Security and Government Affairs Committee's Subcommittee on Federal Financial Management, Government Information, Federal Services, and Information Security, May 14,

2008 ("NARA Oversight Hearing") (attached as Exhibit 2): "The consequences of failed record keeping in Federal agencies today will adversely impact our nation tomorrow."

It is perhaps not surprising that a president facing unprecedented low approval ratings, whose major policy initiatives have been widely repudiated, and who has resisted congressional and judicial oversight and scrutiny of many of his administration's actions should be so impervious to the historical importance of the records the plaintiffs seek to preserve. This Court stands on a different footing, however, and must consider the harm to the public if the most complete set of records of this administration is not preserved. As George Mason University Professor Martin J. Sherwin, testifying at the NARA Oversight Hearing on behalf of the National Coalition for History, stated: "A president's papers are the property of the American people. Historians should have the greatest access to these records to present to future generations the most accurate account possible of our nation's past, warts and all." (Written testimony attached as Exhibit 3).[9]

In sum there is a clear factual and legal predicate for Judge Facciola's recommendation that the preservation order be expanded.

## II.  THE WHITE HOUSE HAS FAILED TO DEMONSTRATE IT WILL SUFFER HARM FROM AN EXPANDED PRESERVATION ORDER.

While the record is clear that absent an expanded preservation order plaintiffs face the threat of irreparable harm, defendants have not demonstrated they will suffer harm of such a

---

[9] Professor Sherwin, testifying specifically about the missing emails at issue here, also described the problems that the loss of these documents presents: "If these records are indeed lost, imagine the difficulties that future historians of the Iraq War will have in presenting a full picture of the decisions that led us into this conflict. A nation inflicted by a White House induced case of historical Alzheimer's disease cannot expect to face future international challenges with the added wisdom that historical understanding contributes." Id.

magnitude that it should outweigh the clear harm to plaintiffs and the public. Despite two opportunities to present evidence of any resulting harm, the White House relies only on sweeping and unsubstantiated claims of harm that, on their face, are highly suspect.

First, the White House provided significantly incomplete answers to the Court's questions, which sought information relating to the entirety of the EOP. In response to the question of how many current employees were at the White House during the relevant time period, the White House responded with the number of individuals "who presently work at *EOP FRA components* . . ." 3d Payton Decl. at ¶ 4 (emphasis added). Similarly, in response to the question of the number of hard drives in EOP's possession or custody during the relevant time period the White House, while claiming an inability to answer this question, provided the number of "workstations that may have been used in an *EOP FRA component* in the relevant time period." Ds' Resp. at p. 19 (emphasis added). Yet neither of Judge Facciola's questions was limited to EOP FRA components.[10] Moreover, CREW has ongoing litigation with OA over its agency status, <u>CREW v. Off. of Administration</u>, Civil No. 07-0964 (CKK), and it is entirely unclear from the White House's answers which components it has unilaterally considered to be "EOP FRA components."

Second, and most significantly, the White House failed to provide the requested evidence of the burden that an expanded preservation order would pose. Its claim that the "financial and staff burdens" of ascertaining what is on the 545 workstations "are extraordinary" is not

---

[10] While the White House has challenged the Court's ability to issue relief that extends to presidential records covered by the Presidential Records Act, it has not disputed that the missing emails, like all of the emails currently stored on White House servers, included co-mingled presidential and federal records. Thus, the Court's inquiry properly focused on the entire universe of emails.

substantiated by any details beyond its statement that it would require the participation of "numerous OCIO employees." Payton Decl. at ¶¶ 7, 8. Likewise, its claim that providing "more detailed information regarding the content on the 438 tapes is extraordinary," id. at ¶ 13, lacks any support or detail beyond the generalized statement that the burden would include "financial resources," "[s]ignificant senior management oversight" and the diversion of "OA personnel" from "core mission and Presidential transition planning activities." Id. Equally nonspecific is the claim of the White House that "the Court's proposals . . . would divert OA from its comprehensive, measured, process-driven, and cost-effective approach to address Federal Records Act compliance,. id. at ¶ 14, a statement that in any event is nearly incomprehensible.

At bottom, the White House has offered nothing of substance to balance against the clear harm to the plaintiffs and the public absent an expanded preservation order. Inflated rhetoric is simply no substitute for the evidence that the Court properly demanded of defendants. Having failed twice to meet their burden, defendants' objections to the expanded relief recommended by Judge Facciola ring especially hollow and are entitled to no weight.

## CONCLUSION

For the foregoing reasons, defendants' motion to reconsider should be denied and defendants' objections to the First Report and Recommendations should be rejected.

Respectfully submitted,

_____/s/_____
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
   in Washington
1400 Eye Street, N.W., Suite 450

19

Washington, D.C.  20530
Phone:  (202) 408-5565
Fax:  (202) 588-5020

Attorneys for Plaintiff CREW

Dated:  May 19, 2008

**EXHIBIT 1**

# UNIVERSITY OF WISCONSIN–MADISON
College of Letters and Science

May 15, 2008

DEPARTMENT OF HISTORY
3211 Humanities Building
455 North Park Street
Madison, Wisconsin 53706-1483

Phone:  (608) 263-1800
Fax:     (608) 263-5302


Anne L. Weismann, Chief Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, N.W.
Suite 450
Washington, D.C.  20005

Dear Ms. Weismann:

   I enjoyed our talk regarding your suit to require the White House to meet its legal obligations by restoring and preserving missing e-mails from its servers.  As a historian, with a longstanding interest in the accessibility of archival material, I applaud your effort.  As you know, I successfully sued the National Archives and former President Richard M. Nixon to open and release Nixon's presidential tapes.  It should be noted I originally sued the Archives, but Nixon himself entered the suit as Intervenor.  I fought that suit for four years; of course, my concern for the integrity and openness of the tapes long-antedated my action.
   My interest in fighting for the preservation and accessibility of source materials continues.  I appeared before Congress to testify against President George W. Bush's Executive Order of 2002, effectively repudiating the Presidential Records Act of 1978.  His Order was an obvious attempt to protect his father and himself in the future.
   All this, I assure you, goes beyond partisan or personal considerations.  I told Dan Burton (R-IN) that preservation of presidential records simply was non-partisan.  He finally understood and in the end, he led his fellow Republicans to repeal Bush's Order.  No small feat.
   What is at stake is the integrity and completeness of the historical record.  Beyond our own considerations, we owe a complete record to future generations.  It must not be violated out of momentary partisan and personal needs.

And now we have a new source of materials: e-mails.  Many years earlier, historians confronted the fact that a significant amount of executive business occurred via telephone,  Steadily, through the years, the executive branch opened this material, substantially adding to and improving the historical record.

No doubt some of this material will turn out to be trivial.  But that is for later generations of historians and other interested parties to explore.

Once again, my concern for the integrity of the historical record is paramount here; this is no partisan matter.  Our history counts, and everything must be done to preserve the documentary record, and make it accessible to all.


Sincerely yours,

Stanley I. Kutler
Emeritus Fox Professor of Law & American Institutions

## STANLEY I. KUTLER

Stanley I. Kutler is the E. Gordon Fox Emeritus Professor of American Institutions at the University of Wisconsin, and also Professor of Law. He is the author of <u>Abuse of Power: The New Nixon Tapes</u> (Free Press, 1997), a book that resulted from his successful law suit against the National Archives and Nixon, to force the release of the long-suppressed tapes. He has written widely in a number of fields of American history, particularly concentrating on American constitutional history and the twentieth century. His other major books include <u>The Wars of Watergate: The Last Crisis of Richard Nixon</u> (Knopf, 1992); <u>The American Inquisition</u> (Hill & Wang, 1982; paperback ed., 1983; English ed., Faber & Faber, 1984), and winner of the Silver Gavel Award, American Bar Association, 1983; <u>Privilege and Creative Destruction: The Charles River Bridge Case</u> (Norton, 1978; revised edition, 1989); and <u>Judicial Power and Reconstruction Politics</u> (University of Chicago Press, 1968). In addition, he has authored or edited more than half a dozen text books in various fields of American history, including <u>The Supreme Court and the Constitution</u> (Norton, 1969, 1977, 1984) and <u>Looking for America</u>, (2 vols., Norton, 1975, 1980). His scholarly articles have appeared in leading history and legal periodicals.

He recently edited the new edition of the <u>Dictionary of American History</u>, a 10-volume work (Scribner's 2002), which was awarded the American Library Association Best Reference Book Award. He also edited the four-volume work, <u>Encyclopedia of Twentieth Century America</u> (Scribner's, 1995), and <u>The Encyclopedia of the Vietnam War</u> (Scribner's, 1995). The Vietnam volume received the A.L.A.'s Best Reference Prize in 1996 and the 20th Century work was awarded the prize for the best reference work by the Association of Book Publishers. He founded <u>Reviews in American History</u>, and edited it from 1972-1997.

Kutler has been a Guggenheim Fellow, holder of the Garibaldi Chair in Political Science, University of Bologna, 1991, Distinguished Exchange Scholar (National Science Foundation) for China in 1982, and Fulbright 40th Anniversary Distinguished Lecturer, Peru, in 1987, Bicentennial Professor, Tel Aviv University, Israel, in 1984, and Fulbright Lecturer, Japan, 1977.

Kutler has written op-ed pieces and reviews for a variety of publications, including <u>The New York Times</u>, <u>The Wall Street Journal</u>, <u>Washington Post</u>, <u>Los Angeles Times</u>, <u>Chicago Tribune</u>, <u>The Nation</u>, <u>Chronicles of Higher Education</u>, <u>Times Literary Supplement</u>, Slate, and <u>Salon</u>, and the <u>American Prospect</u>, among others. He has appeared as an occasional commentator on National Public Radio, as well as the "Today", "Nightline," and many other television programs. He also has worked as a consultant on a number of film projects, Including historical advisor for the Emmy-winning BBC-Documentary, "Watergate." and he was advisor for the Showtime film, "The Day Ronald Reagan Was Shot." He now will work for HBO on a projected 8-part dramatization of Watergate. He has written several plays, including "I, Nixon."

4112 Keewatin Trail
Verona, WI 53593
(608) 831-4112
sikutler@wisc.edu

**EXHIBIT 2**

Oral Statement of


Paul Brachfeld

Inspector General

National Archives and Records Administration

Before the

Senate Homeland Security and Government Affairs Committee's Subcommittee on

Federal Financial Management, Government Information, Federal Services, and

Information Security


May 14, 2008

Mr. Chairman and Members of the Subcommittee, I thank you for offering me the opportunity to testify today.

NARA represents America's past like no other agency. We hold the treasure troves of our nation's history. However, as an organization, we must live in the present while preparing for the future that focuses upon electronic records. Today I will be quite candid in discussing what I and my staff have observed during my tenure as the National Archives Inspector General.

Archivist Allen Weinstein has in tangible ways supported my office, as well as me personally. However, our work comes at a price. In the wake of certain investigations and significant audits conducted by my office; my staff and I have been met with significant resistance and unfounded challenges.

Our audits and investigations have consistently identified challenges in core elements of NARA's operations that we believe, by definition, constitute material weaknesses. While preservation workstations sit empty in our world-renowned laboratories due to funding and staffing constraints, contractors siphon funds for projects that are ill defined, poorly managed and fail to meet user needs. While millions of dollars flow to the Electronic Records Archive program – which to date is well over budget and has failed to meet deliverable dates – and other IT related contracts, Archivists struggle under resource

constraints to process and preserve the ever-expanding quantities of records arriving at

NARA everyday.  While NARA is exposed to significant frauds and the loss or theft of

millions of dollars worth of accountable property such as laptops, desktops, and servers,

Presidential artifacts sit unprocessed and vulnerable due to limited resources.  Finally the

importance of these issues is magnified by the fact the Archivist and I share the belief

that NARA is by definition a national security agency as we hold the vital records of

virtually every Federal agency, as well as those of such other entities as the Warren and

911 Commissions.

I will dedicate the balance of my testimony to the Electronic Records Archive program

and related electronic White House Presidential Records.  I am also available to discuss

other audit and investigative work products produced by my office touching upon areas

ranging from preservation of holdings, processing and accessing federal records or the

recovery of hundreds of stolen Federal records via our highly successful and unique

Archival Recovery Team (ART) concept recently featured in the April edition of

Smithsonian Magazine.

Electronic Records Archive

With regard to the Electronic Records Archive Program, in December of 2001, nearly 7

years ago, I first approached the former Archivist about the need for audit coverage of the

ERA Program by stating:

"Resources have not been assigned to the OIG to facilitate our independent analysis of the program and to serve as a basis to report to the Archivist, Congress, and the American people on the status of the ERA program. Stakeholders actively involved in designing, building and coordinating the deployment of ERA may be blinded from identifying issues that exist and call out for identification."

In a subsequent meeting in April, 2002, I requested two audit positions to support the fledgling ERA program. The former Archivist told me he could give me 50 people and I still couldn't cover it, so he asked me how I thought I could do it with two. I responded that I would take the two – but received none.

Dedicated ERA audit resources sought by the OIG in budget submission after budget submission were not forthcoming even as I defined that the value of independent, dedicated and skilled oversight over this critical program could not be overstated and the risks of not performing this function unacceptable. GAO report 03-880 issued in August of 2003 defined NARA's need to staff key unfilled ERA positions to mitigate the long-term risk to the acquisition. In meetings with the GAO I urged them to define that one of the key unfilled ERA staff positions be dedicated to the NARA OIG to support independent and expert oversight of the program and related contractors. Regrettably, the GAO did not act upon this request.

Unfortunately, it came as no surprise to my office when on July 27, 2007; NARA issued a Cure Notice to the ERA prime contractor for "failure to make progress in the work so

as to endanger performance under the subject contract." Indeed, the impact of delays and

cost overruns is significant and profound. While I do not know if or when ERA will be

fully operational, any additional delay will adversely impact other NARA operations,

require NARA to consume additional scarce dollars to sustain the Archives Research

Catalog or develop some other vehicle to bridge the gap until ERA meets baseline

functionality requirements.

Finally in the fall of 2007, with the support of Archivist Weinstein, this office was able to

staff a dedicated ERA audit position. One need not have been a visionary or a soothsayer

to anticipate the problems that have encumbered the ERA program. We hope that at this

late date that OIG audit support will prove to be of value.

White House E-Mail Records

In April 2007, an article raised my concern as to the condition of the White House

records, as under the Presidential Records Act, Bush 43 Presidential Records will accrue

to NARA. The ingestion of these records is to be a key and early benchmark in the

successful deployment of ERA. Following the April 2007 article, I requested briefings

and was informed by key NARA staff members that the Bush 43 development and

transition to a new and effective record keeping system had not been accomplished and

records were being stored in a vulnerable production server environment. After looking

into this I found an internal NARA report for the fourth quarter of FY 2006 where a

NARA official reported that they "continued" to work on matters relating to management of electronic records by the Executive Office of the President, Office of Administration.

The problem for my office is that concerns as to access issues or functionality of White House record keeping systems were never directed to my attention by knowledgeable NARA officials prior to press accounts reaching my desk. Thus I was not afforded the opportunity to address a significant condition which will potentially impact a major NARA program that falls under my statutory jurisdiction.

I am aware of momentum to provide NARA additional authority to ensure Federal agency compliance with records standards most notably with regard to their internal preservation of electronic records. I believe that such legislation and related funding is required. If NARA does not assume this role, then I ask who will. NARA traditionally has not viewed itself as an enforcement entity but rather one that focuses upon collegiality and relationships. I believe that given limited cognizance into agency record keeping processes, a void exists in which inappropriate treatment or loss of Federal records may well be occurring. This position may be alien to my peers at NARA but I come from dual law enforcement and audit backgrounds and believe that additional powers, authority and resources are needed in this area. The consequences of failed record keeping in Federal agencies today will adversely impact our nation tomorrow.

In terms of personnel and budget, NARA is not large, but its mission surely is. I am an Inspector General. My statement today will most certainly have repercussions, but my candor reflects my statutory duty to this subcommittee and the American taxpayer.

I thank you for the opportunity to testify and am available to take your questions.

# EXHIBIT 3

**Testimony of Dr. Martin J. Sherwin**
**Representing the National Coalition for History**

**Oversight of the National Archives and Records Administration (NARA) & the National**
**Historical Publications and Records Commission (NHPRC)**
**Senate Homeland Security and Governmental Affairs Committee**
**Subcommittee on Federal Financial Management, Government Information, Federal**
**Services and International Security**
**May 14, 2008**

Mr. Chairman, Ranking Member Coburn and Members of the Subcommittee;

My name is Martin J. Sherwin, University Professor of History at George Mason University and
I am here today representing the National Coalition for History (NCH).

NCH is a consortium of over 60 organizations that advocates on federal legislative and
regulatory issues affecting historians, archivists, teachers, researchers, and other stakeholders.
As historians, researchers and conservators of American history and culture we care deeply about
the programs and activities of the National Archives and Records Administration (NARA) and
the National Historical Publications and Records Commission (NHPRC).  Thank you for the
opportunity to present our views on the National Archives and NHPRC today.

First, on behalf of the constituency I represent, I want to thank you Mr. Chairman, for holding
this hearing.  To our knowledge, this is the first oversight hearing on the National Archives in
well over a decade.  The archives are the repository of our nation's heritage and while we have
faced many pressing domestic and international concerns during this period, I submit that we
stand in danger of undermining our democratic institutions when we neglect the institutions that
provide the American people with the opportunity to understand their history.

**The Stakes for Democracy and Presidential Records**

At the dedication of his presidential library in 1941, President Franklin D. Roosevelt made it
clear why the National Archives, and its Presidential Library System are so vital to our nation's
citizens.

> It seems to me [he said] that the dedication of a library is in itself an act of faith.
> To bring together the records of the past and to house them in buildings where
> they will be preserved for the use of men and women in the future, a Nation must
> believe in three things.
>
> .
> It must believe in the past.
> It must believe in the future.
> It must, above all, believe in the capacity of its own people so to learn from the

past that they can gain in judgment in creating their own future.

Forty-six years ago I was a young Ltjg in the U.S. Navy trying to decide whether to study law, business or history. In October 1962 I participated in the Cuban Missile Crisis and my experiences during that extraordinary event led me to dedicate my career to understanding the principles, assumptions and details of American politics and foreign policy. I turned to studying U.S. history because I realized reflecting on that crisis how profoundly our politics and our policies influence the behavior of other nations. Only through the careful historical investigation of our government's policy making process can we understand the truth about policy formation. It is in the nature of the political process of any government that much of what we know about contemporary decisions will be revealed by historical research – by a review of the documents – to be incorrect, or at best partially correct. I submit that our democracy cannot remain robust without this constant historical auditing of our government's behavior. Just as the press is the fourth estate of our democracy, it seems to me that President Franklin Roosevelt was making the point in 1941 that history is its fifth, and equally essential, estate.

Ominously, the current administration does not appear to share President Roosevelt's view that sustaining our way of life depends in important ways on our access to history. Under the Presidential Records Act of 1978, presidential records are supposed to be released to historians and the public 12 years after the end of a presidential administration. In November 2001, however, President George W. Bush issued Executive Order (EO) 13233 that overturned an executive order issued by President Reagan and gave current and former presidents, their heirs or designees and former vice presidents broad authority to withhold presidential records or delay their release.

I consider this an outrage, nothing less than a frontal assault on the principle of open government that sustains our democracy. The president and vice president are public servants, elected to office to serve our nation, not as dictators, not as they define their service, but as our laws, our traditions and our institutions have defined them. After their tenure has expired, it is the public's right to know in a timely manner the details of how they went about fulfilling their responsibilities. Their actions are not a privileged secret that they and their families have the right to control. That is how dictatorships operate. That is how totalitarian societies function. That is a certain recipe for corruption. Does Congress not care enough about sustaining the future of our democracy to assure that the 1978 presidential records act is restored?

The history of the struggle to overturn executive order 13233 is instructive.

On October 1, a federal district court judge gave open government advocates a partial, but significant victory in a lawsuit they filed in 2001 questioning the legality of EO 13233. The judge struck down the section of the EO that allows a former president to indefinitely delay the release of records. However, it left intact other dangerous provisions.

The court held that the core provisions of the Executive Order are not "ripe" for judicial review, and will not be until the veto over the release of records is exercised. Until then, the threat of withholding presidential records will remain intact, and when records are ultimately withheld,

2

more years of litigation will be needed to overcome the effects of EO 13233. By contrast, passage of legislation to nullify EO 13233 would immediately correct the distortion of the Presidential Records Act that the Executive Order has created. On behalf of the organizations I am representing, I strongly recommend the prompt passage of such legislation.

On March 14, 2007, by a vote of 333-93, the U.S. House of Representatives approved H.R. 1255, the "Presidential Records Act Amendments of 2007," a bill that would revoke EO 13233. 104 Republicans joined 229 Democrats to support the bill despite a threatened White House veto.

On June 20, 2007, the Committee on Homeland Security and Governmental Affairs reported out H.R. 1255 and its companion bill (S. 886) by voice vote. Twice since then, Majority Leader Harry Reid has sought to bring the bill to the Senate floor under unanimous consent

Last September, Senator Jim Bunning (R-KY) blocked a vote in the Senate on the bill, preventing floor action throughout the fall. On December 18, 2007, Senator Bunning lifted his hold. On January 22, 2008, Senate Majority Leader Harry Reid (D-NV) once again brought the "Presidential Records Act Amendments of 2007" to the floor under the Senate's unanimous consent rule. However, this time Senator Jeff Sessions (R-AL) publicly put a hold on the bill and blocked floor consideration. I would be interested to hear Senator Sessions explain how his actions promote our nation's democratic institutions.

This pro-transparency bill is non-partisan and applies equally to former presidents of both parties. Hypothetically, were Senator Clinton to be elected, and then re-elected, the Bush and Clinton families could conceivably have control of the release of records dating from as far back as 1981, George H.W. Bush's first term as vice president, up to 2017, or the end of Hillary Clinton's second term. To allow a former president's heirs to shape their parent's legacy by controlling access to their records makes an objective historical assessment nearly impossible and, I submit, undermines the foundations of our democratic institutions.

At a time when our nation's citizens are cynical about excessive government secrecy, this is one area where Congress has the ability to contribute to bolster the public's confidence in its government. A president's papers are the property of the American people. Historians should have the greatest possible access to these records to present to future generations the most accurate account possible of our nation's past, warts and all.

Chairman Lieberman has worked tirelessly to get this bill to the floor to no avail. It has broad bi-partisan support. We strongly urge you to work with your colleagues on both sides of the aisle to pass this legislation before the upcoming presidential election. The new president, no matter which party is elected, should start with a clean slate with regard to the preservation of presidential records.

**Presidential Transition and Missing White House E-mails:**

As you know, there has been on-going controversy, and litigation, over millions of White House e-mails that are either missing or have been destroyed. In court documents filed last week, the White House admitted that that it has no computer back-up tapes with data written before May

3

23, 2003, and that it cannot track the history of missing e-mails created between March and May 2003.

This three-month gap includes the historically critical period from when the United States invaded Iraq in March 2003, and the May 1, 2003 announcement by President Bush that major combat operations had ended in Iraq. If these records are indeed lost, imagine the difficulties that future historians of the Iraq War will have in presenting a full picture of the decisions that led us into this conflict. A nation inflicted by a White House induced case of historical Alzheimer's disease cannot expect to face future international challenges with the added wisdom that historical understanding contributes.

The end of President Bush's term is now less than nine months away, but no firm recovery plan for these missing or lost e-mails has emerged from meetings on this issue between the White House and NARA. If these hundreds of days of e-mails are truly missing, and not destroyed, the question becomes where is the $15 million or more estimated by the White House's Office of Administration to recover these presidential records going to come from?

When a similar situation concerning missing e-mails occurred at the end of the Clinton administration, the White House's Office of Administration was forced by Congress to absorb the cost of recovery. We strongly urge you to follow the Clinton administration precedent and mandate that whatever funds are necessary to recover the missing e-mails come out of the OA's budget and not that of NARA.

**Resources**

Any report on the state of the National Archives and Records Administration of necessity must include a discussion of resources, financial and human. NARA faces enormous challenges not only processing and preserving traditional paper records, but also in making the transition to managing electronic records as well. As the production of records from all types of media continues to grow exponentially, NARA is constantly challenged to do more with already strained resources.

I have been told, and I have no reason to think otherwise, that Archivist Weinstein has done an excellent job of getting the most out of every federal dollar and leveraging the use of NARA's funds. However, in recent years, because of the lack of funds, Dr. Weinstein has been left in the unenviable position of having to perform triage on his agency. For example, in 2006 NARA was forced to severely curtail public research hours at its facilities because of budget difficulties. It was only because House and Senate appropriators last year provided specifically allocated funds to NARA that it was able to restore these vital public services.

We understand that Congress continues to face enormous fiscal challenges in crafting the federal budget for fiscal year 2009. We are encouraged that as it did in this current fiscal year, NARA would again receive increased funding under the President's proposed FY 2009 budget. However, this funding is not in reality so much an increase as an attempt to rectify years of chronic under-funding of NARA. These modest funding increases are not a down payment on NARA's future, but rather back payments for years of neglect.

4

At a recent hearing before the Senate Judiciary Committee on completion of the Founding Fathers projects that receive support from the NHPRC, historian David McCullough said "you can tell a lot about a society by how it spends its money. Here is our chance, and it's long overdue, to show what we care about, what we value, and what we're proud to pay for."

When your constituents elected each of you, they entrusted you with great responsibilities. Obviously, we rely on you to make wise decisions about our nation's future. But you are also the stewards of America's past. Decisions you make about funding NARA and NHPRC, and ensuring preservation and access to federal and presidential records, directly effect whether our democratic institutions will be reinforced by a robust historical understanding, or weakened by a shallow, superficial historical awareness.

**National Historical Publications and Records Commission (NHPRC):**

I am sure that many of you drive past the National Archives building on your way home from your day here in the Senate. I'm sure you have noticed it is not unusual to see long queues of people stretching down the block and around the building in the evening for a chance to gaze briefly upon the Declaration of Independence, the Constitution and the Bill of Rights. However, the National Archives is much more than the keeper of the Charters of Freedom. Through the development of its many on-line services, NARA's records are now readily accessible to all Americans, not just those who come to visit Washington.

However, for the fourth consecutive year, the President has proposed zero funding for the National Historical Publications and Records Commission (NHPRC). We strongly oppose this irresponsible recommendation and request Congress to appropriate FY 2009 funding at the fully authorized level – $10 million for the NHPRC national grants program and an additional $2 million for staffing and related program administration.

In fiscal year 2008, Congress saved the NHPRC from elimination, and provided $7.5 million for grants, a $2 million increase from the previous fiscal year. However, the NHPRC has not received its fully authorized amount of $10 million since FY 2004. In the following three fiscal years the NHPRC only received only half that amount, or approximately $5 million per-fiscal year.

The NHPRC leverages every federal dollar with private sector contributions at a level approaching 50%. As a consequence, the Commission has been able to fund a wide variety of programs by combining private sector funds with a small federal investment. However, the annual uncertainty over the survival of the NHPRC and an unpredictable funding level makes it difficult to attract private capital. NHPRC grants are the linchpins for the funding structure of most projects. Loss of the NHPRC's funding will have a domino effect causing funding from other sources to be withdrawn or reduced.

Without critical NHPRC funding, award-winning biographies of American presidents and the founding fathers from such noted historians as David McCullough, James Patterson, Joseph Ellis, and others might never have been written. Without such funding Kai Bird and I could not

5

have written, *American Prometheus: The Triumph and Tragedy of J. Robert Oppenheimer*, which won the 2006 Pulitzer Prize and National Book Critics Circle Award.

Beyond its annual funding challenges, the NHPRC faces an uncertain future, for reasons that I find totally indefensible. This funding is oxygen for our democratic blood and to cut it off threatens to create an anemic national history.

NHPRC's current authorization expires in FY 2009. As we have seen, even with an authorization, the NHPRC has been under siege. Without congressional reauthorization, we fear that NHPRC would be even more vulnerable in the future.

A bill (H.R. 5582) to reauthorize the National Historical Publications and Records Commission (NHPRC) was recently introduced in the House by Representative Wm. Lacy Clay (D-MO). The bill would reauthorize the NHPRC at an annual level of $20 million for fiscal years (FY) 2010 – 2014.

We urge you Chairman Carper and Ranking Member Coburn to work together to introduce a companion bill in the Senate and to ensure that it passes before the current reauthorization expires next year.

**The Need for Additional Archival Staff**

The recent controversy over the release of Senator Hillary Rodham Clinton's papers from the Clinton Presidential Library covering her time as First Lady brought to public attention the need for additional archival staff not only at the presidential libraries but also throughout NARA. The lengthy time it took to release Senator Clinton's records fostered an appearance of impropriety and an inaccurate public perception of NARA somehow conspiring with the Clintons to keep these records from the public. The truth is that delays in responding to public requests at all of the presidential libraries have been exacerbated by both the lack of archival staff and the impact of Executive Order 13233. It is an ominous occurrence that historians and American citizens must resort to litigation in order to expedite the release of records.

We were pleased to see that the President's request for the coming fiscal year includes an additional $1.6 million to add 15 archivist positions to the Presidential Library system to begin to reduce the enormous backlog of materials that need to be processed. If appropriated, these additional funds, along with the $800,000 in funding Congress added last fiscal year to hire additional archivists, will begin to address the problem of under-staffing at NARA.

Unfortunately, the reality is that NARA's archival staffing level has remained stagnant for many years while the number of records that need to be processed has continued to grow exponentially as the use of electronic records has proliferated. While it is unrealistic to think that the staff shortage will be solved in a single fiscal year, we are encouraged by the fact that that the problem has been recognized and is being incrementally addressed. We hope that additional funding will be provided over the next few years to continue to remedy NARA's archival staff shortage.

6

**Repairs & Restoration:** We are distraught to see the dramatic $20 million cut in NARA's FY 2009 proposed budget for Repairs and Restoration down to a level of $9.2 million. Report language to the FY 2008 appropriation for NARA states:

> NARA is directed to update its comprehensive capital needs assessment for its entire infrastructure of presidential libraries and records facilities. The fiscal year 2008 President's Budget provided funding for ongoing repairs only to records facilities, leaving presidential libraries-some of which are in major disrepair-sorely in need of support and at risk for flooding and other potential dangers. The Appropriations Committees urge that the fiscal year 2009 President's Budget include funding for both records facilities and presidential libraries.

Despite this clear mandate from the House and Senate Appropriations Committees, the Administration has chosen to cut funding for the restoration of facilities already in the Presidential Library system while at the same time expending funds elsewhere in NARA's budget to prepare for the George W. Bush Presidential Library, a "library," that will be more like a presidential vault, if EO13233 is not nullified.

A perfect example of the maintenance needs faced by some presidential libraries is the Franklin D. Roosevelt Presidential Library and Museum in Hyde Park, New York. The FDR presidential library was the first, and is the oldest, in the presidential library system. Much of the library's infrastructure such as heating and air conditioning, as well as fire safety and security systems are dangerously out-moded and violate industry standards for the preservation of archival materials. The electrical wiring dates back to the library's opening in 1941, the basement often floods due to an ancient septic system and leaks frequently appear in the roof and flashing.

As NARA's overseers, I urge this Subcommittee to do all it can to ensure the presidential libraries that are already in the system are maintained adequately.

**Recommendations for Expediting Research at NARA Facilities**

None of the legislative or funding recommendations that I have urged you to act upon will realize their full potential if researchers are not able to expeditiously access the records that they are entitled to read. I therefore have created a list of recommendations based upon my experiences, and the experiences of several other historians, that will promote a broader and more efficient distribution of the information.

1.  Digitizing collections: The goal must be to digitize all the collections in the national archive system and upload them on the web as expeditiously as possible. The example set by the National Security Archive at George Washington University is an excellent model to emulate. For the National Archives and Presidential Libraries, this is an enormous long-term undertaking, but the goal of achieving it should be clearly stated and vigorously promoted.

In the meantime, there are some simple steps that can be taken immediately that will improve research access:

     a) All of the inventories of the archives' Record Groups finding aids and descriptions should be digitized and made available on-line which, among other advantages, would allow researchers to order records for use 24 hours ahead of time via the web.  This will save time for both archivists and researchers and allow researchers who can only visit the archives on Saturdays to have records pulled for their use.

     b) Archivist Weinstein should convene a Digital Records Advisory Committee composed of diverse group of historians who would set priorities for the order in which the national archives' collections would be digitized, and recommend other actions to promote this process.

2. Declassification:  The declassification of records continues to be a serious problem.  For example, a researcher working in the Eastern Europe collection has informed me that RG 59 (SD) is declassified only through 1974 in spite of the 30-year rule. Many documents are pulled out from already declassified boxes including from the 1940s and 50s.  There are no documents in those collections that originated from secretaries, assistant and deputy secretaries in the 1960s making it difficult to figure out how policy was made.  This is one specific examples intended to highlight a general problem.

3. CIA records:  Allen Dulles' papers were cleared for declassification in 1992, but only released to Mudd Library at Princeton University last year – in the form of excised PDF files. Even OSS material is heavily excised and very patchy. Its easy to see that most of it is still withheld.  This researcher reports that the Hungarian archives have been far more forthcoming.  Hungary has done far more.

4. Wireless Access:  I would also recommend that wireless access to the web be installed in all archives and presidential library reading rooms in order to enable researchers to look use the web to supplement and expedite their research.

Again, thank you for the opportunity to provide this testimony regarding NARA's budget for FY 2009, and for your past strong support for its mission of preserving our Nation's history.

I will be happy at this time to respond to any questions you may have.

8

**Martin J. Sherwin** is **University Professor of History** at George Mason University in Fairfax, Virginia. Before moving to GMU in 2007 he was the Walter S. Dickson Professor of English and American History at Tufts University for 27 years. His recent book, *American Prometheus: The Triumph and Tragedy of J. Robert Oppenheimer* (with Kai Bird) won the **2006 Pulitzer Prize** for biography, the **National Book Critics Circle Award** for biography and the **English Speaking Union Book Award**. It was a *Washington Post* and *Boston Globe* Best Seller. *Time Magazine* selected it as one of the 6 best non-fiction books of 2005 and the *New York Times* listed it as one of the 50 best non-fiction books of the year.

Professor Sherwin is also the author of *A World Destroyed: The Atomic Bomb and the Grand Alliance* which won the **Bernath Prize** awarded by the Society of Historians of American Foreign Relations as well as the **American History Book Prize** awarded by the National Historical Society. **It was the 1976 finalist for both the National Book Award and the Pulitzer Prize**. Often referred to as a "classic," it has been in print continuously for over 30 years. The current paperback edition of *A World Destroyed* is subtitled: *Hiroshima and Its Legacies.* He is currently writing a book on the nuclear arms race and the Cuban Missile Crisis. scheduled to be published by Knopf in 2012, "Gambling With Armageddon."

Professor Sherwin is recognized widely as a dynamic and distinguished lecturer. In 1985, and again in 1986, The Council for the Advancement and Support of Education awarded him its "**Professor of the Year, Silver Medal Award**."

Professor Sherwin was also the founding director and executive producer of the **Global Classroom Project,** a 'space bridge' program that employed TV satellite technology to link his students at Tufts with university students in Moscow for interactive discussions about the nuclear arms race and the environment. The programs were broadcast throughout the Soviet Union and on selected PBS stations in the United States (1988-'92),

Professor Sherwin has been an advisor for many documentary films on the history of the nuclear age, and he was the co-executive producer and NEH Project Director of the PBS documentary film, "Citizen Kurchatov: Stalin's Bomb Maker," (1998) a biography of Igor Kurchatov, the first scientific director of the Soviet Union's nuclear weapons programs.

Professor Sherwin has held appointments as the Cardozo Fund Visiting Professor of American History at Yale University and as the Barnette-Miller Visiting Professor of International Relations at Wellesley College. He has been on the faculties of U.C. Berkeley, Princeton, Dartmouth, and Cornell Universities. In 1994 he was appointed "Honorable UNESCO Professor of Humanities" at Mendeleyev University in Moscow.

Professor Sherwin has received fellowships from the John D. and Catherine T. MacArthur Foundation, the Guggenheim Foundation, the American Academy of Arts and Science, the National Endowment for the Humanities, the Sloan Foundation, and the Rockefeller Foundation. He was a visiting scholar at the Institute for Advanced Studies in Princeton and at Harvard's Charles Warren Center for Studies in American History.